No. 23-2103

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JENNIFER L. BECKETT-LYNN,
Individually, and as Personal Representative
of the Estate of Keith Lynn,
*Plaintiff-Appellant*

v.

UNITED STATES OF AMERICA,
*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

## JOINT APPENDIX

Jason Scott Luck
P.O. Box 47
Bennettsville, SC 29512
843.479.6863
*Counsel for Plaintiff-Appellant*

Stephen F. DeAntonio
DeANTONIO LAW FIRM, LLC
P.O. Box 30069
Charleston, SC 29417
843.577.8080
*Counsel for Plaintiff-Appellant*

Paul E. Tinkler
William P. Tinkler
TINKLER LAW FIRM, LLC
P.O. Box 31813
Charleston, SC 29417
843.853.5203
*Counsel for Plaintiff-Appellant*

Lee Holmes
Lee E. Berlinsky
UNITED STATES ATTORNEY
151 Meeting Street, Suite 200
Charleston, SC 29401
843.727.4381
*Counsel for Defendant-Respondent*

# TABLE OF CONTENTS

Docket Report from U.S. District Court ..................................................... 1

Complaint (ECF Entry 1) .......................................................................... 6

    Declaration of Allen Mark Jacobs (12/02/2020) (ECF Entry 1-1) .............. 10

Plaintiffs' Expert Disclosure (ECF Entry 18) ........................................ 107

Defendant's Expert Disclosure (ECF Entry 19) ..................................... 110

Plaintiffs' Amended Expert Disclosure (ECF Entry 26) .......................... 113

Claim for Damage, Injury, or Death (Form 95) (ECF Entry 39-1) ....................... 118

Deposition Transcript of Allen Mark Jacobs (ECF Entry 39-2) .......................... 122

Notice Regarding Bench Trial (ECF Entry 42) ...................................... 154

Notice Regarding Bench Trial (ECF Entry 48) ...................................... 156

Order [on Motion in Limine] (ECF Entry 50) ....................................... 158

Order Granting Continuance [and request under Fed. R. Civ. P. 56(f)] (ECF Entry 55) .......................................................................... 166

Deposition Transcript of Allen Mark Jacobs (excerpt) (ECF Entry 58-1) ............ 168

Deposition Transcript of Thomas E. Brothers (excerpt) (ECF Entry 58-2) ......... 176

Declaration of John Womack (ECF Entry 58-3) .................................... 182

Declaration of Mark R. Jackson (ECF Entry 58-4) ................................ 184

Declaration of Jan Fritz (ECF Entry 58-5) .......................................... 187

Declaration of Allen Mark Jacobs (11/18/2022) (ECF Entry 59-1) .................... 192

i

Plaintiffs' Memorandum in Reply to Defendant's Rule 56(f) Brief
(ECF Entry 63) ................................................................... 194

Discharge Summaries (USA DOCS_1145-6) (ECF Entry 63-1) .......................... 200

Consult Requests (USA DOCS_1744-5) (ECF Entry 63-2) ............................. 202

Consult Requests (USA DOCS_1756) (ECF Entry 63-3) .................................... 204

Consult Requests (USA DOCS_1757) (ECF Entry 63-4) .................................... 205

Opinion and Order [granting Summary Judgment] (ECF Entry 68) ..................... 206

Report of Rick Delmonte (ECF Entry 71-1 pp. 1-2) ............................................ 218

Report of Jan Fritz (ECF Entry 71-1 pp. 3-12) ................................................... 220

Report of Mark R. Jackson (ECF Entry 71-1 pp. 13-14) ..................................... 230

Report of John Womack (ECF Entry 71-1 pp. 15-19) .......................................... 232

Email from Lee Berlinsky (11/30/2021) (ECF Entry 71-2) .................................. 237

Email from William Tinkler (11/08/2022) (ECF Entry 71-3) .............................. 238

Email from Paul Tinkler (03/22/2023) (ECF Entry 71-4) .................................... 239

Email from Paul Tinkler (03/24/2023) (ECF Entry 71-5) .................................... 242

Email thread: William Tinkler / Lee Berlinsky (ECF Entry 72-1) ........................ 243

Plaintiffs' Witness/Exhibit List (ECF Entry 72-2) .............................................. 246

Parts N & O of Respondent's Pre-Trial Brief (ECF Entry 72-3) .......................... 247

Defendant's Proposed Pre-Trial Findings of Fact and Conclusions of Law
(ECF Entry 75-1) ........................................................................ 248

Order [denying Motion to Reconsider] (ECF Entry 78) ....................................... 262

Notice of Appeal (ECF Entry 79) ....................................................................... 266

# U.S. District Court
## District of South Carolina (Charleston)
## CIVIL DOCKET FOR CASE #: 2:20-cv-04277-JD

| | |
|---|---|
| Lynn et al v. United States of America | Date Filed: 12/09/2020 |
| Assigned to: Honorable Joseph Dawson, III | Date Terminated: 04/04/2023 |
| Case in other court: United States Court of Appeals for the Fourth Circ, 23-02103 | Jury Demand: None |
| Cause: 28:2674 Federal Tort Claims Act | Nature of Suit: 362 Personal Inj. Med. Malpractice |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**Keith Lynn**                    represented by    **Paul E Tinkler**
Tinkler Law Firm LLC
154 King Street
3rd Floor
Charleston, SC 29401
843-853-5203
Fax: 843-261-5647
Email: paultinkler@tinklerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen F DeAntonio**
DeAntonio Law Firm
545 Parkwood Estates Drive
Charleston, SC 29407
843-577-8080
Fax: 843-577-4188
Email: sdeantonio@deanlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Paul Tinkler**
Tinkler Law Firm LLC
PO Box 31813
Charleston, SC 29417
843-853-5203
Email: williamtinkler@tinklerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jennifer Lynn**                    represented by    **Paul E Tinkler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen F DeAntonio**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Paul Tinkler**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States of America**                    represented by    **Lee Ellis Berlinsky**
US Attorneys Office

**JA 1**

PO Box 978
Charleston, SC 29402
843-727-4381
Fax: 843-727-4443
Email: lee.berlinsky@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martin L Holmes**
US Attorneys Office (Chas)
151 Meeting Street
Suite 200
Charleston, SC 29401-2238
843-727-4381
Email: martin.holmes@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/09/2020 | 1 | COMPLAINT against United States of America ( Filing fee $ 402 receipt number 0420-9522354.), filed by Keith Lynn, Jennifer Lynn. Service due by 3/9/2021. (Attachments: # 1 Exhibit Declaration of Allen Jacobs). (vdru, ) (Entered: 12/11/2020) |
| 12/09/2020 | 2 | Local Rule 26.01 Answers to Interrogatories by Jennifer Lynn, Keith Lynn.(vdru, ) (Entered: 12/11/2020) |
| 12/09/2020 | 3 | Summons Issued as to United States of America (U.S. Attorney for SC District). (vdru, ) (Entered: 12/11/2020) |
| 01/12/2021 | 5 | Case Reassigned to Judge Honorable Joseph Dawson, III. Judge Honorable Margaret B Seymour no longer assigned to the case. (glev, ) (Entered: 01/12/2021) |
| 02/12/2021 | 6 | ANSWER to 1 Complaint by United States of America.(Berlinsky, Lee) (Main Document 6 replaced on 2/12/2021) (rweb, ). Modified on 2/12/2021 to correct case number on document as verified by filing user (rweb, ). (Entered: 02/12/2021) |
| 02/12/2021 | 7 | Local Rule 26.01 Answers to Interrogatories by United States of America.(Berlinsky, Lee) (Main Document 7 replaced on 2/12/2021) (rweb, ). Modified on 2/12/2021 to correct case number on document as verified by filing user (rweb, ). (Entered: 02/12/2021) |
| 03/12/2021 | 8 | **SCHEDULING ORDER Rule 26(f) Conference Deadline 4/2/2021, 26(a) Initial Disclosures due by 4/16/2021, Rule 26 Report due by 4/16/2021, Motions to Amend Pleadings due by 5/7/2021, Plaintiffs ID of Expert Witness due by 6/7/2021, Defendants ID of Expert Witnesses Due by 7/7/2021, Records Custodian Affidavit due by 7/7/2021, Discovery due by 9/7/2021, Motions due by 10/7/2021, Jury Selection Deadline 1/5/2022, Mediation Due by 9/7/2021, Signed by Honorable Joseph Dawson, III on 3/12/21. (rweb, ) (Entered: 03/12/2021)** |
| 03/12/2021 | 9 | **MEDIATION ORDER Mediation Due by 9/7/2021, Signed by Honorable Joseph Dawson, III on 3/12/21. (rweb, ) (Entered: 03/12/2021)** |
| 03/15/2021 | 10 | NOTICE of Request for Protection from Court Appearance by Lee Ellis Berlinsky for April 5, 2021 - April 8, 2021 (Berlinsky, Lee) (Entered: 03/15/2021) |
| 03/15/2021 | 11 | NOTICE of Request for Protection from Court Appearance by Lee Ellis Berlinsky for August 3, 2021 - August 6, 2021 (Berlinsky, Lee) (Entered: 03/15/2021) |
| 03/15/2021 | 12 | NOTICE of Request for Protection from Court Appearance by Lee Ellis Berlinsky for August 9, 2021 - August 11, 2021 (Berlinsky, Lee) (Entered: 03/15/2021) |
| 03/24/2021 | 13 | Joint Rule 26(f) Report by Jennifer Lynn, Keith Lynn.(Tinkler, William) (Entered: 03/24/2021) |
| 03/29/2021 | 14 | **AMENDED SCHEDULING ORDER. 26(a) Initial Disclosures due by 6/15/2021, Rule 26 Report due by 6/15/2021, Motions to Amend Pleadings due by 7/6/2021, Plaintiffs ID of Expert Witness due by 8/6/2021, Defendants ID of Expert Witnesses Due by 9/6/2021, Records Custodian Affidavit due by 9/6/2021, Discovery due by 11/8/2021, Motions due by 12/6/2021, Jury Selection Deadline 2/7/2022, Mediation Due by 11/8/2021, Signed by Honorable Joseph Dawson, III on 3/29/21. (rweb, ) (Entered: 03/29/2021)** |
| 05/28/2021 | 15 | NOTICE of Request for Protection from Court Appearance by Lee Ellis Berlinsky for July 12 - July 16, 2021 (Berlinsky, Lee) (Entered: 05/28/2021) |
| 06/15/2021 | 16 | Local Rule 26.03 Answers to Interrogatories by United States of America.(Berlinsky, Lee) (Entered: 06/15/2021) |
| 06/15/2021 | 17 | Local Rule 26.03 Answers to Interrogatories by Jennifer Lynn, Keith Lynn.(Tinkler, Paul) (Entered: 06/15/2021) |

**JA 2**

| 08/06/2021 | 18 | PLAINTIFF'S ID OF EXPERT WITNESSES by Jennifer Lynn, Keith Lynn.(Tinkler, Paul) (Entered: 08/06/2021) |
| 09/07/2021 | 19 | DEFENDANT'S ID OF EXPERT WITNESSES by United States of America.(Berlinsky, Lee) (Main Document 19 replaced on 9/8/2021) (rweb, ). Modified on 9/8/2021 to correct case number on document as verified by filing user (rweb, ). (Entered: 09/07/2021) |
| 11/10/2021 | 20 | Joint MOTION to Amend/Correct *the Scheduling Order* by Jennifer Lynn, Keith Lynn. Response to Motion due by 11/29/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Proposed order is being emailed to chambers with copy to opposing counsel.(Tinkler, William) (Entered: 11/10/2021) |
| 11/16/2021 | 22 | **TEXT ORDER granting 20 Motion to Amend/Correct. Signed by Honorable Joseph Dawson, III on 11/16/21. (rweb, )** (Entered: 11/16/2021) |
| 11/16/2021 | 23 | **SECOND AMENDED SCHEDULING ORDER; Plaintiffs ID of Expert Witness due by 12/31/2021, Defendants ID of Expert Witnesses Due by 1/31/2022, Records Custodian Affidavit due by 1/31/2022, Discovery due by 3/31/2022, Motion in Limine due by 5/1/2022, Motions due by 5/1/2022, Jury Selection Deadline 6/1/2022, Mediation Due by 4/15/2022. Signed by Honorable Joseph Dawson, III on 11/16/21. (rweb, )** (Entered: 11/16/2021) |
| 11/19/2021 | 24 | NOTICE of Request for Protection from Court Appearance by Lee Ellis Berlinsky for November 22-24, 2021 (Berlinsky, Lee) (Entered: 11/19/2021) |
| 12/15/2021 | 25 | NOTICE of Request for Protection from Court Appearance by Lee Ellis Berlinsky for December 20-23, 2021 and December 27-30, 2021 (Berlinsky, Lee) (Entered: 12/15/2021) |
| 01/03/2022 | 26 | PLAINTIFF'S ID OF EXPERT WITNESSES by Jennifer Lynn, Keith Lynn.(Tinkler, William) (Entered: 01/03/2022) |
| 03/24/2022 | 27 | Joint MOTION to Amend/Correct *Scheduling Order* by Jennifer Lynn, Keith Lynn. Response to Motion due by 4/7/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Proposed order is being emailed to chambers with copy to opposing counsel.(Tinkler, William) (Entered: 03/24/2022) |
| 03/31/2022 | 29 | **TEXT ORDER granting 27 Joint Motion to Amend Scheduling Order. Signed by Honorable Joseph Dawson, III on 3/31/22.(rweb, )** (Entered: 03/31/2022) |
| 03/31/2022 | 30 | **THIRD AMENDED SCHEDULING ORDER; Discovery due by 3/31/2022, Motion in Limine due by 5/1/2022, Motions due by 5/1/2022, Bench Trial Deadline 6/1/2022, Mediation Due by 4/22/2022. All other dates set out. Signed by Honorable Joseph Dawson, III on 3/31/22. (rweb, )** (Entered: 03/31/2022) |
| 05/02/2022 | 32 | Consent MOTION Status Conference Hearing To Be Set By The Court by United States of America. Response to Motion due by 5/16/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Berlinsky, Lee) (Entered: 05/02/2022) |
| 05/02/2022 | 33 | RULE 26(a)(3)PRETRIAL DISCLOSURES by United States of America. Objections to PreTrial Disclosures due by 5/16/2022.(Berlinsky, Lee) (Entered: 05/02/2022) |
| 05/02/2022 | 34 | MOTION in Limine by United States of America. Response to Motion due by 5/16/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order. (Berlinsky, Lee) (Entered: 05/02/2022) |
| 05/10/2022 | 36 | NOTICE of Request for Protection from Court Appearance by Lee Ellis Berlinsky for July 5-11, 2022; July 15, 2022 and August 8-9, 2022 (Berlinsky, Lee) (Entered: 05/10/2022) |
| 05/10/2022 | 37 | NOTICE of Hearing: Telephone Conference set for 5/12/2022 01:00 PM before Honorable Joseph Dawson III. The parties have circulated conference line information. (rweb, ) (Entered: 05/10/2022) |
| 05/12/2022 | 38 | **MINUTE ENTRY: The Court held a telephonic status conference pursuant to 37 NOTICE of Hearing: Telephone Conference set for 5/12/2022. The parties discussed scheduling and are directed to confirm their availability by May 19, 2022, for a bench trial as discussed during the status conference. In consideration of the foregoing, 32 Joint Motion for a Status Conference Hearing is denied as it is moot. Proceedings held before Honorable Joseph Dawson, III: finding as moot 32 Motion ; Telephone Conference held on 5/12/2022. (rweb, )** (Entered: 05/12/2022) |
| 05/16/2022 | 39 | RESPONSE in Opposition re 34 MOTION in Limine Response filed by Jennifer Lynn, Keith Lynn.Reply to Response to Motion due by 5/23/2022 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Ex. A - SF-95s, # 2 Ex. - B - Jacobs Dep.)(Tinkler, William) (Entered: 05/16/2022) |
| 06/03/2022 | 42 | NOTICE of Hearing: Bench Trial set for 8/15/2022 09:30 AM in Charleston Courtroom #1, J. Waties Waring Judicial Center, 83 Meeting St, Charleston before Honorable Joseph Dawson III. Bench Trial set for 8/16/2022 09:30 AM in Charleston Courtroom #1, J. Waties Waring Judicial Center, 83 Meeting St, Charleston before Honorable Joseph Dawson III. Bench Trial set for 8/17/2022 09:30 AM in Charleston Courtroom #1, J. Waties Waring Judicial Center, 83 Meeting St, Charleston before Honorable Joseph Dawson III. Bench Trial set for 8/18/2022 09:30 AM in Charleston Courtroom #1, J. Waties Waring Judicial Center, 83 Meeting St, Charleston before Honorable Joseph |

**JA 3**

**USCA4 Appeal: 23-2103      Doc: 21      Filed: 02/13/2024      Pg: 7 of 270**

| | | |
|---|---|---|
| | | Dawson III. Bench Trial set for 8/19/2022 09:30 AM in Charleston Courtroom #1, J. Waties Waring Judicial Center, 83 Meeting St, Charleston before Honorable Joseph Dawson III. (rweb, ) (Entered: 06/03/2022) |
| 06/30/2022 | 43 | Consent MOTION to Continue *the Trial Set For August 15, 2022,* by United States of America. Response to Motion due by 7/14/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Berlinsky, Lee) (Entered: 06/30/2022) |
| 07/07/2022 | 45 | **TEXT ORDER granting 43 Consent Motion for Continuance of Trial Currently Set for August 15, 2022; the parties are directed to meet and confer regarding their dates of availability through the end of this year for a rescheduled trial. The parties are directed to provide this information to dawson_ecf@scd.uscourts.gov within 10 days of this order. Signed by Honorable Joseph Dawson, III on 7/7/22.(rweb, )** (Entered: 07/07/2022) |
| 07/07/2022 | 46 | NOTICE of Cancellation of Hearing: 8/15/22 at 9:30 (rweb, ) (Entered: 07/07/2022) |
| 07/25/2022 | 48 | NOTICE of Hearing: Bench Trial set for 11/14/2022 09:30 - 11/18/2022 in Charleston Courtroom #2, J. Waties Waring Judicial Center, 83 Meeting St, Charleston before Honorable Joseph Dawson III. (Entered: 07/25/2022) |
| 08/15/2022 | 50 | **ORDER: Defendant's Motion In Limine (DE 34) is denied as provided herein. Signed by the Honorable Joseph Dawson, III on 8/15/2022. (lgib, )** (Entered: 08/15/2022) |
| 10/04/2022 | 51 | NOTICE of Appearance by Martin L Holmes on behalf of United States of America (Holmes, Martin) (Entered: 10/04/2022) |
| 10/14/2022 | 52 | RULE 26(a)(3)PRETRIAL DISCLOSURES by Jennifer Lynn, Keith Lynn. Objections to PreTrial Disclosures due by 10/28/2022.(Tinkler, William) (Entered: 10/14/2022) |
| 10/18/2022 | 53 | Joint MOTION Status Conference re 48 Notice of Hearing by United States of America. Response to Motion due by 11/1/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Berlinsky, Lee) (Entered: 10/18/2022) |
| 11/11/2022 | 54 | Emergency MOTION to Continue *Trial* by Jennifer Lynn, Keith Lynn. Response to Motion due by 11/28/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Tinkler, William) (Entered: 11/11/2022) |
| 11/14/2022 | 55 | **ORDER GRANTING CONTINUANCE. Signed by the Honorable Joseph Dawson, III on 11/14/2022. (lgib, )** (Entered: 11/14/2022) |
| 11/15/2022 | 56 | NOTICE of Request for Protection from Court Appearance by Lee Ellis Berlinsky for November 21-23, 2022; November 25, 2022; and December 19-23, 2022 (Berlinsky, Lee) (Entered: 11/15/2022) |
| 11/18/2022 | 57 | STATUS REPORT by Jennifer Lynn, Keith Lynn. (Tinkler, William) (Entered: 11/18/2022) |
| 11/23/2022 | 58 | MOTION for Summary Judgment by United States of America. Response to Motion due by 12/7/2022. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A, Deposition of Dr. Jacobs, # 2 Exhibit B, Deposition of Thomas Brothers, # 3 Exhibit C, Declaration of John Womack, # 4 Exhibit D, Declaration of Mark Jackson, # 5 Exhibit E, Declaration of Jan Fritz)No proposed order.(Holmes, Martin) (Entered: 11/23/2022) |
| 11/23/2022 | 59 | REPLY by Jennifer Lynn, Keith Lynn to 55 Order on Motion to Continue . (Attachments: # 1 Jacobs Declaration) (Tinkler, William) (Entered: 11/23/2022) |
| 12/01/2022 | 62 | RESPONSE in Support re 58 MOTION for Summary Judgment. Response filed by United States of America (Berlinsky, Lee). Modified on 12/2/2022 to correct event type. (prou, ) (Entered: 12/02/2022) |
| 12/01/2022 | 63 | REPLY to Response to Motion re 58 MOTION for Summary Judgment Response filed by Jennifer Lynn, Keith Lynn. (Attachments: # 1 Ex. A - USA DOCS_1145-46, # 2 Ex. B - USA DOCS_1744-45, # 3 Ex. C - USA DOCS_1756, # 4 Ex. D - USA DOCS_1757) (Tinkler, William). Modified on 12/2/2022 to correct event type(prou, ) (Attachment 2 replaced on 12/2/2022) (prou, ). Modified on 12/2/2022 to replace Exhibit B per request of filing user (prou, ). (Entered: 12/02/2022) |
| 02/10/2023 | 64 | NOTICE of Hearing: Bench Trial set for 5/9/2023 09:30 AM - 5/11/2023 in Charleston Courtroom #2, J. Waties Waring Judicial Center, 83 Meeting St, Charleston before Honorable Joseph Dawson III. (swel, ) Modified to correct docket text on 2/10/2023 (cwhi, ). (Entered: 02/10/2023) |
| 02/21/2023 | 65 | NOTICE of Request for Protection from Court Appearance by Lee Ellis Berlinsky for March 13-16, 2023; May 12 and May 15, 2023 (Berlinsky, Lee) (Entered: 02/21/2023) |
| 03/16/2023 | 66 | NOTICE of Request for Protection from Court Appearance by Lee Ellis Berlinsky for July 3-7, 2023 and July 28, 2023 (Berlinsky, Lee) (Entered: 03/16/2023) |
| 03/31/2023 | 67 | NOTICE of Request for Protection from Court Appearance by Lee Ellis Berlinsky for April 10-13, 2023 (Berlinsky, Lee) (Entered: 03/31/2023) |
| 04/04/2023 | 68 | **ORDER: The Court grants Defendant summary judgment pursuant to Rule 56(f), Judgment Independent of the Motion, as provided herein; therefore, Plaintiffs' case is dismissed. AND IT IS SO ORDERED. Signed by** |

**JA 4**

| | | the Honorable Joseph Dawson, III on 4/3/2023. (lgib, ) (Entered: 04/04/2023) |
|---|---|---|
| 04/04/2023 | 69 | SUMMARY JUDGMENT in favor of United States of America against Keith Lynn and Jennifer Lynn. (lgib, ) (Entered: 04/04/2023) |
| 05/02/2023 | 70 | MOTION for Reconsideration re 69 Summary Judgment, 68 Order on Motion for Summary Judgment, by Jennifer Lynn, Keith Lynn. Response to Motion due by 5/16/2023. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Tinkler, William) (Entered: 05/02/2023) |
| 05/15/2023 | 71 | RESPONSE in Opposition re 70 MOTION for Reconsideration re 69 Summary Judgment, 68 Order on Motion for Summary Judgment, Response filed by United States of America.Reply to Response to Motion due by 5/22/2023 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit 1: Expert Reports from Defendant (Redacted), # 2 Exhibit 2: November 30, 2021 Email from Berlinsky, # 3 Exhibit 3: November 8, 2022 Email from Tinkler, # 4 Exhibit 4: March 22, 2023 Email from Tinkler, # 5 Exhibit 5: March 24, 2023 Email from Tinkler)(Berlinsky, Lee) (Entered: 05/15/2023) |
| 05/22/2023 | 72 | REPLY to Response to Motion re 70 MOTION for Reconsideration re 69 Summary Judgment, 68 Order on Motion for Summary Judgment, Response filed by Jennifer Lynn, Keith Lynn. (Attachments: # 1 Exhibit A - Email Thread, # 2 Exhibit B - Exhibit List, # 3 Exhibit C - USA N and O)(Tinkler, William) (Entered: 05/22/2023) |
| 07/12/2023 | 73 | **TEXT ORDER: In light of Plaintiffs' 70 Motion for Reconsideration and brief, in which Plaintiffs raised an issue regarding the United States' submission of proposed findings of fact and conclusions of law to the Court ex parte, pursuant to 48 Notice Regarding Bench Trial, the Defendant is directed to provide the proposed findings and conclusions of law to Plaintiffs by July 14, 2023. Thereafter, Plaintiffs are authorized to provide a supplemental memorandum, if any, with respect to any additional or supplemental matters in support of their Motion for Reconsideration by July 28, 2023. Signed by the Honorable Joseph Dawson, III on 7/12/2023. (lgib, ) (Entered: 07/12/2023)** |
| 07/28/2023 | 75 | REPLY by Jennifer Lynn, Keith Lynn to 73 Order,, . (Attachments: # 1 Exhibit A - United States' Proposed Order) (Tinkler, William) (Entered: 07/28/2023) |
| 08/04/2023 | 77 | RESPONSE in Opposition re 70 MOTION for Reconsideration re 69 Summary Judgment, 68 Order on Motion for Summary Judgment, Response filed by United States of America.Reply to Response to Motion due by 8/11/2023 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Berlinsky, Lee) (Entered: 08/04/2023) |
| 08/24/2023 | 78 | **ORDER: The Court denies Plaintiffs' motion for reconsideration. IT IS SO ORDERED. Signed by the Honorable Joseph Dawson, III on 8/24/2023. (lgib, ) (Entered: 08/24/2023)** |
| 10/19/2023 | 79 | NOTICE OF APPEAL as to 69 Summary Judgment, 68 Order on Motion for Summary Judgment, 78 Order on Motion for Reconsideration by Jennifer Lynn, Keith Lynn. - Filing fee $ 505, receipt number ASCDC-11381613. The Docketing Statement form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Tinkler, William) (Entered: 10/19/2023) |
| 10/19/2023 | 80 | Transmittal Sheet for Notice of Appeal to USCA re 79 Notice of Appeal, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (lgib, ) (Entered: 10/19/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/05/2024 12:55:16 | | |
| **PACER Login:** | JasonLuck | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-04277-JD |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |
| **Exempt flag:** | Not Exempt | **Exempt reason:** | Not Exempt |

**JA 5**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Keith Lynn and Jennifer Lynn, | Case No.  **2:20-cv-4277-MBS** |
| Plaintiffs, | |
| vs. | **COMPLAINT** |
| United States of America, | **(28 U.S.C. § 2674)** |
| Defendant. | |

Plaintiffs Keith Lynn and Jennifer Lynn, complaining of Defendant United States of America, hereby allege as follows:

### Parties, Jurisdiction, and Venue

1.      Plaintiff Keith Lynn ("Keith") resides in the State of South Carolina and has been a patient at the U.S. Department of Veterans Affairs ("VA") facility in Charleston, South Carolina.

2.      Plaintiff Jennifer Lynn ("Jennifer") resides in the State of South Carolina.  She is married to Keith and resides with him.

3.      Defendant United States of America is a body politic that operates through its executive branch an agency of government known as the VA, which, among other services, provides health care services to veterans of the U.S. military branches.  At all times material to this action, Defendant, through the VA, was responsible for the correct response to Keith's health care needs.

4.      Plaintiffs, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*. (hereinafter "FTCA"), seek compensatory damages arising from Defendant's negligence in failing to adhere to the prevailing professional standard of care that is generally recognized as acceptable and appropriate by reasonably prudent similar health care providers.

2:20-cv-04277-MBS    Date Filed 12/09/20    Entry Number 1    Page 2 of 4

5.      Jurisdiction is proper in that this action is premised upon federal causes of action under the FTCA.  Specifically, the Court has jurisdiction of the instant action pursuant to 28 U.S.C. § 1331, in that this case arises under the FTCA, and pursuant to 28 U.S.C. § 1346, in that this Court has original jurisdiction over all claims against the United States of America and the various agencies thereof, including the VA.

6.      Pursuant to the FTCA, Plaintiffs, on or about October 4, 2019, presented their claims to the appropriate federal agency for administrative settlement.  As of the date of this filing, Plaintiffs have received neither a denial nor an acceptance of their claims.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1402(b), as Plaintiffs reside this judicial district and the events or omissions giving rise to the claims occurred in this judicial district.

### Cause of Action for Medical Negligence (Keith Lynn)

8.      On or about January 15, 2019, Keith presented at the VA's Charleston facility with pain and swelling of his right leg.  At that time, Keith had a history of pain and swelling of his leg and was being followed by podiatrists at the VA for a diagnosis of Charcot's joint disease.

9.      After presentation on January 15, 2019, the non-podiatry staff at the VA diagnosed osteomyelitis and performed a below the knee amputation of Keith's right leg.

10.     That there was insufficient evidence to support a diagnosis of osteomyelitis and the amputation performed on January 17, 2019, was unnecessary.

11.     That, subsequent to the amputation in January 2019, complications developed, requiring amputation of the leg above the knee.

12.     That Defendant failed to adhere to the applicable standards of care, such that Defendant's failures deviated from the applicable standard of care imposed upon the doctors.

13.     That, as a direct and proximate result of Defendant's negligence, Keith has suffered damage in that his right leg has been amputated above the knee.  This has resulted in pain and suffering, disability, disfigurement, loss of enjoyment of life, and other actual damages.

**Cause of Action for Loss of Consortium (Jennifer Lynn)**

14.     Jennifer incorporates and re-alleges the allegations of Paragraphs 1 through 13 as if they were set forth herein verbatim.

15.     As a direct and proximate result of Keith's disability caused by Defendant's negligence, Jennifer has suffered a loss of consortium.  In particular, Keith's amputation and confinement to a wheelchair necessitated Jennifer to provide continuous care for him, and she has therefore experienced a loss of Keith's companionship, aid, society, and services that she enjoyed before Defendant's negligent acts.

Wherefore, Plaintiffs Keith Lynn and Jennifer Lynn pray for a judgment against Defendant United States of America for their actual damages as may be determined by this Court in a sum that is fair and just and consistent with Plaintiffs' submitted claims.

Respectfully submitted,

TINKLER LAW FIRM LLC

 /s/ Paul E. Tinkler
Paul E. Tinkler (D.S.C. No. 4108)
William P. Tinkler (D.S.C. No. 11794)
P.O. Box 366
Charleston, SC  29402
(843) 853-5203
(843) 261-5647 (fax)
paultinkler@tinklerlaw.com
williamtinkler@tinklerlaw.com

Stephen F. DeAntonio (D.S.C. No. 1049)
DeANTONIO LAW FIRM, LLC
P.O. Box 30069
Charleston, SC 29417

sdeantonio@deanlawfirm.com

December 9, 2020                              *Counsel for Plaintiffs*

# DECLARATION OF ALLEN MARK JACOBS DPM, FACFAS, FAPWH

1.      I have reviewed in detail the medical records forwarded to me by Keith Lynn's counsel.  The majority of the records reviewed were from the Charleston South Carolina Veterans Administration Medical Center.

2.      Based upon my review of these medical records, it appears that Mr. Lynn underwent an unnecessary below the knee amputation of his right leg.  The medical records appear to indicate that Mr. Lynn was being followed by the podiatry service at the South Carolina Veterans Administration Medical Center for a diagnosis of Charcot's joint disease.

3.      The medical records indicate that Mr. Lynn presented with signs and symptoms consistent with Charcot's joint disease.  On admission to the hospital following examination in the emergency department, and was found to be afebrile, with no laboratory studies which supported the diagnosis of acute infection or osteomyelitis.  Mr. Lynn presented with radiographic changes consistent with Charcot's joint disease, possibly with an associated soft tissue infection and abscess of undetermined etiology.

4.      Specifically, on January 15, 2019, Mr. Lynn presented to the emergency department of the Charleston South Carolina Veterans Administration Hospital.  His records indicate that he has multiple history of Charcot's joint disease.  The records indicate that he was afebrile, and demonstrated no signs or symptoms suggestive of acute infection or sepsis.  The records indicate no elevation in his white blood cell count/leukocytosis.  The records indicate the presence of no open wound or ulceration.

5.      A CT scan was performed which was interpreted as demonstrating evidence of advanced chronic osteomyelitis, and the presence of an abscess.  In actuality the CT scan changes demonstrated findings consistent with Charcot joint disease and not advanced

2:20-cv-04277-MBS   Date Filed 12/09/20   Entry Number 1-1   Pg. 14 of 270

osteomyelitis. If, in fact, an abscess had been present, this could have been properly treated by incision and drainage and not urgent amputation of the right leg. It appears the decision to perform an amputation was based upon the possible existence of an abscess in the soft tissues, as well as the misinterpretation of the x-ray changes as osteomyelitis, rather than Charcot joint disease. Furthermore, although less likely, Mr. Lynn suffered from gouty arthritis, which may have been a contributing factor to his swelling, redness, pain, and radiographic/CT changes.

6.      Mr. Lynn presented repeatedly for evaluation at the Charleston South Carolina Veterans Administration Hospital for the evaluation of edema in both the left and right lower extremity. The podiatry attending staff made a diagnosis of Charcot's joint disease and were actively treating Mr. Lynn for this problem up to 48 hours prior to his admission to the Charleston South Carolina Veterans Administration Hospital and eventual amputation of his right leg. Mr. Lynn underwent multiple venous Doppler studies for his edema. Edema represents the first clinical stage of Charcot's joint disease. His venous Doppler studies were negative. Mr. Lynn underwent multiple radiographic imaging studies of his left and right foot and ankle and leg, including CT scan and MRI study. Again, the MRI studies demonstrated bone marrow edema typical of Charcot's joint disease. Imaging studies of Mr. Lynn's right lower extremity demonstrated multiple bones and joints affected, more typical of Charcot's joint disease and not osteomyelitis.

7.      It appears that the non-podiatric medical staff of the Charleston South Carolina Veterans Administration Hospital was unfamiliar with Charcot's joint disease, which occurs with frequency in a patient with diabetes, neuropathy, and concurrent pathology such as obesity.

8.      If in fact Mr. Lynn suffered from an abscess, this could have been treated by incision and drainage. Instead, the imaging studies which demonstrated changes consistent with

Charcot joint disease were misinterpreted as being that of osteomyelitis, and his right leg sacrificed as a result of this misinterpretation.

9.     The medical records of Mr. Lynn indicate the presence of no open wound or ulceration or other potential etiology to account for the presence of an abscess in the right leg.

10.     Following amputation of his right leg, the pathology report documented no evidence of ulceration, or infection to support the need for urgent amputation of the right leg.

11.     My opinions in this matter are expressed with a reasonable degree of medical certainty.  My opinions are based upon my review of the medical records provided to me, as well as my experience greater than 40 years treating patients such as Mr. Lynn who suffer from diabetes, neuropathy and Charcot joint disease.  A copy of my curriculum vitae is attached hereto.

<u>Review of Medical Records</u>

12.     Mr. Lynn had a long history of receiving medical care for a variety of complaints and concerns from the Charleston South Carolina Veterans Administration Hospital.  He suffered from multiple pathologic issues including diabetes, morbid obesity, diabetic neuropathy, hypertension, and anxiety/depression, factor V laden mutation, gout, sleep apnea, cardiopulmonary disease, history of prior DVT.

13.     On May 18, 2018, Mr. Lynn presented with bilateral edema of the lower extremities.  No open wound or ulceration was described.  Venous Dopplers were performed which were negative for DVT.

14.     It should be noted that swelling (edema) is the first clinical manifestation of Charcot's joint disease.

15.     Mr. Lynn presented initially with right foot and leg swelling on June 21, 2018.

2:20-cv-04277-MBS    Date Filed 12/09/20    Entry Number 1-1    Page 4 of 97

He was evaluated in emergency department of the South Carolina Veterans Administration Hospital. He was not diagnosed with any open wound, ulceration or sepsis.

16.     Radiographs were obtained of the right ankle on this date. Soft tissue swelling was present. There was no evidence of fracture, dislocation, or infection including osteomyelitis.

17.     Edema is typically the initial clinical presentation for Charcot's joint disease.

18.     The venous Doppler were performed given a suspected thrombosis was also obtained given the extent of swelling present. There was no evidence on Doppler examination of any DVT.

19.     Mr. Lynn was again evaluated in the emergency department July 9, 2018 for right ankle and foot pain and swelling. He was diagnosed with gouty arthritis. There was no indication of any ulceration, soft tissue infection, or osteomyelitis. He was prescribed colchicine or standard treatment of gouty arthritis.

20.     The extent of the swelling and pain in the right lower extremity was significant, prompting a venous Doppler study to rule out DVT. This study was negative for evidence of venous thrombosis.

21.     On July 20, Mr. Lynn was again evaluated with swelling and pain in the right ankle joint. He was evaluated in the emergency department of the Charleston South Carolina Veterans Administration Hospital. He was not diagnosed with any sections process.

22.     An MRI of the right foot was performed on July 28, 2018. The testing was ordered by Dr. Stephen O'Connor with "a concern for osteomyelitis?". The MRI demonstrated edema of the soft tissues with bone marrow edema in the distal tibia, talus, calcaneus, navicular, cuboid, and cuneiform bones. The interpretation was that of soft tissue swelling and "neuropathic joint is favored over osteomyelitis".

23.     The MRI on this date was consistent with Charcot's joint disease which begins
with bone marrow edema.  Given the absence of any open wound or ulceration, the afebrile state
of Mr. Lynn with no signs or symptoms of systemic infection (no fever, malaise, fatigue,
tachycardia, tachypnea, leukocytosis) the MRI findings are absolutely consistent with Charcot's
joint disease.

24.     Radiographs were obtained of the right foot and ankle on July 28, 2018.  These
radiographs demonstrated changes consistent with Charcot joint disease.

25.     On August 13, 2018 he was evaluated by a podiatrist, Dr. Byron, for his right foot
and ankle concerns.  Mr. Lynn was diagnosed with Charcot joint disease.  He was treated in
standard matter of Charcot's joint disease with compression, the use of a CROW walker, and a
bone stimulator was prescribed.  Non-weightbearing with a wheelchair was recommended.  He
was also prescribed a knee walker in order to decrease weightbearing to his right lower
extremity.  Radiographic evaluation of the right and left foot on this date demonstrated changes
consistent with Charcot joint disease.  There was no evidence of osteomyelitis.

26.     Radiographs on August 13, 2018 were ordered by Dr. Debbie Byron of the
podiatry department.  Under reason for study was "concern for Charcot foot/ankle changes".
The x-rays demonstrated soft tissue swelling of the right foot.  Arthritic changes were noted
within the right foot X-rays of the left foot demonstrated mild arthritic changes.  The
interpretation with reference to the right foot was significant "fairly widespread" soft tissue
swelling.  No significant morbidities were felt to be present in the left foot.

27.     X-rays of the right foot were ordered by Dr. Debbie Byron on October 12, 2018.
Under reason for study was "Charcot joint management".  The request indicates that there was a
history of gouty arthritis.  The x-rays demonstrated early irregularity of the mid foot at the

calcaneal cuboid and cuboid cuneiform joints consistent with Charcot's joint disease. The radiographs were interpreted by Dr. Dmitry Havaizhew M.D.

28.    On November 19, 2018 he was again followed up by the podiatry service by Dr. Ravenell. Once again, a diagnosis of Charcot's joint disease was made. Swelling and redness and pain were noted with a collapse of the foot consistent with Charcot joint disease. Radiographs were obtained which again demonstrated signs of Charcot's joint disease.

29.    One January 15, 2019, 2 days before his amputation, Mr. Lynn was again evaluated by Dr. Ravenell. The medical records indicate that Mr. Lynn was again diagnosed with Charcot's joint disease. At the time of this examination Mr. Lynn demonstrated increased swelling and pain and difficulty wearing his CROW walker boot. The records indicate no suggestion of any infectious disease. The records indicate no open wound or ulceration. Radiographs were obtained on this date of the right leg and foot as well as the right knee. These x-rays demonstrated changes consistent with Charcot joint disease. There was no evidence of abscess, no evidence of osteomyelitis.

30.    The x-ray report of this date indicates that radiographs were obtained of the **left foot**. The records indicate that there was some confusion by the radiology department as to whether the x- rays were representative of the left or the right foot. It appears a conclusion was drawn that these x-rays were of the left foot. Soft tissue swelling was noted to be present and periosteal reaction of the distal fibula was noted to be present. Deformity of the foot consistent with Charcot's joint disease was also noted to be present. The radiographs were interpreted as "probably consistent with the history of a Charcot joint". Advancing destructive changes of multiple bones were noted again, consistent with Charcot joint disease. X-rays of the distal leg were also obtained which again demonstrated changes consistent with Charcot's joint disease.

31.    Given the **bilateral swelling present in the legs of Mr. Lynn, a venous Doppler was performed**.  The Doppler studies demonstrated no evidence of venous thrombosis.  However, the degree of edema was sufficient in both lower chest remedies to warrant the performance of a venous Doppler study to rule out blood clot.

32.    A CT scan of **the left** calf, ankle and foot was obtained on January 13, 2019.  Periosteal changes were noted along the distal fibula which could be seen in Charcot's joint disease.  Periosteal change was also noted on the distal tibia again, consistent with Charcot joint disease.  A large gas containing fluid collection was noted along the anterior and lateral aspect of the distal leg.  The radiographic interpretation was that it was "compatible" with an abscess.  Air bubbles and an additional area of fluid collection surrounding the ankle and hindfoot were also noted to be present.  Destruction and fragmentation of the calcaneus "compatible" with osteomyelitis was also noted.  However, these changes are also consistent with Charcot's joint disease.  The radiologist notes that "some component of neuropathic arthropathy could be present as well".  It was felt that the changes were less likely associated with Charcot's joint disease.  Areas of tendinitis were also noted area periosteal reaction was also noted in multiple bones of the foot including the cuboid, lateral cuneiform, middle cuneiform and talus.  The interpretation was that the changes were "consistent" with osteomyelitis.  An abscess was also noted.

33.    The changes present on the CT scan were consistent with Charcot joint disease and possibly an abscess although, given the absence of any ulceration or entry for bacteria it is difficult to understand how an abscess would have occurred in the leg of Mr. Lynn.  He would be somewhat if not extremely unusual to have osteomyelitis of 6 bones in the leg and foot, however, multiple bone involvement is typical for Charcot's joint disease.

## Pathology Report

34.    Following the below the knee amputation of the right leg Mr. Lynn, the amputated leg was evaluated by pathology.  The report lists the surgeon as Thomas Brothers M.D. and the current surgeon as Kristen Quinn M.D.

35.    The pathology specimen demonstrated no open wound or ulceration.  Minimal atherosclerotic plaque was noted indicating that there was not extensive vascular disease which would have justified the amputation.  There is no indication of any infectious change, abscess, osteomyelitis, or soft tissue defect which would allow the entry of bacteria into the leg or foot.

## Summary

36.    Appears that Mr. Lynn suffered from Charcot's joint disease of the right foot and possibly the left foot.  He was diagnosed and treated for Charcot joint disease of the right and possibly left foot by the podiatric service at the Charleston South Carolina Veterans Administration Hospital.  The medical records indicate clinical signs, symptoms, and radiographic and imaging changes consistent with Charcot's joint disease.  A diagnosis of osteomyelitis was made by indirect evidence, that is, an incorrect diagnosis based on the clinical signs, symptoms, and imaging studies as osteomyelitis.  While an abscess may have existed, there was never any direct evidence demonstrating osteomyelitis, and the urgent removal of Mr. Lynn's right leg was neither indicated nor necessary and was a departure from the applicable standard of care.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 2, 2020.

Dr. Allen Mark Jacobs, DPM,
FACFAS, FAPWH

# Allen M. Jacobs, D.P.M., FACFAS

| | | |
|---|---|---|
| Private Office: | 10/2005-Present | 6400 Clayton Road<br>Suite 402<br>St. Louis, MO 63117<br>(314) 367-6545<br>FAX (314) 367-7038 |
| | 1981-2005 | Central West End Foot Care<br>100 North Euclid Ave., LL #4<br>St. Louis, MO 63108<br>(314) 367-6545<br>FAX (314) 367-7038 |
| Date of Birth: | | August 5, 1947<br>Philadelphia, Pennsylvania |
| Education: | 1973 | Pennsylvania College of<br>Podiatric Medicine |
| | 1969 | Temple University,<br>Grd. College - Liberal Arts |
| | 1965 | Central High School<br>Philadelphia, Pennsylvania |
| Surgical Residency Training: | 1973-74 | Monsignor Clement Kern Hospital<br>For Special Surgery<br>Warren, Michigan |
| Current Podiatry Licensure: | | Missouri: 000436 |
| Certification: | 1973 | Diplomat, National Board of<br>Podiatric Examiners |
| | 1981 | Diplomat, American Board of<br>Podiatric Surgery |
| | 1982 | Fellow, American College of<br>Foot and Ankle Surgeons |
| | 2006 | Fellow, American Professional<br>Wound Care Association |
| Recertification: | 2000, 2010 | American Board of Podiatric Surgery |

1

# Allen M. Jacobs, D.P.M., FACFAS

Society Memberships:

- American Board of Podiatric Surgery
- American College of Foot and Ankle Surgeons
- Missouri State Podiatric Medical Society
- American Podiatric Medical Association
- St. Louis Podiatry Society
- American Diabetes Association
- American Professional Wound Care Association

Current Activities

- Private Practice, St. Louis, MO
- Chairperson, Journal Management Counsel: American College of Foot and Ankle Surgeons
- Editorial Advisory Board: Podiatry Today
- Editorial Advisory Board: Foot and Ankle Quarterly
- Editorial Advisory Board: Clinics in Podiatric Medicine and Surgery
- Adjunct Clinical Professor: St. Louis University School of Medicine

Hospital Affiliations

- St. Louis University Hospital
- Des Peres Hospital
- Christian Hospital Northeast
- St. Anthony's Hospital
- St. Mary's Hospital

Surgery Center Affiliation

- Manchester Surgery Center

Honors and Awards:

1. Pennsylvania College of Podiatric Medicine Alumni Award, 1973. Presented annually to the graduating student maintaining the highest scholastic average over the prior four years.
2. Professor M.H. Samitz Award, 1973. Presented annually to the graduating student maintaining the highest grade point average in dermatology.
3. Professor Louis M. Newman Award, 1973. Presented annually the graduating student demonstrating the greatest proficiency in foot surgery.
4. Clinical Sciences Award, 1973. Presented annually to the graduating student maintaining the highest grade point average in clinical sciences.
5. American College of Foot Roentgenology Award, 1973. Presented for the best thesis in radiology and related sciences for "Radiologic Evaluation of Growth Factors Influencing the Development of Normal Tibial Varum."
6. Professor Vincent A. Jablon Award, 1973. Presented annually to the graduating student maintaining the highest grade point average in diagnostic radiology.
7. Gordon Pharmacology Award, 1973. Presented annually to the graduating student maintaining the highest grade point average in pharmacology.
8. Philadelphia County Podiatric Society Orthopedics Award, 1973. Presented annually to the graduating student maintaining the highest grade point average and demonstrating the greatest proficiency in orthopedics and in biomechanics.

2

**Allen M. Jacobs, D.P.M., FACFAS**

9.  Sterling-Hartford Honorary Anatomical Society, 1973.  Membership conferred upon the graduating student demonstrating the greatest proficiency in anatomy, histology and embryology.

10. Pi Delta National Podiatric Honor Society, 1973.  Membership conferred upon students maintaining a cumulative average over 90% or better in all course work in podiatry college.

11. Who's Who in American Universities and Colleges, 1973.

12. First Place Award, American Podiatric Medical Association Hall of Science, 1980. Given at the American Podiatric Medical Association National Scientific Meeting, Detroit, Michigan, for "Radionuclide Bone Imaging of the Foot and Ankle."

13. First Place Award, American Podiatric Medical Association Hall of Science, 1981. Given at the American Podiatric Medical Association National Scientific Meeting, Fort Lauderdale, Florida, for "Advances in the Management of the Diabetic Foot."

14. Second Place Award for Excellence in Medical Writing, American College of Foot Surgeons, 1981.

15. Second Place Award for Excellence in Medical Writing, American College for Foot Surgeons, 1982.

16. Second Place Award for Excellence in Medical Writing, American College for Foot Surgeons, 1983.

17. Second Place Award for Excellence in Medical Writing, American College for Foot Surgeons, 1984.  Presented at ACFS Annual Meeting, Las Vegan, Nevada, for "Tarsal Tunnel Syndrome: A Manifestation of Systemic Disease."

18. Dedication to Podiatry Award, 1984.  Texas Podiatric Medical Association.

19. Award of Appreciation for Dedication to the Advancement of Podiatric Medical Education, 1984.  Podiatry Society of Virginia.

20. Certificate of Appreciation for the Advancement of Podiatric Education, 1984. Memphis (Tennessee) Podiatry Hospital Association.

21. Award for Dedication of the Advancement of Podiatric Education, 1984.  Student National Podiatry Association, Cleveland (Ohio) college of Podiatric Medicine.

22. Third Place Award for Excellence in Medical Writing, American College for Foot Surgeons, 1985.

(3)

**Allen M. Jacobs, D.P.M., FACFAS**

23.     Award for Appreciation for Dedication to Podiatric Education and the Advancement of the Podiatric Profession, 1985. Pittsburgh (Pennsylvania) Podiatry Hospital.

24.     Third Place Award for Excellence in Medical Writing, American College for Foot Surgeons, 1986.

25.     Third Place Award for Excellence in Medical Writing, American College for Foot Surgeons, 1987.

26.     William K. Stickel Award for Medical Writing and Research, American Podiatric Medical Association, 1987.

27.     Presidents Lecture, Midwest Conference, 1991.


*Academic and Professional Appointments:*

1.     Director, Podiatry Service, Deaconess Hospital, St. Louis, Missouri, 1988 to 2004.

2.     Director, Podiatric Surgical Residency Training, Deaconess Hospital, St. Louis, Missouri, 1987 to 2004.

3.     Director, Podiatric Surgical Residency Training, Central Medical Center, St. Louis, Missouri, 1987 to 1992.

4.     Contributing Editor, Journal fo Foot Surgery, American College of Foot Surgeons, 1980 to 1990.

5.     Special Features Editor, Podiatry Tracts. Williams and Wilkins, Publishers. 1989 to 1992.

6.     Review Editor, Journal of Foot Surgery. Williams and Wilkins, Publishers. 1982 to 1988.

7.     Contributing Editor, Podiatry Tracts. Williams and Wilkins, Publishers. 1987 to 1992.

8.     Scientific Chairman, American Podiatric Medical Association, National Scientific Sessions: 1987, 1988, 1989, 1991.

9.     Scientific Chairman, Missouri Podiatric Medical Association, State Meetings: 1982, 1983, 1984, 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995.

(4)

**Allen M. Jacobs, D.P.M., FACFAS**

10.      Adjunct Clinical Professor, Des Moines (Iowa) College of Osteopathy and Podiatric Medicine, 1986 to 2004.

11.      Adjunct Clinical Professor, William Scholl College of Podiatric Medicine, 1998 to 2004.

12.      Missouri State Podiatric Peer Review Committee, 1985 to Present.

13.      Dow Corning-Wright Corporation, Implant Advisory Committee Member, 1985 to 1987.

14.      Instructor, Department of Radiology, Logan college of Chiropractic Medicine, St. Louis, Missouri.  1979 to 1984.

15.      Missouri State Pharmacy Formulary committee Member.  Appointed by Governor John Ashcroft, 1987 to 1988.

16.      Chairman, Department of Podiatric Medicine and Surgery, Veterans Administration Hospital, Washington, D.C., 1978.

17.      Associate Director, Podiatric Medical Services, Veterans Administration Central Office, Washington, D.C., 1978.

18.      Chairman, Lindell Hospital Department of Podiatric Medicine and Surgery, St. Louis, Missouri, 1981 to 1987.

19.      Director and Chairman, Lindell Hospital Podiatric Surgical Residency Training Program, St. Louis, Missouri, 1980 to 1987.

20.      Lindell Hospital Tissue Review Committee Member, St. Louis, Missouri, 1979 to 1986.

21.      Lindell Hospital Blood Transfusion Review committee Member, St. Louis, Missouri, 1981 to 1987.

22.      Lindell Hospital Antibiotic Utilization Review Committee Member, St. Louis, Missouri, 1981 to 1987.

23.      Lindell Hospital Infection Control Committee Member, St. Louis, Missouri, 1980 to 1987.

24.      Lindell Hospital Medical Executive Committee Member, St. Louis, Missouri, 1980 to 1987.

(5)

**Allen M. Jacobs, D.P.M., FACFAS**

25.        Missouri Medicaid Physician's Advisory Board Member, 1986 to 1987.

26.        Chairman, Pennsylvania College of Podiatric Medicine Surgical Credentials Committee, 1977.

27.        Assistant Professor of Surgery, Pennsylvania College of Podiatric Medicine, 1977.

28.        Director, Pennsylvania College of Podiatric Medicine Master of Science Post-Doctoral Degree Program, 1977.

29.        Director, Postgraduate Course on Advanced Rearfoot Surgery, Pennsylvania College of Podiatric Medicine, 1977.

30.        Chairman, Podiatric Medical Education Committee and Director of Podiatric Residency Training, Washington Memorial Hospital, Turnersville, New Jersey, 1977 to 1978.

31.        Chairman, Podiatric Residency Training Committee, Broad Street Hospital, Philadelphia, Pennsylvania, 1977.

32.        Director, Philadelphia Podiatry Residents' Journal club, Pennsylvania College of Podiatric Medicine, 1977.

33.        Pennsylvania College of Podiatric Medicine Admissions Committee Member, 1976 to 1977.

34.        Pennsylvania College of Podiatric Medicine Emergency Care Committee Member, 1976 to 1977.

35.        Washington Memorial Hospital Podiatry Credentials Committee Member, 1976.

36.        Co-Chairman, Pennsylvania College of Podiatric Medicine Seminar on Diagnostic Radiologic Techniques of the Lower Extremity, 1976.

37.        Co-Chairman, Pennsylvania College of Podiatric Medicine, Department of Surgery, Pediatric Orthopedics Seminar, 1977.

38.        Externship Programs Director, Pennsylvania college of Podiatric Medicine Externships at Washington Memorial Hospital, Turnersville, New Jersey, (Podiatric Medicine, Podiatric Surgery, Internal Medicine, Orthopedics, Pediatrics, Physical Therapy and Urology), 1977.

39.        Chairman, Symposium on Cavus Foot Deformity, Department of Medical Education, Washington Memorial Hospital, Turnersville, New Jersey, 1977.

(6)

**Allen M. Jacobs, D.P.M., FACFAS**

40.    Chairman, Seminar on Advances in Physical Therapeutics and in the Management of Foot Pathology, Washington Memorial Hospital, Turnersville, New Jersey, 1977.

41.    Scientific Chairman, Veterans Administration Regional Medical Education Center, First National Conference on Podiatric Care of the Aging Veteran Patient, Washington, D.C., 1977.

42.    Examiner, American College of Foot Surgeons Fellowship Examination Committee, 1983, 1984, 1985.

43.    Scientific Chairman, American College of Foot Surgeons Annual Scientific Meeting, Tampa, Florida, 1985.

44.    Chairman, Seminar on Management of Lower Extremity Infectious Disease, Central Medical Center, St. Louis, Missouri, 1987.

45.    Chairman, Missouri National Podiatric Surgical Seminar, Sheraton Westport Plaza, St. Louis, Missouri, 1989, 1990.


*ORIGINAL PUBLICATIONS - Textbook Chapters:*

1.    Jacobs, Allen M. and Lawrence Oloff.  "Fracture Non-Union."  <u>Clinics in Podiatry 2</u> Chapter (2), Pages 379-406.  W.B. Saunders, Philadelphia, PA.  April, 1985.

2.    Jacobs, Allen M. and Lawrence Oloff.  "Podiatric Metallurgy and the Effects of Implant Materials on Living Tissue."  <u>Clinics in Podiatry 2</u> Chapter (1), Pages 121-141.  W.B. Saunders, Philadelphia, PA.  January, 1985.

3.    Jacobs, Allen M. And Lawrence Oloff.  "Complications of Implant Arthroplasty."  <u>Complications in Foot Surgery: Second Edition.</u>  Pages 274-308.  Williams and Wilkins, Baltimore, MD.  1984.

4.    Jacobs, Allen M. And Lawrence Oloff.  "The Diabetic Foot."  <u>Complications in Foot Surgery: Second Edition.</u>  Pages 309-356.    Williams and Wilkins, Baltimore, MD. 1984.

5.    Jacobs, Allen M. And Lawrence Oloff.  "Management of Osteomyelitis."  <u>Comprehensive Textbook of Foot Surgery, Volume Two.</u>  Pages 1041-1066. Williams and Wilkins, Baltimore, MD.  1987.

6.    Jacobs, Allen M., R.J. O'Leary, W.G. Totty and D.C. Hardy.  "Magnetic Resonance Imaging of the Foot Ankle."  <u>Clinics in Podiatric Medicine and Surgery 4.</u>  Pages

(7)

**Allen M. Jacobs, D.P.M., FACFAS**

121-141.  W.B. Saunders, Philadelphia, PA.  October, 1987.

7.        Jacobs, Allen M.  "The Subluxing Peroneal Tendon: Stabilizing Procedures."  Current Therapy in Podiatric Surgery.  Pages 93-99.  B.C. Decker, 1988.

8.        Jacobs, Allen M.  "Radiographic Evaluation of the Diabetic Foot."  Radiology of the Foot: Second Edition.    Williams and Wilkins, Baltimore, MD.  1988.

9.        Jacobs, Allen M.  "Magnetic Resonance Imaging for Bone and Joint Disorders."  Radiology of the Foot: Second Edition.  Williams and Wilkins, Baltimore, MD.  1988.

10.       Jacobs, Allen M.  "Local Antibiotic Treatment of Soft Tissue and Bone Infection of the Foot and Ankle."  The High Risk Foot in Diabetes Mellitus.  Pages 421-441.  Churchill-Livingston.

11.       Jacobs, Allen M.  "Postoperative Infections."  Infectious Disease of the Lower Extremity.  Pages 251-265.  Williams and Wilkins, Baltimore, MD. 1991.

12.       Jacobs, Allen M.  "Surgical Management of Common Foot Infections."  Infectious Disease of the Lower Extremity.  Pages 347-363.  Williams and Wilkins, Baltimore, MD.  1991.

13.       Jacobs, Allen M.  "The Enigma of the Insensitive Foot."  Medical and Surgical Therapeutics of the Foot and Ankle: Manual of Podiatric Therapeutics.  Pages 649-659.  Williams and Wilkins, Baltimore, MD.  1992.

14.       Jacobs, Allen M.  and H.R. Protzel.  "The Foot in Geriatric Medicine."  Cowdry's Geriatrics.  Manning Publishing Co.  St. Louis, MO.  1992.

15.       Jacobs, Allen M.  "Electrical Stimulation of Bone Healing."  Textbook of Podiatric Surgery.  Williams and Wilkins, Baltimore, MD.  1992.

16.       Jacobs, Allen M.  "Venous Disorders."  Vascular Disorders of the Lower Extremity.

17.       Jacobs, Allen M.  "Current Concepts in Bone Healing."  Advances in Podiatric Medicine and Surgery.  C.V. Mosby, Publishers.  1995.

*ORIGINAL PUBLICATIONS - Videotaped Presentations:*

1.        "Radiographic Evaluation of Infections."  PICA Risk Management Series, 1988.

2.        "Early Diagnosis and Treatment of Infections."  PICA Risk Management Series, 1988.

(8)

**Allen M. Jacobs, D.P.M., FACFAS**

3.        "Surgical Management of the Diabetic Foot." Vascular Diagnostic Corporation, 1980. Recipient of American Podiatric Medical Association Hall of Science First Place Award, Hollywood, Florida.

4.        "Radionuclide Bone Imaging in Podiatry." National Podiatric Research and Training Center, St. Louis, MO, 1979.

5.        "Radiographic Analysis of First Ray Deformities." Seminar on Cavus Foot Deformity, Pennsylvania College of Podiatric Medicine, 1976.

6.        Surgical Management of Structural Hallux Abductus Deformity by Osteotomy and Compression Fixation with Miniature Bone Plates." Third Annual Surgical Seminar, Pennsylvania College of Podiatric Medicine, 1975.

7.        "Radiologic Analysis of Cavus Foot Deformity." Seminar on Cavus Foot Deformity, Pennsylvania College of Podiatric Medicine, 1975.

8.        "Sports Medicine Instructional Course Lecture." Washington University School of Medicine and Milliken Communications Corporation, 1979.

*ORIGINAL PUBLICATIONS - Published Journal Articles:*

1.        "Multiple Enchodromatosis: A Case Report and Review of the Literature." Journal of Foot Surgery 13, 1974. Kaplan, Kaplan, Jacobs and Bean.

2.        "Nosocomial Infections in Podiatric Surgery: An Analysis of Preoperative, Operative and Postoperative Factors." Journal of Foot Surgery 14, 1975. Kaplan, Kaplan and Jacobs.

3.        "Biplane Osteotomy in the Correction of Fifth Metatarsal Head Lesions." Journal of Foot Surgery 14, 1975. Kaplan, Kaplan and Jacobs.

4.        "Soft Tissue Tumors of the Foot." Journal of Foot Surgery 14, 1975. Berlin and Jacobs.

5.        "Structural Hallux Abductus: Correction by Osteotomy and Fixation by Self-Compressing Bone Plates." Audio Journal of Podiatry, November, 1975. Jacobs.

6.        "Hibbs Tenosuspension in the Treatment of Claw-Toe Deformity." Journal of Foot Surgery 14, 1975. Butlin and Jacobs.

7.        "Triple Arthrodesis: A Review of Current Techniques." Journal of Foot Surgery 15, 1976. Kaplan, Kaplan and Jacobs.

(9)

**Allen M. Jacobs, D.P.M., FACFAS**

8.      "Limping in Children: An Etiologic Survey in Podiatric Practice." Audio Journal of Podiatry, March, 1976.

9.      "Tarsal Tunnel Syndrome: Diagnosis and Surgical Management." Audio Journal of Podiatry, September, 1978.

10.     "Professional Services Letter Defining the Determination of Clinical Privileges of Podiatrists." Veterans Administration Manual, October, 1978.

11.     "Radiological Assessment and Diagnosis of Lateral Ankle Joint Injuries." Journal of Foot Surgery 19, (2) 1979. Downing, Oloff, Jacobs.

12.     "Sports Medicine Review: The Lower Extremity." Instructional Computer Course Lectures. Milliken Communications and Washington University School of Medicine, 1980. Oloff, Jacobs.

13.     "Lateral Ankle Joint Stabilization Techniques: Classification and Criteria." Journal of Foot Surgery 19, (2) 1980. Visser, Oloff, Jacobs.

14.     "Calcaneal Osteotomy in the Management of Flexible Flatfoot Deformity: A Preliminary Report." Journal of Foot Surgery 20, (3) 1981. Oloff, Jacobs.

15.     "Surgical Anatomy of the Lateral Ankle Joint Complex." Journal of Foot Surgery 20, (4) 1981. Klein, Oloff, Jacobs.

16.     "Tarsal Coalitions in Rigid Flatfoot: An Instructional Course Lecture." Journal of Foot Surgery 21, (1) 1982. Jacobs, Oloff, Sollecito, Klein.

17.     "Diabetic Autonomic Neuropathy in the Surgical Management of the Diabetic Foot." Journal of Foot Surgery 21, (1) 1982. Schustek, Jacobs.

18.     "Elevated Temperature in the Postoperative Patient." Journal of Foot Surgery 21, (4) 1982. Drago, Jacobs, Oloff.

19.     "A Comparative Study of Postoperative Care with Phenol Nail Procedures." Journal of Foot Surgery 22, (4) 1983. Drago, Jacobs, Oloff.

20.     "Tarsal Tunnel Syndrome: A Manifestation of Systemic Diseases." Journal of Foot Surgery 22, (4) 1983. Oloff, Jacobs, Jaffe.

21.     "The Utilization of Differential Scintigraphy in the Clinical Diagnosis of Osseous and Soft Tissue Changes Affecting the Diabetic Foot." Journal of Foot Surgery 23, (1) 1984. Visser, Jacobs, Oloff, Drago.

(10)

## Allen M. Jacobs, D.P.M., FACFAS

22.     "Radionuclide Evaluation of Complications Following Metatarsal Osteotomy and Implant Arthroplasty of the Foot." Journal of Foot Surgery 23, (1) 1984. Jacobs, Klein, Oloff, Tuccio.

23.     "Sickle Cell Anemia in Podiatric Surgery." Journal of Foot Surgery 23, (2) 1984. Caputi, Jacobs, Oloff.

24.     "The Utilization of Radionuclide Bone and Joint Imaging in Arthritic and Related Disease." Journal of Foot Surgery 23, (2) 1984. Sollecito, Jacobs, Oloff, Soave, Bernstein.

25.     "A Comprehensive Review of Hallux Limitus." Journal of Foot Surgery 23, (3) 1984. Jacobs, Amarnek, Oloff.

26.     "Atypical Fibrosis Histocytoma of the Great Toe." Journal of Foot Surgery 23, (3) 1984. Jacobs, Amarnek, Oloff.

27.     "Surgical Management of Forefoot Supinatus in Flexible Flatfoot Deformity." Journal of Foot Surgery 23, (5) 1984. Jacobs, Oloff.

28.     "Rheumatoid Nodulosis in the Foot: A Variation of Rheumatoid Arthritis." Journal of Foot Surgery 23, (5) 1984. Jacobs, Oloff, Oloff-Soloman.

29.     "Tenography in the Diagnosis of Tendon Disorders of the Foot and Ankle." Radiology, June, 1984. Gilula, Oloff, Jacobs, Caputi, Solomon, Destouet.

30.     "Cysts and Cyst-Like Lesions of the Foot." Journal of Foot Surgery 24, (1) 1985. Bernstein, Jacobs, Oloff, Gilula.

31.     "Adolescent Hallux Valgus: Its Etiology and Surgical Management." Journal of Foot Surgery 25, (1) 1986. Amarnek, Jacobs, Oloff.

32.     "A Statistical Analysis of Reliability of the Proximal Articular Set Angle." Journal of Foot Surgery 25, (1) 1986. Amarnek, Mollica, Jacobs, Oloff.

33.     "Reflex Sympathetic Dystrophy Syndrome." Journal of Foot Surgery 25, (2) 1986. Carlson, Jacobs.

34.     "Non-Steroidal Anti-Inflammatory Drugs in Podiatric Medicine and Surgery." Journal of Foot Surgery 25, (3) 1986. Jacobs, Oloff, Williams.

35.     Opening Base-Wedge Osteotomy of the First Metatarsal Utilizing Rigid External Fixation." Journal of Foot Surgery 25, (5) 1986. Amarnek, Juda, Oloff, Jacobs.

(11)

**Allen M. Jacobs, D.P.M., FACFAS**

36. "Complications of Subtalar Arthroereisis." <u>Journal of Foot Surgery 26, (2)</u> 1987. Oloff, Naylor, Jacobs.

37. "Management of Osteomyelitis With The Utilization of Antibiotic Loaded Bone Cement." <u>Podiatry Tracts 1, (2)</u> 1988. Jacobs.

38. "Retrospective Analysis of the Long Term Effects of the Lisfranc's Fracture-Dislocations." <u>Podiatry Tracts 1, (3)</u> 1988. Jacobs.

39. "The Lapidus Procedure for Juvenile Bunion Deformity." <u>Podiatry Tracts 1, (3)</u> 1988. Jacobs.

40. "Impaired Vascular Response to Ischemia in Diabetic Patients. <u>Podiatry Tracts 1, (3)</u> 1988. Jacobs.

41. "Bone Scintigraphy and Radiography in the Early Detection of Diabetic Osteopathy." <u>Podiatry Tracts 2, (2)</u> 1989. Jacobs.

42. "Thermographic Evaluation of the Autonomic Effects of Nerve Blocks in the Foot." <u>Journal of the American Podiatric Medical Association 79, (3)</u> 1989. Jacobs.

43. "Autonomic Neuropathy in Diabetes Mellitus." <u>Podiatry Tracts 2, (4)</u> 1989. Jacobs.

44. "Bone and Joint Pathology in Diabetes Mellitus." <u>Podiatry Tracts 2, (4)</u> 1989. Jacobs.

45. "The Etiology of Hallux Valgus." <u>Podiatry Tracts 2, (1)</u> 1989. Jacobs.

46. "Magnetic Resonance Imaging of Partial and Complete Rupture of the Achilles Tendon." <u>Podiatry Tracts 3, (4)</u> 1990. Jacobs, Seifert.

47. "Principles in the Management of Common Bone Tumors of the Foot and Ankle." <u>Podiatry Tracts 3, (5)</u> 1990. Jacobs, Kirisits.

48. "Basal Cell Carcinoma: An Infrequent Redal Reality." <u>Journal of American Podiatry Society 28, (4)</u> 1989. Jacobs.

49. "Local Antibiotic Treatment of Soft Tissue and Bone Infections of the Foot." <u>Journal of American Podiatry Association 80, (7)</u> 1990. Stabile, Jacobs.

50. "Development and Application of Antibiotic Loaded Bone Cement Beads." <u>Journal of American Podiatry Association 80, (7)</u> 1990. Stabile, Jacobs.

(12)

**Allen M. Jacobs, D.P.M., FACFAS**

51.        "Antibiotic Loaded Bone Cement in the Management of Foot and Ankle Infection." <u>Clinic of Podiatry.</u> 1990.  Jacobs.

52.        "Utilization of Antibiotic Loaded Bone Cement and the Treatment of Soft Tissue and Bone Infection." <u>Podiatry Tracts 1, (2)</u> 1988.  Jacobs.

53.        "Early Detection of Vascular Dysfunction in Type I Diabetes."  <u>Podiatry Tracts 1, (4)</u> 1988.  Sorgensen, Russo, Mattioli, Moore, Jacobs.

54.        The Late Results of Tarsometatarsal Joint Injuries."  <u>Podiatry Tracts 1, (5)</u> 1988. Brunet, Wiley, Jacobs.

55.        "Adolescent Bunions Treated by the Modified Lapidus Procedure."  <u>Podiatry Tracts 1, (6)</u> 1989.  Clark, Verth, Sigvard, Jacobs.

56.        "Fractures and Fracture Dislocations of the Tarsometatarsal Joint."  <u>Podiatry Tracts 2, (3)</u> 1989.  Arntz, Verth, Hansen, Jacobs.

57.        "Radiographic Evaluation of Rheumatic Syndrome in the Diabetic Foot."  <u>Podiatry Tracts 2 (4)</u> August, 1989.

58.        "Summary of Consensus Statement-Report and Recommendations of the San Antonio Conference on Diabetic Neuropathy." <u>Podiatry Tracts 2, (5)</u> October, 1989.

59.        "Diabetic Neuropathy: A New Look at an Old Problem."  <u>Podiatry Tracts 2, (4)</u> August, 1989.  Brainerd, Jacobs.

60.        "Evaluation and Management of Complications and Sequelae Following the STA Operation." <u>Podiatry Tracts 3, (2)</u> April, 1990.  Seifert, Kirisits, Protzel, Jacobs.

61.        "Foot Manifestations and Sequelae of Juvenile Rheumatoid Arthritis."  <u>Podiatry Tracts 3, (2)</u> April, 1990.  Kirisits, Protzel, Jacobs.

62.        "Calcaneal Osteotomy in the Management of Flatfoot Deformity." <u>Podiatry Clinics,</u> July, 1991.  Geistler, Jacobs.

63.        "Synovectomy Arthroplasty as an Alternative to Triple Arthrodesis."  <u>Podiatry Clinics.</u> Pages 485-500. Vol. 8, No. 3.  1991.  Hodson, Albrecht, Jacobs.

64.        "Foot Disorders in the Elderly Diabetic Patient."  <u>Podiatry Clinics.</u>  Vol. 9, No. 4. September, 1992.  Protzel, Jacobs.

65.        "Evaluation and Management of Common Bone Tumors of the Foot and Ankle." <u>Podiatry Tracts.</u> Pages 313-330. Vol. 3, No. 6. 1990.  Jacobs.

(13)

**Allen M. Jacobs, D.P.M., FACFAS**

66.     "The Arthritis of Hallux Limitus/Rigidus." <u>Podiatry Tracts.</u> Pages 283-291. Vol. 4, No. 6. 1991. Jacobs.

67.     "Postoperative Pain Management Utilizing Agonist-Antagonist Medication." <u>Podiatry Tracts.</u> 1992. Youngblood, Jacobs.

68.     "Opioid Receptor Affinity for Agonist Antagonist Drugs." <u>Journal of American Podiatric Medical Society.</u> Vol. 82, No. 10. 1992. Youngblood, Jacobs.

69.     "Epidural Morphine as an Adjuvant to the Treatment of Pain in a PATIENT with Acute Inflammatory Polvradiculopathy Secondary to Guillain-Barre Syndrome." <u>Journal of American Podiatric Medical Society.</u> Vol. 30, No. 3. 1991. Longombardi, Comens, Jacobs.

70.     "Reflex Sympathetic Dystrophy Syndrome." <u>Podiatry Tracts.</u> Vol. 5, No. 3. 1991. Kirisits, Protzel, Jacobs.

71.     "Electrically Induced Osteogenesis." <u>Podiatry Tracts.</u> Pages 117-134. Vol. 5, No 3. 1992. Vanore, Jacobs.

72.     "Advanced Clinical Applications of Electromagnetic Field Effects (Condensation)." <u>Podiatry Tracts.</u> Pages 135-140. Vol. 5, No. 3. 1992. Jacobs.

73.     "Biomechanical Effects of Pulsed Electromagnetic Fields (Condensation and Analysis)." <u>Podiatry Tracts.</u> Pages 141-143. Vol. 5, No. 3. 1992. Jacobs.

74.     "Electrical Effects in Bone (Condensation and Analysis)." <u>Podiatry Tracts.</u> Pages 144-146. Vol. 5, No. 3. 1992. Jacobs.

75.     "Pulsing Electromagnetic Fields: A New Method to Modify Cell Behavior in Calcified and Noncalcified Tissues (Condensation and Commentary)." <u>Podiatry Tracts.</u> Pages 147-149. Vol. 5, No. 3. 1992. Jacobs.

76.     "Noninvasive Electrical Stimulation for Non-United Bone Fracture (Condensation and Commentary)." <u>Podiatry Tracts.</u> Pages 150-152. Vol. 5, No. 3. 1992. Jacobs.

77.     "Treatment of Recalcitrant Nonunion with a Capacitatively Coupled Electrical Field (Condensation and Commentary)." <u>Podiatry Tracts.</u> Pages 153-154. Vol. 5, No. 3. 1992. Jacobs.

78.     "A Ten Year Review of Treatment of Delayed Union and Nonunion with Implanted Bone Growth Stimulator (Condensation and Commentary)." <u>Podiatry Tracts.</u> Pages 155-158. Vol. 5, No 3. 1992. Jacobs.

(14)

**Allen M. Jacobs, D.P.M., FACFAS**

79.   "Clinical Applications of Electrical Bone Stimulation." <u>Podiatry Tracts.</u> Audio Lecture. Vol. 5, No. 3. 1992. Vanore, Jacobs.

80.   "An Alternative Approach to the Mandatory Year of Clinical Residency Training." <u>JAPMA.</u> Vol. 82, No. 11. 1992. Jacobs.

*ORIGINAL PUBLICATIONS - Original Papers Prepared for Seminars and Scientific Meetings:*

1.   <u>PRELIMINARY REPORT ON THE STATUS OF SELF COMPRESSING MINIATURE BONE PLATES IN THE SURGICAL MANAGEMENT OF STRUCTURAL HALLUS ABDUCTUS DEFORMITY</u>
     Presented at Pennsylvania College of Podiatric Medicine Annual Surgical Seminar.  Cherry Hill, NJ.  September, 1975.

2.   <u>MODIFICATION OF THE MITCHELL BUNIONECTOMY FOR THE CORRECTION OF FIRST METATARSAL ARTICULAR ALTERATION</u>
     Presented at Southern New Jersey Podiatry Society Scientific Meeting.  Cherry Hill, NJ.  October, 1975.

3.   <u>SURGICAL MANAGEMENT OF THE INTRACTABLE PLANTAR KERATOMA</u>
     Presented at Philadelphia County Podiatry Society Scientific Meeting.  Philadelphia, PA.  May, 1976.

4.   <u>RADIOGRAPHIC EVALUATION OF FIRST RAY DEFORMITIES</u>
     Presented at Pennsylvania College of Podiatric Medicine Diagnostic Foot Radiology Seminar.  Philadelphia, PA.  April, 1976.

5.   <u>METATARSUS ADDUCTUS: A LITERATURE REVIEW</u>
     Presented at Southern New Jersey Podiatry Society Scientific Meeting.  Cherry Hill, NJ.  September, 1977.

6.   <u>DIFFERENTIAL DIAGNOSIS OF LIMPING IN CHILDREN</u>
     Presented at Pennsylvania College of Podiatric Medicine Pediatric Orthopedic Seminar.  Philadelphia, PA.  October, 1976.

7.   <u>TARSAL COALITIONS: DIFFERENTIAL DIAGNOSIS OF THE RIGID VALGUS FOOT</u>
     Presented at Southern New Jersey Podiatry Society Scientific Weekend. Cherry Hill, NJ. May, 1977.

**Allen M. Jacobs, D.P.M., FACFAS**

8.   CURRENT CONCEPTS IN PEDIATRIC ORTHOPEDICS WITH A SPECIAL EMPHASIS ON TRANSVERSE PLANE ABNORMALITIES OF THE LOWER EXTREMITY
> 1)   Tarsal Tunnel Syndrome: Diagnosis and Management.
> 2)   Tarsal Coalitions: Radiographic and Clinical Evaluation Techniques.
> Presented at New Jersey Podiatry Society Scientific Sessions.  Rutgers Medical College.  New Brunswick, NJ.  October, 1977.

9.   RADIOGRAPHIC ANALYSIS OF CAVUS FOOT DEFORMITY
> Presented at Pennsylvania College of Podiatric Medicine Diagnostic Foot Radiology Seminar.  Philadelphia, PA.  April, 1976.

10.   ETIOLOGY OF CAVUS FOOT DEFORMITIES: A REVIEW OF NEUROMUSCULAR CONSIDERATIONS
> Presented at Washington Memorial Hospital Seminar on Cavus Foot Deformity.  Turnersville, NJ.  November, 1977.

11.   SURGICAL AND BIOMECHANICAL CONSIDERATIONS IN THE MANAGEMENT OF POSTERIOR CAVUS FOOT DEFORMITY
> Presented at Washington Memorial Hospital Seminar on Cavus Foot Deformity.  Turnersville, NJ.  November, 1977.

12.   A REVIEW OF IMPLANT ARTHROPLASTY TECHNIQUES IN THE MANAGEMENT OF BUNION DEFORMITY
> Presented at New York State (Southern Tier) Podiatry Society. February, 1977.

13.   SURGICAL MANAGEMENT OF METATARSUS ADDUCTUS
> Presented at Atlantic County Podiatry Society Scientific Meeting.  Pleasantville, NJ.  April, 1977.

14.   LIMPING IN CHILDREN
> Presented at American Podiatry Association Region 3 Scientific Meeting.  Cherry Hill, NJ.  May, 1977.

15.   RADIONUCLIDE BONE IMAGING IN THE EVALUATION OF FOOT PATHOLOGY
> Presented at Pennsylvania College of Podiatric Medicine Surgical Seminar.  Philadelphia, PA.  October, 1978.

16.   BIOMECHANICAL IMPLICATIONS AND SURGICAL MANAGEMENT OF HALLUX LIMITUS

(16)

**Allen M. Jacobs, D.P.M., FACFAS**

> Presented at Riverside Hospital Scientific Meeting. Farleigh Dickinson University, NJ. March, 1978.

17.   BONE SCANNING IN THE EVALUATION OF PEDIATRIC FOOT DISORDERS
> Presented at Scientific Weekend Massachusetts Podiatry Society, University of Massachusetts Medical School. Worcester, MA. April, 1978.

18.   TOMOGRAPHIC EVALUATION OF THE SUBTALAR JOINT IN FLEXIBLE FLATFOOT DEFORMITY
> Presented at Monsignor Clement Kern Hospital for Special Surgery, Surgical Seminar. Detroit, MI. May, 1978.

19.   BIOMECHANICAL CONSIDERATIONS IN THE SURGICAL CORRECTION OF JUVENILE METATARSUS ADDUCTUS DEFORMITY
> Presented at Monsignor Clement Kern Hospital for Special Surgery, Surgical Seminar. Detroit, MI. May, 1978.

20.   BONE SCANNING IN PODIATRIC MEDICINE
> Presented at Monsignor Clement Kern Hospital for special Surgery, Surgical Seminar. Detroit, MI. May, 1978.

21.   TARSAL TUNNEL SYNDROME
> Presented at Civic Hospital Resident Alumni Society 22nd Annual Scientific Meeting and Surgical Seminar. Tucson, AZ. May, 1978.

22.   BIOMECHANICS OF FIRST METATARSOPHALANGEAL JOINT IMPLANT ARTHROPLASTY
> Presented at Civic Hospital Resident Alumni Society 22nd Annual Scientific Meeting and Surgical Seminar. Tucson, AZ. May, 1978.

23.   RADIONUCLIDE BONE IMAGING IN PODIATRIC MEDICINE
> Presented at Civic Hospital Resident Alumni Society 22nd Annual Scientific Meeting and Surgical Seminar. Tucson, AZ. May, 1978.

24.   RADIONUCLIDE BONE IMAGING IN PODIATRY
> Presented at Southern Virginia Podiatry Society Scientific Meeting. Fairfax, VA. September, 1978.

25.   RADIONUCLIDE BONE IMAGING IN PODIATRY: EVALUATION AND SURGICAL MANAGEMENT OF PEDIATRIC FLATFOOT, IN-TOED AND OUT-TOED GAIT IN CHILDREN AND EVALUATION/THERAPY/SURGICAL MANAGEMENT OF THE HIGH-ARCHED FOOT
> Presented at Texas Podiatry Society "Day of Science". Dallas, TX. September, 1978.

(17)

**Allen M. Jacobs, D.P.M., FACFAS**

(18)

**Allen M. Jacobs, D.P.M., FACFAS**

26.    METATARSUS ADDUCTUS: DIAGNOSIS, EVALUATION AND TREATMENT
Presented at Washington, D.C. Podiatry Society Scientific Meeting. Washington, D.C. September, 1978.

27.    BONE SCANNING IN PODIATRY
Presented at Washington, D.C. Podiatry Society Scientific Meeting. Washington, D.C. October, 1978.

28.    TARSAL TUNNEL SYNDROME AND ITS DIFFERENTIAL DIAGNOSIS
Presented at Pennsylvania College of Podiatric Medicine 5th Annual Surgical Conference, University of Pennsylvania Children's Hospital. Philadelphia, PA. October, 1978.

29.    *    DIAGNOSIS AND MANAGEMENT OF THE RIGID VALGUS FOOT
*    RADIOLOGIC EVALUATION OF BUNION DEFORMITY
*    METATARSAL    OSTEOTOMIES:    CURRENT    SURGICAL TECHNIQUES
*    EVALUATION OF THE PEDIATRIC PATIENT FOR TENDO-ACHILLES SURGICAL PROCEDURES
*    RADIONUCLIDE BONE IMAGING IN PODIATRY
*    EVALUATION    AND    MANAGEMENT    OF    SURGICAL COMPLICATIONS
*    BIOMATERIALS IN FOOT SURGERY: AN OVERVIEW
Presented at Milton S. Hershey Medical School Faculty Scientific Meeting, Pennsylvania Podiatry Association Annual Surgical Seminar. Hershey, PA. November, 1978.

30.    RADIONUCLIDE BONE IMAGING IN PODIATRY
Presented at Veterans Administration Scientific Chairperson at Regional Medical Education Center (RMEC), 1st National Conference on Podiatric Care of the Aging Veteran Patient. Washington, D.C. December, 1978.

31.    *    IMPLANT ARTHROPLASTY IN PODIATRIC SURGERY
*    RADIONUCLIDE BONE IMAGING IN PODIATRY
Presented at Midwest Podiatry Conference Annual Meeting. Chicago, IL. April, 1978.

32.    *    IMPLANT ARTHROPLASTY IN PODIATRIC SURGERY
*    RADIONUCLIDE BONE IMAGING IN PODIATRY
Presented at Indiana States Podiatry Society Annual Meeting, Notre Dame University. South Bend, IN. May, 1978.

33.    RECENT ADVANCES IN PODIATRIC SURGERY

(19)

**Allen M. Jacobs, D.P.M., FACFAS**

Presented at St. Louis Pharmacists' Society Meeting.  St. Louis, MO.  May, 1979.

(20)

**Allen M. Jacobs, D.P.M., FACFAS**

34. HEEL PAIN: THE PODIATRIST'S VIEW
    Presented at Washington University Medical School Rheumatology Department, Resident and Fellow Lecture Series. St. Louis, MO. May, 1979.

35. * MANAGEMENT OF DIABETIC FOOT INFECTIONS
    * OSTEOTOMY OF THE TIBIA FOR THE CORRECTION OF ANKLE VALGUS
    * BASIC SOFT TISSUE FLAPS IN THE MANAGEMENT OF SOFT TISSUE MASSES OF THE PLANTAR ARCH
    Presented at Civic Hospital Resident Alumni Society 23rd Annual Scientific Meeting. Egland AFB, FL. 1979.

36. EVALUATION OF PERIPHERAL NEUROPATHIES AFFECTING THE LOWER EXTREMITY
    Presented at American Podiatry Association Annual Scientific Meeting. Detroit, MI. August, 1979.

37. * SURGICAL TECHNIQUES FOR ACHILLES TENDON LENGTHENING
    * SURGICAL RECONSTRUCTION OF THE FLEXIBLE FLATFOOT
    * RADIOGRAPHIC EVALUATION OF FLATFOOT DEFORMITY
    Presented at Monsignor Clement Kern Hospital for Special Surgery, Surgical Seminar. Detroit, MI. August, 1979.

38. IMPLANTS AND BIOMATERIALS
    Presented at Missouri State Podiatry Society Annual Meeting. Lake of the Ozarks, MO. August, 1979.

39. PODIATRIC CARE IN EXTENDED CARE FACILITIES: SOME GUIDELINES
    Presented to Missouri Catholic Association of Homes for the Aged. St. Louis, MO. August, 1979.

40. * IMPLANTS AND BIOMATERIALS
    * RADIOLOGIC EVALUATION OF RHEUMATOID ARTHRITIS IN THE FOOT
    * HEEL PAIN AND THE SPONDYLOARTHROPATHIES: CLINICAL AND RADIOLOGIC EVALUATION
    * GOUT AND PSEUDOGOUT: DIAGNOSIS AND MANAGEMENT OF PEDAL SEQUELAE
    * TARSAL TUNNEL SYNDROME
    Presented at Milwaukee Podiatry Society Scientific Meeting. Milwaukee, WI. October, 1979.

41. * CURRENT SURGICAL TECHNIQUES IN THE MANAGEMENT OF

(21)

**JA 38**

**Allen M. Jacobs, D.P.M., FACFAS**

COMMON DIGITAL DEFORMITIES
* SURGICAL MANAGEMENT OF THE INGROWN NAIL: CURRENT METHODOLOGY
* RADIOLOGIC EVALUATION OF LOWER EXTREMITY FRACTURES
* MANAGEMENT OF COMPLICATIONS FOLLOWING METATARSAL OSTEOTOMIES
* BIOCHEMICAL AND BIOPHYSICAL CONSIDERATIONS IN THE UTILIZATION OF STAINLESS STEEL IMPLANTS IN FOOT SURGERY
* RADIOGRAPHIC AND CLINICAL EVALUATION OF THE PEDAL ARTHRIDITIES
* RADIONUCLIDE BONE IMAGING IN PODIATRY
* EVALUATION AND MANAGEMENT OF DIGITAL AND METATARSAL TRAUMA
           Presented at Milton S. Hershey Medical School Faculty Scientific Meeting. Pennsylvania Podiatry Association Annual Surgical Seminar. Hershey, PA. November, 1979.

42. * EVALUATION AND MANAGEMENT OF TARSAL TUNNEL SYNDROME
    * RADIONUCLIDE BONE IMAGING IN PODIATRY
           Presented at Connecticut State Podiatry Society Annual Seminar. New Haven, CT. December, 1979.

43. IMPLANT ARTHROPLASTY IN THE MANAGEMENT OF PEDAL OSTEOARTHRITIS
           Presented at St. Louis Pharmacists' Society Meeting. St. Louis, MO. January, 1980.

44. * SILASTIC IMPLANT ARTHROPLASTY IN RECONSTRUCTIVE SURGERY OF THE FOOT: CURRENT METHODOLOGY AT LINDELL HOSPITAL
    * PHYSICAL AND BIOCOMPATIBILITY PROPERTIES OF STAINLESS STEEL, COBALT AND TITANIUM ALLOY IMPLANTS (AISI 316 LVM) IN FOOT SURGERY
    * BIOMECHANICALLY-INDUCED OSTEOARTHRITIS OF THE FIRST METATARSOPHALANGEAL JOINT: CLINICAL AND RADIOGRAPHIC EVALUATION
           Presented at North Carolina State Podiatry Society Annual Surgical Seminar. Charlotte, NC. January, 1980.

45. * LOWER EXTREMITY MANIFESTATIONS OF ADULT AND JUVENILE RHEUMATOID ARTHRITIS
    * LOWER EXTREMITY RECONSTRUCTIVE SURGERY AND PERIOPERATIVE MANAGEMENT OF GOUT AND RHEUMATOID ARTHRITIS
           Presented at Civic Hospital Resident Alumni Society 24th Annual

(22)

**Allen M. Jacobs, D.P.M., FACFAS**

Surgical Seminar. Phoenix, AZ. May, 1980.

46.  * EVALUATION AND SURGICAL MANAGEMENT OF THE DIABETIC FOOT WITH SPECIAL REFERENCE TO THE CONTROL OF INFECTIOUS DISEASE
     * RADIONUCLIDE BONE IMAGING IN PODIATRY
     * LOWER EXTREMITY MANIFESTATIONS OF THE SERONEGATIVE SPONDYLOARTHROPATHIES
                    Presented at New Mexico State Podiatry Society Annual Surgical Seminar. Albuquerque, NM. July, 1980.

47.  * RADIONUCLIDE BONE IMAGING IN PODIATRY
     * SURGICAL MANAGEMENT OF THE DIABETIC FOOT
     * IMPLANTS AND BIOMATERIALS WITH SPECIAL REFERENCE TO THE UTILIZATION OF POLYMETRIC IMPLANTS IN THE MANAGEMENT OF HALLUX LIMITUS
                    Presented at Northwestern Ohio Podiatry Academy. Toledo, OH. January, 1981.

48.  * SURGICAL MANAGEMENT OF ULCERATIONS AND INFECTIONS IN THE DIABETIC FOOT WITH SPECIAL REFERENCE TO THE CLINICAL VASCULAR ASSESSMENT
     * CALCANEAL OSTEOTOMY IN THE MANAGEMENT OF FLEXIBLE FLATFOOT
     * RADIONUCLIDE BONE IMAGING IN PODIATRY WITH SPECIAL REFERENCE TO THE EVALUATION OF HEALING IMPLANT SURGERIES AND METATARSAL OSTEOTOMIES
                    Presented at New York State Podiatry Society Annual Scientific Meeting. New York, NY. March, 1981.

49.  * RADIOGRAPHIC EVALUATION OF GOUTY ARTHRITIS
     * ADULT AND JUVENILE RHEUMATOID ARTHRITIS AND JUVENILE ANKYLOSING SPONDYLITIS IN THE LOWER EXTREMITIES
                    Presented at the American College of Chiropractic Radiologist Annual Scientific Meeting. St. Louis, MO. March, 1981.

50.  * DIFFERENTIAL SCINTIGRAPHY IN THE EVALUATION FO DIABETIC OSTEOLYSIS, OSTEOMYELITIS AND CHARCOT JOINT DISEASE
     * THALLIUM 201 SCINTIGRAPHY IN THE EVALUATION OF THE HEALING POTENTIAL OF LOWER EXTREMITY DIABETIC ULCERATION AND CORRELATION WITH XENON 133 CLEARANCE STUDIES
     * CALCANEAL OSTEOTOMY IN THE MANAGEMENT OF FLATFOOT DEFORMITY WITH SPECIAL REFERENCE TO FOREFOOT SUPINATUS

(23)

**Allen M. Jacobs, D.P.M., FACFAS**

DEFORMITY
* LATERAL ANKLE JOINT STABILIZATION TECHNIQUES: CURRENT METHODOLOGY AT LINDELL HOSPITAL
* SURGICAL MANAGEMENT OF DIABETIC FOOT ULCERATIONS AND INFECTIONS
> Presented at Civic Hospital Resident Alumni Society 25[th] Annual Surgical Seminar. Detroit, MI. May, 1981.

51. * CALCANEAL OSTEOTOMY IN THE MANAGEMENT OF FLATFOOT DEFORMITY
* STJ SILASTIC ARTHROEREISIS AND THE HOKE PROCEDURE IN THE MANAGEMENT OF MEDIAL INSTABILITY IN FLATFOOT DEFORMITY
* EVALUATION AND MANAGEMENT OF RIGID FLATFOOT DEFORMITY WITH SPECIAL REFERENCE TO TARSAL COALITIONS
* EVALUATION AND MANAGEMENT OF TARSAL TUNNEL SYNDROME
* LOWER EXTREMITY MANIFESTATIONS OF THE SERONEGATIVE SPONDYOARTHROPATHIES WITH SPECIAL REFERENCE TO REITER'S SYNDROME, PSORIATIC ARTHRITIS AND ANKYLOSING SPONDYLITIS
* SURGICAL MANAGEMENT OF INFECTION AND ULCERATIONS IN THE DIABETIC PATIENT
* RADIONUCLIDE BONE IMAGING AND DIFFERENTIAL SCINTOGRAPHY IN PODIATRY WITH SPECIAL REFERENCE TO THE DIABETIC FOOT
> Presented to Ohio College of Podiatric Medicine Pi Delta National Honor Society Scientific Weekend Seminar. Cleveland, OH. May, 1981.

52. PSORIATIC ARTHRITIS AND REITER'S SYNDROME: A REVIEW WITH SPECIAL EMPHASIS ON PODIATRIC MANIFESTATIONS
> Presented to Missouri State Podiatry Society Annual Meeting and Seminar. September, 1981.

53. * RADIONUCLIDE AND RADIOGRAPHIC EVALUATION OF THE DIABETIC FOOT
* CLINICAL LABORATORY AND RADIOGRAPHIC EVALUATION OF INFLAMMATORY RHEUMATIC DISEASE
> Presented to American Podiatric Medical Association Region 14 Annual Scientific Seminar. Denver, CO. September, 1981.

54. BIOMECHANICALLY INDUCE OSTEOARTHRITIS IN THE FOOT
> Presented to St. Louis Rheumatism Society. St. Louis, MO. February, 1982.

55. BIOMATERIAL AND BIOPHYSICS OF PEDAL IMPLANT

(24)

**Allen M. Jacobs, D.P.M., FACFAS**

ARTHROPLASTY/LESSER MPJ IMPLANT ARTHROPLASTY
> Presented at American College of Foot Surgeons Annual Meeting and Scientific Seminar. Houston, TX. February, 1982.

56.   *   JUVENILE BUNION DEFORMITY: CURRENT TECHNIQUES IN MANAGEMENT
     *   JUVENILE CAVUS FOOT DEFORMITY: EVALUATION AND MANAGEMENT
> Presented to Suburban Hospital Association Symposium on Congenital and Early Childhood Defects of the Lower Extremity. Washington, D.C. March, 1982.

57.   *   EVALUATION AND MANAGEMENT OF TRANSVERSE PLANE FLATFOOT DEFORMITY
     *   SURGICAL RECONSTRUCTION OF ARTHRITIS JOINTS
> Presented at Midwest Podiatry Conference. Chicago, IL. April, 1982.

58.   *   RADIOGRAPHIC AND VASCULAR EVALUATION OF THE DIABETIC FOOT
     *   RADIOGRAPHIC EVALUATION OF SOLITARY BONE LESIONS OF THE FOOT
     *   RADIONUCLIDE EVALUATION OF COMPLICATIONS OF IMPLANTS
> Presented to Civic Hospital Resident Alumni Society 26th Annual Surgical Seminar. Sarasota, FL. May, 1982.

59.   *   MEDICAL MANAGEMENT OF THE ARTHRITIS PATIENT
     *   RADIONUCLIDE EVALUATION OF COMPLICATIONS IN THE POSTOPERATIVE PATIENT
     *   NSAID'S IN PODIATRIC MEDICINE AND SURGERY
     *   SURGICAL MANAGEMENT OF FLATFOOT DEFORMITY BY CALCANEAL OSTEOTOMY
> Presented at Western New York State Podiatry Society Scientific Meeting. Buffalo, NY. October, 1982.

60.   *   EVALUATION OF DIABETIC NEUROPATHY
     *   SURGICAL MANAGEMENT OF THE DIABETIC FOOT
     *   RADIOGRAPHIC EVALUATION OF THE COMPLICATIONS OF METATARSAL OSTEOTOMIES AND IMPLANTS
     *   SURGICAL MANAGEMENT OF FLATFOOT DEFORMITY
> Presented at Western Pennsylvania Podiatry Society Annual Scientific Meeting. Pittsburgh, PA. October, 1982.

61.   *   SURGICAL MANAGEMENT OF THE ARTHRITIC PATIENT

(25)

**JA 42**

**Allen M. Jacobs, D.P.M., FACFAS**

    * ACUTE AND CHRONIC COMPLICATIONS OF IMPLANT ARTHROPLASTY
    * NSAID'S IN PODIATRIC MEDICINE AND SURGERY
    * SURGICAL MANAGEMENT OF FLEXIBLE AND NON-FLEXIBLE FLATFOOT DEFORMITY
        Presented at Monsignor Clement Kern Hospital for Special Surgery Surgical Seminar. Warren, MI. November, 1982.

62. MEDICAL AND SURGICAL MANAGEMENT OF THE ARTHRITIC PATIENT
        Presented at William School College of Podiatric Medicine. Chicago, IL. November, 1982.

63.   * FEVER IN THE POSTOPERATIVE PATIENT
    * LONG TERM COMPLICATIONS OF IMPLANT ARTHROPLASTY
    * COMPLICATIONS IN THE SURGICAL MANAGEMENT OF THE ARTHRITIC PATIENT
    * PROPHYLACTIC ANTIBIOTICS IN FOOT SURGERY
    * BONE SCANNING IN THE EVALUATION OF COMPLICATIONS OF IMPLANT SURGERY AND OSTEOTOMIES OF THE FOOT
    * COMPLICATIONS OF FLATFOOT SURGERY
        Presented at Northwestern Ohio Podiatry Society Symposium on Complications in Foot Surgery. Toledo, OH. February, 1983.

64.   * SURGICAL MANAGEMENT OF THE ARTHRITIC PATIENT
    * BONE SCANNING IN THE EVALUATION OF COMPLICATIONS OF IMPLANT SURGERY AND OSTEOTOMIES OF THE FOOT
    * LONG TERM COMPLICATIONS OF IMPLANT ARTHROPLASTY
    * NSAID'S IN PODIATRIC MEDICINE AND SURGERY
        Presented at New York State Podiatry Society Annual Scientific Meeting. March, 1983.

65. NSAID'S IN PODIATRIC MEDICINE AND SURGERY
        Presented at Civic Hospital Resident Alumni Society 27th Annual Surgical Seminar. Cancun, Mexico. April, 1983.

66.   * DIFFERENTIAL DIAGNOSIS OF SERONEGATIVE RHEUMATOID ARTHRITIC VARIANTS
    * SELECTION OF APPROPRIATE NSAID DRUGS
    * SURGICAL TREATMENT OF ARTHRITIC PATIENTS
        Presented at American College of Foot Surgeons Western Division Annual Surgical Seminar. Monterey, CA. May, 1983.

67.   * BONE SCANNING IN THE EVALUATION OF COMPLICATIONS OF IMPLANT SURGERIES AND OSTEOTOMIES OF THE FOOT

(26)

**Allen M. Jacobs, D.P.M., FACFAS**

&ast; LONG TERM COMPLICATIONS OF IMPLANT ARTHROPLASTY
&ast; SURGICAL MANAGEMENT OF THE ARTHRITIC PATIENT
&ast; MANAGEMENT OF FLEXIBLE FLATFOOT DEFORMITY
    Presented at American Podiatric Medical Association Annual
Scientific Meeting. Boston, MA. August, 1983.

68. &ast; EVALUATION AND MANAGEMENT OF FEVER IN THE POSTOPERATIVE PATIENT
&ast; CT SCANNING IN THE EVALUATION OF FOOT PATHOLOGY: DELAYED UNION, NON-UNION AND PSEUDOARTHRITIS RECOGNITION AND MANAGEMENT
&ast; MECHANISMS OF ANKLE JOINT FRACTURES
    Presented at William Scholl College of Podiatric Medicine 6th
Annual Alumni Meeting. Chicago, IL. September, 1983.

69. ETIOLOGY OF CAVUS FOOT DEFORMITY
    Presented at Pennsylvania College of Podiatric Medicine
Continuing Education Seminar. Philadelphia, PA. February, 1984.

70. &ast; PODIATRIC METALLURGY
&ast; IMPLANT ARTHROPLASTY OF THE FOOT
&ast; TENDON TRANSFERS FOR CAVUS FOOT DEFORMITIES
&ast; CT SCANNING OF THE FOOT AND ANKLE
    Presented at Ohio College of Podiatric Medicine SNPA Annual
Seminar. Cleveland, OH. February, 1984.

71. &ast; CLINICAL AND HISTOLOGIC CORRELATIONS OF GAP BONE HEALING
&ast; EARLY RECOGNITION AND MANAGEMENT OF POSTOPERATIVE INFECTIONS
&ast; IMPLANT ARTHROPLASTY FOR LESSER TOES
    Presented at American College of Foot Surgeons Annual
Scientific Meeting. Las Vegas, NV. February, 1984.

72. &ast; CALCANEAL OSTEOTOMY IN THE SURGICAL MANAGEMENT OF FLEXIBLE FLATFOOT DEFORMITY
&ast; MEDICAL COLUMN STABILIZATION PROCEDURE: SUBTALAR JOINT IMPLANT
    Presented at Texas Podiatry Society Annual Scientific Meeting.
San Antonio, TX. March, 1984.

73. SURGICAL AND NON-SURGICAL MANAGEMENT OF THE ARTHRITIC FOOT
    Presented at Washington University School of Medicine
Department of Rheumatology Meeting. April, 1984.

(27)

**JA 44**

**Allen M. Jacobs, D.P.M., FACFAS**

74.  PREOPERATIVE EVALUATION OF COAGULOPATHIES
      Presented at Midwest Podiatry Society Scientific Meeting. Chicago, IL April, 1984.

75.  NSAID'S AND THEIR APPLICATION IN PODIATRIC MEDICINE
      Presented at Civic Hospital Resident Alumni Society 28th Annual Surgical Seminar. Sarasota, FL. May, 1984.

76.  *  PRINCIPLES IN EVALUATION OF POSTOPERATIVE BONE HEALING
 *  FEVER IN POSTOPERATIVE PATIENTS
 *  RECOGNITION AND MANAGEMENT OF DELAYED UNION AND NON-UNION
      Presented at American Podiatric Medical Association Region 8 annual Scientific Meeting. Norfolk, VA. May, 1984.

77.  *  SURGICAL MANAGEMENT OF FLEXIBLE AND RIGID FLATFOOT DEFORMITY
 *  COMPLICATIONS OF IMPLANT ARTHROPLASTY
      Presented at Michigan State Podiatry Society Annual Scientific Session. Flint, MI. September, 1984.

78.  *  SURGICAL MANAGEMENT OF FLEXIBLE FLATFOOT DEFORMITY IN THE ADULT PATIENT
 *  NON-OPERATIVE MANAGEMENT OF THE ARTHRITIC PATIENT
 *  MANAGEMENT OF COMMON PODIATRIC INFECTIONS
      Presented at American College of Foot Surgeons Western New York Division Scientific Meeting. Buffalo, NY. September, 1984.

79.  *  AUTONOMIC NEUROPATHY IN THE DIABETIC FOOT
 *  CT SCANNING OF THE FOOT AND ANKLE
 *  RADIOGRAPHIC EVALUATION OF THE DIABETIC FOOT
      Presented at American Podiatric Medical Association Region 1 Annual Scientific Meeting. Newton, MA. October, 1984.

80.  *  ORAL MEDICATIONS IN THE TREATMENT OF THE ARTHRITIC FOOT
 *  OFFICE EVALUATION OF THE SERONEGATIVE ARTHRIDITIES
 *  SURGICAL MANAGEMENT OF THE RHEUMATOID FOOT
 *  RADIOGRAPHIC EVALUATION OF COMMON ARTHRITIC DEFORMITIES OF THE FOOT AND ANKLE
      Presented at Ohio Podiatric Society Scientific Meeting. Cincinnati, OH. December, 1984.

81.  HOSPITAL PROTOCOL FOR CHIROPRACTIC PHYSICIANS
      Presented at Ohio Chiropractic Association Scientific Meeting.

(28)

**Allen M. Jacobs, D.P.M., FACFAS**

Toledo, OH.  November, 1984.

82.  RADIOGRAPHIC EVALUATION OF THE DIABETIC FOOT
Presented at University of Texas Health Sciences Center Diabetic Foot Symposium.  San Antonio, TX.  December, 1984.

83.  *  ORAL MEDICATIONS IN THE TREATMENT OF THE ARTHRITIC FOOT
     *  OFFICE EVALUATION OF THE SERONEGATIVE ARTHRIDITIES
     *  SURGICAL MANAGEMENT OF THE RHEUMATOID FOOT
     *  RADIOGRAPHIC EVALUATION OF THE COMMON ARTHRITIC DEFORMITIES OF THE FOOT AND ANKLE
Presented at Southern Florida Podiatry Society Scientific Meeting.  Boynton Beach, FL.  December, 1984.

84.  *  SURGICAL MANAGEMENT OF JUVENILE BUNION DEFORMITY
     *  SURGICAL MANAGEMENT OF FLATFOOT DEFORMITY IN THE PEDIATRIC PATIENT
     *  ORAL MEDICATION IN THE TREATMENT OF ARTHRITIC DISEASE OF THE FOOT AND ANKLE
Presented at Pittsburgh Podiatry Hospital Scientific Sessions.  Pittsburgh, PA.  January, 1985.

85.  *  CT SCANNING OF THE FOOT AND ANKLE
     *  COMPLICATIONS OF IMPLANT ARTHROPLASTY
     *  SURGICAL MANAGEMENT OF THE ARTHRITIC FOOT
Presented at British Columbia Podiatry Society Annual Scientific Meeting.  Vancouver, British Columbia, CANADA.  February, 1985.

86.  EVALUATION AND MANAGEMENT OF POSTOPERATIVE COMPLICATIONS
Presented at American College of Foot Surgeons Scientific Seminar.  Tampa, FL, 1985.

87.  *  NEUROPATHY IN THE DIABETIC FOOT
     *  ORAL MEDICATIONS IN THE MANAGEMENT OF THE ARTHRITIC FOOT
     *  INFECTIONS AND INFECTION-LIKE DISORDERS OF THE DIABETIC FOOT
Presented at American Podiatric Medical Association Region 1 Annual Scientific Meeting.  Boston, MA.  March, 1985.

88.  *  EVALUATION AND MANAGEMENT OF POSTOPERATIVE COMPLICATIONS
     *  SURGICAL MANAGEMENT OF THE DIABETIC FOOT (PARTS I and II)

(29)

**JA 46**

**Allen M. Jacobs, D.P.M., FACFAS**

    *   ANTIBIOTIC SELECTION FOR POSTOPERATIVE INFECTION
               Presented at William Scholl College of Podiatric Medicine Annual Alumni Scientific Meeting. Chicago, IL. March, 1985.

89.  *   ORAL MEDICATIONS IN THE TREATMENT OF THE ARTHRITIC FOOT
     *   SURGICAL MANAGEMENT OF THE RHEUMATOID FOOT
     *   RADIOGRAPHIC EVALUATION OF THE DIABETIC FOOT
               Presented at American Podiatric Medical Association Region 7 Annual Scientific Meeting. Tacoma, WA. April, 1985.

90.  *   ORAL MEDICATIONS IN THE TREATMENT OF THE ARTHRITIC FOOT
     *   SURGICAL MANAGEMENT OF THE PRERHEUMATOID FOOT
     *   OFFICE EVALUATION OF THE SERONEGATIVE SPONDYLOARTHROPATHIES
     *   RADIOGRAPHIC EVALUATION OF COMMON ARTHRITIC DEFORMITIES OF THE FOOT AND ANKLE
               Presented at Scientific Meeting. West Palm Beach, FL. April, 1985.

91.  *   CT SCANNING AND MRI OF THE FOOT AND ANKLE
     *   ORAL MEDICATIONS IN THE TREATMENT OF THE ARTHRITIC FOOT
     *   COMPLICATIONS OF IMPLANT ARTHROPLASTY
               Presented at Oklahoma Podiatry Society Annual Scientific Session. Shangri-La, OK. May, 1985.

92.  *   ORAL MEDICATIONS IN THE TREATMENT OF THE ARTHRITIC FOOT
     *   OFFICE EVALUATION OF THE SERONEGATIVE SPONDYLOARTHROPATHIES
     *   RADIOGRAPHIC EVALUATION FO COMMON ARTHRITIC DEFORMITIES OF THE FOOT AND ANKLE
               Presented at University of Massachusetts Medical School. March, 1985.

93.  *   SURGICAL MANAGEMENT OF THE ARTHRITIC FOOT
     *   CT SCANNING OF THE FOOT
               Presented at Rochester, New York. Scientific Meeting. March, 1985.

94.  SURGICAL MANAGEMENT OF THE ARTHRITIC FOOT
               Presented at William Scholl College of Podiatric Medicine Scientific Meeting. Chicago, IL. June, 1985.

95.  *   SURGICAL MANAGEMENT OF FLATFOOT DEFORMITY
     *   SURGICAL MANAGEMENT OF HALLUX RIGIDUS

(30)

**Allen M. Jacobs, D.P.M., FACFAS**

     *    SURGICAL MANAGEMENT OF THE ARTHRITIC FOOT
                 Presented at Monsignor Clement Kern Hospital for Special Surgery Residency Lecture Series. Detroit, MI. June, 1985.

96.    COMPLICATIONS OF RIGID INTERNAL FIXATION
                 Presented at Missouri State Podiatry Society Annual Scientific Meeting.

97.    *    EVALUATION AND MANAGEMENT OF THE DIABETIC FOOT INFECTION
       *    PERIOPERATIVE SURGICAL MANAGEMENT OF THE DIABETIC FOOT
                 Presented at American Podiatric Medical Association Region 1 Annual Scientific Meeting. Boston, MA. October, 1985.

98.    *    ORAL MEDICATION IN THE TREATMENT OF THE ARTHRITIC FOOT
       *    OFFICE EVALUATION OF THE SERONEGATIVE SPONDYLOARTHROPATHIES
       *    SURGICAL MANAGEMENT OF THE RHEUMATOID FOOT
       *    SURGICAL MANAGEMENT OF THE DIABETIC FOOT
                 Presented at Arkansas Podiatric Society. Hot Springs, AR.

99.    *    RADIOGRAPHIC RELIABILITY IN EVALUATION OF HALLUX ABDUCTOVALGUS DEFORMITY
       *    SURGICAL MANAGEMENT OF HALLUX LIMITUS
                 Presented at American Podiatric Medical Association Region 3 37th Annual Scientific Meeting. Atlantic City, NJ. May, 1986.

100.    *    HYPERURICEMIA AND GOUT
       *    SURGICAL MANAGEMENT OF THE ARTHRITIC PATIENT
       *    SURGICAL MANAGEMENT OF HALLUX LIMITUS AND OSTEOARTHRITIS OF THE FIRST METATARSOPHALANGEAL JOINT
       *    LABORATORY EVALUATION OF THE ARTHRITIC PATIENT
       *    UTILIZATION OF NSAID DRUGS IN PODIATRIC MEDICINE
                 Presented at Missouri Podiatric Medical Association Scientific Meeting. Lake of the Ozarks, MO. May, 1986.

101.    *    EVALUATION AND MANAGEMENT OF INFLAMMATORY ARTHRITIS AFFECTING THE FOOT AND ANKLE
       *    SURGICAL MANAGEMENT OF THE ARTHRITIC FOOT
       *    THE USE AND ABUSE OF NON-STEROIDAL ANTI-INFLAMMATORY DRUGS
                 Presented at Maine Podiatric Association Scientific Meeting. York Harbor, ME. May/June, 1986.

(31)

**Allen M. Jacobs, D.P.M., FACFAS**

102.  *  <u>MANAGEMENT OF HALLUX LIMITUS BY APPLICATION OF RIGID INTERNAL FIXATION TO COMMONLY PERFORMED OSTEOTOMIES</u>
      *  <u>USE OF ANTIBIOTIC-LOADED BONE CEMENT IN THE TREATMENT OF OSTEOMYELITIS</u>
      *  <u>COMPLICATIONS OF IMPLANT ARTHROPLASTY</u>
            Presented at William Scholl College of Podiatric Medicine 8th Annual Surgical Seminar.  Chicago, IL.  June, 1985.

103.  <u>LONG TERM REACTION OF THE BODY TO PARTICULATE SHARDS FROM POLYMETRIC IMPLANTS OF THE FOOT AND ANKLE</u>
            Presented at American Podiatric Medical Association Annual Meeting Scientific Lecture Program.  San Antonio, TX.  August, 1986.

104.  <u>APPLICATIONS OF CT AND MRI SCANNING IN THE EVALUATION OF FOOT AND ANKLE DEFORMITIES</u>
            Presented at Illinois Podiatric Medical Association Annual Scientific Meeting.  September, 1986.

105.  *  <u>UTILIZATION OF ANTIBIOTIC-LOADED BONE CEMENT IN THE MANAGEMENT OF SOFT-TISSUE INFECTIONS</u>
      *  <u>USE OF ORAL ANTIBIOTICS IN THE TREATMENT OF COMMONLY ENCOUNTERED PODIATRIC INFECTIONS</u>
      *  <u>EVALUATION AND MANAGEMENT OF INFECTED IMPLANT AND OSTEOTOMY SURGERY</u>
            Presented at Missouri State Podiatric Association Scientific Meeting.  Kansas City, MO.  September, 1986.

106.  *  <u>HYPERURICEMIA AND GOUT</u>
      *  <u>SURGICAL MANAGEMENT OF THE ARTHRITIC PATIENT</u>
      *  <u>SURGICAL MANAGEMENT OF HALLUX LIMITUS AND OSTEOARTHRITIS OF THE FIRST METATARSOPHALANGEAL JOINT</u>
      *  <u>LABORATORY EVALUATION OF THE ARTHRITIC PATIENT</u>
      *  <u>UTILIZATION OF NSAID DRUGS IN PODIATRIC MEDICINE</u>
            Presented at Connecticut Podiatric Association Scientific Meeting.  Trumbull, CT.  December, 1986.

107.  *  <u>EVALUATION AND MANAGEMENT OF DIABETIC FOOT INFECTIONS</u>
      *  <u>USE OF ANTIBIOTIC-LOADED BONE CEMENT IN THE TREATMENT OF SOFT TISSUE AND OSSEOUS INFECTIONS OF THE FOOT</u>
      *  <u>SURGICAL MANAGEMENT OF HALLUX LIMITUS AND RIGIDUS</u>
            Presented at American Podiatric Medical Association Region 1 Scientific Meeting.  Boston, MA.  October, 1986.

108.  <u>EVALUATION OF HEEL PAIN WITH PARTICULAR REFERENCE TO THE</u>

(32)

**JA 49**

**Allen M. Jacobs, D.P.M., FACFAS**

SERONEGATIVE SPONDYLOARTHROPATHIES
Presented at Arkansas Scientific Meeting. December, 1986.

109. * USAGE OF ANTIBIOTIC IMPREGNATED BONE CEMENT IN OSTEOMYELITIS
* SURGICAL AND NON-SURGICAL TREATMENT OF INFLAMMATORY ARTHRITIC FOOT DEFORMITIES
* CT SCANNING AND MRI OF HALLUX LIMITUS AND RIGIDUS
Presented at Utah Podiatry Association Scientific Seminar. Snowbird Ski Resort. Salt Lake City, UT. January, 1987.

110. SPORTS INJURIES: PREVENTION AND TREATMENT
Presented at St. Louis Science Center Meeting. St. Louis, MO. January, 1987.

111. * RADIOLOGIC AND DIAGNOSTIC EVALUATION OF TUMORS
* SURGICAL COMPLICATIONS IN NERVE LESIONS PROCEDURES
Presented at Podiatric Pathology Laboratories Fund for Podiatry Education and Research. Bahai Mar Resort and Yachting Center. Fort Lauderdale, FL. March, 1987.

112. * UTILIZATION OF ADVANCED RADIOGRAPHIC AND SCINTIGRAPHIC TECHNIQUES IN THE DIAGNOSIS OF FOOT PATHOLOGY
* MANAGEMENT OF DIABETIC FOOT INFECTIONS WITH SPECIAL REFERENCE TO ANTIBIOTIC-LOADED BONE CEMENT
* SURGICAL AND NON-SURGICAL MANAGEMENT OF INFLAMMATORY ARTHRITIS AFFECTING THE FOOT
* CURRENT METHODOLOGY AND PROBLEMS IN THE MANAGEMENT OF SYMPTOMATIC FLEXIBLE FLATFOOT DEFORMITY
* NEW APPROACHES IN THE MANAGEMENT OF PERIPHERAL NERVE INJURIES OF THE FOOT AND ANKLE
Presented at St. Vincent's Hospital Division of Podiatry, Department of Orthopedics Foot Symposium. Worcester, MA. March, 1987.

113. USE OF NON-STEROIDAL ANTI-INFLAMMATORY DRUGS IN PODIATRIC MEDICINE
Presented at Hillsboro County Podiatric Association Scientific Meeting. Tampa, FL. March, 1987.

114. THE ARTHRITIC FOOT
Presented at Scientific Meeting. Sarasota, FL. March, 1987.

115. RHEUMATOLOGY ENCOUNTERED IN PODIATRIC PRACTICE
Presented at Scientific Meeting. Cape Coral, FL. March, 1987.

(33)

**JA 50**

**Allen M. Jacobs, D.P.M., FACFAS**

116.  * NERVE INJURIES AND POST-TRAUMATIC SYNDROMES
      * USE OF CT SCANNING AND MRI WITH SOFT TISSUE INJURIES
                        Presented at ACFO/ACFS/Midwest Podiatric Conference Joint
      Scientific Seminar. Chicago, IL. April, 1987.

117.  * LESSER METATARSAL OSTEOTOMIES
      * CONGENITAL DEFORMITIES
      * PLANTARFLEXED FIRST METATARSAL
      * SURGICAL AND MEDICAL COMPLICATIONS
      * JOINT REPLACEMENT ARTHROPLASTY
                        Presented at Midwest Podiatry Conference Board Review
      Instructional Courses. Chicago, IL. April, 1987.

118.  BASIC REARFOOT SURGERY
                        Presented at Midwest Podiatry Conference Scientific Meeting.
      Chicago, IL. April, 1987.

119.  * USE OF ANTIBIOTIC-IMPREGNATED BONE CEMENT IN THE
        TREATMENT OF OSTEOMYELITIS
      * HALLUX LIMITUS: SURGICAL MANAGEMENT AND POSTOPERATIVE
        REHABILITATION
                        Presented at Podiatry Hospital of Pittsburgh Residents' Lecture
      Series. Pittsburgh, PA. May, 1987.

120.  * ESSENTIAL SURGICAL TECHNIQUE (FOR OR, SCRUB TECHNICIANS)
      * HEEL PAIN
      * FOOT INFECTIONS
      * THE DIABETIC FOOT IN PODIATRIC MEDICINE
                        Presented at Ohio Podiatric Medical Association Annual
      Scientific Meeting. Columbus, OH. May, 1987.

121.  UTILIZATION OF NSAID'S IN PODIATRIC MEDICINE AND SURGERY
                        Presented from Midwest Podiatry Education Group, Inc. Darien,
      IL and Naperville, IL. June, 1987.

122.  BONE AND JOINT CHANGES IN THE ARTHRITIC FOOT AND IN THE
      DIABETIC FOOT (CHARCOT JOINT)
                        Presented at American Podiatric Medical Association 75th
      Annual Scientific Meeting. Washington, D.C. August, 1987.

123.  * SURGICAL MANAGEMENT OF FOOT DEFORMITY ASSOCIATED WITH
        INFLAMMATORY ARTHRITIS
      * MANAGEMENT APPROACHES TO FIRST MPJ OSTEOARTHRITIS

(34)

**JA 51**

**Allen M. Jacobs, D.P.M., FACFAS**

* MANAGEMENT OF REFLEX SYMPATHETIC DYSTROPHY SYNDROME AND CHRONIC PAIN SYNDROMES OF THE FOOT AND ANKLE
* ESSENTIAL MEDICOLEGAL ASPECTS OF PODIATRIC SURGERY FOR PHYSICIANS' ASSISTANTS
>  Presented at Missouri Podiatric Medical Association Scientific Meeting. Omni Hotel. St. Louis, MO. September, 1987.

124. * HEEL PAIN
  * OFFICE EVALUATION OF THE ARTHRITIC PATIENT
  * ANTIBIOTIC-LOADED BONE CEMENT FOR OSTEOMYELITIS
>  Presented at American College of Foot Surgeons Regional Scientific Seminar. Buffalo, NY. September, 1987.

125. COMPLICATIONS IN FOOT SURGERY
>  Presented at Iowa College of Podiatric Medicine, Guest Lecture Series. Des Moines, IA. October, 1987.

126. * RADIOGRAPHIC, SCINTIGRAPHIC, COMPUTED TOMOGRAPHIC AND MAGNETIC RESONANCE IMAGED STUDIES IN EVALUATION OF THE NATURE AND EXTENT OF FOOT AND ANKLE INFECTION
  * DIAGNOSIS OF OSTEOMYELITIS
  * LOCAL ANTIBIOTIC TREATMENT OF INFECTION/OSTEOMYELITIS
>  Presented at Indiana Podiatric Medical Association Scientific Meeting. Indianapolis, IN. October, 1987.

127. * HOW TO UTILIZE ANTIBIOTIC-LOADED BONE CEMENT IN THE TREATMENT OF FOOT INFECTIONS
  * EVALUATION AND MANAGEMENT OF POSTOPERATIVE INFECTIONS
  * RADIOGRAPHIC, SCINTIGRAPHIC, COMPUTED TOMOGRAPHIC AND MAGNETIC RESONANCE IMAGED STUDIES IN EVALUATION OF THE NATURE AND EXTENT OF FOOT AND ANKLE INFECTION
>  Presented at American Podiatric Medical Association Region 1 National Scientific Meeting. Boston, MA. October, 1987.

128. * NON-STEROIDAL ANTI-INFLAMMATORY DRUGS
  * MANAGEMENT AND EVALUATION OF POSTOPERATIVE COMPLICATIONS
  * MRI AND CT SCANNING/ANTIBIOTIC-LOADED BONE CEMENT
>  Presented at Michigan Podiatric Medical Association Scientific Meeting. Kalamazoo, MI. October, 1987.

129. THE DIABETIC FOOT
>  Presented at Deaconess Hospital Department of Medical Education Meeting. St. Louis, MO. October, 1987.

(35)

**Allen M. Jacobs, D.P.M., FACFAS**

130. * <u>BIOMECHANICAL, RADIOGRAPHIC AND CLINICAL ASSESSMENT OF PEDAL OSTEOTOMIES</u>
     * <u>ORIGIN AND MANAGEMENT OF THE PROBLEM OSTEOTOMY</u>
     * <u>UTILIZATION OF ANTIBIOTIC-LOADED BONE CEMENT IN THE TREATMENT OF FOOT AND ANKLE INFECTION</u>
     * <u>POSTOPERATIVE INFECTIONS</u>
     * <u>SURGICAL ALTERNATIVES TO TRIPLE ARTHRODESIS</u>
     * <u>OSSEOUS NEOPLASTIC DISEASE OF THE FOOT: RADIOGRAPHIC EVALUATION AND PRINCIPLES OF SURGICAL ONCOLOGY FOR COMMON LESIONS</u>
     * <u>EVALUATION AND MANAGEMENT OF INFLAMMATORY ARTHRITIS OF THE FOOT</u>
     * <u>METALLIC FIXATION IN THE FOOT AND PODIATRIC METALLURGY</u>
     * <u>POLYMERS IN THE FOOT: HARMFUL OR HELPFUL?</u>
     * <u>RADIOGRAPHIC EVALUATION OF THE DIABETIC FOOT</u>
     * <u>CT, MRI AND TENOGRAPHY: CLINICOPATHOLOGIC CORRELATIONS</u>
              Presented at William Scholl College of Podiatric Medicine Alumni Association Lectures. San Juan, PUERTO RICO. January 18-23, 1988.

131. * <u>OFFICE MANAGEMENT OF THE OSTEOARTHRITIC PATIENT</u>
     * <u>ANTIBIOTIC-IMPREGNATED BONE CEMENT</u>
     * <u>TOMOGRAPHY OF THE FOOT AND ANKLE</u>
              Presented at Florida Podiatric Medical Association Scientific Symposium. Orlando, FL. January 28-29, 1988.

132. <u>THE DIABETIC FOOT</u>
              Presented at Lutheran Medical Center Department of Medical Education. St. Louis, MO. February, 1988.

133. * <u>HEEL PAIN</u>
     * <u>EVALUATION OF THE ARTHRITIC PATIENT</u>
     * <u>SPORTS-RELATED FOOT INJURIES</u>
              Presented at New York State Podiatric Medical Association, Monroe Division. Rochester, NY. February 6, 1988.

134. <u>UTILIZATION OF NSAID'S IN PODIATRIC MEDICINE AND SURGERY</u>
              Presented at Indianapolis Areas Podiatrists Meeting. Indianapolis, IN. February 25, 1988.

135. <u>SURGICAL MANAGEMENT OF THE ARTHRITIC FOOT</u>
              Presented at Kansas State Podiatry Society Meeting, University of Kansas Medical Center. Wichita, KS. March 5, 1988.

(36)

**Allen M. Jacobs, D.P.M., FACFAS**

136.　THE OPERATIVE MANAGEMENT OF DIABETIC FOOT INFECTIONS
　　　　　　　　Presented at New Hampshire Podiatry Society Meeting.　March 6, 1988.

137.　*　EARLY DIAGNOSIS AND TREATMENT OF INFECTION
　　　*　RADIOGRAPHIC EVALUATION OF AN INFECTIOUS PROCESS OF THE FOOT AND ANKLE
　　　　　　　　Presented for PICA (Podiatry Insurance Company of America). Houston, TX.　March 18, 1988.

138.　OPERATIVE AND NON-OPERATIVE MANAGEMENT OF OSTEOARTHRITIS
　　　　　　　　Presented at St. Petersburg Podiatry Society Meeting.　St. Petersburg, FL.　March 31, 1988.

139.　EVALUATION AND MANAGEMENT OF THE DIABETIC FOOT
　　　　　　　　Presented at Deaconess Hospital Family Medicine Department Meeting.　St. Louis, MO.　April 7, 1988.

140.　EVALUATION AND MANAGEMENT OF COMMON FOOT PROBLEMS
　　　　　　　　Presented at Florida Academy of Family Physicians Scientific Meeting.　Jacksonville, FL.　April 8, 1988.

141.　*　REVISIONAL SURGERY OF THE FOOT IN OSTEOARTHRITIS
　　　*　CT SCANNING OF THE FOOT AND ANKLE
　　　　　　　　Presented at Michigan Podiatric Medical Association Scientific Meeting.　Battle Creek, MI.　April 9, 1988.

142.　EVALUATION AND MANAGEMENT OF COMMON FOOT PROBLEMS
　　　　　　　　Presented at Washington University School of Medicine, Department of Rheumatology.　St. Louis, MO.　April 13, 1988.

143.　*　BIOMECHANICS OF LESSER METATARSAL PATHOLOGY
　　　*　LESSER METATARSAL SURGERY
　　　*　CONGENITAL DEFORMITIES OF THE FOOT
　　　*　GENERAL PRINCIPLES OF REARFOOT SURGERY
　　　*　GENERAL PRINCIPLES OF RADIOGRAPHIC EVALUATION OF THE FOOT AND ANKLE
　　　　　　　　Presented at Midwest Board Review Course and Midwest Podiatry Conference Seminar.　Chicago, IL.　April 22-23, 1988.

144.　SURGICAL MANAGEMENT OF OSTEOMYELITIS
　　　　　　　　Presented at Iowa College of Podiatric Medicine Annual Scientific Seminar.　Des Moines, IA.　April 30, 1988.

**Allen M. Jacobs, D.P.M., FACFAS**

145.  UTILIZATION OF NSAID'S IN PODIATRIC MEDICINE AND SURGERY
                        Presented at Minneapolis Podiatry Society Meeting.
      Minneapolis, MN.  May 18, 1988.

146.  PRINCIPLES IN THE MANAGEMENT OF THE ARTHRITIC FOOT
                        Presented at Duluth Podiatry Society Meeting.  Duluth, MN.
      May 18, 1988.

147.  UTILIZATION OF NSAID'S IN PODIATRIC MEDICINE AND SURGERY
                        Presented at Fort Wayne Podiatry Society Meeting.  Fort Wayne,
      IN.  May 26, 1988.

148.  IMPLANT ARTHROPLASTY SURGERY: INDICATIONS AND UPDATE
                        Presented at Virginia Podiatry Society Meeting.  Norfolk, VA.
      June 4, 1988.

149.  EVALUATION AND MANAGEMENT OF POSTOPERATIVE INFECTIONS:
      THE LEGAL VIEWPOINT
                        Presented for PICA Risk Management Program Lectures.  June
      5, 1988.

150.  *  THE KELLER BUNIONECTOMY: A NEW LOOK AT AN OLD
         PROCEDURE
      *  EVALUATION AND MANAGEMENT OF INFECTION FOLLOWING
         IMPLANT ARTHROPLASTY OF THE FOOT
      *  OSTEOTOMY OF THE FIRST METATARSAL
                        Presented at William Scholl College of Podiatric Medicine
      Annual Scientific Meeting.  Chicago, IL.  June 10-12, 1988.

151.  REHABILITATION OF THE SURGICAL PATIENT FOLLOWING FIRST
      METATARSAL SURGERY
                        Presented at Indiana Podiatric Medical Association Scientific
      Meeting.  South Bend, IN.  June 29, 1988.

152.  EVALUATION AND MANAGEMENT OF COMMON SPORTS INJURIES OF
      THE FOOT AND ANKLE
                        Presented at Florida Academy of Osteopathic Family Medicine.
      Orlando, FL.  August 5, 1988.

153.  UTILIZATION OF A NEW THERAPEUTIC DEVICE FOR STRENGTHENING
      THE PLANTAR ARCH OF THE FOOT
                        Presented at American Podiatric Medical Association National
      Scientific Meeting.  August 19, 1988.

154.  *  EVALUATION AND MANAGEMENT OF COMMON BENIGN TUMORS

(38)

**JA 55**

**Allen M. Jacobs, D.P.M., FACFAS**

OF THE FOOT AND ANKLE
* SURGICAL MANAGEMENT OF THE ARTHRITIC PATIENT
* EVALUATION AND MANAGEMENT OF PERIPHERAL NEUROPATHY
    Presented at New York Podiatric Medical Society, American College of Foot Surgeons, Western New York Division Joint Scientific Meeting. Buffalo, NY.  September 3, 1988.

155. UTILIZATION OF ANTIBIOTIC-LOADED BONE CEMENT IN THE MANAGEMENT OF OSTEOMYELITIS OF THE FOOT AND ANKLE
    Presented at the Foot and Ankle Institute Annual Scientific Symposium.  Philadelphia, PA.  September 23, 1988.

156. EVALUATION AND MANAGEMENT OF COMMON ARTHRITIC SYNDROMES OF THE FOOT AND ANKLE
    Presented at Michigan Podiatric Medical Association.  Boyn Highland, MI.  September 30, 1988.

157. * TENOGRAPHY OF THE FOOT AND ANKLE
    * MAGNETIC RESONANCE IMAGING OF THE FOOT AND ANKLE
    * SURGICAL MANAGEMENT OF FLATFOOT DEFORMITY
    * REFLEX SYMPATHETIC DYSTROPHY SYNDROME: EVALUATION AND TREATMENT
    * NON-STEROIDAL ANTI-INFLAMMATORY DRUGS
    Presented at Western Pennsylvania Podiatry Society Scientific Meeting.  Pittsburgh, PA.  September 31 and October 1, 1988.

158. EVALUATION AND MANAGEMENT OF BENIGN SOFT TISSUE AND OSSEOUS NEOPLASMS OF THE FOOT AND ANKLE
    Presented at Missouri Podiatric Medical Association Scientific Meeting.  Kansas City, MO.  October 7, 1988.

159. EVALUATION AND MANAGEMENT OF BENIGN BONE TUMORS OF THE FOOT AND ANKLE WITH PARTICULAR REFERENCE TO DIAGNOSTIC IMAGING
    Presented at Keystone Podiatry Society Meeting.  Harrisburg, PA.  October 14-15, 1988.

160. EVALUATION AND MANAGEMENT OF THE DIABETIC FOOT
    Presented at Deaconess Hospital Department of Medicine Meeting.  St. Louis, MO.  November 8, 1988.

161. EVALUATION AND MANAGEMENT OF COMMON DIABETIC FOOT PROBLEMS
    Presented at University of Indiana Medical School Scientific

(39)

**Allen M. Jacobs, D.P.M., FACFAS**

Meeting.  South Bend, IN.  November 9, 1988.

162.  UNDERLINE OF ORAL MEDICATION IN THE MANAGEMENT OF OSTEOARTHRITIS IN THE OFFICE SETTING
Presented to Indiana Podiatric Medical Association Scientific Meeting.  South Bend, IN.  November 16, 1988.

163.  *  UTILIZATION OF TENOGRAPHY IN EVALUATION OF TENDON PROBLEMS OF THE FOOT AND ANKLE
 *  MAGNETIC RESONANCE IMAGING OF THE FOOT AND ANKLE
 *  PRINCIPLES IN THE MANAGEMENT OF COMMON BENIGN BONE TUMORS OF THE FOOT AND ANKLE
Presented to the Massachusetts Podiatry Society.  Boston, MA.  November 19, 1988.

164.  *  PRINCIPLES IN THE MANAGEMENT OF SOFT TISSUE AND BONE TUMORS OF THE FOOT AND ANKLE
 *  UTILIZATION OF ANTIBIOTIC-LOADED BONE CEMENT IN THE MANAGEMENT OF THE DIABETIC SOFT TISSUE AND BONE INFECTIONS
 *  CHARCOT'S JOINT DISEASE:  NON-OPERATIVE AND OPERATIVE MANAGEMENT
Presented to Denver Podiatry Society.  Denver, CO.  February 3-4, 1989.

165.  MANAGEMENT OF RHEUMATIC SYNDROMES OF THE FOOT AND ANKLE
Presented to Deaconess Hospital Department of Family Medicine.  St. Louis, MO.  February 14, 1989.

166.  HALLUX LIMITUS: PRINCIPLES OF SURGICAL MANAGEMENT AND REHABILITATION FOLLOWING SURGERY
Presented to Central Massachusetts Podiatry Society.  Worcester, MA.  February 28, 1989.

167.  EVALUATION AND MANAGEMENT OF TENDON PATHOLOGY OF THE FOOT AND ANKLE
Presented to Western Massachusetts Podiatry Society.  March 1, 1989.

168.  *  EVALUATION AND MANAGEMENT OF NEUROPATHY ASSOCIATED BONE AND JOINT DISEASE OF THE DIABETIC FOOT
 *  RADIOGRAPHIC EVALUATION OF BENIGN AND MALIGNANT OSSEOUS NEOPLASM OF THE FOOT AND ANKLE
Presented at the St. Louis Podiatry Seminar.  St. Louis, MO.

(40)

JA 57

**Allen M. Jacobs, D.P.M., FACFAS**

March 3, 1989.

169. \* <u>RADIOGRAPHIC EVALUATION OF POSTOPERATIVE INFECTIOUS DISEASE OF THE FOOT AND ANKLE</u>
\* <u>PRINCIPLES IN THE MANAGEMENT OF BENIGN OSSEOUS AND SOFT TISSUE TUMORS</u>
Presented to Texas Podiatry Society. Houston, TX. March 4, 1989.

170. \* <u>UTILIZATION OF RADIONUCLIDE BONE IMAGING IN THE EVALUATION OF PATHOLOGY IN THE DIABETIC FOOT</u>
\* <u>CURRENT CONCEPTS OF NEUROPATHIC DISEASE IN THE DIABETIC FOOT</u>
Presented at Diabetic Foot Symposium of the American College of Foot Orthopedics. Chicago, IL. March 30, 1989.

171. \* <u>PRINCIPLES OF FOREFOOT RECONSTRUCTION AND LESSER METATARSAL OSTEOTOMIES</u>
\* <u>COMMON REARFOOT OPERATIVE PROCEDURES</u>
Presented to Annual Surgical Board Review Conference Midwest Podiatry Meeting. Chicago, IL. March 31, 1989.

172. <u>APPLICATION OF MAGNETIC RESONANCE IMAGING FOR THE EVALUATION OF TRAUMA OF THE FOOT AND ANKLE</u>
Presented to the Midwest Podiatry Conference Annual Scientific Sessions. Chicago, IL. April 1, 1989.

173. <u>EVALUATION AND MANAGEMENT OF HEEL-SPUR AND HEEL-SPUR-LIKE SYNDROMES</u>
Presented to Western Pennsylvania Podiatry Society. Harrisburg, PA. March 28, 1989.

174. \* <u>MAGNETIC RESONANCE IMAGING FO THE FOOT AND ANKLE</u>
\* <u>TENOGRAPHY IN THE EVALUATION OF FOOT AND ANKLE PAIN</u>
Presented to the National Podiatric Medical Association Annual Scientific Meeting. Miami, FL. May 6, 1989.

175. \* <u>RADIOGRAPHIC EVALUATION OF BONE AND JOINT DISEASE IN THE DIABETIC FOOT</u>
\* <u>UTILIZATION OF ANTIBIOTIC-LOADED BONE CEMENT IN THE TREATMENT OF BONE AND SOFT TISSUE INFECTIONS OF THE DIABETIC FOOT</u>
Presented to Annual Scientific Meeting Veterans' Administration Podiatry Service. Minneapolis, MN. May 9, 1989.

(41)

Allen M. Jacobs, D.P.M., FACFAS

176. <u>PRINCIPLES OF THE UTILIZATION OF ANTIBIOTIC-LOADED BONE CEMENT IN THE MANAGEMENT OF COMMON SOFT TISSUE AND BONE INFECTIONS OF THE FOOT AND ANKLE</u>
Presented to the Department of Surgery, Deaconess Hospital. St. Louis, MO. May 10, 1989.

177. <u>ANTIBIOTIC SELECTION IN THE MANAGEMENT OF COMMON INFECTIONS IN THE DIABETIC FOOT</u>
Presented to Florida Podiatry Society. Melbourne, FL. May 18, 1989.

178. * <u>PRINCIPLES IN THE MANAGEMENT OF POSTOPERATIVE PAIN</u>
* <u>PRINCIPLES IN THE MANAGEMENT OF BENIGN SOFT TISSUE AND BONE TUMORS OF THE FOOT AND ANKLE</u>
* <u>APPLICATION OF MAGNETIC RESONANCE IMAGING OF THE FOOT AND ANKLE</u>
* <u>TENOGRAPHY OF THE FOOT AND ANKLE</u>
Presented to Virginia Podiatry Society. Virginia Beach, VA. June 2-3, 1989.

179. * <u>EVALUATION AND MANAGEMENT OF ISCHEMIC VASCULAR DISEASE IN THE DIABETIC FOOT</u>
* <u>EVALUATION AND MANAGEMENT OF NEUROPATHY IN THE DIABETIC PATIENT</u>
* <u>PRINCIPLES OF INCISION AND DRAINAGE IN THE MANAGEMENT OF DIABETIC FOOT INFECTIONS</u>
* <u>OVERVIEW OF PATHOLOGY UNIQUE TO THE DIABETIC FOOT</u>
* <u>ARTHROPLASTY FOR THE MANAGEMENT OF HALLUX LIMITUS</u>
* <u>UTILIZATION OF BONE GRAFTING IN THE MANAGEMENT OF HALLUX LIMITUS</u>
* <u>EVALUATION AND MANAGEMENT OF DELAYED UNION AND NON-UNION OF BONE WITH ELECTRICAL STIMULATIONS</u>
Presented to annual Scientific Meeting, William Scholl College of Podiatric Medicine and Surgery. Chicago, IL. June 8-10, 1989.

180. <u>EVALUATION AND MANAGEMENT OF BONE AND JOINT INFECTION IN THE DIABETIC FOOT</u>
Presented to Jacksonville Podiatry Society. Jacksonville, FL. June 12, 1989.

181. <u>A RETROSPECTIVE ANALYSIS OF THE SAFETY OF ELECTIVE FOOT SURGERY IN THE DIABETIC PATIENT</u>
Presented to Annual Scientific Meeting, American Podiatric

(42)

**Allen M. Jacobs, D.P.M., FACFAS**

Medical Association.  Boston, MA.  August 18, 1989.

182.  THE   EVALUATION   AND   MANAGEMENT   OF   PAIN   IN   THE
POSTOPERATIVE PATIENT
Presented to Missouri State Podiatric Medical Society Annual
Scientific Meeting.  St. Louis, MO.  September 7, 1989.

183.  *  EVALUATION AND MANAGEMENT OF PAIN IN THE POSTOPERATIVE
PATIENT
*  PRINCIPLES   IN   THE   RADIOGRAPHIC   EVALUATION   OF   COMMON
BENIGN BONE TUMORS OF THE FOOT AND ANKLE
Presented to Wisconsin State Podiatry Society Annual Scientific
Meeting. Madison, WI.  September 15, 1989.

184.  RADIOLOGY OF THE DIABETIC FOOT
Presented  to  Central  Florida  Podiatry  Society.   Orlando, FL.
September 22, 1989.

185.  *  MANAGEMENT  OF  BENIGN  BONE  TUMORS  OF  THE  FOOT  AND
ANKLE
*  MANAGEMENT OF POSTOPERATIVE PAIN
*  TENOGRAPHY OF THE FOOT AND ANKLE
*  EVALUATION AND MANAGEMENT OF POSTOPERATIVE INFECTIONS
*  SURGICAL MANAGEMENT OF SUBTALAR JOINT PAIN
Presented   to   Arkansas   State   Podiatry   Annual   Meeting.
Russerville, AR.  October 6-7, 1989.

186.  *  MRI OF THE FOOT AND ANKLE
*  TENOGRAPHY OF THE FOOT AND ANKLE
*  INFECTION MANAGEMENT IN THE DIABETIC FOOT
Presented to Indiana State Podiatry Society.   Indianapolis, IN.
October 21, 1989.

187.  BONE AND JOINT DISEASE IN THE DIABETIC FOOT
Presented to St. Louis University Medical College Department of
Geriatric Medicine.  St. Louis, MO.  October 25, 1989.

188.  PEDIATRIC FOOT DEFORMITY: EVALUATION OF COMMON PROBLEMS
Presented   to   Deaconess   Hospital   Department   of   Family
Medicine.  St. Louis, MO.  November 21, 1989.

189.  BONE AND JOINT DISORDERS IN THE DIABETIC FOOT
Presented to the Annual Diabetes Symposium, Kilo Diabetes and
Vascular Research Foundation.  St. Louis, MO.  December 2, 1989.

(43)

**Allen M. Jacobs, D.P.M., FACFAS**

190.   EVALUATION OF FOOT AND ANKLE INJURIES UTILIZING MRI
           Presented to the Memphis Podiatry Society.   Memphis, TN.
   January 24, 1990.

191.   MANAGEMENT OF OSTEOMYELITIS UTILIZING ANTIBIOTIC BEADS
           Presented to the Northwest Podiatric Medical Institute of
   Cozumel, MEXICO.  February 3, 1990.

192.   RHEUMATIC DISEASE: FOOT MANIFESTATIONS
           Presented to the Department of Rheumatology, Washington
   University School of Medicine.  St. Louis, MO.  February 28, 1990.

193.   POSTOPERATIVE REHABILITATION
           Presented to the St. Louis Podiatry Meeting Society.  St. Louis,
   MO.  March 3, 1990.

194.   REVISIONAL SURGERY IN FAILED DIABETIC AMPUTATION TREATMENT
   OF NON-UNIONS
           Presented to Marlboro Hospital Podiatry Department.  Marlboro,
   MA.  March 10, 1990.

195.   *   EVALUATION AND MANAGEMENT OF OSSEOUS NEOPLASMS
       *   NON-SURGICAL AND SURGICAL MANAGEMENT OF SUBTALAR
           JOINT PAIN
       *   LESSER METATARSAL SURGERY
       *   SURGICAL MANAGEMENT OF FLEXIBLE FLATFOOT DEFORMITY
               Presented to the Midwest Podiatry Meeting.  Chicago, IL.  April
   6-8, 1990.

196.   RHEUMATIC DISORDERS OF THE FOOT AND ANKLE
           Presented to the Department of Family Medicine, Deaconess
   Hospital.  St. Louis, MO.  April 17, 1990.

197.   SURGICAL MANAGEMENT OF FLEXIBLE FLATFOOT DEFORMITY
           Presented to the Podiatry Department, Yale University.   New
   Haven, CT.  April 18, 1990.

198.   *   MANAGEMENT OF POSTOPERATIVE PAIN
       *   EVALUATION AND TREATMENT OF POSTOPERATIVE INFECTION
       *   EVALUATION AND MANAGEMENT OF SUBTALAR JOINT PAIN
               Presented to Connecticut State Podiatry Society.  Hartford, CT.
   April 19-21, 1990.

199.   *   MANAGEMENT OF POSTOPERATIVE PAIN

(44)

**JA 61**

**Allen M. Jacobs, D.P.M., FACFAS**

    \*   SURGICAL MANAGEMENT OF SUBTALAR JOINT PAIN
           Presented to the University of Massachusetts Medical College Podiatry Department. Worchester, MA. May 11, 1990.

200.  BONE AND JOINT DISEASE IN THE DIABETIC FOOT
           Presented to the American Podiatry Association Annual Scientific Meeting. Las Vegas, NV. August 10, 1990.

201.  EVALUATION AND MANAGEMENT OF POSTOPERATIVE INFECTIONS
           Presented to the Missouri State Podiatry Society Annual Scientific Meeting. Kansas city, KS. September 9, 1990.

202.  \*  MANAGEMENT OF WEB SPACE INFECTIONS
     \*  THE SCARF AND LUDLOFF OSTEOTOMY: INDICATIONS AND APPLICATIONS
     \*  MANAGEMENT OF DELAYED UNION AND NON-UNION MODIFIED WATERMAN AND COTTON OSTEOTOMY
           September 14-15, 1990.

203.  EVALUATION OF COMMON ANKLE INJURIES
           Presented to the Department of Family Medicine, Deaconess Hospital. St. Louis, MO. September 18, 1990.

204.  \*  DIAGNOSTIC IMAGING FOR INFECTION: CONCEPTS AND CONTROVERSIES
     \*  LOCAL ANTIBIOTIC THERAPY IN FOOT AND ANKLE INFECTIONS
     \*  POSTOPERATIVE INFECTIONS
           Presented to the Pittsburgh Podiatry Hospital. Pittsburgh, PA. October 5-6, 1990.

205.  \*  MANAGEMENT OF RECURRENT NEUROMA PAIN
     \*  SURGICAL MANAGEMENT OF PLANTAR FIBROMATOSIS
     \*  OSTEOMYELITIS: CURRENT TRENDS IN MANAGEMENT
     \*  TENDON AND LIGAMENT INJURIES IN THE ATHLETE
     \*  CHARCOT JOINT DISEASE
           Presented to the Region 1 Podiatry Meeting. Boston, MA. October 12-14, 1990.

206.  \*  SURGICAL MANAGEMENT OF SUBTALAR JOINT PAIN POSTOPERATIVE INFECTIONS
     \*  NON-UNIONS: DIAGNOSIS AND MANAGEMENT
           Presented to the Pioneer Podiatry Society. Lake Texoma, OK. October 18-20, 1990.

(45)

**Allen M. Jacobs, D.P.M., FACFAS**

207.   *  <u>BLEEDING DISORDERS IN THE SURGICAL PATIENT</u>
      *  <u>MANAGEMENT OF LISFRANC FRACTURE DISLOCATIONS</u>
      *  <u>MANAGEMENT OF COMMON BONE TUMORS</u>
      *  <u>TREATMENT OF NON-UNIONS</u>
                    Presented to the Northern Podiatry Podiatric Academy. Cleveland, OH.  November 9-10, 1990.

208.   *  <u>SURGICAL MANAGEMENT OF INFECTION</u>
      *  <u>POSTOPERATIVE INFECTIONS</u>
                    Presented to the Ohio Podiatric Medical Association.  Columbus, OH.  November 16-17, 1990.

209.   *  <u>METABOLIC NEUROPATHIES: DIAGNOSIS AND MANAGEMENT</u>
      *  <u>MANAGEMENT OF PAINFUL NEUROPATHIES: DRUG THERAPY</u>
      *  <u>EVALUATION OF ELECTRODIAGNOSTIC STUDIES</u>
                    Presented to the Pennsylvania Podiatric Medical Association Annual Scientific Seminar.  Hershey, PA.

210.   *  <u>EVALUATION AND MANAGEMENT OF OSTEOMYELITIS</u>
      *  <u>TOE WEB INFECTIONS</u>
      *  <u>ANTIBIOTIC-LOADED BONE CEMENT</u>
      *  <u>POSTOPERATIVE INFECTIONS</u>
                    Presented to William Scholl college of Podiatry.   Chicago, IL. December 15, 1990.

211.   *  <u>SURGICAL MANAGEMENT OF SUBTALAR JOINT PAIN</u>
      *  <u>POSTOPERATIVE INFECTIONS</u>
                    Presented at Pittsburgh Podiatry Hospital.   Pittsburgh, PA. February 2, 1991.

212.   *  <u>RETROSPECTIVE ANALYSIS OF COMPLICATIONS FOLLOWING THE STA-PEG OPERATION</u>
      *  <u>ANTIBIOTIC-LOADED BONE CEMENT: A LOOK BACK</u>
      *  <u>INFECTION RATES WITH CONCURRENT NAIL AND BONE SURGERY</u>
                    Presented at American College of Foot Surgeons.  San Francisco, CA. February 14-16, 1991.

213.  <u>MANAGEMENT OF NON-UNIONS</u>
                    Presented at Arkansas State Podiatry Society.  Little Rock, AR. March 2, 1991.

214.   *  <u>POSTOPERATIVE INFECTIONS</u>
      *  <u>SURGICAL MANAGEMENT OF PLANTAR FIBROMATOSIS</u>
      *  <u>NON-UNION OF BONE: TREATMENT</u>

(46)

**Allen M. Jacobs, D.P.M., FACFAS**

Presented at St. Louis Podiatry Seminar.  St. Louis, MO.  March 8-9, 1991.

215.   *   PAIN FOLLOWING NEUROMA SURGERY
       *   PLANTAR FIBROMATOSIS
       *   POSTOPERATIVE INFECTIONS
                   Presented at Washington State Podiatry Society.  Semi Amu, WA.  March 23, 1991.

216.   *   OSTEOMYELITIS IN THE DIABETIC FOOT
       *   RADIOGRAPHIC EVALUATION OF THE DIABETIC FOOT
       *   NEUROPATHY IN DIABETES
                   Presented at Wichita, KS.  April 5-6, 1991.

217.   *   ADVANCES IN THE MANAGEMENT OF THE DIABETIC FOOT
       *   SUBTALAR JOINT PAIN
                   Presented at Midwest Podiatry Conference.  Chicago, IL.  April 11-13, 1991.

218.   *   POSTOPERATIVE INFECTION
       *   SUBTALAR JOINT PAIN
       *   MANAGEMENT OF COMMON BONE TUMORS
                   Presented at Kentucky State Podiatry Society.  Frankfort, KY.  April 20, 1991.

219.   *   NON-UNION OF BONE
       *   POSTOPERATIVE INFECTION
       *   RECURRENT NEUROMA PAIN
                   Presented at Coney Island Hospital.  New York, NY.  April 27, 1991.

220.   *   PLANTAR FIBROMATOSIS
       *   SUBTALAR JOINT PAIN
       *   POSTOPERATIVE INFECTION
                   Presented at Region 3 Podiatry Conference.  Atlantic City, NJ. May 2-4, 1991.

221.   SUBTALAR JOINT PAIN
                   Presented at Veterans' Administration Hospital.  Minneapolis, MN.  May 4, 1991.

222.   *   RECURRENT NEUROMA PAIN
       *   PLANTAR FIBROMATOSIS
       *   NON-UNION OF BONE

(47)

**JA 64**

**Allen M. Jacobs, D.P.M., FACFAS**

        *   SUBTALAR JOINT PAIN
                     Presented at Virginia Podiatry Society.  Virginia Beach, VA.
July 6, 1991.

223.   *   EVALUATION AND MANAGEMENT OF NEUROPATHIES
       *   NON-UNION: EVALUATION AND MANAGEMENT
                     Presented at Connecticut State Podiatry Society.  July 19-21,
1991.

224. POSTOPERATIVE OSTEOMYELITIS
                     Presented at APMA National Scientific Meeting.  Orlando, FL.
August 9, 1991.

225.   *   SOFT TISSUE TUMORS OF THE FOOT
       *   PERIPHERAL NEUROPATHIES
       *   NON-UNION: ELECTRICAL MANAGEMENT
       *   SUBTALAR JOINT PAIN
                     Presented at Oregon State Podiatry Society.  Bend, OR.  August
24, 1991.

226.   *   SURGICAL MANAGEMENT OF POSTOPERATIVE INFECTIONS
       *   EVALUATION AND MANAGEMENT OF NSAID-INDUCED COMPLICATIONS
       *   EVALUATION AND MANAGEMENT OF DEGENERATIVE ARTHRITIS
                     Presented at Marlboro Hospital.  Marlboro, MA.  September 28,
1991.

227.   *   COMPLICATIONS OF BUNION SURGERY
       *   NON-UNION OF DISTAL OSTEOTOMY IN THE MANAGEMENT OF HALLUX VALGUS
       *   A REVIEW OF THE KELLER BUNIONECTOMY
       *   CLINICAL AND RADIOGRAPHIC EVALUATION OF FLATFOOT DEFORMITY
       *   SUBTALAR JOINT ARTHRITIS
       *   RADIOGRAPHIC EVALUATION OF ARTHRITIS
                     Presented at Region 1 Scientific Seminar.  Boston, MA.  October
10-12, 1991.

228.   *   EVALUATION AND MANAGEMENT OF POSTOPERATIVE INFECTIONS
       *   CURRENT AND FUTURE BIOMATERIAL CONSIDERATIONS IN IMPLANT SURGERY
       *   UPDATE ON NON-STEROIDAL ANTI-INFLAMMATORY MEDICATIONS
       *   MANAGEMENT OF NON-UNION FOLLOWING OSTEOTOMY OR FRACTURE

(48)

**Allen M. Jacobs, D.P.M., FACFAS**

Presented at Pennsylvania Podiatric Medical Association. Hershey, PA. November 7-10, 1991.

229. \* EVALUATION AND MANAGEMENT OF ABNORMAL BONE HEALING
    \* IMPLANTS AND BIOMATERIALS
    \* DISTAL METAPHYSICAL OSTEOTOMY
           Presented at Pennsylvania Podiatric Medical Association. "Hershey West". Palm Springs, CA. December 5-7, 1991.

230. EVALUATION OF THE DIABETIC FOOT
           Presented at the Annual Symposium of the Kilo Diabetes and Vascular Research Foundation. St. Louis, MO. December 14, 1991.

231. \* SURGICAL MANAGEMENT OF FLATFOOT DEFORMITY
    \* HEEL PAIN AND RHEUMATIC PATHOLOGIES
    \* POSTOPERATIVE INFECTIONS
    \* NON-STEROIDAL ANTI-INFLAMMATORY MEDICATIONS
           Presented at Pittsburgh Podiatry Hospital. Pittsburgh, PA. February 2, 1992.

232. REQUIREMENTS FOR AN ENTRY LEVEL RESIDENCY PROGRAM IN PODIATRY
           New Orleans, LA. March 6, 1992.

233. \* RADIOLOGY OF OSTEOMYELITIS
    \* IMPLANT MODIFIED INFECTIONS
           Presented at Florida Podiatry Association. Singer Island, FL. March 7, 1992.

234. \* IMPLANTS AND BIOMATERIALS
    \* COMPLICATIONS OF IMPLANT ARTHROPLASTY
           Presented at St. Louis Podiatry Seminar. St. Louis, MO. March 20-21, 1992.

235. \* MID-SHAFT OSTEOTOMY FOR BUNION CORRECTION
    \* DIGITAL SURGERY
    \* IMPLANT COMPLICATIONS
           Presented at Pennsylvania Podiatry Association Board Review Course. Harrisburg, PA. April 2-3, 1992.

236. \* PAIN FOLLOWING NEUROMA SURGERY
    \* EVALUATION AND MANAGEMENT OF PERIPHERAL NEUROPATHY
    \* HEEL PAIN: EVALUATION AND TREATMENT
           Presented at Northern Ohio Podiatry Academy. Youngstown, OH. April 4, 1992.

(49)

**Allen M. Jacobs, D.P.M., FACFAS**

237.  RADIOGRAPHIC EVALUATION OF ANKLE INJURIES
                        Presented at ACFS/ACFO Annual Scientific Conference.
      Chicago, IL.  April 9, 1992.

238.  EVALUATION AND MANAGEMENT OF NON-UNION POSTOPERATIVE
      INFECTIONS
                        Presented at Midwest Podiatry Conference.  Chicago, IL.  April
      10-11, 1992.

239.  *  COMPLICATIONS OF FOOT SURGERY:   EVALUATION AND
         TREATMENT
      *  EVALUATION AND MANAGEMENT OF BONE TUMORS
                        Presented at Midwest Podiatry Board Review Course.  Chicago,
      IL.  April 10-11, 1992.

240.  COMMON RHEUMATIC DISORDERS AFFECTING THE FOOT
                        Presented for the Rheumatology Department, Washington
      University School of Medicine.  St. Louis, MO.  June 3, 1992.

241.  THE DIABETIC FOOT
                        Presented at Annual Summer Geriatric Institute, St. Louis
      University Medical School.  St. Louis, MO.  June 17, 1992.

242.  *  DIABETES MELLITUS IN THE ELDERLY
      *  TENDON PATHOLOGY: EVALUATION AND TREATMENT
      *  DISTAL METAPHYSICAL OSTEOTOMY IN BUNION SURGERY
      *  MRI OF THE FOOT AND ANKLE
                        Presented at Connecticut State Podiatry Society.  Mystic, CT.
      July 17-19, 1992.

243.  *  SYNOVECTOMY OF THE FOOT AND ANKLE
      *  AUTONOMIC NEUROPATHY IN THE DIABETIC FOOT
                        Presented at Kansas City Podiatry Residency.  Kansas City, MO.
      August 15, 1992.

244.
                        Presented at Missouri State Podiatry Society Annual Scientific
      Meeting.  Kansas City, MO.  September 11, 1992.

245.  *  PAIN FOLLOWING NEUROMA SURGERY
      *  SUBTALAR JOINT PAIN
      *  POSTOPERATIVE INFECTIONS
      *  EVALUATION AND MANAGEMENT OF NON-UNION

(50)

**JA 67**

**Allen M. Jacobs, D.P.M., FACFAS**

  * PRINCIPLES OF FLATFOOT SURGERY
  * NEW IMPLANTS AND BIOMATERIALS
       Presented at Texas Podiatry Association.  Dallas, TX.  September
  19-20, 1992.

246. * SELECTION AND UTILIZATION OF TOPICAL STEROIDS
  * TREATMENT OF CUTANEOUS MYCOSES
  * WEB SPACE INFECTIONS
  * REFLEX SYMPATHETIC DYSTROPHY SYNDROME
  * REARFOOT SURGERY FOR PES CAVUS
  * TREATMENT OF PUNCTURES AND LACERATIONS
  * EVALUATION AND MANAGEMENT OF VASOSPASTIC DISORDERS
       Presented at Region 1Annual Scientific Meeting.  Boston, MA.
  October 9-11, 1992.

247. * DIABETES MELLITUS IN THE ELDERLY
  * SURGICAL MANAGEMENT OF OSTEOMYELITIS
  * DIABETIC NEUROPATHY
  * SURGICAL MANAGEMENT OF POSTOPERATIVE INFECTIONS
       Presented at Arkansas Podiatry Association.  Hot Springs, AR.
  October 24-25, 1992.

248. * RISK ASSESSMENT FOR THE PODIATRIC SURGICAL PATIENT
  * POSTOPERATIVE MANAGEMENT OF THE PODIATRY SURGICAL
  PATIENT
  * DECISION MAKING IN HALLUX VALGUS SURGERY
  * CLINICAL PHARMACOLOGY
       Presented at Pennsylvania Podiatry Association Annual
  Scientific Meeting. Hershey, PA.  November 5-8, 1992.

249. * DIABETIC NEUROPATHY
  * OSTEOMYELITIS: CLINICAL MANAGEMENT
  * PAIN FOLLOWING NEUROMA SURGERY
  * EVALUATION AND TREATMENT OF NON-UNION
       Presented at Colorado State Podiatry Association.  Denver, CO.
  December 5-6, 1992.

250. THE AGING FOOT IN THE NURSING HOME
       Presented at The Symposium on Long Term Care, St. Louis
  University Medical School.  St. Louis, MO.  December 12, 1992.

251. * PREOPERATIVE EVALUATION OF THE DIABETIC PATIENT
  * TREATMENT OF THE CHARCOT FOOT
  * FOOT PATHOLOGY IN THE UNDIAGNOSED DIABETIC PATIENT

(51)

**JA 68**

**Allen M. Jacobs, D.P.M., FACFAS**

     *   <u>HALLUX LIMITUS</u>
                 Presented at North Carolina State Podiatry Seminar. Fayetteville, NC. January 21-23, 1993.

252.  *   <u>PAIN AND PAIN MANAGEMENT</u>
      *   <u>COMPLICATIONS OF NEUROMA SURGERY</u>
      *   <u>COMPLICATIONS OF FOOT SURGERY</u>
                 Presented at Midwest Annual Scientific Conference. Chicago, IL. March 5-7, 1993.

253.  *   <u>OPIOID RECEPTORS AND PAIN MANAGEMENT</u>
      *   <u>PERIPHERAL NEUROPATHY</u>
                 Presented at Super Seminar. Las Vegas, NV. March 13-14, 1993.

254.  *   <u>DIABETES MELLITUS IN THE ELDERLY</u>
      *   <u>SURGICAL MANAGEMENT OF PLANTAR FIBROMA</u>
      *   <u>TREATMENT OF NON-UNION</u>
      *   <u>POSTOPERATIVE INFECTION</u>
                 Presented at Eastern Ohio Academy. Youngstown, OH. March 21, 1993.

255.  *   <u>POSTOPERATIVE PAIN MANAGEMENT</u>
      *   <u>DIABETES IN THE ELDERLY PATIENT</u>
      *   <u>ORAL ANTIBIOTIC THERAPY IN PODIATRY</u>
      *   <u>COMPLICATIONS IN FOOT SURGERY</u>
                 Presented at New York City Podiatry Association. New York, NY. March 27, 1993.

256.  *   <u>NSAID THERAPY IN THE ELDERLY</u>
      *   <u>DIABETES IN THE ELDERLY</u>
      *   <u>MANAGEMENT OF NON-UNIONS</u>
      *   <u>POSTOPERATIVE PAIN</u>
                 Presented at Pittsburgh Podiatry Hospital. Pittsburgh, PA. April 10, 1993.

257.  *   <u>DIGITAL SURGERY</u>
      *   <u>MID-SHAFT OSTEOTOMY FOR BUNION DEFORMITY</u>
      *   <u>EVALUATION AND MANAGEMENT OF BUNION SURGERY COMPLICATIONS</u>
      *   <u>EVALUATION AND MANAGEMENT OF HEEL PAIN</u>
                 Presented at Pennsylvania Podiatry Society APBS Board Review Course. Harrisburg, PA. April 15-18, 1993.

(52)

**JA 69**

**Allen M. Jacobs, D.P.M., FACFAS**

258. EVALUATION AND MANAGEMENT OF THE DIABETIC FOOT
Presented at the Department of Family Medicine, Deaconess Hospital.  St. Louis, MO.  April 20, 1993.

259. \* DIABETES IN THE OLDER PATIENT
\* EVALUATION AND MANAGEMENT OF POSTOPERATIVE INFECTIONS
\* CURRENT TRENDS IN THE MANAGEMENT OF NON-UNION
Presented at Oklahoma Podiatry Society.  Shangri-La, OK.  May 1-2, 1993.

260. ELECTRICAL STIMULATION AND BONE GRAFTING FOR NON-UNION
Presented at Ohio Podiatry Society.  Columbus, OH.  May 15, 1993.

261. \* DIABETIC ULCERATION IN THE OLDER PATIENT
\* MANAGEMENT OF ARTHRITIS IN THE OLDER PATIENT
\* EVALUATION AND MANAGEMENT OF NON-UNION
Presented at Foot and Ankle Symposium.  Minneapolis, MN.  May 22-23, 1993.

262. \* DIABETIC NEUROPATHY: EVALUATION AND TREATMENT
\* STEROID RESPONSIVE DISORDERS OF THE SKIN
\* DIABETES IN THE ELDERLY PATIENT
\* COMPLICATIONS OF FOOT SURGERY
Presented at Virginia Podiatry Society.  Virginia Beach, VA.  June 20, 1993.

263. COMPLICATIONS OF IMPLANT ARTHROPLASTY OF THE GREAT TOE
Presented at Missouri State Podiatry Society.  St. Louis, MO.  September 10, 1993.

264. \* RADIOGRAPHIC EVALUATION FO ANKLE INJURIES
\* RADIOGRAPHIC EVALUATION OF THE DIABETIC FOOT
\* RADIOGRAPHIC EVALUATION OF BONE TUMORS
Presented at Texas Podiatry Society.  Dallas, TX.  September 11-12, 1993.

265. \* CURRENT CONCEPTS IN DIABETIC NEUROPATHY
\* DIABETES IN THE OLDER PATIENT
Presented at Northcoast Seminar.  Cleveland, OH.  October 21, 1993.

266. \* OSTEOTOMY OF THE HALLUX FOR BUNION CORRECTION
\* ARTHRODESIS IN THE MANAGEMENT OF BUNION DEFORMITY

(53)

**Allen M. Jacobs, D.P.M., FACFAS**

      \* <u>INFECTION MANAGEMENT FOLLOWING BUNION SURGERY</u>
      \* <u>VASOSPASTIC COMPLICATIONS OF SURGERY</u>
      \* <u>COMMON DERMATOSES AND TOPICAL STEROIDS</u>
      \* <u>REFLEX DYSTROPHY AND CAUSALGIA</u>
      \* <u>MANAGEMENT OF LACERATIONS AND PUNCTURE WOUNDS</u>
                Presented at Region 1 Podiatry Seminar. Boston, MA. October 23-24, 1993.

267.  \* <u>USE OF NSAID'S IN THE OLDER PATIENT</u>
      \* <u>DVT AND PULMONARY EMBOLISM</u>
      \* <u>SYSTEMIC LUPUS: FOOT MANIFESTATIONS</u>
                Presented at Pennsylvania Podiatry Society. Hershey, PA. November 12-14, 1993.

268.  \* <u>EVALUATION AND MANAGEMENT OF POSTOPERATIVE INFECTIONS</u>
      \* <u>USE AND ABUSE OF ANTI-INFLAMMATORY MEDICATIONS</u>
      \* <u>DVT AND PULMONARY EMBOLISM</u>
      \* <u>COMPLICATIONS OF BUNION SURGERY</u>
                Presented at North Carolina Podiatry Society. Greensboro, NC. January 13-15, 1993.

269.  \* <u>MANAGEMENT OF DIABETIC ULCERS</u>
      \* <u>DIABETES IN THE OLDER PATIENT</u>
      \* <u>COMPLICATIONS OF DIABETIC NEUROPATHY</u>
      \* <u>MANAGEMENT OF OSTEOMYELITIS IN THE DIABETIC PATIENT</u>
                Presented at Houston Residency Program. Houston, TX. January 29, 1994.

270. <u>THE AGING FOOT</u>
                Presented at Board Review Course, St. Louis University School of Medicine. St. Louis, MO. March 12, 1994.

271.  \* <u>COMPLICATIONS OF BUNION SURGERY</u>
      \* <u>EVALUATION AND MANAGEMENT OF BUNION SURGERY</u>
      \* <u>SURGICAL MANAGEMENT OF PLANTAR FIBROMATOSIS</u>
      \* <u>EVALUATION AND MANAGEMENT OF POSTOPERATIVE PAIN</u>
      \* <u>EVALUATION AND SURGICAL MANAGEMENT OF OSTEOMYELITIS</u>
                Presented at Northeastern Academy of Podiatry. Youngstown, OH. March 20, 1994.

272. <u>IMPLANTS AND BIOMATERIALS: CURRENT CONCEPTS</u>
Presented at No Nonsense Seminar. Cleveland, OH. April 8, 1004.

273.  \* <u>MANAGEMENT OF FLATFOOT DEFORMITY</u>

(54)

**Allen M. Jacobs, D.P.M., FACFAS**

    \*   MRI OF THE FOOT AND ANKLE
               Presented at Midwest Podiatry Conference.  Chicago, IL.  April 14-16, 1994.

274.  \*   EVALUATION AND MANAGEMENT OF OSTEOMYELITIS
      \*   COMPLICATIONS OF BUNION SURGERY
      \*   ARTHRODESIS IN BUNION SURGERY
               Presented for AACPPM.  Livonia, MI.  May 14, 1994.

275.  \*   CURRENT CONCEPTS OF BONE HEALING
      \*   SURGICAL MANAGEMENT OF FLATFOOT DEFORMITY
               Presented at Pittsburgh Podiatry Hospital.  Pittsburgh, PA.  May 21-22, 1994.

276.  \*   EVALUATION AND MANAGEMENT OF NON-UNION
      \*   DVT AND PULMONARY EMBOLISM
      \*   ANTIBIOTIC-LOADED BONE CEMENT AND OSTEOMYELITIS
               Presented at Iowa State Podiatry Society.  Des Moines, IA.  June 11, 1994.

277.  EVALUATION AND MANAGEMENT OF GERIATRIC FOOT DISORDERS
               Presented at St. Louis University.  St. Louis, MO.  June 16, 1994.

278.  \*   COMPLICATIONS OF BUNION SURGERY
      \*   MANAGEMENT OF POSTOPERATIVE PAIN
      \*   CONNECTIVE TISSUE DISORDERS
      \*   ORAL ANTIFUNGAL THERAPY
               Presented at Connecticut State Podiatry Society.  Stanford, CT. July 15-17, 1994.

279.  \*   EVALUATION AND MANAGEMENT OF RSDS
      \*   CORONARY, RENAL AND CEREBRAL VASCULAR DISEASE IN THE PODIATRY PATIENT
      \*   CURRENT CONCEPTS IN BONE HEALING
      \*   THE SCARF AND LUDLOFF BUNIONECTOMY
               Presented at Region 1 Podiatry Meeting.  Boston, MA.  August 25-27, 1994.

280.  CURRENT CONCEPTS IN DIABETIC NEUROPATHY
               Presented at Missouri State Podiatry Seminar.  Kansas City, MO. September 9, 1994.

281.  \*   DIAGNOSTIC IMAGING FOR INFECTIOUS DISEASE
      \*   DIAGNOSTIC IMAGING FOR TENDON DISORDERS

(55)

**Allen M. Jacobs, D.P.M., FACFAS**

       * <u>DIAGNOSTIC IMAGING FOR BONE TUMORS</u>
       * <u>DIAGNOSTIC IMAGING FOR RHEUMATIC DISORDERS</u>
                Presented at Indiana State Podiatry Society. Indianapolis, IN. October 15, 1994.

282.  * <u>DIABETES MELLITUS IN THE OLDER PATIENT</u>
       * <u>AUTONOMIC NEUROPATHY IN DIABETIC ULCERATION</u>
       * <u>MANAGEMENT OF THE CHARCOT FOOT</u>
       * <u>MANAGEMENT OF OSTEOMYELITIS IN THE DIABETIC FOOT</u>
                Presented at Flushing Hospital. Queens, NY. October 22, 1994.

283.  * <u>EVALUATION AND MANAGEMENT OF ANKLE LIGAMENT INJURY</u>
       * <u>CURRENT CONCEPTS IN BONE HEALING</u>
       * <u>PRINCIPLES IN DIGITAL SURGERY</u>
       * <u>EVALUATION AND MANAGEMENT OF RHEUMATIC DISORDERS</u>
                Presented at Pennsylvania Podiatry Association. Hershey, PA. November 3-5, 1994.

284.  <u>DIABETIC NEUROPATHIES</u>
                Presented at Mount Sinai Hospital. Cleveland, OH. January 23, 1995.

Updates as of 12/31/2009

**Recent seminars; scientific papers presented**

**American College foot and ankle surgeons**
**Annual scientific seminar**
**Los Angeles California**
**February 16-20, 1999**

Deep venous thrombosis; diagnosis and treatment overview

Perioperative antibiotics; when and where

Reflex sympathetic dystrophy syndrome

Evaluation and management of osteomyelitis

Surgical management of plantar ulcers

Antibiotic loaded bone cement for osteomyelitis

**New York state podiatric medical Association**
**Annual scientific seminar**
**New York City New York**
**January 20-23, 2005**

Forefoot surgery in the older patient

Ulcer management in the older patient

Postoperative pain management in the geriatric patient

Delayed union and nonunion; strategies for evaluation and management

Nerve injury following bunion repair-anatomical considerations

Considerations in the prevention and treatment of complications following bunion surgery

Complex regional pain syndrome

Diabetes mellitus in the older patients

**Connecticut podiatric medical Association**
**Annual scientific sessions**
**Uncasville, Connecticut**
**April 1-2, 2005**

Indications and surgical technique for arthroereisis implant foot surgery

Calcaneal osteotomy techniques and fixation alternatives

The Cox 2 medications; are they safe ??

**JA 75**

**No nonsense seminar**
**Independence Ohio**
**March 14, 15 2008**

Perioperative considerations in bunion surgery

Evaluation and management of neuropathy he treat patient


**59th annual region 3 APMA scientific meeting**
**Atlantic City, New Jersey**
**April 22-25, 2008**

Evaluation and management of motor neuropathy in the diabetic patient

Surgical management of ulceration in the diabetic patient

Evaluation and management of nonpainful neuropathy


**Ohio College of podiatric medicine**
**Third annual "Southern exposure seminar**
**Cincinnati Ohio**
**May 1-4, 2008**

Peds of the bone: A look at malpractice cases

The use and abuse of corticosteroids in podiatry

The foot and ESRD

Amputations and amputation techniques

The role of osteotomy configuration in bunion surgery


**Western division of New York State podiatric medical Association**
**"Shuffle off to Buffalo" annual scientific meeting**
**September 19, 20, 2008**
**Buffalo New York**

Bone and joint pathology in the diabetic patient

Motor neuropathy in a diabetic patient


**American professional Wound Care Association**
**Annual scientific seminar**
**Fort Worth Texas**
**March 6, 7 2008**

Assessment, diagnosis and management of wound infection

Management of painful neuropathy


**North Central Academy of podiatric medicine
(No nonsense seminar"
Independence Ohio
March 14-16, 2008**

Bone and joint pathology in a diabetic patient

Plantar fasciotomy: Are we seen a paradigm shift?


**St. Louis podiatry seminar
St. Louis Missouri
March 20-21 2008**

MRSA infection update

Elective foot surgery in a diabetic patient

Charcot's joint disease; evidence based medicine

Medial column stabilization for the correction of flatfoot deformity

Epidermal nerve fiber density testing in diabetic neuropathy

Evaluation and management of small fiber neuropathy


**Ohio College of podiatric medicine
Scientific seminar
Independence Ohio
May 2, 3 2008**

Evaluation and management of ulceration of the heel

Hyperbaric oxygen in the management of diabetic ulceration


**Society of Puerto Rican podiatrists
Annual scientific meeting
Fajardo, Puerto Rico
June 19-21 2008**

Motor neuropathy in the patient with diabetes

Evaluation and management of sensory neuropathy in the diabetic patient

Evaluation and management of infection and diabetic patient

Evaluation and management of ulceration in the diabetic patient


**Virginia podiatric medical Association
Annual scientific sessions**

**Virginia Beach Virginia**
**June 26-28, 2008**

Diabetic foot update 2008

Evaluation and management of fibromyalgia in the podiatry patient

Evaluation and management of symptomatic diabetic neuropathy

**Oregon state podiatry Society**
**Annual scientific meeting**
**Portland Oregon**
**October 4, 2008**

Small fiber neuropathy; evaluation and management

**Oklahoma State podiatry Society**
**Annual scientific meeting**
**Tulsa Oklahoma**
**October 24, 2008**

Evaluation and management of neuropathy in the diabetic patient

Evaluation and management of infection in the diabetic patient

**William Goldfarb Foundation**
**Pennsylvania podiatric medical Association**
**"Podiatric approach on care of the elderly patient"**
**Annapolis Maryland**
**December 5-7, 2008**

Evaluation and management of motor neuropathy

The role of homocysteine in diabetic foot pathology

New cardiovascular horizons
New Orleans Louisiana
September 12-14, 2008

Evaluation and management of diabetic neuropathy

Homocysteine and diabetic foot pathology

Evaluation and management of ulceration in the diabetic foot

**St. Louis podiatry seminar**
**21st annual scientific session**
**Chesterfield Missouri**
**February 20, 21 2009**

Operative factors and medical mistakes

Ethical issues in podiatric medicine and surgery

Nerve fiber regrowth in the diabetic patient

Decompression surgery in diabetic neuropathy

Improving results of flatfoot surgery

Pathophysiology of Charcot's joint disease

Surgical management of Charcot's joint disease

**No nonsense seminar**
**North Central Academy of podiatric medicine**
**Cleveland Ohio**
**March 14, 2009**

Evaluation of small fiber neuropathy

Diabetic Charcot joint disease; decision-making and treatment protocols

**Diabetic foot global conference**
**Hollywood California**
**Friday, March 20, 2009**

Pharmacologic management of diabetic peripheral neuropathy

**The American College of Foot and Ankle Surgeons**
**Annual scientific conference, March 5-8, 2009**

Perioperative management of the surgical patient:
Anti-inflammatories/disease modifying agents

Management of acute and chronic ankle joint injury

Ethical issues in surgical decision-making

Neuropathy-decompression versus surgical alternatives

**Annual scientific conference;**
**Virginia nurse practitioner association**
**Williamsburg Virginia**
**March 19, 2009**

Evaluation and management of diabetic peripheral neuropathy

**Connecticut podiatric medical Association**
**Annual scientific conference**
**Uncasville, Connecticut**

**March 27, 28 2009**

Getting on your last nerve: Evaluation and management of Morton's neuroma

Fibromyalgia; manifestations in the podiatry patient

Wrong site, wrong side, wrong surgery; examination of wrong site surgery

**American Professional Wound Care Association**
**Annual scientific conference**
**Philadelphia Pennsylvania**
**April 3, 4 2009**

Nutritional assessment of chronic wounds; key markers and values

Drug interactions and wound repair

**Western Pennsylvania Hospital**
**Department of foot and ankle surgery**
**2009 Symposium on foot and ankle surgery**
**Pittsburgh Pennsylvania,**
**April 17, 18 2009**

Effective surgical management of flatfoot deformity

Evaluation and management of Morton's neuroma

Diabetic foot update; 2009

Evaluation and management of Charcot's joint disease

Motor neuropathy in the diabetic patient

Medical mistakes; ethical considerations

Ninth cocci, homocysteine, and diabetic foot pathology

**Fourth annual southern exposure scientific meeting**
**Cincinnati Ohio**
**April 23-26, 2009**

Elective surgery in the patient with diabetes

Topical antibiotics, antiseptics, and bioburden

May I inject something here? A look at steroid injections

Ethical and ethical issues in podiatric surgery

Fibromyalgia: Podiatric manifestations and management

Improving the results of flatfoot surgery

JA 80

Principles for reconstruction of cavus foot deformity

**Oklahoma Podiatric Medical Association**
**Tulsa Oklahoma**
**May 14, 15 2009**

Current standards for evaluation and management of plantar fasciitis

Ethics and podiatry

Nitroglycerin cocci, homocysteine, and diabetic foot pathology

**APMA region 4 CME seminar**
**Ohio podiatric medical Association**
**June 4-6, 2009**
**Columbus Ohio**

Diabetic neuropathy; surgical management versus medical care

Nitric oide, neuropathy, and wound healing in the diabetic patient

**Virginia podiatric medical Association**
**Annual scientific meeting**
**Virginia Beach Virginia**
**June 25-28, 2009**

Nerve fiber regeneration in the diabetic patient

The HAT graft for bunion correction

Epidermal nerve fiber density testing in a patient with diabetes

Evaluation of nitrate now practice cases, what or risk factors

**American College of foot and ankle surgery**
**Diabetic foot update seminar**
**Santa Rosa California**
**July 9-11 2009**

Evaluation and management of ankle fractures in the diabetic patient

DVT and pulmonary embolism; perioperative considerations

Evaluation and management of osteomyelitis in a diabetic patient

**Texas A&M medical school**
**Fifth annual diabetes conference**
**Corpus Christi Texas**
**July 31-August 2, 2009**

Evaluation and management of small fiber neuropathy

**Oregon state podiatric Society**
**August 6, 2009**

Evaluation and management of diabetic neuropathy

**Hahnemann Medical College**
**Department of Neurology**
**Grand Rounds**
**September 4, 2009**

Small fiber neuropathy

**Tennessee State Podiatric Medical Association**
**Annual Scientific Conference**
**September 11, 2009**

Surgical Management of Flatfoot Deformity
Management of Second Metatarsal Pathology
Evaluation and Management of Diabetic Neuropathy

**Kansas City podiatric residency association**
**September 15, 2009**
Osteotomy stabilization principles; compression without screws
Medical legal issues; documentation for common podiatric surgical procedures

**Grand rounds**
**Alton Memorial Hospital**
**September 16, 2009**

Principles to advance wound healing in chronic nonhealing wound management

**Diabetic limb salvage conference**
**Georgetown University Hospital**
**September 24-26, 2009**

Medical legal considerations in the management of osteomyelitis

Evaluation and management of small fiber neuropathy

**Kilo diabetes and vascular research Foundation**
**Current topics and diabetes, endocrinology, and vascular disease**
**St. Louis Missouri November 20, 21 2009**

Amputation prevention: Risk factors in the diabetic foot

Diagnosis and management of tarsal coalition and rigid flatfoot deformity

**Temple University school of medicine**
**"A day with Allen Jacobs"**
**Philadelphia Pennsylvania**
**January 21, 2006**

Bone and joint disorders in the diabetic patient

Office evaluation and treatment of diabetic neuropathy

Evaluation and management of Charcot's joint disease

Evaluation and management of infection in the diabetic patient

Chronic wound care for ulcerations in the diabetic patient

Prophylactic surgical management of forefoot ulceration

Evaluation and management of midfoot ulcers

Evaluation and management of heel ulceration

Documentation and medical legal issues

**Missouri state podiatric medical Association**
**Annual scientific meeting**
**Kansas City Missouri**
**September 14, 15; 2006**

Deep vein thrombophlebitis, prophylaxis, diagnosis and treatment

The role of bioburden in wound healing

Medical-legal considerations in foot and ankle surgery

**Forest Park Hospital**
**Department of internal medicine; grand rounds**
**St. Louis Missouri**
**September 24, 2006**

Neuropathic complications of the diabetic foot

**Cardiovascular institute of the South**
**Annual scientific meeting**
**New Orleans Louisiana**
**November 2,-November 4, 2006**

Pharmacologic approach for diabetic peripheral neuropathy

**Goldfarb Foundation**
**35th annual clinical conference**
**Diabetes and PVD**
**Philadelphia Pennsylvania**
**November 10-12, 2006**

Pharmacologic approach to neuropathic pain


**APMA region one annual scientific conference**
**Boston Massachusetts**
**November 17, 2006**

Evaluation and management of diabetic neuropathy


**North central Academy of podiatric medicine**
**"No nonsense seminar"**
**Independence Ohio**
**March 9-11, 2007**

Prevention, diagnosis, and management of DVT and pulmonary embolism

Lessons learned from malpractice cases reviewed


**Connecticut podiatric medical Association**
**Annual scientific meeting**
**Uncasville, Connecticut**
**March 30-31, 2007**

Bed to the bone: A look at podiatric malpractice cases

Operative factors in bunion surgery failure

MRSA: Update 2007

Pharmacologic management of diabetic neuropathy


**Northeast New York podiatric medical Association**
**Annual scientific seminar**
**Albany New York (turning stone resort)**
**April 4-April 6, 2007**

Management of flatfoot deformity; surgical principles

Ethics in podiatric medicine and surgery

Evaluation and management of diabetic ulceration and infection

Evaluation and management of posterior calcaneal pain

Evaluation and management of Achilles tendinosis

**Annual scientific meeting**
**Orlando Florida**
**March 14-18, 2007**

Diabetic neuropathy

DVT and pulmonary embolism

Perioperative management of the patient with rheumatoid arthritis

Etiologic considerations in neuromuscular foot deformity


**St. Louis University school of medicine**
**Updated diabetes and endocrinology**
**St. Louis Missouri**
**March 23, 24 2007**

Amputation prevention in the diabetic patient; risk factor identification


**Connecticut podiatric medical Association**
**Annual scientific symposium**
**Uncasville, Connecticut**
**March 30-31, 2007**

Bone and joint disorders in a diabetic patient

Wrong site, wrong foot, wrong procedure

Improving the results of flexible flat foot deformity

Evaluation and management of infection in this patient with diabetes

**Northeast New York podiatric Academy**
**Annual scientific session**
**Albany New York**
**April 4-April 6, 2007**


Evaluation and management of ulceration in diabetic patient

Evaluation and management of small fiber neuropathy

Principles for the management of flatfoot deformity

Improving the results of bunion surgery correction

Evaluation and management of posterior calcaneal pain



**American professional Wound Care Association**

Use and abuse of corticosteroids in foot and ankle pathology

**American professional Wound Care Association**
**National clinical conference**
**Philadelphia Pennsylvania**
**April 6-8, 2007**

Diabetic foot; infection versus bio burden

Selection in utilization of topical antimicrobial therapy in wound care

**North Carolina foot and ankle Society**
**Annual scientific seminar and exposition**
**Greensboro North Carolina**
**January 25-28, 2007**

Calcaneal osteotomy for flatfoot correction revisited

"Bed to the bone" a look at podiatry malpractice cases

Medical management of symptomatic diabetic neuropathy

**Michigan state podiatric medical Association**
**"Great lakes conference"**
**Troy Michigan**
**February 17, 2007**

Etiology and management of symptomatic diabetic neuropathy

**19th annual St. Louis podiatry seminar**
**St. Louis Missouri**
**March 2-3, 2007**

Evaluation and management of peripheral edema

Evaluation and management of chronic venous insufficiency, dermatitis, and ulceration

DVT and pulmonary embolism

Pharmacologic management of symptomatic neuropathy

MRSA: Management in a diabetic patient

The procedure of Paul Lapidus: A perspective on clinical application

Improving the results of calcaneal osteotomy

Injection of the Achilles tendon?

**American College of foot and ankle surgeons**

**Annual scientific meeting**
**Philadelphia Pennsylvania**
**April 19-22, 2007**

Hyperbaric oxygen and management of ulceration

Evaluation and management of diabetic foot infection

Evaluation and management of painful diabetic neuropathy

**Virginia podiatric medical Association**
**Annual scientific meeting**
**Williamsburg Virginia**
**June 28-July 1, 2007**

Motor neuropathy in the diabetic patient

MRSA evaluation and management

Homocysteine and diabetic foot pathology

Complication management in diabetic foot pathology

**South Carolina podiatric medical Association**
**Annual scientific seminar**
**Myrtle Beach South Carolina**
**July 11-15, 2007**

Evaluation and management of symptomatic neuropathy and a diabetic patient

Management of infection in a patient with diabetes

Ulcer management in a patient with diabetes

Evaluation and management of Charcot's joint disease

Motor neuropathy in a patient with diabetes

**American podiatric medical Association**
**Annual scientific meeting**
**Philadelphia Pennsylvania**
**Thursday, August 16, 2007**

Pharmacologic management of diabetic neuropathy

**Socieded de Medicos Podiatris**
**Annual scientific meeting**
**Fajardo, Puerto Rico**
**August 9-12 2007**

Role of homocysteine in diabetic foot pathology

Second MPJ pain

Evaluation and management of flatfoot deformity

Evaluation and management of heel pain

Fibromyalgia ND podiatric patient


**Kilo diabetes and vascular research Foundation**
**35th annual scientific seminar**
**Current topics in diabetes, endocrinology and vascular disease**
**St. Louis Missouri**
**November 2-3, 2007**

Aggressive management principals for diabetic neuropathy


**Ohio State podiatric medical Association**
**Annual scientific conference**
**Easton Ohio**
**June 7-9, 2007**


Evaluation and management of symptomatic diabetic neuropathy


**"Super bones" annual scientific seminar**
**Atlantis resort, Bahamas**
**January 16-20, 2008**

Homocysteine and diabetic foot pathology


**New York State podiatric medical Association**
**Annual scientific meeting**
**New York City, New York**
**January 25-27**

Elective surgery in the patient with diabetes

Evaluation and management of infection in the diabetic patient

Evaluation of neuropathy in the diabetic patient


**American College of foot and ankle surgeons**
**Annual scientific seminar**
**Long Beach California**
**February 20-24, 2008**

Pain management in the foot and ankle surgical patient

Medical legal considerations in bunion surgery

Current concepts in the management of diabetic neuropathy


**JA 88**

Recent publications;

Case reports in the management of diabetic neuropathy
Allen M. Jacobs, David Allie, Gary Chandler, Gabriel Rodriguez
Vascular disease management November/ December, 2005

Soft tissue procedures with stabilization of medial arch pathology in the management of flexible flat foot deformity
Allen M Jacobs
Clinics and podiatric medicine and surgery
Volume 24, #4 2007

Minimizing legal risk with bunion procedures
Allen M. Jacobs DPM
Podiatry Today, April 2009

Evaluation and management of MRSA infection
Allen M. Jacobs DPM
Podiatry Today, August 2009

Remittive therapy in the management of symptomatic and nonsymptomatic diabetic neuropathy
Allen Jacobs DPM    Wounds volume 21, #4 2009

Remittive therapy in the management of symptomatic and nonsymptomatic diabetic neuropathy
Vascular Disease Management volume 6, # 3 2009

Diabetic Peripheral Neuropathy
Peter Sheehan and Allen Jacobs
Wounds issue #4, April 2009

Perioperative Management Of the Patient with Rheumatoid Arthritis
Allen Mark Jacobs DPM
Clinics in Podiatric Medicine and Surgery (in press-2009)

Current status and activities 2019-2020

1.  Full-time private practice       6400 Clayton Rd., St. Louis Missouri

2.  Scientific co-chairperson:       Limb salvage and wound healing section
                                     Complex Cardiovascular Catheter Solutions
                                     Annual scientific meeting

3.  Scientific co-chairperson:       Annual Scientific Conference
                                     Association of Physicians in Wound Healing

4.  Editorial advisor;               Foot and Ankle Quarterly

5.  Editorial board;                 Clinics in Podiatric Medicine and Surgery

6.  Faculty and lecturer:            Annual Scientific Conference
                                     American College of Foot and Ankle Surgeons

7.  Scientific chairperson:          St. Louis Podiatry annual scientific sessions

8.  Medical consultant:              BAKO diagnostic laboratories

9.  Medical consultant;              Stryker orthopedics

10. Medical consultant:              Arche Healthcare

11. Scientific co-chairperson:       New Cardiovascular Horizons
                                     Annual scientific sessions/St. Louis Missouri

12. Medical editor:                  Center for Podiatric Medical Education

13. Clinical researcher;             PERI (Professional Education and Research Institute)

14. Board of directors:              CMET (Council on Medical Education and Testing)

15. Board of directors:              APWH (Association of Physicians in Wound Healing)

16. Examiner:                        American Board of Foot and Ankle Surgery

Current status: Board certifications   2019-2020

1. American Board of Foot and Ankle surgery (ABFAS)

     Board certification in foot, reconstructive surgery and ankle surgery

2. CMET (Council for Medical Education and Testing)

     Multispecialty board certification and wound evaluation and management

3. NIH

     Certification in research ethics


Current fellowship status 2019-2020

1. Fellow, American College of Foot and Ankle Surgeons

2. Fellow, Association of Physicians in Wound Healing

3. Fellow, Temple Univerity Philadelphia Pennsylvania

Recent awards

2018    **Wound care physician of the year**
Awarded by the Association of Physicians in Wound Healing (APWH)
This is an international association of MD's, DO's DPM's dedciated to the advancement of
wound healing and limb salvage. Award for education, research, and clinical
advancements in limb salvage and wound care.

2014    **Fellowship Status: Temple University Philadelphia Pennsylvania**
Awarded by Temple University for achievement in research and education.
This was the first time that a DPM was awarded this status by the University

2010    **Lifetime Achievement Award and Selection to the Podiatry Hall of Fame**
Awarded by Podiatry Managment based upon a national vote of podiatric physicians
throughout the United States. To this date, only 36 podiatrists have achieved this status.

Awards for state governments.

1.    **Jay Nixon, Gov, Missouri**
      Lifetime achievement award for accomplishments in podiatry 2010

2.    **William Clinton, Gov. Arkansas**
      "Arkansas Traveler"  1985
      Awarded for academic accomplishment in podiatry and podiatric education

3.    **Michael Dukakis, Gov, Massachusettes**
      Achievements in podiatric education  1985
      On behalf of the massachusttes State Podiatry Society

2:20-cv-04277-MBS   Date Filed 12/09/20   Entry Number 1-1   Page 85 of 97
USCA4 Appeal: 23-2103   Doc: 21   Filed: 02/13/2024   Pg: 97 of 270

Recent publications

Medial Column Soft Tissue Corrective Procedures in the Surgical Management Of Posterior Tibial
Tendon Dysfunction
Jacobs AM
Clinics and Podiatric Medicine and Surgery 2015

Osteomyelitis associated with Charcot joint arthropathy
Rubin, LG and Jacobs, AM
Osteomyelitis of the foot and ankle
Springer 2015

Complications of Foot and Ankle Surgery 2018
Springer 2017
Chapter 1: Anatomy of complications
Jacobs

Use of an aseptically processed, dehydrated human amnion and chorion membrane improves
likelihood and rate of healing in chronic diabetic foot ulcers:, A prospective randomized,
multicenter clinical trial in 80 patients (multiple co-authors)
International Wound Journal volume 15, issue 6, 2018

Perioperative Management Of the Geriatric Patient
Clinics and Podiatric Medicine and Surgery 2019
(Multiple co-authors)

Lecture presentations at seminars

January 13, 14, 15, 16, 2011
Super bones annual meeting
Atlantis Bahamas

January 20, 21, 2011
Florida State Podiatric Medical Association
Orlando Florida

January 22, 23
Michigan State Podiatry Side He
Traverse City Michigan,

January 29, 2011
Granite medical Clinic
Columbus Ohio

February 18, 19, 2011
Georgia Podiatric Medical Association
Atlanta Georgia

February 25, 26, 2011
St. Louis Podiatry Seminar
St. Louis Missouri

March 5, 6, 2011
Midwest Podiatry Conference
Chicago Illinois

March 9, 10, 11
American College of Foot and Ankle Surgeons
Washington DC

March 12, 13, 2011
Northeast podiatric medical Association
Cleveland Ohio

March 31, April 1, 2, 2011
APWCA
Philadelphia Pennsylvania

April 9, 2011
Western Pennsylvania Hospital
Pittsburgh Pennsylvania

April 28, 29, 30, 2011
Southern exposure/Kent state University
Cincinnati Ohio

May 20, 2011
Kentucky Podiatric Medical Association
Lexington Kentucky

May 21, 22, 2011
Northeast podiatric Foundation

Albany New York

June 10, 11, 2011
International Academy of Insulin Resistance
Los Angeles California

June 17, 18, 2011
Florida Podiatric Medical Association
Boca Raton Florida

July 14, 15, 16, 2011
Virginia Podiatric Medical Association
Virginia Beach, Virginia

July 28, 29, 30, 31, 2011
American Podiatric Medical Association
Boston Massachusetts

August 2, 2011
St. Anthony's Hospital
St. Louis Missouri

August 26, 27, 28, 2011
Missouri Podiatric Medical Association
St. Louis Missouri

September 22, 23, 24, 25
Kent State College of Podiatric Medicine
Rye New York

October 1, 2011
Temple University College of Podiatry
Philadelphia Pennsylvania

October 12, 2011
North Carolina Podiatry Society
Greensboro North Carolina

October 14, 2011
Arkansas Podiatric Medical Association
Little Rock Arkansas

October 15, 2011
New York Podiatric Medical Association

October 16, 2011
Cornell University medical school
New York City, New York

October 21, 22, 23, 2011
Super bones West
Las Vegas Nevada

November 11, 12, 2011
Region 7, APMA
Vancouver produce Columbia

November 16, 17, 18, 2011

**JA 96**

Desert Foot
Phoenix Arizona

November 19, 2011
Kilo Diabetes Association
St. Louis Missouri

December 1, 2011
New York Podiatric Medical Association
Buffalo New York

January 13, 2012
North Carolina State Podiatry Association
Pinehurst North Carolina

January 19, 20, 21, 2012
Florida State Podiatric Medical Association
Orlando Florida

January 27, 28, 29, 2012
New York State podiatric medical Association
York city, New York

February 9, 2012
Alabama State Podiatry Society
Birmingham Alabama

February 22, 23, 24, 25, 26
Kent state podiatry college
Southeast regional Meeting
Orlando Florida

March 1, 2, 3, 4, 2012
American College of Foot and Ankle Surgeons
Los Angeles California

March 9, 10, 11, 2012
Northeast Podiatric Medical Association
Cleveland Ohio

March 16, 17, 2012
St. Louis Podiatry Seminar
St. Louis Missouri

March 23, 24, 25, 2012
Connecticut State Podiatric Medical Association
Mystic Connecticut

March 29, 2012
American Professional Wound Care Association
Philadelphia Pennsylvania

March 30, 31, 32, 2012
Super bones
Atlantis, Bahamas

April 20, 21, 2012

Midwest Podiatry Seminar
Chicago Illinois

April 22, 2012
Kansas Podiatric Medical Association

April 26, 27, 28, 2012
Southern exposure/Kent state podiatry college
Cincinnati Ohio

May 2, 2012
Region 3, American Podiatric Medical Association
Atlantic City New Jersey

May 4, 5, 6, 2012
Northeastern Podiatric Foundation
Albany New York

May 11, 2012
Columbia medical school Limb Salvage
New York City New York

June 7, 2012
New cardiovascular horizons
New Orleans Louisiana

June 9, 10, 2012
Ohio Podiatric Medical Association
Columbus Ohio

July 18, 2012
Texas Podiatric Medical Association
Sugarland Texas

July 19, 2012
California Podiatric Medical Association
Sacramento California

August 17, 2012
American Podiatric Medical Association
Washington DC

September 21, 2012
New York State podiatric medical Association
Buffalo New York

September 22, 2012
Tennessee podiatric medical Association
Franklin Tennessee

September 27, 2017
Alabama Podiatric Medical Association

October 12, 2012
Iowa podiatric medical Association
Des Moines Iowa

October 6, 2012

Temple University College of Podiatry
Philadelphia Pennsylvania

October 12, 13 2012
Ohio College of Podiatric Medicine
Rye New York

October 17, 2012
Texas podiatric medical Association
Corpus Christi Texas

October 20, 2012
R. Consult Podiatric Medical Association
Ft. Smith Arkansas

October 26, 2012
Oklahoma Podiatric Medical Association

November 30, 31, 2012
Kilo Diabetes Foundation Annual Meeting
St. Louis Missouri


January 25, 26, 27, 2013
New York State Podiatric Medical Association

January 31, 2013
Texas Podiatric Medical Association
Dallas Texas

February 11, 12, 13, 14, 2013
American College of Foot and Ankle Surgeons
Las Vegas Nevada

February 20, 2013
Georgia Podiatric Medical Association
A. lead Georgia

March 6, 7, 8 2013
Kent State Podiatry College
Orlando Florida

March 9, 10
Northeastern Ohio Podiatry Society
Cleveland Ohio

March 15, 16, 2013
St. Louis Podiatry Seminar
St. Louis Missouri

March 21, 22, 23, 2013
Connecticut Podiatric Medical Association
Mystic Connecticut

April 4, 5, 6, 2013
Association of Physicians in Wound Healing
Newark New Jersey

April 18, 2013
NAPA Valley California

April 20, 21, 2013
Kentucky Podiatric Medical Association
Lexington Kentucky

April 25, 2013
Ohio Podiatric Medical Association
Columbus Ohio

May 2, 2013
Region 3 Scientific Meeting
Atlantic City New Jersey

May 12, 13, 2013
Save the Limb Save a Life
Orlando Florida

June 5, 6, 2013
New Cardiovascular Horizons
New Orleans, Louisiana

June 8, 2013
Ohio Podiatric Medical Association
Columbus Ohio

June 20, 21, 22, 2013
Virginia Podiatric Medical Association
Virginia Beach, Virginia

June 27, 2013
Diabetic Limb Salvage Seminar
Washington DC

June 28, 2013
Washington University school of medicine/wound care seminar
St. Louis Missouri

June 29, 2013
National Podiatric Medical Association
Miami Florida

May 3, 4, 2013
Northeastern Podiatric Foundation
Albany New York

August 22, 2013
Missouri State Podiatry Society
Kansas City Missouri

August 23, 24, 2013
Georgia State Podiatric Medical Association
Atlanta Georgia

September 22, 2013
Temple University School of Podiatry

Philadelphia Pennsylvania

October 4, 2013
Iowa State Podiatry Society
Des Moines Iowa

October 24, 2013
Northeastern Podiatry Foundation
Albany New York

October 30, 2013
Connecticut Podiatric Medical Association
Hartford Connecticut

November 9, 2013
Goldfarb Foundation scientific sessions
Philadelphia Pennsylvania

January 11, 12, 2014
North Carolina podiatric medical Association
Charlotte, North Carolina

January 24, 25, 26, 2014
New York State Podiatric Medical Association Annual Scientific Sessions

February 18, 19, 20, 21, 22, 2014
Kent state Podiatric Medical Association
Cincinnati Ohio

February 27, 28, 29, 2014
American College of Foot and Ankle Surgeons
Orlando Florida

March 7, 8, 9, 2014
Northwestern Podiatric Medical Association
Cleveland Ohio

March 28, 29, 2014
St. Louis Podiatry meeting
St. Louis Missouri

April 26, 27, 2014
Kentucky Podiatric Medical Association
Louisville Kentucky

May 1, 2, 3,
Southeast exposure Seminar
Cincinnati Ohio

September 20, 21, 2014
Temple University school of Podiatry
Philadelphia Pennsylvania

October 2, 2014
Iowa State Podiatry Annual Scientific Meeting
Des Moines Iowa

October 3, 2014
Minnesota State Podiatry Annual Scientific Sessions
Minneapolis, Minnesota

October 18, 19, 2014
New York State Podiatric Medical Association
Buffalo New York

October 25, 2014
Pennsylvania Podiatric Medical Association
Pennsylvania

January 23, 24, 25, 2015
New York State Podiatric Medical Association
New York City New York

February 20, 21, 22, 2015
American College of Foot and Ankle Surgeons
Annual Scientific Meeting
San Antonio Texas

February 25, 26, 27, 28, 2015
Kent State College of Podiatric Medicine
Cincinnati Ohio

March 7, 2015
New York College of Podiatric Medicine
New York City, New York

March 26, 27, 28, 2015
St. Louis Podiatry Seminar
St. Louis Missouri

April 17, 18, 2015
New York State Podiatry Association
Monroe New York

April 22, 23, 24, 25, 2015
Kent State College of Podiatric Medicine
Cincinnati Ohio

May 2,3, 2015
Northeastern Podiatric Foundation
Albany New York

June 4, 5, 6, 2015
Ohio Cardiac or Medical Association
Columbus Ohio

June 25, 26, 27, 2015
Virginia Podiatric Medical Association
Virginia Beach, regina

September 19, 2015
New Cardiovascular Horizons
St. Louis Missouri

September 20, 2015

**JA 102**

Temple University College of Podiatry
Sylvia Pennsylvania

October 1, 2, 3, 4,
Association of Physicians in Wound Healing
Philadelphia Pennsylvania

October 16, 17, 2015
New York Podiatric Medical Association
Albany New York

October 23, 2015
Supersaver Annual Scientific Session
Cleveland Ohio

October 24, 2015
West Penn Hospital scientific sessions
Pittsburgh Pennsylvania

January 22, 23, 24, 2016
New York Podiatric Medical Association, annual scientific sessions

February 11, 12, 13, 14, 2016
American College of Foot and Ankle Surgeons
Annual scientific sessions

February 24, 25, 26, 27, 28, 2016
Kent state College of Podiatric Medicine
Cincinnati Ohio

March 11, 12, 13, 2016
Northeastern Podiatric Medical Association
Cleveland Ohio

March 18, 19, 2016
St. Louis Podiatry Seminar
St. Louis Missouri

April 9, 10, 2016
West Palm Beach Podiatric Medical Association
West Palm Beach Florida

September 17, 2016
New Cardiovascular Horizons
St. Louis Missouri

September 24, 2016
Temple University College of Podiatric Medicine
Philadelphia Pennsylvania

November 5, 2016
Kilo Diabetes seminar
St. Louis Missouri

November 12, 13, 2016
Georgia Podiatric Medical Association
Atlanta Georgia

December 14, 15, 16, 17, 2016
Kent State Podiatry College
Orlando Florida

February 27, 28, March 1, 2017
American College of Foot and Ankle Surgeons
Annual scientific sessions

March 11, 12, 2017
Northeastern Ohio Podiatric Medical Association
Cleveland Ohio

March 17, 18, 2017
St. Louis Podiatry Seminar
St. Louis Missouri

May 31, 2017
New Cardiovascular Horizons
New Orleans, Louisiana

August 6-7, 2017
Missouri Podiatric Medical Association
Kansas City Missouri

September 30, 2017
New Cardiovascular Horizons
St. Louis Missouri

January 13, 2018
Western Pennsylvania Hospital Scientific Conference
Pittsburgh Pennsylvania

January 19, 20, 21, 2018
New York State Podiatric Medical Association
New York City, New York

February 1, 2, 3, 4, 2018
Atlantis, Bahamas
St. Louis Podiatry Seminar/New York College of podiatric medicine

February 23, 24 2018
Georgia Podiatric Medical Association
Atlanta Georgia

March 10, 11, 2018
Northeastern Podiatric Medical Society
Cleveland Ohio "No-Nonsense" seminar

March 16, 17, 2018
St. Louis Missouri
St. Louis Podiatry seminar
St. Louis Missouri

March 22, 23, 24, 25, 2018
Annual Scientific Sessions
American College of Foot and Ankle Surgeons
Nashville Tennessee

**JA 104**

May 3, 4, 5, 2018
Ontario Podiatric Medical Association
Toronto Canada

August 24, 25, 2018
St. Louis Podiatric Medical Association
St. Louis Missouri

September 7-September 8, 2018
American College of Lower Extremity Surgeons (ACLES)
Detroit Michigan

September 28, 2019
Colorado State Podiatric Medical Association
Denver Colorado

September 29, 2018
New Cardiovascular Horizons
St. Louis Missouri

October 12, 13, 14, 2018
Association of Physicians in Wound Healing/annual scientific conference
Philadelphia Pennsylvania

Recent publications

Medial Column Soft Tissue Corrective Procedures in the Surgical Management Of Posterior Tibial
Tendon Dysfunction
Jacobs AM
Clinics and Podiatric Medicine and Surgery 2015

Osteomyelitis associated with Charcot joint arthropathy
Rubin, LG and Jacobs, AM
Osteomyelitis of the foot and ankle
Springer 2015

Complications of Foot and Ankle Surgery 2018
Springer 2017
Chapter 1: Anatomy of complications
Jacobs

Use of an aseptically processed, dehydrated human amnion and chorion membrane improves
likelihood and rate of healing in chronic diabetic foot ulcers:, A prospective randomized,
multicenter clinical trial in 80 patients (multiple co-authors)
International Wound Journal volume 15, issue 6, 2018

Perioperative Management Of the Geriatric Patient
Clinics and Podiatric Medicine and Surgery 2019
(Multiple co-authors)

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| KEITH LYNN AND JENNIFER LYNN, | Case No. 2:20-cv-04277-JD |
| Plaintiffs, | |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**PLAINTIFFS' NOTICE OF COMPLIANCE
AND CERTIFICATION OF DISCLOSURE**

Plaintiffs Keith Lynn and Jennifer Lynn, by and through undersigned counsel, give notice that they have identified those persons whom they expect to call as experts at trial and certify that a written report prepared and signed by each such expert was served upon the Defendant United States of America, along with the summons and complaint in this action. Plaintiffs reserve the right to disclose any additional expert(s) as permitted by the Federal Rules of Civil procedure, including at trial for purposes of rebuttal and in response to Defendant's expert disclosures due on September 6, 2021.

**IDENTIFICATION OF EXPERTS**

A.    The following individuals are medical care providers and are expected to testify regarding their observations. These individuals and entities may provide information or testimony regarding the injuries sustained by Plaintiff Keith Lynn, the treatment for said injuries, the cause of said injuries, the damages from said injuries, the physical limitations of said injuries, the need for further medical treatment for said injuries, and the reasonable and customary cost of treatment for said injuries.

Plaintiffs incorporate by reference the treating physicians listed in their answers to the Court's Local Civil Rule 26.03 interrogatories, filed and served on June 15, 2021.

B.    The following individuals are those whom Plaintiffs have retained or specially employed to provide expert testimony.  Further, in accordance with Federal Rule of Civil Procedure 26(a)(2)(B), the undersigned hereby certifies that opposing counsel has been served with the expert reports required by Rule 26(a)(2)(B).

**Allen Mark Jacobs DPM, FACFAS FAPWH**
**6400 Clayton Road, Suite 402**
**St. Louis, MO 63117**
**(314) 367-6545**

Respectfully submitted,

TINKLER LAW FIRM LLC

 /s/ Paul E. Tinkler
Paul E. Tinkler (D.S.C. No. 4108)
William P. Tinkler (D.S.C. No. 11794)
P.O. Box 366
Charleston, SC  29402
(843) 853-5203
(843) 261-5647 (fax)
paultinkler@tinklerlaw.com
williamtinkler@tinklerlaw.com

Stephen F. DeAntonio (D.S.C. No. 1049)
DeANTONIO LAW FIRM, LLC
P.O. Box 30069
Charleston, SC 29417
sdeantonio@deanlawfirm.com

August 6, 2021                        *Counsel for Plaintiffs*

2

**JA 108**

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2021, I served **PLAINTIFFS' NOTICE OF COMPLIANCE AND CERTIFICATION OF DISCLOSURE** to Defendant's counsel of record.

 /s/ Paul E. Tinkler
Paul E. Tinkler (D.S.C. No. 4108)

**JA 109**

2:20-cv-04277-JD    Date Filed 09/07/21    Entry Number 19    Page 1 of 3

IN THE UNITED STATES DISTRIC COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Keith Lynn and Jennifer Lynn,            )
                                         )
                    Plaintiffs,          )          CA No.:  2:20-cv-4277-JD
          v.                             )
                                         )
                                         )
United  States of America,               )
                    Defendant.           )
_____)

**DISCLOSURE OF EXPERT WITNESS BY DEFENDANT; F.R.C.P. 26(a)(2)(B):**

1.  *Dr. Mark Jackson*

Defendant will provide plaintiff with the Curriculum Vitae of Dr. Mark Jackson, St. Francis

Hospital, and Carolina Vein Care and Aesthetics, both of Greenville, South Carolina. When

called as witnesses by the government, it is intended that Dr. Jackson will be qualified by the

Court to testify as an expert witness in the field of Vascular Surgery. A written report will be

forthcoming to the plaintiff that shall contain all opinions, the data relied on to form opinions,

and copies of any exhibits to be used. Dr. Jackson is to be compensated at a rate of $375.00 per

hour to review the case or be deposed, and $400.00 per hour for court testimony plus travel

expenses or $2,250.00 per day of trial testimony. On information and belief, Dr. Jackson has not

testified as an expert witness in a deposition or trial over the past four years.


2.  *Dr. Jan Fritz*

Defendant will provide plaintiff with the Curriculum Vitae of Dr. Jan Fritz, New York

University Langone Health Hospital, New York, NY. When called as witnesses by the

government, it is intended that Dr. Fritz will be qualified by the Court to testify as an expert

witness in the field of Radiology. A written report will be forthcoming to the plaintiff that shall

contain all opinions, the data relied on to form opinions, and copies of any exhibits to be used.

Dr. Fritz is to be compensated at a rate of $500.00 per hour to review the case, $500.00 per hour for deposition or $5,000.00 per day, and $500.00 per hour for court testimony plus travel expenses or $5,000.00 per day of trial testimony. On information and belief, Dr. Fritz has testified as an expert witness in a deposition or trial over the past four years and his list of cases is being provided to plaintiff.

3.  *Dr. John Womack*

Defendant will provide plaintiff with the Curriculum Vitae of Dr. John Womack, Piedmont Orthopedic Associates, Greenville, South Carolina. When called as witnesses by the government, it is intended that Dr. Womack will be qualified by the Court to testify as an expert witness in the field of Orthopedic Surgery specializing in Foot and Ankle. A written report will be forthcoming to the plaintiff that shall contain all opinions, the data relied on to form opinions, and copies of any exhibits to be used. Dr. Womack is to be compensated at a rate of $400.00 per hour to review the case, $550.00 per hour to be deposed, and $400.00 per hour for court testimony or $3,200.00 per day of trial testimony. On information and belief, Dr. Womack has not testified as an expert witness in a deposition or trial over the past four years.

4.  *Dr. Rick Delmonte*

Defendant will provide plaintiff with the Curriculum Vitae of Dr. Rick Delmonte, New York University Langone Health Hospital, New York, NY. When called as witnesses by the government, it is intended that Dr. Delmonte will be qualified by the Court to testify as an expert witness in the field of Podiatric Medicine. A written report will be forthcoming to the plaintiff that shall contain all opinions, the data relied on to form opinions, and copies of any exhibits to be used. Dr. Delmonte is to be compensated at a rate of $600.00 per hour to review the case or be deposed, and $5,000.00 per half day for court testimony. On information and belief, Dr. Jackson has not testified as an expert witness in a deposition or trial over the past four years.

M. RHETT DEHART
ACTING UNITED STATES ATTORNEY

BY:_____s/Lee E. Berlinsky_____
       LEE E. BERLINSKY (#5443)
       Assistant U.S. Attorney
       151 Meeting Street, Suite 200
       Charleston, S.C. 29401
       Phone: (843) 266-1667
       E-Mail: Lee.Berlinsky@usdoj.gov

September 6, 2021

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

KEITH LYNN AND JENNIFER LYNN,

　　　　　Plaintiffs,

　　vs.

UNITED STATES OF AMERICA,

　　　　　Defendant.

Case No. 2:20-cv-04277-JD

**PLAINTIFFS' AMENDED NOTICE OF COMPLIANCE
AND CERTIFICATION OF DISCLOSURE**

　　　　Plaintiffs Keith Lynn and Jennifer Lynn, by and through undersigned counsel, give notice that they have identified those persons whom they expect to call as experts at trial and certify that a written report prepared and signed by each such expert (except as otherwise indicated below) was served upon the Defendant United States of America.  Plaintiffs reserve the right to disclose any additional expert(s) as permitted by the Federal Rules of Civil procedure, including at trial for purposes of rebuttal and in response to Defendant's expert disclosures due on January 31, 2022.

**IDENTIFICATION OF EXPERTS**

　　　　A.　　The following individuals are medical care providers and are expected to testify regarding their observations.  These individuals and entities may provide information or testimony regarding the injuries sustained by Plaintiff Keith Lynn, the treatment for said injuries, the cause of said injuries, the damages from said injuries, the physical limitations of said injuries, the need for further medical treatment for said injuries, and the reasonable and customary cost of treatment for said injuries.

Plaintiffs incorporate by reference the treating physicians listed in their answers to the Court's Local Civil Rule 26.03 interrogatories, filed and served on June 15, 2021.

B.    The following individuals are those whom Plaintiffs have retained or specially employed to provide expert testimony.  Further, in accordance with Federal Rule of Civil Procedure 26(a)(2)(B), the undersigned hereby certifies that opposing counsel has been served with the expert reports required by Rule 26(a)(2)(B), except where the report is indicated as forthcoming.

**Allen Mark Jacobs DPM, FACFAS FAPWH**
**6400 Clayton Road, Suite 402**
**St. Louis, MO 63117**
**(314) 367-6545**

**Dr. Oliver G. Wood, Jr. (Report Forthcoming)**
**PO Box 24677**
**Columbia, SC  29224**
**(803) 736-1300**

Respectfully submitted,

TINKLER LAW FIRM LLC

 /s/ William P. Tinkler
Paul E. Tinkler (D.S.C. No. 4108)
William P. Tinkler (D.S.C. No. 11794)
P.O. Box 366
Charleston, SC  29402
(843) 853-5203
(843) 261-5647 (fax)
paultinkler@tinklerlaw.com
williamtinkler@tinklerlaw.com

Stephen F. DeAntonio (D.S.C. No. 1049)
DeANTONIO LAW FIRM, LLC
P.O. Box 30069
Charleston, SC 29417

2

2:20-cv-04277-JD    Date Filed 01/03/22    Entry Number 26    Page 3 of 4

sdeantonio@deanlawfirm.com

January 3, 2022                          *Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 3, 2022, I served **PLAINTIFFS' AMENDED NOTICE OF COMPLIANCE AND CERTIFICATION OF DISCLOSURE** to Defendant's counsel of record.

 /s/ William P. Tinkler
William P. Tinkler (D.S.C. No. 11794)

4



# TINKLER LAW

**Paul Tinkler**
paultinkler@tinklerlaw.com

**William Tinkler**
williamtinkler@tinklerlaw.com

PO Box 366, Charleston, SC 29402  |  www.tinklerlaw.com

October 7, 2019

**VIA US MAIL (CERTIFIED
RETURN RECEIPT)**
Tammy Kennedy, Esquire
Office of Chief Counsel
VA Regional Office
3322 West End Avenue, Suite 509
Nashville, TN 37203

      RE: Tort Claim Form 95
      Keith Edward Lynn (DOB) 4/14/71
      Jennifer Lynn (DOB) 1/20/75

Dear Ms. Kennedy,

      Enclosed please find a Tort Claim Form 95 that I am serving on behalf of my clients Keith Edward Lynn and his wife, Jennifer Lynn. I am also attaching portions of the VA medical records related to the claim and a list of witnesses as referenced on the forms. I would appreciate your filing both of the forms at your convenience.

      Please do not hesitate to contact me should you have any questions.

      Thanking you for your kind assistance, I am

              Sincerely,

              Raul E. Tinkler

Enclosures:
Tort Claim Form 95 (Keith Lynn)
Tort Claim Form 95 (Jennifer Lynn)
Partial VA medical records (Keith Lynn)
Witness List
cc:    Stephen D'Antonio, Esquire
       Keith and Jennifer Lynn

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency:<br><br>Ralph H. Johnson VA Medical Center<br>109 Bee Street<br>Charleston, SC 29401 | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.)  (Number, Street, City, State and Zip Code)<br>Keith Edward Lynn<br>108 Rudolph Court<br>Ridgeville, SC 29472 |
|---|---|

| 3. TYPE OF EMPLOYMENT<br>☒ MILITARY  ☐ CIVILIAN | 4. DATE OF BIRTH<br>04/14/71 | 5. MARITAL STATUS<br>Married | 6. DATE AND DAY OF ACCIDENT<br>January 17, 2019 | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

Failure to diagnose Osteomyelitis resulting in an above the knee amputation. (medical records attached hereto associated with the amputation)

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

Failure to diagnose Osteomyelitis resulting in an above the knee amputation. (medical records attached hereto associated with the amputation)

| 11. | WITNESSES |
|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
| See attached | See attached |

| 12. (See instructions on reverse.) | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY<br>$1,000,000 | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.)<br>Keith Edward Lynn | 13b. Phone number of person signing form<br>843-291-5231 | 14. DATE OF SIGNATURE<br>October 4, 2019 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for the civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

95-109                NSN 7540-00-634-4046

STANDARD FORM 95
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☐ No

16. Have you filed a claim on your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes   ☐ No   17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts.)

19. Do you carry public liability and property damage insurance? ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☐ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form..**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item #12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* **Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
 A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, D.C. 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

SF 95   BACK

JA 119

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency: <br> Ralph H. Johnson VA Medical Center <br> 109 Bee Street <br> Charleston, SC 29401 | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, Street, City, State and Zip Code) <br> Jennifer Lynn <br> 108 Rudolph Court <br> Ridgeville, SC 29472 |
|---|---|

| 3. TYPE OF EMPLOYMENT <br> ☐ MILITARY ☒ CIVILIAN | 4. DATE OF BIRTH <br> 11/20/1975 | 5. MARITAL STATUS <br> Married | 6. DATE AND DAY OF ACCIDENT <br> January 17, 2019 | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

Loss of consortium due to injury to husband.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code)

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

See # 8

| 11. | WITNESSES | |
|---|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) | |
| See attached | See attached | |

| 12. (See instructions on reverse.) | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY <br> $1,000,000 | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. Phone number of person signing form <br> 843-291-5231 | 14. DATE OF SIGNATURE <br> October 4, 2019 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for the civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

95-109                    NSN 7540-00-634-4046                    STANDARD FORM 95
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

**Attachment to Form 95**

Keith Lynn: DOB 04/14/71

**Witnesses:**

**Keith Lynn**
108 Rudolph Court
Ridgeville, SC 29472
843-291-5231

**Jennifer Lynn**
108 Rudolph Court
Ridgeville, SC 29472
843-291-5231

**Rahn A. Ravenell, MD**
Podiatrist
180 Wingo Way #201
Mt. Pleasant, SC 29464
843-253-4066

**Otis E. Engelman, MD**
Attending Physician
Ralph H. Johnson VA Medical Center
109 Bee Street
Charleston, SC 29401
843-253-4066

**Debbie L. Byron, MD**
Podiatrist
Ralph H. Johnson VA Medical Center
109 Bee Street
Charleston, SC 29401
843-253-4066

**William Hernandez-Alicea, MD**
Attending Physician
Ralph H. Johnson VA Medical Center
109 Bee Street
Charleston, SC 29401
843-253-4066

**Thomas Brothers, MD**
Attending Surgeon
Ralph H. Johnson VA Medical Center
109 Bee Street
Charleston, SC 29401
843-253-4066

**John Mcalhany, MD**
Attending Physician
Ralph H. Johnson VA Medical Center
109 Bee Street
Charleston, SC 29401
843-253-4066

**Peter A. Rosenthal, MD**
Staff Radiologist
Ralph H. Johnson VA Medical Center
Charleston, SC 29401
843-253-4066

**Any and all physicians who
treated Keith Lynn at the Ralph H.
Johnson VA Medical Center.
Please refer to all of Mr. Lynn's
medical records at the VA.**

JA 121

Page 1

1              UNITED STATES DISTRICT COURT
               DISTRICT OF SOUTH CAROLINA
2                 CHARLESTON DIVISION
3    KEITH LYNN AND JENNIFER LYNN,
4              Plaintiffs,
5         vs.          CASE NO. 2:20-cv-4277-JD
6    UNITED STATES OF AMERICA,
7              Defendant.
8
9    VIDEOCONFERENCE
     DEPOSITION OF:   ALLEN MARK JACOBS, DPM
10
     DATE:            March 11, 2022
11
     TIME:            2:05 p.m.
12
     LOCATION:        6400 Clayton Road
13                    Suite 402
                      St. Louis, MO  63117
14
     TAKEN BY:        Counsel for the Defendant
15
     REPORTED BY:     KAREN NELLIUS, RPR
16                    (Appearing via videoconference)
     _____
17
18
19
20
21
22
23
24
25

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

---

Page 2

1  APPEARANCES OF COUNSEL:
2    ATTORNEYS FOR PLAINTIFFS
        KEITH LYNN AND JENNIFER LYNN:
3
        TINKLER LAW FIRM, LLC
4        BY:  WILLIAM P. TINKLER
          (Appearing via videoconference)
5        571 Savannah Highway
          Charleston, SC  29407
6        843-853-5203
          Williamtinkler@tinklerlaw.com
7
8      DEANTONIO LAW FIRM, LLC
          BY:  STEPHEN F. DEANTONIO
9          (Appearing via videoconference)
          3 Gamecock Avenue
10        Suite 304A
          Charleston, SC  29407
11        843-577-8080
          Sdeantonio@deanlawfirm.com
12
      ATTORNEYS FOR THE DEFENDANT
13      UNITED STATES OF AMERICA:
14      UNITED STATES DEPARTMENT OF JUSTICE
          BY:  LEE E. BERLINKSY
15          (Appearing via videoconference)
          151 Meeting Street
16        Suite 200
          Charleston, SC  29401
17        843-266-1679
          Lee.berlinsky@usdoj.gov
18
19
20        (INDEX AT REAR OF TRANSCRIPT)
21
22
23
24
25

---

Page 3

1        ALLEN MARK JACOBS, DPM,
2  being first duly sworn, testified as follows:
3        EXAMINATION
4  BY MR. BERLINSKY:
5    Q.  Good afternoon, Dr. Jacobs.  My name is
6  Lee Berlinsky.  I'm a United States attorney.  I'm
7  in Charleston, South Carolina.  I noticed your
8  deposition because you are identified as an expert
9  witness in the case of Mr. Lynn versus the United
10  States.
11        Are you familiar with that lawsuit and
12  your role as an expert?
13    A.  Yes.
14    Q.  Okay.  I'll talk as fast as I can.  We
15  have a court reporter, Karen, who is obviously on
16  this same WebEx conference, and I would just ask a
17  couple of housekeeping matters to help Karen take a
18  good stenographic report.
19        If you would wait until I finish my
20  question before you begin your answer, that would
21  be greatly appreciated so that we don't cross
22  communicate.  Is that fair?
23    A.  Yes.
24        (DEFENDANT EXHIBIT 1, DECLARATION OF
25  ALLEN MARK JACOBS DPM, FACFAS, FAPWH AND CV, was

---

Page 4

1  marked for identification.)
2  BY MR. BERLINSKY:
3    Q.  I sent out an Exhibit Number 1, which
4  is your Declaration and attached CV.  Did you
5  receive that?
6    A.  Yes.
7    Q.  Okay.
8      MR. BERLINSKY:  Karen, do you have a
9  copy of that for the record?
10      REPORTER:  Yes, I do.
11      MR. BERLINSKY:  Paul and Steve, if
12  there is no objection, I'm going at some point
13  during the flow of this deposition to ask that that
14  be offered as Exhibit 1.  Okay?
15      MR. TINKLER:  No objection.
16  BY MR. BERLINSKY:
17    Q.  I want to go through your resume very
18  quickly, Dr. Jacobs.  It's quite impressive and
19  quite long.  I think you noted that you've been
20  doing this for 40 years; is that right?
21    A.  Yes.
22    Q.  Even up until today you have some
23  surgery to perform.  So you are active?
24    A.  I am.
25    Q.  Okay.  What I have charted down was a

---

Page 5

1  56-page resume with an additional 32 pages, give or
2  take, for updates since 2009.  Does that sound
3  familiar to what you think is representative of
4  your most current CV or has it been updated?
5    A.  No.  That's my most current CV.
6    Q.  Thank you.
7      You are a doctor in podiatric medicine;
8  is that fair?
9    A.  Yes.
10    Q.  I note that you are in St. Louis, which
11  is part of Missouri.  In your practice, are you
12  licensed in any states other than Missouri?
13    A.  I am not.
14    Q.  Okay.  Tell me what is the specific
15  scope of podiatry medicine, at least in St. Louis?
16  And then I'm going to ask you if it's any different
17  in South Carolina just while we get started on
18  this.
19    A.  I don't know what the scope of practice
20  is in South Carolina.
21    Q.  Okay.
22    A.  In Missouri it would be foot, ankle,
23  and lower leg.
24    Q.  In Missouri are you able to perform
25  procedures above the ankle?

---

2 (Pages 2 - 5)

Allen Mark Jacobs, DPM                               March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 6

1    A. Yes.
2    Q. Okay. And you are unaware as to
3 whether or not in South Carolina a podiatrist is
4 allowed to perform surgeries and procedures above
5 the ankle?
6    A. I am not.
7    Q. Okay. Just so the record is clear, you
8 are not familiar with the South Carolina law on
9 that issue; is that fair?
10    A. That's correct.
11    Q. Okay. Did you provide a fee schedule
12 to Mr. Lynn's attorneys in anticipation of serving
13 as an expert witness?
14    A. I would think.
15    Q. And what are your current rates? And
16 if you want to break that down to an hourly rate or
17 a deposition rate or a trial rate.
18    A. I don't have that sheet with me. I'm
19 certain my girls provided it to plaintiffs'
20 counsel. I would think they can provide you with a
21 copy or I can obtain one if you need one.
22    Q. We will need one because the federal
23 rules provide a requirement that that information
24 be provided.
25        MR. TINKLER: I do have that. I can

Page 7

1 get it to you, Lee.
2 BY MR. BERLINSKY:
3    Q. Additionally, there is a requirement to
4 list cases that you have either testified in or
5 been deposed in over the last four years.
6 Dr. Jacobs, have you provided a list to counsel for
7 the plaintiff?
8    A. I don't know if he was provided one or
9 not, but, again, if that's not available, we can
10 provide one.
11    Q. Okay. I'll just ask you a few general
12 questions since that information is not readily
13 available to you. Do you know if you have sent any
14 invoices for payments that have not been made yet?
15    A. I don't. I don't know if the girls had
16 sent an invoice for preparation time for the
17 deposition, but I would think that would be the
18 only invoice.
19    Q. Okay. Do you know if you get a daily
20 rate for a deposition or is it an hourly rate?
21    A. It's -- I'm not sure. I think we
22 charge $2,500, maybe, for a deposition. $2,000 or
23 $2,500 maybe.
24    Q. Okay. Do you send the bill through
25 your practice or do you have a separate entity that

Page 8

1 you perform expert services for that is run
2 differently than your medical office?
3    A. I believe it's part of my practice. I
4 don't have any other businesses.
5    Q. Okay. And then just a general
6 question, if you know the answer to this: What is
7 the percentage of income between serving as an
8 expert and serving as a podiatrist, if you have
9 that breakdown?
10    A. I don't. I'm in full-time private
11 practice, if that will help, but I don't know the
12 percentage. I would think it would be well less
13 than 10 percent.
14    Q. Okay. Do you know just generally how
15 many times you have served as an expert in the
16 past?
17    A. Many. I don't have an exact number,
18 but I've done many depositions. I've been to court
19 a number of times, and I have reviewed many, many
20 cases over the years.
21    Q. Would it be more than 100?
22    A. That I've reviewed?
23    Q. Yes, sir.
24    A. I would think so.
25    Q. Okay. Would it be more than 500?

Page 9

1    A. No.
2    Q. Okay. Have you yourself ever been
3 sued?
4    A. Oh, yes.
5    Q. Approximately how many times?
6    A. I would think five or six times in my
7 career.
8    Q. Okay. Are there any active lawsuits
9 against you personally?
10    A. No. And I've never had a judgment or a
11 settlement of any case. Anytime I've ever been
12 sued, it's been withdrawn.
13    Q. Other than the case that we're working
14 on here on behalf of Mr. Lynn, how many active
15 cases do you have at the moment where you are an
16 expert?
17    A. I don't know. I would say at least 10,
18 less than 20, I suppose, but there is a number. As
19 you know, these things drag on for years and years.
20    Q. Okay. If we were to send an inquiry to
21 plaintiffs' counsel on those questions that you are
22 unable to answer today, would you be able to get to
23 those answers at some point?
24    A. I would think so.
25    Q. Okay. Well, I just don't want to

3 (Pages 6 - 9)

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 10

1  disrupt the deposition now for you to start
2  fumbling around to get those answers.  It just
3  doesn't seem to make much sense for the flow of
4  productivity.  Is that fair?
5      A.  Yes.
6      Q.  Okay.  As far as your testimony in
7  court or at a deposition, let's say, have you ever
8  been advised by an attorney that has hired you that
9  your opinions have not been allowed or been
10 discredited by the court?
11     A.  Never.
12     Q.  Okay.  Have you ever testified in an
13 area of expertise other than in podiatry?
14     A.  I don't believe so.
15     Q.  Do you host any social media websites
16 or podcasts that are relevant to the field of
17 podiatry?
18     A.  I don't host any social media sites of
19 any type.  I do have an online educational center.
20 It's called the Center For Podiatric Education.
21 It's a free educational website for podiatric
22 physicians for postgraduate education.
23     Q.  Okay.  I don't want to go too far into
24 the weeds on that, but you say it's a free website.
25 Do you have to have a license to practice to

Page 11

1  subscribe to that?
2      A.  No.
3      Q.  It's just open to the general public?
4      A.  It is.
5      Q.  Okay.  How often do you update the
6  materials on that website?
7      A.  I've more or less discontinued updating
8  it.  So I would say the last time I put a lecture
9  up was probably two or three years ago.  I do most
10 of my educational work now for an organization
11 called Continuing Medical Education Online.
12     Q.  Okay.
13     A.  And I do that regularly.
14     Q.  I indicated earlier, it looks like
15 there is about 88 pages of CV, which is quite
16 impressive.  Running through that without spending
17 a lot of time with respect to the fact that you are
18 going to have a surgery at 3:00 in your time zone,
19 just tell me, were there any articles or
20 publications that you've been involved in that you
21 refer to directly related to this case?
22     A.  Just in a general sense.  I'm fairly
23 well published in the area of infections, Charcot's
24 joint disease, and diabetic foot.  I'm sure there
25 is -- and I think there are probably some more that

Page 12

1  have not made it.  I pretty much stopped
2  maintaining my CV.  I just don't keep it up
3  anymore.  I'm sort of at the end of my career, and
4  I really don't spend a good deal of time adding,
5  but I assure you I continue publishing on a regular
6  basis, and I probably should keep it up, but I
7  don't maintain it.
8      Q.  You are fairly well published and have
9  experience, knowledge, and training in infections.
10 Does that extend beyond, let's say, osteomyelitis?
11     A.  Yes.  Soft tissue and bone infection.
12     Q.  Okay.  Do you do much work in the field
13 of necrotizing soft tissue infections?
14     A.  Well, I have one patient in house now
15 that I'm treating with a necrotizing infection of
16 the foot.  Of the leg, actually.  I had one earlier
17 this year that resulted in a leg amputation.  So
18 actual necrotizing fascial infections are not
19 common, but I see several a year.  Not tons.  My
20 practice is heavily weighted in diabetic foot.  It
21 fell that way.  It wasn't intentional.  So I
22 probably have a bit more experience in that area
23 than the average podiatrist would.
24     Q.  Have you ever offered any expert
25 opinions regarding the necrotizing fascitis that

Page 13

1  you mentioned?
2      A.  I don't think so.
3      Q.  Okay.  If you would look at Exhibit
4  Number 1, the Declaration.
5      A.  Yes.
6      Q.  If you look at the back page, would you
7  agree with me that your signature is on that?
8      A.  It is.
9      Q.  Okay.  And it's dated December 2nd,
10 2020.  Do you agree with that?
11     A.  It is.
12     Q.  Okay.  I just want to focus a little
13 bit of our testimony at the moment on this
14 Declaration.  In relation to the date it was
15 signed, when was it prepared?
16     A.  When?
17     Q.  Yes, sir.
18     A.  I have no idea.
19     Q.  Okay.  Do you know who prepared it?
20     A.  I would assume plaintiff's counsel did
21 based on a report that I submitted to him.
22     Q.  Is there a report that you've written
23 that is different than this Declaration?
24     A.  There probably is a report somewhere
25 that I've given him, yes.  It's my style to review

4 (Pages 10 - 13)

Allen Mark Jacobs, DPM                                March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 14

1 records, speak on the telephone, and then at some
2 point submit a written document.
3      Q.   Okay.
4      MR. BERLINSKY:  I don't think I've seen
5 a copy of that.  We can go off the record or I can
6 just ask.
7           Paul, do you know anything about this
8 written report?
9      MR. TINKLER:  I'm just going from a
10 vague recollection.  We were required to file a
11 formal declaration, as I recall it, in conjunction
12 with filing, and I think he submitted something to
13 us that we just put in this format, is what I'm
14 recalling.
15     MR. BERLINSKY:  Okay.  Well, let's do
16 this.  I want to keep going with the deposition.
17 At some point, I'll make a request for that report,
18 and if there is a reason to re-depose Dr. Jacobs,
19 is that fair that we try to get him back online at
20 some point down the road?
21     MR. TINKLER:  Yeah.
22     MR. BERLINSKY:  All right.  Thanks.
23 BY MR. BERLINSKY:
24     Q.   So when you are looking at this --
25 Dr. Jacobs, we'll go back on the record.  I'm not

Page 15

1 sure we ever left the record.  I'll leave that for
2 Karen to figure out based on what I was talking
3 about.
4           But at any rate, this document that was
5 signed by you on December 2nd, 2020, you did not
6 prepare this document; is that fair?
7      A.   Not the final form, no.  But I felt it
8 accurately represented my thoughts on the matter or
9 I would not have signed it.
10     Q.   Okay.  When you look at paragraph
11 number 1, can you tell me what the medical records
12 that were forwarded to you by Mr. Lynn's counsel
13 were that you reviewed to prepare this?
14     A.   The medical records from the
15 Charleston, South Carolina Veterans Administration
16 Hospital.
17     Q.   Okay.  Do you know how far back they
18 went at the time --
19     A.   They were voluminous.  I'm sorry.  I
20 cut you off.  I apologize.
21     Q.   I was just saying, do you know how far
22 back in time the records were that you were given?
23     A.   I don't recall.  But there were several
24 thousand pages of records.  I do recall that.
25     Q.   Okay.  That's what I would like to

Page 16

1 clarify.  At some point during the discovery phase,
2 which we are in currently of this case, we provided
3 about 9,000 pages to plaintiff's counsel.  I'm
4 wondering did you have that many pages at the time
5 you provided this record or was that different?
6      A.   There were quite a few thousand pages.
7 I don't recall, it's been some time, whether it was
8 exactly 9,000 pages, but it was quite voluminous.
9      Q.   Okay.  Can you just summarize the
10 relevant portions that you would have reviewed,
11 just so that I don't ask you questions that go too
12 far back, to get a better understanding of where
13 the Charcot foot issue with Mr. Lynn may have
14 developed that you focused on?
15     A.   I think the key elements for me were
16 sometime in the year 2018 when he was first seeking
17 care for his Charcot's joint.
18     Q.   Okay.  That's fair enough.  I think for
19 the purposes of this lawsuit, I don't want to go
20 too far beyond maybe that time period.  Okay?
21     A.   Yes.
22     Q.   Just so we can hone it in, do you
23 recall that there was an MRI done for Mr. Lynn in
24 that 2018 time period?
25     A.   There was.

Page 17

1      Q.   And would you agree with me that that
2 MRI was done close in time to when the foot issues
3 began for Mr. Lynn?
4      A.   That's fair.
5      Q.   Okay.  I think soon after the MRI, do
6 you understand that Mr. Lynn would have had a
7 referral to an orthopedist who then referred him to
8 a podiatrist?
9      A.   Yes.
10     Q.   And just for purposes of this
11 deposition, do you remember the first podiatrist
12 that Mr. Lynn would have had a consult with?
13     A.   If I recall correctly, it was
14 Dr. Byron.
15     Q.   Yes, sir.  Again, just to kind of put a
16 perimeter around these records, is it fair for us
17 to focus on the records from Dr. Byron up until the
18 time of the amputation or for purposes of your
19 Declaration?
20     A.   There was also a second podiatrist,
21 Dr. Ravenel, I believe that's the name, that cared
22 for Mr. Lynn in addition to Dr. Byron or
23 subsequently to Dr. Byron.
24     Q.   Okay.  After the Declaration was
25 prepared and signed by -- prepared by someone else

5 (Pages 14 - 17)

Allen Mark Jacobs, DPM                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 18

1  and signed by you on December 2nd of 2020, what
2  additional records have you been given since that
3  time?
4      A.  Two depositions, one by Dr. Ravenel and
5  the other of Dr. Brothers.  I believe that would
6  encompass the additional records I have received.
7      Q.  You received transcripts from those
8  depositions already?
9      A.  Yes.
10     Q.  Do you know when you would have
11 received those?
12     A.  In the last two weeks.
13     Q.  Okay.  Have you been given any expert
14 reports from the defendant's hired experts?
15     A.  Yes.  I should have included that.  I
16 apologize.  There were three expert reports.  One
17 was from a Dr. Fritz, was it, who as I understand
18 is a radiologist; I received a report from a
19 Dr. Del Monte, who I understand to be a podiatrist;
20 and a Dr. Womack, who I understand to be a foot and
21 ankle orthopedic surgeon.
22     Q.  Just to refresh your recollection, how
23 about a vascular surgeon named Dr. Jackson?
24     A.  I don't recall seeing a report from a
25 Dr. Jackson.

Page 19

1      Q.  Okay.  As a result of being provided
2  the two depositions and the three expert witness
3  reports from the defendant's case, have you amended
4  or changed any of your opinions or statements that
5  are included in your Declaration?
6      A.  Somewhat.
7      Q.  Okay.  What would be the additions that
8  I have not been privy to by the fact that I have
9  not been given a new declaration?
10     A.  Well, they didn't alter the fundamental
11 basis of my criticism, if that will help you.  What
12 I thought was interesting was Dr. Brothers'
13 contention that he examined the leg in the
14 operating room before proceeding with a rather
15 major decision to amputate a man's leg and yet the
16 operative report did not include any description of
17 his doing so, and the pathology report identified
18 no incisions that would have suggested that
19 Dr. Brothers did indeed examine that leg prior to
20 proceeding with the decision to perform an
21 amputation.  I thought there was some inconsistency
22 there.  Other than that, my opinions have not
23 changed.
24     Q.  Okay.  So let's talk about your
25 opinions.  Tell me if you come to court whenever

Page 20

1  this trial is set for Mr. Lynn, what is or what are
2  your opinions that you are going to testify to in
3  this case?
4      A.  Sure, Mr. Berlinsky.  I'll try to
5  summarize them as best I can in a concise manner.
6      Q.  I was going to say, if you want to
7  enumerate them first and go into them or tell me
8  how many there are.  Whatever is easiest for you.
9      A.  Not many.  I'm very focused on this
10 case.
11     Q.  Okay.
12     A.  Mr. Lynn inarguably had a Charcot's
13 joint deformity of his right foot and ankle, which
14 was severe.  He was treated by two podiatric
15 physicians for a Charcot's joint deformity.  They
16 both diagnosed him with Charcot's joint.  His
17 x-rays and description of his foot in the medical
18 records were consistent with Charcot's joint.
19     He then in June started to develop
20 increasing redness, pain, and swelling in his right
21 ankle joint.  This was addressed by the
22 podiatrists.  The key issue arose really January
23 15th of 2019, as you are well aware.  He presented
24 to Dr. Ravenel with continuing increased redness,
25 swelling, and pain in his right ankle joint and had

Page 21

1  some loss of appetite and some malaise, general
2  poor feeling.
3      Dr. Ravenel did not diagnose him with
4  an infection, as you are well aware.  He diagnosed
5  him with a Charcot's joint, but due to the degree
6  of swelling and I suppose redness and warmth
7  ordered an ultrasound for a DVT, which was
8  negative.  Mr. Lynn was not satisfied, apparently,
9  with that diagnosis and went to the emergency
10 department at the Johnson Charleston VA Hospital.
11 He was diagnosed with an infection in his right
12 foot and ankle, was admitted to the hospital.  A CT
13 scan showed the presence of fluid and gas density
14 in his leg, and he was diagnosed with an infection.
15 He was evaluated by Dr. Brothers, and his leg was
16 amputated two days later.
17     And my criticism is simply stated as
18 follows.  There was a diagnosis made of
19 osteomyelitis, which was only based on x-ray
20 interpretation and CT interpretation, as there was
21 never any bone biopsy or pathology done either
22 before the leg was amputated or following
23 amputation by the pathologist.  So the diagnosis of
24 osteomyelitis was strictly presumptive and was
25 based on indirect evidence with clinical and x-ray

6 (Pages 18 - 21)

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 22

1 studies that also would be consistent with
2 Charcot's joint disease and no effort was made to
3 establish that diagnosis.
4         More importantly to me is this issue of
5 amputating the leg without any type of evaluation.
6 You have to understand to a podiatrist losing a leg
7 is like a physician losing a life. That's what we
8 try to preserve, are legs. And dealing with many
9 amputee patients, I don't think we should take the
10 removal of a man's leg lightly. I think you want
11 to see if there is any chance of salvaging that
12 limb.
13         This is a patient that had no urgent
14 need for amputation. Mr. Lynn was not febrile. He
15 did not have an elevated white cell count. He was
16 hemodynamically stable. His laboratory studies
17 were unimpressive, and, in fact, were inconsistent
18 with a necrotizing fascial infection. And based on
19 an x-ray that was interpreted as being
20 osteomyelitis without any proof of bone infection
21 and based on a presumption that the gas on the CT
22 scan that was visualized was representative of a
23 necrotizing infection and not simply an infection
24 with a gas-forming organism which would have
25 presented the same way, no effort was made to

Page 23

1 verify that diagnosis of a necrotizing infection,
2 and Dr. Brothers proceeded with an amputation. And
3 although he said in his deposition that he did
4 verify this, I think that the absence of describing
5 that in the operative note -- because anyone making
6 a decision to remove a person's leg you would think
7 would have documented I made an incision, I
8 checked, there was advanced terrible destruction,
9 this leg was not salvageable; therefore, I
10 proceeded to make the decision to perform an
11 amputation. Because his leg was not in danger.
12 Even Dr. Brothers' own notes state clearly that
13 Mr. Lynn was hemodynamically stable. There was no
14 urgency to remove that leg to, quote, save his
15 life. So that's sort of my issue.
16         Number 2 is if this were a necrotizing
17 infection, that does not mandate the need for an
18 amputation. Necrotizing infections call for
19 antibiotic therapy certainly. They call for
20 debridement, incision, and drainage, but just
21 making a diagnosis of necrotizing fasciitis does not
22 equal the need for immediate amputation,
23 particularly in a person who is hemodynamically
24 stable.
25         Number 3 is if the argument is made

Page 24

1 that this man's leg was somehow in danger with no
2 fever, no elevated white count, no significant
3 laboratory abnormalities, if that's the argument
4 that this man had necrotizing fasciitis -- a
5 diagnosis that Dr. Brothers never entered in the
6 medical record. He said it was an abscess, he said
7 it was osteomyelitis, he said it was possibly
8 cellulitis, but he never used the term, I don't
9 believe, necrotizing fasciitis.
10         But let us say that Dr. Brothers says,
11 well, I didn't write it, but I really thought this
12 man had a life-threatening problem. There was no
13 -- why would he wait 48 hours? Now, the discussion
14 was held that when he entered the hospital, he was,
15 quote, over-anticoagulated because he was on
16 Warfarin since he had had a history of prior deep
17 vein thrombophlebitis, and Mr. Lynn suffered from a
18 congenital clotting disorder that's called factor V
19 Leiden mutation, and he was on Warfarin, which you
20 probably well know is a blood thinner for the fact
21 that he had a history of prior DVT and he had
22 factor V Leiden.
23         If Mr. Lynn's leg were in danger
24 somehow, even though his leg was so unimpressive
25 that the same day he was admitted Dr. Ravenel saw

Page 25

1 him and was not impressed that there were signs or
2 symptoms of infection, but if that were the case,
3 then you would have reversed the Coumadin. You
4 don't have to wait 48 hours. You could have given
5 him plasma. You could have given him it's called
6 four-factor concentrate. It's like a prothrombin
7 concentrate. If the man's leg were in danger, you
8 could have within hours reversed that heparin and
9 taken him to the operating room. So the suggestion
10 that this was an urgent matter but they had to wait
11 somehow 48 hours to wait for the Coumadin to go
12 away and get in range is not consistent with
13 medical fact.
14         When you have an emergency -- when I've
15 had patients with serious infections or major
16 fractures that required immediate care and they are
17 anticoagulated, the anticoagulants are listed. One
18 of the newer ones, like a Xarelto or a Pradaxa, the
19 newer novel agents, they are a little bit harder to
20 reverse. But Coumadin there are many ways to
21 reverse it almost immediately. You could give a
22 high dose of vitamin K. They gave him 5
23 milligrams, but you can give him more than that.
24 You could have given it intravenously. And you can
25 give fresh frozen plasma, which within, I don't

7 (Pages 22 - 25)

Page 26

1 know, four or five hours you could take that
2 patient to the operating room.  Or you could have
3 given a prothrombic concentrate.
4        If you treat a patient with a
5 necrotizing infection, the rule you have in surgery
6 is ER to OR.  That patient needs to go right to the
7 operating room, not two days later, and if there
8 are confounding factors, such as
9 over-anticoagulation, the patient was 4.1 and he
10 wasn't in range, that's reversible.  I've done it.
11 I've had it done for patients of mine in the past.
12 In fact, as I say, I have a patient right now,
13 oddly enough, that I'm waiting for the CT today
14 that we may take to the OR with a necrotizing
15 fascial infection of her leg.  And the other thing
16 that's -- so I think she had an infection, don't
17 get me wrong, but I don't think she had necrotizing
18 fasciitis.  The labs were inconsistent with it.
19 Everyone's behavior was inconsistent with it.
20        And, again, even if he did -- urgent
21 amputation of that leg was not directly indicated
22 unless you first confirm, yes, that's what he's
23 got, there is irreversible damage, let's proceed
24 with the amputation.  That's my criticism,
25 basically.  And we have no confirmation at all.

Page 27

1        And I have no idea how that VA works.
2 I used to be in a VA hospital myself, the
3 Washington, D.C., VA.  I served as assistant
4 director of VA services for the Veterans
5 Administration in Washington, D.C. for podiatry
6 services, and so I have some VA experience, and
7 I've referred Veterans Administration patients here
8 in St. Louis from our VA hospitals to my office for
9 surgery.  So I'm not unfamiliar with the VA
10 hospital system, and I don't -- so I don't think
11 they function in a way different from most, well,
12 somewhat different, but generally most medical
13 care.  And I have no explanation as to why that leg
14 wasn't examined to establish the reason the leg was
15 amputated.  As you well know, there was no
16 verification of any of these diagnoses.
17        So basically I'm saying I don't argue
18 that Mr. Lynn had an infection superimposed on a
19 Charcot foot.  My argument is whether the leg had
20 to be amputated without at least some effort at
21 verifying the pathology, the diagnosis that
22 Dr. Brothers presumably made, although nowhere in
23 the record does he ever say necrotizing fasciitis.
24 He uses words like abscess, cellulitis, and
25 misinterpretation of those x-rays as being

Page 28

1 osteomyelitis.  And if it was osteo, we don't know
2 that because no one ever did anything to verify the
3 diagnosis.
4        So that's my -- that's really where I'm
5 focused, is the decision to do the amputation,
6 particularly in a man who is stable.  This was not
7 a patient who was on death's door.  I had a
8 patient, as I said earlier, this year.  His foot
9 was gangrene and dead.  He was febrile.  He had
10 like a 20,000 something white count.  He was
11 hemodynamically unstable.  Mr. Lynn was far from
12 that.  He was far from that.  And the patient I
13 have right now in the hospital with a potential
14 necrotizing fascial infection, infectious disease
15 and I are going back and forth right now because
16 she has got an initial negative CT scan but she has
17 got some arguable signs and symptoms consistent
18 with a necrotizing fascial infection.  I'm going to
19 see her this evening, and she may have to be an
20 add-on if her CT comes back confirming that, yes,
21 she has got problems, but we are going to open it
22 up and look and confirm that she has a major issue,
23 and we're going to debride her and do an incision
24 and drainage but we are not going to -- well, I
25 can't amputate legs anyway by law, but we are

Page 29

1 certainly not going to just pass her off to
2 orthopedics or vascular or general surgery and say,
3 well, there you go, she has got an infection, so
4 take her leg off.  I think that's what happened
5 here, quite frankly.  I really do.
6        I just think there should have been some
7 verification to say, yes, this is an unsalvageable
8 leg, which it doesn't sound like there was, and so
9 we're going to take the leg off, we don't want to
10 but we have to.  That's my criticism.
11    Q.  Well, I think you just broke my record
12 for the amount of time.  I have to go back in and
13 ask you a lot of questions about everything that
14 you just testified to.  So let's see if I can do
15 this.  I'm not sure where to start.
16        You said that you had one patient
17 currently in the house and one earlier this year
18 that related to a necrotizing soft tissue
19 infection, correct?
20    A.  I had one that was confirmed earlier
21 this year.  The patient we're watching now
22 potentially has that.  I mean, it's hard to
23 explain.  She is growing an alpha streptococcus,
24 which is one of the more common germs that cause
25 this problem, so we're watching her carefully now,

8 (Pages 26 - 29)

Allen Mark Jacobs, DPM                                                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 30

1 and based on her CT scan which was performed today,
2 this morning, we may or may not take her to the OR.
3        Q.  Well, it was just a yes-or-no question.
4 I'm going to try to go through this as quick as I
5 can.  I'm trying to get a gauge on how many times
6 you have had experience with necrotizing fascitis
7 in your patients.
8        A.  A couple times a year.  Mostly in the
9 foot.  Occasionally in the leg.
10        Q.  Okay.
11        A.  It's not common.
12        Q.  Right.  So let's just assume that in
13 South Carolina a podiatrist cannot work above the
14 ankle.  Okay?  Is necrotizing fascitis something
15 that you've seen in the foot area?
16        A.  Of course.  Of course you do.
17        Q.  Okay.  And you were saying that this
18 particular patient didn't have a sign of infection.
19 I believe that you even write that in your
20 paragraph number 4.  Let's see if that's the right
21 paragraph.  It says:  No signs or symptoms
22 suggestive of acute infection or sepsis.  Is that
23 the reference that you were making to when you were
24 testifying earlier?  You said no --
25        A.  I should have inserted the word

Page 31

1 pathognomonic, diagnostic of.
2        Q.  You said the white blood cell count
3 wasn't high, no fever, correct?
4        A.  Yes.
5        Q.  And those are things that you are
6 relying on as symptoms for an infection that a
7 doctor would recognize and look at for a
8 differential diagnosis; is that correct?
9        A.  Those are some of them.  Those are
10 signs.  But, again, when you look at infection, you
11 look at other things.  Other laboratory studies,
12 for example.
13        Q.  You mentioned that -- and this is in
14 your dissertation of your opinion or your
15 criticism.  I didn't think you called it an
16 opinion.  Your criticism.  You said that Mr. Lynn
17 had a loss of appetite and some malaise.  You
18 testified to that earlier.
19        A.  Yes.
20        Q.  But you didn't extract that from the
21 notes of Dr. Ravenel, did you?
22        A.  No.  That was in the hospital records,
23 and the records said that those symptoms had been
24 ongoing for approximately four days, I believe.
25        Q.  You didn't see any record with

Page 32

1 Dr. Ravenel on January 15th of 2019 where the
2 patient reported a history that included a loss of
3 appetite or malaise, did you?
4        A.  No.
5        Q.  Did you see any indication when
6 Mr. Lynn was with Dr. Ravenel on January 15th, that
7 morning, where he reported the history of
8 intermittent chills?
9        A.  No.
10        Q.  Did you see where Mr. Lynn told
11 Dr. Ravenel that he had decreased energy?
12        A.  No.
13        Q.  Did you seen where Mr. Lynn told
14 Dr. Ravenel that he had vomit the day before that
15 appointment?
16        A.  No.
17        Q.  Did you see the note where Mr. Lynn
18 reported that he had fatigue for almost four days
19 before the appointment on January the 15th with
20 Dr. Ravenel?
21        A.  No.  If this will save you effort, I'm
22 not arguing that Mr. Lynn did not have an
23 infection.  I'm arguing that there was evidence
24 that he had a necrotizing fascial infection that
25 required amputation.  I'm not arguing that he did

Page 33

1 not have an infection.
2        Q.  Do you think that Mr. Lynn's amputation
3 was a result of trying to treat osteomyelitis?
4        A.  It's possible.
5        Q.  Did you see --
6        A.  You mean treating a Charcot that was,
7 in fact, osteo?  Is that what you are asking me?
8        Q.  What I'm asking you is do you think
9 that Dr. Brothers performed an amputation on
10 Mr. Lynn to treat osteomyelitis?
11        A.  That was part of his -- yes, because he
12 states in his record that Mr. Lynn had
13 osteomyelitis.  Dr. Brothers made that diagnosis.
14        Q.  Okay.  Do you think that the
15 osteomyelitis was in the foot region where the
16 Charcot foot disease was?
17        A.  I don't know that there was ever
18 osteomyelitis anywhere.  But if it was, it could
19 have been in the foot, it could have been in the
20 ankle, it could have been in the distal tibia and
21 fibula.
22        Q.  Okay.  Do you believe that Dr. Brothers
23 amputated the leg of Mr. Lynn to treat the
24 necrotizing fascitis?
25        A.  Yes.

9 (Pages 30 - 33)

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 34

1    Q.  Okay.  Do you think that there was an
2  amputation to treat necrotizing fascitis and
3  osteomyelitis?  Do you think that was in
4  Dr. Brothers' differential diagnosis, to perform
5  that procedure?
6    A.  Yes.
7    Q.  When you look at your opinion, which is
8  number 7 --
9       I'm going to read it into the record.
10      -- it says:  It appears that the
11  non-podiatric medical staff of the Charleston South
12  Carolina Veterans Administration Hospital was
13  unfamiliar with Charcot's joint disease, which
14  occurs with frequency in a patient with diabetes,
15  neuropathy, and concurrent pathology such as
16  obesity.  Do you see where I read?
17    A.  Yes.
18    Q.  Where does that statement come from
19  that the non-podiatric medical staff at the VA was
20  unfamiliar with Charcot joint disease?
21    A.  The fact that they -- that Dr. Brothers
22  presumed the diagnosis of osteomyelitis based on
23  x-ray and CT evaluation when, in fact, those same
24  x-ray changes may have been representative of
25  Charcot's joint, and that should have been included

Page 35

1  in a differential diagnosis.  It's a very difficult
2  differentiation to make.
3    Q.  In your opinion, what does it take to
4  qualify as a non-podiatric medical staff member to
5  be familiar with Charcot joint disease?
6    A.  To be familiar?
7    Q.  Right.
8    A.  It would be reflected in your medical
9  records, your decisionmaking, the fact that you
10  recognize there are advanced resorptive or
11  destructive bone changes, and these could be
12  representative of osteomyelitis or they could be
13  representative of Charcot's joint disease, and
14  efforts would be made to try to discriminate the
15  two because the treatment is entirely different.
16    Q.  Your statement says that the
17  non-podiatric medical staff was unfamiliar with
18  Charcot joint disease, and I want to know what does
19  it take in your opinion to be familiar with that?
20    A.  I just answered your question.
21    Q.  Is it based on the number of cases?
22    A.  In part.  Obviously it's just your
23  general knowledge of the entity.
24    Q.  Who exactly are you referring to in
25  that statement?

Page 36

1    A.  Dr. Brothers.
2    Q.  Anyone else?
3    A.  No.
4    Q.  How do you know what experience
5  Dr. Brothers has with Charcot joint disease?
6    A.  He described it in his deposition.
7    Q.  Based on his description, you don't
8  believe he is familiar with Charcot joint?
9    A.  I think he has got some familiarity.
10    Q.  And what is he lacking?
11    A.  Experience.  It's not his specialty.
12    Q.  How many cases would you say a doctor
13  would have to see of Charcot joint to be familiar
14  with Charcot joint?
15    A.  It would be strictly conjecture on my
16  part.
17    Q.  Well, I don't remember seeing -- I
18  don't remember that Dr. Brothers stated,
19  but I thought it was 10 to 15 cases a year.  Is
20  that not enough?  You can correct me if I'm wrong.
21    A.  I would think that would be adequate
22  experience, if he understood what it was he was
23  seeing.
24    Q.  It's your testimony, if I understand
25  it, that Dr. Brothers specifically is a

Page 37

1  non-podiatric medical staff member and he is
2  unfamiliar with Charcot joint disease.  Is that my
3  understanding of your testimony?
4    A.  Yes.
5    Q.  Okay.  Have you seen any written
6  statements or had any conversations with anyone
7  else about Dr. Brothers' experience with or without
8  a lacking in Charcot foot disease?
9    A.  No.
10    Q.  Looking at your Declaration in
11  paragraphs number 5 and number 8, there is a
12  sentence that's very similar in both of them.  So
13  I'm going to give you a chance to read them both.
14  If you would refresh your memory with paragraphs 5
15  and 8 as it relates to the abscess that's present.
16    A.  Okay.  I've looked at it.
17    Q.  It says -- in paragraph number 5, it
18  says:  If, in fact, an abscess had been present,
19  this could have been properly treated by incision
20  and drainage and not urgent amputation of the right
21  leg.  Do you see that?
22    A.  Yes.
23    Q.  And then in paragraph 8, it says:  If,
24  in fact, Mr. Lynn suffered from an abscess, this
25  could have been treated by incision and drainage.

10 (Pages 34 - 37)

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 38

1  Do you see that?
2      A.  Yes.
3      Q.  Did you see where Dr. Brothers had a
4  medical note on January the 16th that he was
5  considering incision and drainage and possible
6  debridement of Mr. Lynn?
7      A.  Yes.
8      Q.  Did he, in fact, consider incision and
9  drainage?
10     A.  Well, he didn't do it.  So he may have
11 thought about it, but it was not done.  That's my
12 major criticism.  There is nothing that would have
13 been lost by saying before I make the decision to
14 remove his leg, I'm going to open this up and look
15 and confirm my impression.  That was not done.
16     Q.  Is it your opinion that once you open
17 the leg up you can close it back and then talk to
18 the patient or is that done simultaneous in the
19 procedure?
20     A.  No.  He would have said:  Mr. Lynn, I'm
21 going to open this leg.  I'm going to examine it
22 and see if we have something that we can save and
23 effectively cure over time or possibly cure over
24 time or if it's apparent that there is too much
25 damage, there is too much destruction.  If there is

Page 39

1  too much necrosis, we cannot salvage this leg, then
2  we are going to go ahead and remove it.  I think
3  that would have been the appropriate thing to do.
4         I mean, that's the focus of my
5  criticism.  Everything that was done here was
6  indirect evidence or presumption, when it was
7  possible that that was not the diagnosis, and,
8  because the leg was never examined for some reason
9  we'll never know whether there was or was not an
10 unsalvageable situation.
11     Q.  That's your opinion, that it was not
12 examined, correct?
13     A.  Well, I know it wasn't examined because
14 you would have put it in the operative note.  And,
15 number 2, the pathologist has a description of the
16 skin, and there is no description of any additional
17 incisions other than the one made at the level of
18 the amputation.
19     Q.  I understand.  I understand what you
20 are saying about the pathology.  I'm talking about
21 Dr. Brothers.  If he has a different recollection
22 as to looking at the site of the infection to
23 determine whether or not it was salvageable and he
24 made a decision intraoperatively that it was not
25 salvageable, would that have been the correct thing

Page 40

1  for him to do?
2      A.  Yes.
3      Q.  Okay.  And by the correct thing, that
4  means if it's not salvageable then you amputate,
5  correct?
6      A.  If it's not salvageable, correct.
7  Understanding, again, that not every case of
8  necrotizing fasciitis requires amputation.
9      Q.  I want to ask you about that.  You talk
10 about the abscess in general.  Which location are
11 we talking about here?
12     A.  In the leg.  The distal leg.
13     Q.  So is your description of the abscess
14 the gaseous tissue that was described in the leg
15 area and not in the foot?
16     A.  I don't know where the infection
17 extended from because, as you know, there was no
18 open wound and there is not necessarily -- I mean,
19 the gas can travel.  So there is not always a
20 direct correlation between the gas visualized and
21 the exact level of the infection, but it was the
22 anterior lateral aspect of the right leg.
23     Q.  When you look at paragraph number 32,
24 you have the boldface font referring to the left
25 foot -- left calf, ankle, and foot.  Do you see

Page 41

1  that in paragraph 32?
2      A.  Yes.
3      Q.  Why is that in boldface?
4      A.  I did not do that.  So I don't know why
5  that was put the way it was.  As you know, there
6  was some confusion as to x-rays and so forth, but
7  no, I did not bold that.
8      Q.  Did you yourself ever look at the
9  x-rays or the CT scans or the MRI or have you only
10 looked at the impressions that were prepared by
11 radiology?
12     A.  I was sent some of the images.  I don't
13 recall how many.  There were quite a few taken in
14 the last two years, but I did look at the -- some
15 of the radiographs and I believe the CT.
16     Q.  Are you yourself trained to identify
17 necrotizing fasciitis?
18     A.  To a point.  I don't pretend to have
19 the expertise of a radiologist, but I over read my
20 own CTs.
21     Q.  Do you disagree with Dr. Fritz's report
22 that he identified the necrotizing fasciitis that
23 was mentioned on the CT scan?
24     A.  I don't recall if he -- well, no, I
25 don't disagree.  I agree that the changes he

11 (Pages 38 - 41)

Allen Mark Jacobs, DPM                                 March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

1 so-called described in his little term paper were
2 present.
3     Q.  Did you make a note when you were
4 reviewing the records in this case why vascular
5 surgery was consulted by Dr. Glover from the
6 emergency department?
7     A.  No.
8     Q.  Are you aware, does it matter to you,
9 if Dr. Glover contacted vascular surgery to look at
10 a necrotizing fasciitis that he was suspicious of?
11    A.  No.
12    Q.  Would that have been the proper
13 decision made by an emergency room physician to
14 consult with vascular surgery in that situation?
15    A.  They can consult with vascular.  They
16 can consult with general surgery.  They can consult
17 with orthopedics.  I don't know what the particular
18 regimen is that's followed at the Charleston VA
19 Hospital.
20    Q.  Okay.  When the consult was made to
21 vascular surgery, do you think that the knowledge
22 and experience of Dr. Brothers required him to
23 follow up with the request for service?
24    A.  No.  I would think if he -- if that's
25 the -- if that's the referral pattern that's

1 typically followed, then of course it's
2 appropriate.
3     Q.  I want to go back.  You had sort of
4 deflected an answer to my earlier questions, and I
5 wanted to make sure it's on the record.  We were
6 talking about intermittent chills, decreased
7 energy, decreased appetite, fatigue, vomiting and
8 nausea earlier that are things that are mentioned
9 in Mr. Lynn's emergency room medical records,
10 correct?
11    A.  Yes.
12    Q.  Are those considered symptoms of an
13 infection?
14    A.  It can be.
15    Q.  Okay.  And do you know if a blood
16 glucose lab finding of greater than 400 can be
17 considered a finding of, symptomatic of, an
18 infection?
19    A.  It can be.
20    Q.  Okay.  You don't disagree that the
21 record clearly indicates that with those findings
22 that it's a possibility that he had this ongoing
23 infection and had those symptoms, correct?
24    A.  That's correct.  Again, to be clear,
25 I'm not arguing there was an infection.  I mean,

1 take, for example, if I were an attorney, which
2 obviously I am not, but if I were an attorney, I
3 would -- and I wanted to paint this in an opposite
4 direction, if I were the plaintiff attorney, I
5 would say, well, Dr. Jacobs, he also had redness,
6 swelling, and pain ongoing since June, are those
7 not also signs and symptoms of an infection?  I
8 would say, yeah, they could be.  So signs and
9 symptoms are -- these things are not pathognomonic.
10        Mr. Lynn had a terrible history of poor
11 diabetes control, for example.  It wouldn't be
12 shocking to find a significantly elevated glucose
13 in this gentleman because I believe the last
14 hemoglobin A1C I saw was something like 12.6, or
15 something like that.  So I'm not arguing with this.
16 I'm just letting you know to be fair these things
17 are not pathognomonic.
18        Yes, everything you mentioned are
19 absolutely consistent with a possible infection.  I
20 would never suggest otherwise.
21    Q.  Going back to the first MRI of Mr. Lynn
22 that is relevant to this case, being in July of
23 2018 and following current with x-rays that were
24 done in August of 2018 and October of 2018 right on
25 up through the January 15th time period, did you

1 see any imaging or studies that had any gas bubble
2 infections or gas bubble tissue?
3     A.  No.
4     Q.  Okay.  And you mentioned that Mr. Lynn
5 had redness and swelling and pain associated with
6 his leg that he was being seen for by podiatry on
7 January the 15th, correct?
8     A.  Yes.
9     Q.  Are those proper indicators for
10 Dr. Ravenel to have considered getting a DVT
11 Dopplar study done since Dr. Ravenel had put him on
12 non-weightbearing for such an extended period of
13 time prior to that date?
14    A.  Of course.
15    Q.  Okay.  So you don't have a problem with
16 Dr. Ravenel ordering a DVT Dopplar, do you?
17    A.  Of course not.
18    Q.  Okay.  What in your understanding of
19 necrotizing fasciitis would have occurred if
20 Dr. Brothers had not amputated at the time when he
21 did?  You are suggesting that he would have tried
22 an incision and a drainage and possibly a round of
23 antibiotics, correct?
24    A.  Well, incision, drainage, and a
25 debridement.  You have to go about cleaning out all

Allen Mark Jacobs, DPM
March 11, 2022

Lynn, Keith and Jennifer v. United Sates Of America

Page 46

1  the dead tissue and infected tissue.  You don't
2  just make an incision -- well, if we were lucky, it
3  would have been an abscess and you could basically
4  do an incision and drainage.  What I'm saying again
5  is even if it were a necrotizing fascial infection,
6  that doesn't mean the patient cannot be treated by
7  an aggressive debridement with antibiotics.
8       So incision and drainage alone may not
9  be sufficient.  And I just want to remind you, I'm
10 sure you know this, that just because you find air
11 on a CT scan doesn't make a diagnosis of
12 necrotizing infection because there are many germs
13 that are gas producers.  So you can have an
14 infection with a bacteria that produces gas, and
15 there are many such organisms, but, again, that
16 does not mandate the need for amputation.  Finding
17 air density on an x-ray or CT scan does not equal a
18 diagnosis of gas gangrene or a necrotizing fascial
19 infection.  That's all I'm saying.
20      The leg should have been opened first,
21 the diagnosis confirmed or not confirmed, and then
22 if the diagnosis were confirmed, you say, I'm sorry
23 about this but the leg has to go.  And that's my
24 whole -- that's the basis of my criticism.
25      Q.  Did you disagree with the treatment of

Page 47

1  the vancomycin and other antibiotics that the
2  hospital had him on beginning on the 15th?
3       A.  Of course not.
4       Q.  Okay.  Do you think that he was on
5  those antibiotics long enough for the doctors to
6  get an understanding as to whether or not there was
7  any improvements?
8       A.  Well, I can't answer that question
9  because you are talking about an individual that
10 basically had benign laboratory findings, did not
11 have overwhelming clinical findings.  So I'm not
12 sure what there was to improve.  Dr. Brothers' own
13 note said that he was stable on the 16th, the day
14 before the amputation, and that he was thinking
15 about doing an incision or drainage and maybe
16 amputating the foot.  He wasn't even talking about
17 the leg.  So I'm not sure what there was to
18 improve, I guess is what I'm saying.
19      For example, I have half a dozen
20 patients in the hospital right now with infections
21 of the leg and/or foot, mostly leg, actually, right
22 now, and they are admitted with an elevated white
23 count or elevated markers for inflammation.  And we
24 give antibiotics, and we look for those markers to
25 come down.  We look for the white cell count to

Page 48

1  come down, their fever to come down, their
2  sedimentation rate to come down, other things, but
3  there you have a comparator.  But when a patient
4  starts with normal laboratory findings, I'm not
5  sure how you judge improvement when they are all
6  within normal range.  Did I explain that okay?
7       Q.  Yes.  Your report doesn't mention
8  necrotizing fascitis at all, does it?
9       A.  No.
10      Q.  Did your notes to the attorney before
11 he prepared this Declaration mention necrotizing
12 fascitis?
13      A.  I don't think so.
14      Q.  When was that first put on your
15 spectrum of being relevant in this case?
16      A.  I don't recall.
17      Q.  Was it after you received the expert
18 reports for the defendant's hired and retained
19 experts?  Was it after you got those reports?
20      A.  No.  I think it was before I saw --
21 Dr. Fritz was really the one that defined that the
22 most.  I think the other two expert reports that I
23 saw sort of said, well, it could have been.
24      Q.  You didn't see any record in the -- any
25 notes in the medical record of Mr. Lynn that

Page 49

1  mentioned necrotizing fascitis?
2       A.  There was one reference somewhere, and
3  that was it.
4       Q.  What was that on?
5       A.  I don't recall.  It might have been in
6  the radiology report, but I'm not certain where I
7  saw it, but I only saw the term used one time.  And
8  it was never used by Dr. Brothers.  But I assume,
9  maybe I'm incorrect, which to me makes the
10 criticism stronger, actually, that that was the
11 basis on which Dr. Brothers went ahead and did the
12 amputation.  Because if it was just an abscess,
13 then clearly an effort at incision and drainage
14 would have been indicated.
15      I was trying to think -- he didn't have
16 any gangrene.  His vascular status was adequate.
17 Dr. Brothers described him as having strong
18 Dopplar-able pulses.  So we didn't have an ischemic
19 issue.  We didn't have a compartment symptom.  And
20 so I looked at this and said, well, what would
21 motivate one to do an urgent amputation of a leg
22 for an infection, and necrotizing fascitis is the
23 thing that comes to mind immediately because I
24 couldn't think of any other infection that you
25 would immediately amputate a leg for without at

13 (Pages 46 - 49)

Allen Mark Jacobs, DPM                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 50

1  least looking and confirming the diagnosis.
2      Q.  Would the end result be -- if there was
3  no amputation and it was a necrotizing fascitis
4  what would have happened?
5      A.  If there were no amputation?  If it was
6  truly necrotizing fascitis, then I would assume at
7  some point Mr. Lynn would have become quite ill.
8  He would have started to develop fevers, have an
9  elevated white count.  There is all sorts of
10 manifestations.  He could have gone into shock,
11 could have gotten hypotensive.  There is all sorts
12 all sorts of manifestations of sepsis, but he would
13 have gotten septic.
14     Q.  Do you rate manifestations in groups of
15 seriousness?  Like, is white blood cell raising or
16 fever more important than loss of appetite,
17 vomiting, things of that nature that he already had
18 exhibited?
19     A.  No.  They were all part of your
20 evaluation of a patient.  I don't think one
21 necessarily takes priority over the other.  The
22 ultimate would have been to incise the area and
23 examine it and see what was happening.  That's
24 ultimately what needed to be done.
25     Q.  And what if Dr. Brothers had incised it

Page 51

1  and drained it and then the infection remained and
2  would just continue to manifest, what would the
3  next step be?
4      A.  It depends.  But amputation would
5  certainly have been a consideration.
6      Q.  Okay.
7      A.  I had a woman far less serious, we
8  amputated a toe, and it was salvageable, but I told
9  her because of the chronicity of this problem you
10 would always have sort of a swollen funky looking
11 toe.  It might be bothersome in shoes, but it's
12 treatable.  And she said I just want the toe off
13 and I want to be done with it.  So it's a far less
14 of a serious issue, but -- so you really don't know
15 what the outcomes would be in the long term.
16 People survive terrible things and other people
17 seem to succumb to relatively minor -- or seemingly
18 minor issues.
19     Q.  Are there other physicians such as
20 Dr. Brothers that would be vascular surgeons that
21 would have opened up the leg, seen the same thing
22 that Dr. Brothers saw, and amputated?
23     A.  I have no idea what other people would
24 have done.  I could only speak to the records I had
25 in this case to look at.

Page 52

1      Q.  Do you know how fast necrotizing
2  fascitis moves?
3      A.  Well, that's another issue.  You are
4  saying, well, he had all these signs for four days.
5      Q.  I asked you -- before you go off, I
6  just want to ask you a direct question.  Do you
7  know the rate at which necrotizing fascitis moves
8  from muscle to muscle?
9      A.  It's very fast.
10     Q.  Okay.  And give me an example of what
11 very fast is in --
12     A.  It could be 24 to 48 hours.  And it's a
13 very fulminant infection typically.  And you are
14 saying now that this man had symptoms of that
15 infection for at least four days prior to
16 admission, so he had plenty of time to get plenty
17 sick if this were, in fact, a necrotizing fascial
18 infection.
19     Q.  Could it have occurred from the
20 timeframe of seeing Dr. Ravenel to going to the
21 emergency department?
22     A.  I think he could have gotten worse in a
23 couple of hours, of course.  Some cases do get --
24 do advance that rapidly.  That's why I told you
25 earlier it's ER to OR.

Page 53

1      Q.  Dr. Jacobs, I'm going to ask if we can
2  go off the record for a few minutes.  I'm just
3  going to look over a couple of things and try to
4  get back as soon as I can on this.  Okay?
5      A.  Sure.
6      Q.  Stretch or take a comfort break.
7          (A recess transpired.)
8  BY MR. BERLINSKY:
9      Q.  I'm just going to try to close out the
10 deposition, Dr. Jacobs.  If I understand your
11 testimony, then I'm just going to get a couple
12 quick summaries.
13         I think that you testified that the
14 blood glucose, the intermittent chills, the
15 decreased energy, the decreased appetite, the
16 fatigue, and the vomit, those are signs and
17 symptoms of an infection?
18     A.  Can be.
19     Q.  Okay.  And where you say in paragraph 4
20 that there were no signs and symptoms of infection
21 -- symptoms of infection, we just went through
22 that, that's not really as accurate based on what
23 we just talked about, correct?
24     A.  Correct.
25     Q.  And as far as the decision of the

14 (Pages 50 - 53)

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 54

1 vascular surgeon to amputate the leg for
2 necrotizing fascitis, that in and of itself is not
3 a deviation in the standard of care of vascular
4 surgery. Are you able to testify on that opinion?
5     A. Obviously you know as well as I do I
6 cannot testify to vascular surgery standards of
7 care.
8     Q. Okay. It sounds to me like you didn't
9 see any evidence in the record that cleared up a
10 presumptive finding of necrotizing fascitis and you
11 think that was a requirement, correct?
12    A. No. What I'm suggesting is even if the
13 diagnosis were that of necrotizing fascitis that
14 there is still the opportunity to salvage a limb.
15 Or other part of the body. I mean, it's not a
16 disease you just get on the leg or the foot. There
17 is the opportunity for salvation of that -- or
18 preservation of that limb with an aggressive
19 debridement, usually multiple debridements are
20 required, but you can salvage the leg. So I'm
21 saying even if there was a true diagnosis of
22 necrotizing fascitis, because all we have is
23 indirect presumptive evidence, that still does not
24 mandate amputation of the limb, that you can
25 salvage limbs with necrotizing fascitis. It's a

Page 55

1 lot of work and -- there is no doubt about it, but
2 they are salvageable in some cases. Not all, but
3 some.
4     Q. Other than visualizing a finding during
5 the surgery, how would you suggest confirmation of
6 necrotizing fascitis?
7     A. You can't. Everything else is
8 presumptive.
9     Q. Okay. I just wanted to make sure.
10    A. It's indirect evidence. You can say
11 x-rays look like it, labs look like it, patient
12 kind of looks like it, but, again when you are
13 making the major decision such as removing a leg
14 from a human being, it's nice to sort of at least
15 take the time to look and say, yes, unfortunately
16 they have what we thought they had and this leg
17 needs to be removed.
18    Q. Yeah. I think you would agree with me
19 that sometimes a necrotizing fascitis can be
20 embedded so deep in tissue that there is no
21 vascular component that even a blood culture would
22 come back confirming. Is that not right?
23    A. I suppose that's theoretically
24 possible. Dr. Fritz had somebody go and dig up a
25 bunch of articles that said, well, you can have

Page 56

1 necrotizing fascitis without a fever, without a
2 leucocytosis, but these are -- I mean, anybody who
3 treats these things knows this would be extremely
4 atypical. These patients are typically pretty
5 sick, especially if they have been having symptoms
6 four days preceding their admission to the
7 hospital. By that time, these infections are
8 pretty aggressive and pretty fulminate, and you
9 should have seen something.
10    Q. That's the second time you made a
11 comment on Dr. Fritz's report. I take that to mean
12 that I should ask you a question. Do you have any
13 issues or take a position about Dr. Fritz or any of
14 the other expert opinions that you've read from the
15 defendant?
16    A. No.
17    Q. Do you have any reason to disagree with
18 any of their findings, that the vascular surgeon
19 was within the standard of care of amputating the
20 leg to prevent the necrotizing fascitis from
21 spreading?
22    A. Well, I don't think Dr. Fritz is in any
23 position to comment on the standard of care for a
24 vascular surgeon any more than I am. He is a
25 radiologist. So, no, I just found it interesting

Page 57

1 that he took such a strong position in his report
2 regarding the essence of his findings that this was
3 consistent with a necrotizing fascial infection.
4 To me it actually argued more strongly that some
5 confirmation should have been made because, here
6 again, the mere fact that you have necrotizing
7 fascitis does not mandate amputation. It just
8 doesn't. You can salvage some of these limbs, and
9 Mr. Lynn was denied that opportunity.
10    Q. I'm going to take a read your
11 report. I don't have any other questions for you
12 at this time, and if we need to go back on the
13 record, then I'll set that up with the attorneys.
14 It's highly unlikely, but I just want to leave that
15 out there as a potential.
16        MR. TINKLER: Thank you. I don't have
17 any questions, Dr. Jacobs.
18        (Off-the-record conference.)
19        (The witness, after having been advised
20 of his right to read and sign this transcript,
21 waives that right.)
22        (The deposition concluded at 3:35 p.m.)
23
24
25

15 (Pages 54 - 57)

Page 58

1        CERTIFICATE OF REPORTER
2
3        I, Karen Nellius, Court Reporter and
4   Notary Public for the State of South Carolina at
5   Large, do hereby certify that the foregoing
6   transcript is a true, accurate, and complete
7   record.
8        I further certify that I am neither
9   related to nor counsel for any party to the cause
10  pending or interested in the events thereof.
11       Witness my hand, I have hereunto
12  affixed my official seal this 22nd day of March,
13  2022 at Charleston, Berkeley County, South
14  Carolina.
15
16
17
18
19
20
21
22  _____
    Karen Nellius, RPR
23  My Commission Expires
    November 14, 2024
24
25

Page 59

1              I N D E X
2
3             Page    Line
4
5   ALLEN MARK JACOBS, DPM        3       1
6   EXAMINATION             3       3
7   BY MR. BERLINSKY
8   CERTIFICATE OF REPORTER     58      1
9
10
11      REQUESTED INFORMATION INDEX
12      (No requested information.)
13
14
15          E X H I B I T S
16
17             Page    Line
18  EXHIBIT 1,            3      24
19  DECLARATION OF ALLEN MARK
20  JACOBS DPM, FACFAS, FAPWH AND
21  CV
22
23
24
25

16 (Pages 58 - 59)

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

**[1 - answer]**                                                    Page 1

| **1** | **3** | **a** |
|---|---|---|
| **1**  3:24 4:3,14 13:4 15:11 59:5,8,18 | **3**  2:9 23:25 59:5,6 59:6,18 | **a1c**  44:14 |
| **10**  8:13 9:17 36:19 | **304a**  2:10 | **able**  5:24 9:22 49:18 54:4 |
| **100**  8:21 | **32**  5:1 40:23 41:1 | **abnormalities** 24:3 |
| **11**  1:10 | **3:00**  11:18 | **abscess**  24:6 27:24 |
| **12.6**  44:14 | **3:35**  57:22 | 37:15,18,24 40:10 |
| **14**  58:23 | | 40:13 46:3 49:12 |
| **14713**  58:20 | **4** | **absence**  23:4 |
| **15**  36:19 | **4**  30:20 53:19 | **absolutely**  44:19 |
| **151**  2:15 | **4.1**  26:9 | **accurate**  53:22 |
| **15th**  20:23 32:1,6 | **40**  4:20 | 58:6 |
| 32:19 44:25 45:7 | **400**  43:16 | **accurately**  15:8 |
| 47:2 | **402**  1:13 | **active**  4:23 9:8,14 |
| **16th**  38:4 47:13 | **4277**  1:5 | **actual**  12:18 |
| | **48**  24:13 25:4,11 | **acute**  30:22 |
| **2** | 52:12 | **add**  28:20 |
| **2**  23:16 39:15 | | **adding**  12:4 |
| **2,000**  7:22 | **5** | **addition**  17:22 |
| **2,500**  7:22,23 | **5**  25:22 37:11,14 | **additional**  5:1 |
| **20**  9:18 | 37:17 | 18:2,6 39:16 |
| **20,000**  28:10 | **500**  8:25 | **additionally**  7:3 |
| **200**  2:16 | **56**  5:1 | **additions**  19:7 |
| **2009**  5:2 | **571**  2:5 | **addressed**  20:21 |
| **2018**  16:16,24 | **58**  59:8 | **adequate**  36:21 |
| 44:23,24,24 | | 49:16 |
| **2019**  20:23 32:1 | **6** | **administration** |
| **2020**  13:10 15:5 | **63117**  1:13 | 15:15 27:5,7 |
| 18:1 | **6400**  1:12 | 34:12 |
| **2022**  1:10 58:13 | | **admission**  52:16 |
| **2024**  58:23 | **7** | 56:6 |
| **22nd**  58:12 | **7**  34:8 | **admitted**  21:12 |
| **24**  52:12 59:18 | | 24:25 47:22 |
| **29401**  2:16 | **8** | **advance**  52:24 |
| **29407**  2:5,10 | **8**  37:11,15,23 | **advanced**  23:8 |
| **2:05**  1:11 | **843-266-1679**  2:17 | 35:10 |
| **2:20**  1:5 | **843-577-8080**  2:11 | **advised**  10:8 57:19 |
| **2nd**  13:9 15:5 18:1 | **843-853-5203**  2:6 | **affixed**  58:12 |
| | **88**  11:15 | **afternoon**  3:5 |
| | **9** | |
| | **9,000**  16:3,8 | |

**agents**  25:19
**aggressive**  46:7 54:18 56:8
**ago**  11:9
**agree**  13:7,10 17:1 41:25 55:18
**ahead**  39:2 49:11
**air**  46:10,17
**allen**  1:9 3:1,25 59:5,19
**allowed**  6:4 10:9
**alpha**  29:23
**alter**  19:10
**amended**  19:3
**america**  1:6 2:13
**amount**  29:12
**amputate**  19:15 28:25 40:4 49:25 54:1
**amputated**  21:16 21:22 27:15,20 33:23 45:20 51:8 51:22
**amputating**  22:5 47:16 56:19
**amputation**  12:17 17:18 19:21 21:23 22:14 23:2,11,18 23:22 26:21,24 28:5 32:25 33:2,9 34:2 37:20 39:18 40:8 46:16 47:14 49:12,21 50:3,5 51:4 54:24 57:7
**amputee**  22:9
**ankle**  5:22,25 6:5 18:21 20:13,21,25 21:12 30:14 33:20 40:25
**answer**  3:20 8:6 9:22 43:4 47:8

**answered** 35:20
**answers** 9:23 10:2
**anterior** 40:22
**antibiotic** 23:19
**antibiotics** 45:23
    46:7 47:1,5,24
**anticipation** 6:12
**anticoagulants**
    25:17
**anticoagulated**
    24:15 25:17
**anticoagulation**
    26:9
**anybody** 56:2
**anymore** 12:3
**anytime** 9:11
**anyway** 28:25
**apologize** 15:20
    18:16
**apparent** 38:24
**apparently** 21:8
**appearances** 2:1
**appearing** 1:16
    2:4,9,15
**appears** 34:10
**appetite** 21:1
    31:17 32:3 43:7
    50:16 53:15
**appointment**
    32:15,19
**appreciated** 3:21
**appropriate** 39:3
    43:2
**approximately** 9:5
    31:24
**area** 10:13 11:23
    12:22 30:15 40:15
    50:22
**arguable** 28:17
**argue** 27:17

**argued** 57:4
**arguing** 32:22,23
    32:25 43:25 44:15
**argument** 23:25
    24:3 27:19
**arose** 20:22
**articles** 11:19
    55:25
**asked** 52:5
**asking** 33:7,8
**aspect** 40:22
**assistant** 27:3
**associated** 45:5
**assume** 13:20
    30:12 49:8 50:6
**assure** 12:5
**attached** 4:4
**attorney** 3:6 10:8
    44:1,2,4 48:10
**attorneys** 2:2,12
    6:12 57:13
**atypical** 56:4
**august** 44:24
**available** 7:9,13
**avenue** 2:9
**average** 12:23
**aware** 20:23 21:4
    42:8

**b**

**b** 59:15
**back** 13:6 14:19
    14:25 15:17,22
    16:12 28:15,20
    29:12 38:17 43:3
    44:21 53:4 55:22
    57:12
**bacteria** 46:14
**based** 13:21 15:2
    21:19,25 22:18,21
    30:1 34:22 35:21
    36:7 53:22

**basically** 26:25
    27:17 46:3 47:10
**basis** 12:6 19:11
    46:24 49:11
**began** 17:3
**beginning** 47:2
**behalf** 9:14
**behavior** 26:19
**believe** 8:3 10:14
    17:21 18:5 24:9
    30:19 31:24 33:22
    36:8 41:15 44:13
**benign** 47:10
**berkeley** 58:13
**berlinksy** 2:14
**berlinsky** 3:4,6
    4:2,8,11,16 7:2
    14:4,15,22,23 20:4
    53:8 59:7
**best** 20:5
**better** 16:12
**beyond** 12:10
    16:20
**bill** 7:24
**biopsy** 21:21
**bit** 12:22 13:13
    25:19
**blood** 24:20 31:2
    43:15 50:15 53:14
    55:21
**body** 54:15
**bold** 41:7
**boldface** 40:24
    41:3
**bone** 12:11 21:21
    22:20 35:11
**bothersome** 51:11
**break** 6:16 53:6
**breakdown** 8:9
**broke** 29:11

**brothers** 18:5
    19:12,19 21:15
    23:2,12 24:5,10
    27:22 33:9,13,22
    34:4,21 36:1,5,18
    36:25 37:7 38:3
    39:21 42:22 45:20
    47:12 49:8,11,17
    50:25 51:20,22
**bubble** 45:1,2
**bunch** 55:25
**businesses** 8:4
**byron** 17:14,17,22
    17:23

**c**

**calf** 40:25
**call** 23:18,19
**called** 10:20 11:11
    24:18 25:5 31:15
    42:1
**care** 16:17 25:16
    27:13 54:3,7
    56:19,23
**cared** 17:21
**career** 9:7 12:3
**carefully** 29:25
**carolina** 1:1 3:7
    5:17,20 6:3,8
    15:15 30:13 34:12
    58:4,14
**case** 1:5 3:9 9:11
    9:13 11:21 16:2
    19:3 20:3,10 25:2
    40:7 42:4 44:22
    48:15 51:25
**cases** 7:4 8:20 9:15
    35:21 36:12,19
    52:23 55:2
**cause** 29:24 58:9
**cell** 22:15 31:2
    47:25 50:15

Allen Mark Jacobs, DPM                                    March 11, 2022

Lynn, Keith and Jennifer v. United Sates Of America

[cellulitis - days]                                                Page 3

cellulitis 24:8
27:24
center 10:19,20
certain 6:19 49:6
certainly 23:19
29:1 51:5
certificate 58:1
59:8
certify 58:5,8
chance 22:11
37:13 57:10
changed 19:4,23
changes 34:24
35:11 41:25
charcot 16:13
27:19 33:6,16
34:20 35:5,18
36:5,8,13,14 37:2
37:8
charcot's 11:23
16:17 20:12,15,16
20:18 21:5 22:2
34:13,25 35:13
charge 7:22
charleston 1:2 2:5
2:10,16 3:7 15:15
21:10 34:11 42:18
58:13
charted 4:25
checked 23:8
chills 32:8 43:6
53:14
chronicity 51:9
clarify 16:1
clayton 1:12
cleaning 45:25
clear 6:7 43:24
cleared 54:9
clearly 23:12
43:21 49:13

clinical 21:25
47:11
close 17:2 38:17
53:9
clotting 24:18
come 19:25 34:18
47:25 48:1,1,2
55:22
comes 28:20 49:23
comfort 53:6
comment 56:11,23
commission 58:23
common 12:19
29:24 30:11
communicate 3:22
comparator 48:3
compartment
49:19
complete 58:6
component 55:21
concentrate 25:6,7
26:3
concise 20:5
concluded 57:22
concurrent 34:15
conference 3:16
57:18
confirm 26:22
28:22 38:15
confirmation
26:25 55:5 57:5
confirmed 29:20
46:21,21,22
confirming 28:20
50:1 55:22
confounding 26:8
confusion 41:6
congenital 24:18
conjecture 36:15
conjunction 14:11

consider 38:8
consideration 51:5
considered 43:12
43:17 45:10
considering 38:5
consistent 20:18
22:1 25:12 28:17
44:19 57:3
consult 17:12
42:14,15,16,16,20
consulted 42:5
contacted 42:9
contention 19:13
continue 12:5 51:2
continuing 11:11
20:24
control 44:11
conversations
37:6
copy 4:9 6:21 14:5
correct 6:10 29:19
31:3,8 36:20
39:12,25 40:3,5,6
43:10,23,24 45:7
45:23 53:23,24
54:11
correctly 17:13
correlation 40:20
coumadin 25:3,11
25:20
counsel 1:14 2:1
6:20 7:6 9:21
13:20 15:12 16:3
58:9
count 22:15 24:2
28:10 31:2 47:23
47:25 50:9
county 58:13
couple 3:17 30:8
52:23 53:3,11

course 30:16,16
43:1 45:14,17
47:3 52:23
court 1:1 3:15
8:18 10:7,10
19:25 58:3
criticism 19:11
21:17 26:24 29:10
31:15,16 38:12
39:5 46:24 49:10
cross 3:21
ct 21:12,20 22:21
26:13 28:16,20
30:1 34:23 41:9
41:15,23 46:11,17
cts 41:20
culture 55:21
cure 38:23,23
current 5:4,5 6:15
44:23
currently 16:2
29:17
cut 15:20
cv 1:5 3:25 4:4 5:4
5:5 11:15 12:2
59:21

d

d 59:1
d.c. 27:3,5
daily 7:19
damage 26:23
38:25
danger 23:11 24:1
24:23 25:7
date 1:10 13:14
45:13
dated 13:9
day 24:25 32:14
47:13 58:12
days 21:16 26:7
31:24 32:18 52:4

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

**[days - due]**                                                    Page 4

52:15 56:6
**dead** 28:9 46:1
**deal** 12:4
**dealing** 22:8
**deanlawfirm.com**
2:11
**deantonio** 2:8,8
**death's** 28:7
**debride** 28:23
**debridement**
23:20 38:6 45:25
46:7 54:19
**debridements**
54:19
**december** 13:9
15:5 18:1
**decision** 19:15,20
23:6,10 28:5
38:13 39:24 42:13
53:25 55:13
**decisionmaking**
35:9
**declaration** 3:24
4:4 13:4,14,23
14:11 17:19,24
19:5,9 37:10
48:11 59:19
**decreased** 32:11
43:6,7 53:15,15
**deep** 24:16 55:20
**defendant** 1:7,14
2:12 3:24 56:15
**defendant's** 18:14
19:3 48:18
**defined** 48:21
**deflected** 43:4
**deformity** 20:13
20:15
**degree** 21:5
**del** 18:19

**denied** 57:9
**density** 21:13
46:17
**department** 2:14
21:10 42:6 52:21
**depends** 51:4
**depose** 14:18
**deposed** 7:5
**deposition** 1:9 3:8
4:13 6:17 7:17,20
7:22 10:1,7 14:16
17:11 23:3 36:6
53:10 57:22
**depositions** 8:18
18:4,8 19:2
**described** 36:6
40:14 42:1 49:17
**describing** 23:4
**description** 19:16
20:17 36:7 39:15
39:16 40:13
**destruction** 23:8
38:25
**destructive** 35:11
**determine** 39:23
**develop** 20:19
50:8
**developed** 16:14
**deviation** 54:3
**diabetes** 34:14
44:11
**diabetic** 11:24
12:20
**diagnose** 21:3
**diagnosed** 20:16
21:4,11,14
**diagnoses** 27:16
**diagnosis** 21:9,18
21:23 22:3 23:1
23:21 24:5 27:21
28:3 31:8 33:13

34:4,22 35:1 39:7
46:11,18,21,22
50:1 54:13,21
**diagnostic** 31:1
**different** 5:16
13:23 16:5 27:11
27:12 35:15 39:21
**differential** 31:8
34:4 35:1
**differentiation**
35:2
**differently** 8:2
**difficult** 35:1
**dig** 55:24
**direct** 40:20 52:6
**direction** 44:4
**directly** 11:21
26:21
**director** 27:4
**disagree** 41:21,25
43:20 46:25 56:17
**discontinued** 11:7
**discovery** 16:1
**discredited** 10:10
**discriminate**
35:14
**discussion** 24:13
**disease** 11:24 22:2
28:14 33:16 34:13
34:20 35:5,13,18
36:5 37:2,8 54:16
**disorder** 24:18
**disrupt** 10:1
**dissertation** 31:14
**distal** 33:20 40:12
**district** 1:1,1
**division** 1:2
**doctor** 5:7 31:7
36:12
**doctors** 47:5

**document** 14:2
15:4,6
**documented** 23:7
**doing** 4:20 19:17
47:15
**door** 28:7
**dopplar** 45:11,16
49:18
**dose** 25:22
**doubt** 55:1
**dozen** 47:19
**dpm** 1:9 3:1,25
59:5,20
**dr** 3:5 4:18 7:6
14:18,25 17:14,17
17:21,22,23 18:4,5
18:17,19,20,23,25
19:12,19 20:24
21:3,15 23:2,12
24:5,10,25 27:22
31:21 32:1,6,11,14
32:20 33:9,13,22
34:4,21 36:1,5,18
36:25 37:7 38:3
39:21 41:21 42:5
42:9,22 44:5
45:10,11,16,20
47:12 48:21 49:8
49:11,17 50:25
51:20,22 52:20
53:1,10 55:24
56:11,13,22 57:17
**drag** 9:19
**drainage** 23:20
28:24 37:20,25
38:5,9 45:22,24
46:4,8 47:15
49:13
**drained** 51:1
**due** 21:5

Allen Mark Jacobs, DPM                                                March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

[duly - focused]                                                              Page 5

| | | | |
|---|---|---|---|
| **duly** 3:2 | **evaluated** 21:15 | **extended** 40:17 | 50:3,6 52:2,7 54:2 |
| **dvt** 21:7 24:21 | **evaluation** 22:5 | 45:12 | 54:10,13,22,25 |
| 45:10,16 | 34:23 50:20 | **extract** 31:20 | 55:6,19 56:1,20 |
| **e** | **evening** 28:19 | **extremely** 56:3 | 57:7 |
| | **events** 58:10 | **f** | **fast** 3:14 52:1,9,11 |
| **e** 2:14 59:1,15 | **everyone's** 26:19 | | **fatigue** 32:18 43:7 |
| **earlier** 11:14 | **evidence** 21:25 | **f** 2:8 | 53:16 |
| 12:16 28:8 29:17 | 32:23 39:6 54:9 | **facfas** 3:25 59:20 | **febrile** 22:14 28:9 |
| 29:20 30:24 31:18 | 54:23 55:10 | **fact** 11:17 19:8 | **federal** 6:22 |
| 43:4,8 52:25 | **exact** 8:17 40:21 | 22:17 24:20 25:13 | **fee** 6:11 |
| **easiest** 20:8 | **exactly** 16:8 35:24 | 26:12 33:7 34:21 | **feeling** 21:2 |
| **education** 10:20 | **examination** 3:3 | 34:23 35:9 37:18 | **fell** 12:21 |
| 10:22 11:11 | 59:6 | 37:24 38:8 52:17 | **felt** 15:7 |
| **educational** 10:19 | **examine** 19:19 | 57:6 | **fever** 24:2 31:3 |
| 10:21 11:10 | 38:21 50:23 | **factor** 24:18,22 | 48:1 50:16 56:1 |
| **effectively** 38:23 | **examined** 19:13 | 25:6 | **fevers** 50:8 |
| **effort** 22:2,25 | 27:14 39:8,12,13 | **factors** 26:8 | **fibula** 33:21 |
| 27:20 32:21 49:13 | **example** 31:12 | **fair** 3:22 5:8 6:9 | **field** 10:16 12:12 |
| **efforts** 35:14 | 44:1,11 47:19 | 10:4 14:19 15:6 | **figure** 15:2 |
| **either** 7:4 21:21 | 52:10 | 16:18 17:4,16 | **file** 14:10 |
| **elements** 16:15 | **exhibit** 3:24 4:3,14 | 44:16 | **filing** 14:12 |
| **elevated** 22:15 | 13:3 59:18 | **fairly** 11:22 12:8 | **final** 15:7 |
| 24:2 44:12 47:22 | **exhibited** 50:18 | **familiar** 3:11 5:3 | **find** 44:12 46:10 |
| 47:23 50:9 | **experience** 12:9 | 6:8 35:5,6,19 36:8 | **finding** 43:16,17 |
| **embedded** 55:20 | 12:22 27:6 30:6 | 36:13 | 46:16 54:10 55:4 |
| **emergency** 21:9 | 36:4,11,22 37:7 | **familiarity** 36:9 | **findings** 43:21 |
| 25:14 42:6,13 | 42:22 | **fapwh** 3:25 59:20 | 47:10,11 48:4 |
| 43:9 52:21 | **expert** 3:8,12 6:13 | **far** 10:6,23 15:17 | 56:18 57:2 |
| **encompass** 18:6 | 8:1,8,15 9:16 | 15:21 16:12,20 | **finish** 3:19 |
| **energy** 32:11 43:7 | 12:24 18:13,16 | 28:11,12 51:7,13 | **firm** 2:3,8 |
| 53:15 | 19:2 48:17,22 | 53:25 | **first** 3:2 16:16 |
| **entered** 24:5,14 | 56:14 | **fascial** 12:18 22:18 | 17:11 20:7 26:22 |
| **entirely** 35:15 | **expertise** 10:13 | 26:15 28:14,18 | 44:21 46:20 48:14 |
| **entity** 7:25 35:23 | 41:19 | 32:24 46:5,18 | **five** 9:6 26:1 |
| **enumerate** 20:7 | **experts** 18:14 | 52:17 57:3 | **flow** 4:13 10:3 |
| **equal** 23:22 46:17 | 48:19 | **fascitis** 12:25 | **fluid** 21:13 |
| **er** 26:6 52:25 | **expires** 58:23 | 23:21 24:4,9 | **focus** 13:12 17:17 |
| **especially** 56:5 | **explain** 29:23 48:6 | 26:18 27:23 30:6 | 39:4 |
| **essence** 57:2 | **explanation** 27:13 | 30:14 33:24 34:2 | **focused** 16:14 20:9 |
| **establish** 22:3 | **extend** 12:10 | 40:8 41:17,22 | 28:5 |
| 27:14 | | 42:10 45:19 48:8 | |
| | | 48:12 49:1,22 | |

Allen Mark Jacobs, DPM
March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

[follow - inarguably]                                                  Page 6

**follow** 42:23
**followed** 42:18 43:1
**following** 21:22 44:23
**follows** 3:2 21:18
**font** 40:24
**foot** 5:22 11:24 12:16,20 16:13 17:2 18:20 20:13 20:17 21:12 27:19 28:8 30:9,15 33:15,16,19 37:8 40:15,25,25 47:16 47:21 54:16
**foregoing** 58:5
**form** 15:7
**formal** 14:11
**format** 14:13
**forming** 22:24
**forth** 28:15 41:6
**forwarded** 15:12
**found** 56:25
**four** 7:5 25:6 26:1 31:24 32:18 52:4 52:15 56:6
**fractures** 25:16
**frankly** 29:5
**free** 10:21,24
**frequency** 34:14
**fresh** 25:25
**fritz** 18:17 48:21 55:24 56:13,22
**fritz's** 41:21 56:11
**frozen** 25:25
**full** 8:10
**fulminant** 52:13
**fulminate** 56:8
**fumbling** 10:2
**function** 27:11

**fundamental** 19:10
**funky** 51:10
**further** 58:8

**g**

**gamecock** 2:9
**gangrene** 28:9 46:18 49:16
**gas** 21:13 22:21,24 40:19,20 45:1,2 46:13,14,18
**gaseous** 40:14
**gauge** 30:5
**general** 7:11 8:5 11:3,22 21:1 29:2 35:23 40:10 42:16
**generally** 8:14 27:12
**gentleman** 44:13
**germs** 29:24 46:12
**getting** 45:10
**girls** 6:19 7:15
**give** 5:1 25:21,23 25:25 37:13 47:24 52:10
**given** 13:25 15:22 18:2,13 19:9 25:4 25:5,24 26:3
**glover** 42:5,9
**glucose** 43:16 44:12 53:14
**go** 4:17 10:23 14:5 14:25 16:11,19 20:7 25:11 26:6 29:3,12 30:4 39:2 43:3 45:25 46:23 52:5 53:2 55:24 57:12
**going** 4:12 5:16 11:18 14:9,16 20:2,6 28:15,18,21

28:23,24 29:1,9 30:4 34:9 37:13 38:14,21,21 39:2 44:21 52:20 53:1 53:3,9,11 57:10
**good** 3:5,18 12:4
**gotten** 50:11,13 52:22
**greater** 43:16
**greatly** 3:21
**groups** 50:14
**growing** 29:23
**guess** 47:18

**h**

**h** 59:15
**half** 47:19
**hand** 58:11
**happened** 29:4 50:4
**happening** 50:23
**hard** 29:22
**harder** 25:19
**heavily** 12:20
**held** 24:14
**help** 3:17 8:11 19:11
**hemodynamically** 22:16 23:13,23 28:11
**hemoglobin** 44:14
**heparin** 25:8
**hereunto** 58:11
**high** 25:22 31:3
**highly** 57:14
**highway** 2:5
**hired** 10:8 18:14 48:18
**history** 24:16,21 32:2,7 44:10
**hone** 16:22

**hospital** 15:16 21:10,12 24:14 27:2,10 28:13 31:22 34:12 42:19 47:2,20 56:7
**hospitals** 27:8
**host** 10:15,18
**hourly** 6:16 7:20
**hours** 24:13 25:4,8 25:11 26:1 52:12 52:23
**house** 12:14 29:17
**housekeeping** 3:17
**human** 55:14
**hypotensive** 50:11

**i**

**idea** 13:18 27:1 51:23
**identification** 4:1
**identified** 3:8 19:17 41:22
**identify** 41:16
**images** 41:12
**imaging** 45:1
**immediate** 23:22 25:16
**immediately** 25:21 49:23,25
**important** 50:16
**importantly** 22:4
**impressed** 25:1
**impression** 38:15
**impressions** 41:10
**impressive** 4:18 11:16
**improve** 47:12,18
**improvement** 48:5
**improvements** 47:7
**inarguably** 20:12

Allen Mark Jacobs, DPM                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

[incise - leiden]                                          Page 7

**incise**  50:22
**incised**  50:25
**incision**  23:7,20
  28:23 37:19,25
  38:5,8 45:22,24
  46:2,4,8 47:15
  49:13
**incisions**  19:18
  39:17
**include**  19:16
**included**  18:15
  19:5 32:2 34:25
**income**  8:7
**inconsistency**
  19:21
**inconsistent**  22:17
  26:18,19
**incorrect**  49:9
**increased**  20:24
**increasing**  20:20
**index**  2:20 59:11
**indicated**  11:14
  26:21 49:14
**indicates**  43:21
**indication**  32:5
**indicators**  45:9
**indirect**  21:25
  39:6 54:23 55:10
**individual**  47:9
**infected**  46:1
**infection**  12:11,15
  21:4,11,14 22:18
  22:20,23,23 23:1
  23:17 25:2 26:5
  26:15,16 27:18
  28:14,18 29:3,19
  30:18,22 31:6,10
  32:23,24 33:1
  39:22 40:16,21
  43:13,18,23,25
  44:7,19 46:5,12,14

46:19 49:22,24
  51:1 52:13,15,18
  53:17,20,21 57:3
**infections**  11:23
  12:9,13,18 23:18
  25:15 45:2 47:20
  56:7
**infectious**  28:14
**inflammation**
  47:23
**information**  6:23
  7:12 59:11,12
**initial**  28:16
**inquiry**  9:20
**inserted**  30:25
**intentional**  12:21
**interested**  58:10
**interesting**  19:12
  56:25
**intermittent**  32:8
  43:6 53:14
**interpretation**
  21:20,20
**interpreted**  22:19
**intraoperatively**
  39:24
**intravenously**
  25:24
**invoice**  7:16,18
**invoices**  7:14
**involved**  11:20
**irreversible**  26:23
**ischemic**  49:18
**issue**  6:9 16:13
  20:22 22:4 23:15
  28:22 49:19 51:14
  52:3
**issues**  17:2 51:18
  56:13

**j**

**jackson**  18:23,25
**jacobs**  1:9 3:1,5,25
  4:18 7:6 14:18,25
  44:5 53:1,10
  57:17 59:5,20
**january**  20:22
  32:1,6,19 38:4
  44:25 45:7
**jd**  1:5
**jennifer**  1:3 2:2
**johnson**  21:10
**joint**  11:24 16:17
  20:13,15,16,18,21
  20:25 21:5 22:2
  34:13,20,25 35:5
  35:13,18 36:5,8,13
  36:14 37:2
**judge**  48:5
**judgment**  9:10
**july**  44:22
**june**  20:19 44:6
**justice**  2:14

**k**

**k**  25:22
**karen**  1:15 3:15,17
  4:8 15:2 58:3,22
**keep**  12:2,6 14:16
**keith**  1:3 2:2
**key**  16:15 20:22
**kind**  17:15 55:12
**know**  5:19 7:8,13
  7:15,19 8:6,11,14
  9:17,19 13:19
  14:7 15:17,21
  18:10 24:20 26:1
  27:15 28:1 33:17
  35:18 36:4 39:9
  39:13 40:16,17
  41:4,5 42:17

43:15 44:16 46:10
  51:14 52:1,7 54:5
**knowledge**  12:9
  35:23 42:21
**knows**  56:3

**l**

**lab**  43:16
**laboratory**  22:16
  24:3 31:11 47:10
  48:4
**labs**  26:18 55:11
**lacking**  36:10 37:8
**large**  58:5
**lateral**  40:22
**law**  2:3,8 6:8
  28:25
**lawsuit**  3:11 16:19
**lawsuits**  9:8
**leave**  15:1 57:14
**lecture**  11:8
**lee**  2:14 3:6 7:1
**lee.berlinsky**  2:17
**left**  15:1 40:24,25
**leg**  5:23 12:16,17
  19:13,15,19 21:14
  21:15,22 22:5,6,10
  23:6,9,11,14 24:1
  24:23,24 25:7
  26:15,21 27:13,14
  27:19 29:4,8,9
  30:9 33:23 37:21
  38:14,17,21 39:1,8
  40:12,12,14,22
  45:6 46:20,23
  47:17,21,21 49:21
  49:25 51:21 54:1
  54:16,20 55:13,16
  56:20
**legs**  22:8 28:25
**leiden**  24:19,22

Allen Mark Jacobs, DPM
March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

[letting - neuropathy]
Page 8

**letting** 44:16
**leucocytosis** 56:2
**level** 39:17 40:21
**license** 10:25
**licensed** 5:12
**life** 22:7 23:15
   24:12
**lightly** 22:10
**limb** 22:12 54:14
   54:18,24
**limbs** 54:25 57:8
**line** 59:3,17
**list** 7:4,6
**listed** 25:17
**little** 13:12 25:19
   42:1
**llc** 2:3,8
**location** 1:12
   40:10
**long** 4:19 47:5
   51:15
**look** 13:3,6 15:10
   28:22 31:7,10,11
   34:7 38:14 40:23
   41:8,14 42:9
   47:24,25 51:25
   53:3 55:11,11,15
**looked** 37:16
   41:10 49:20
**looking** 14:24
   37:10 39:22 50:1
   51:10
**looks** 11:14 55:12
**losing** 22:6,7
**loss** 21:1 31:17
   32:2 50:16
**lost** 38:13
**lot** 11:17 29:13
   55:1
**louis** 1:13 5:10,15
   27:8

**lower** 5:23
**lucky** 46:2
**lynn** 1:3,3 2:2,2
   3:9 9:14 16:13,23
   17:3,6,12,22 20:1
   20:12 21:8 22:14
   23:13 24:17 27:18
   28:11 31:16 32:6
   32:10,13,17,22
   33:10,12,23 37:24
   38:6,20 44:10,21
   45:4 48:25 50:7
   57:9
**lynn's** 6:12 15:12
   24:23 33:2 43:9

**m**

**maintain** 12:7
**maintaining** 12:2
**major** 19:15 25:15
   28:22 38:12 55:13
**making** 23:5,21
   30:23 55:13
**malaise** 21:1 31:17
   32:3
**man** 24:4,12 28:6
   52:14
**man's** 19:15 22:10
   24:1 25:7
**mandate** 23:17
   46:16 54:24 57:7
**manifest** 51:2
**manifestations**
   50:10,12,14
**manner** 20:5
**march** 1:10 58:12
**mark** 1:9 3:1,25
   59:5,19
**marked** 4:1
**markers** 47:23,24
**materials** 11:6

**matter** 15:8 25:10
   42:8
**matters** 3:17
**mean** 29:22 33:6
   39:4 40:18 43:25
   46:6 50:11 54:15
   56:2,11
**means** 40:4
**media** 10:15,18
**medical** 8:2 11:11
   15:11,14 20:17
   24:6 25:13 27:12
   34:11,19 35:4,8,17
   37:1 38:4 43:9
   48:25
**medicine** 5:7,15
**meeting** 2:15
**member** 35:4 37:1
**memory** 37:14
**mention** 48:7,11
**mentioned** 13:1
   31:13 41:23 43:8
   44:18 45:4 49:1
**mere** 57:6
**milligrams** 25:23
**mind** 49:23
**mine** 26:11
**minor** 51:17,18
**minutes** 53:2
**misinterpretation**
   27:25
**missouri** 5:11,12
   5:22,24
**mo** 1:13
**moment** 9:15
   13:13
**monte** 18:19
**morning** 30:2 32:7
**motivate** 49:21
**moves** 52:2,7

**mri** 16:23 17:2,5
   41:9 44:21
**multiple** 54:19
**muscle** 52:8,8
**mutation** 24:19

**n**

**n** 59:1
**name** 3:5 17:21
**named** 18:23
**nature** 50:17
**nausea** 43:8
**necessarily** 40:18
   50:21
**necrosis** 39:1
**necrotizing** 12:13
   12:15,18,25 22:18
   22:23 23:1,16,18
   23:21 24:4,9 26:5
   26:14,17 27:23
   28:14,18 29:18
   30:6,14 32:24
   33:24 34:2 40:8
   41:17,22 42:10
   45:19 46:5,12,18
   48:8,11 49:1,22
   50:3,6 52:1,7,17
   54:2,10,13,22,25
   55:6,19 56:1,20
   57:3,6
**need** 6:21,22 22:14
   23:17,22 46:16
   57:12
**needed** 50:24
**needs** 26:6 55:17
**negative** 21:8
   28:16
**neither** 58:8
**nellius** 1:15 58:3
   58:22
**neuropathy** 34:15

Allen Mark Jacobs, DPM
March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

**[never - phase]**

**never** 9:10 10:11
21:21 24:5,8 39:8
39:9 44:20 49:8
**new** 19:9
**newer** 25:18,19
**nice** 55:14
**non** 34:11,19 35:4
35:17 37:1 45:12
**normal** 48:4,6
**notary** 58:4
**note** 5:10 23:5
32:17 38:4 39:14
42:3 47:13
**noted** 4:19
**notes** 23:12 31:21
48:10,25
**noticed** 3:7
**novel** 25:19
**november** 58:23
**number** 4:3 8:17
8:19 9:18 13:4
15:11 23:16,25
30:20 34:8 35:21
36:18 37:11,11,17
39:15 40:23

**o**

**obesity** 34:16
**objection** 4:12,15
**obtain** 6:21
**obviously** 3:15
35:22 44:2 54:5
**occasionally** 30:9
**occurred** 45:19
52:19
**occurs** 34:14
**october** 44:24
**oddly** 26:13
**offered** 4:14 12:24
**office** 8:2 27:8
**official** 58:12

**oh** 9:4
**okay** 3:14 4:7,14
4:25 5:14,21 6:2,7
6:11 7:11,19,24
8:5,14,25 9:2,8,20
9:25 10:6,12,23
11:5,12 12:12
13:3,9,12,19 14:3
14:15 15:10,17,25
16:9,18,20 17:5,24
18:13 19:1,7,24
20:11 30:10,14,17
33:14,22 34:1
37:5,16 40:3
42:20 43:15,20
45:4,15,18 47:4
48:6 51:6 52:10
53:4,19 54:8 55:9
**once** 38:16
**ones** 25:18
**ongoing** 31:24
43:22 44:6
**online** 10:19 11:11
14:19
**open** 11:3 28:21
38:14,16,21 40:18
**opened** 46:20
51:21
**operating** 19:14
25:9 26:2,7
**operative** 19:16
23:5 39:14
**opinion** 31:14,16
34:7 35:3,19
38:16 39:11 54:4
**opinions** 10:9
12:25 19:4,22,25
20:2 56:14
**opportunity** 54:14
54:17 57:9

**opposite** 44:3
**ordered** 21:7
**ordering** 45:16
**organism** 22:24
**organisms** 46:15
**organization**
11:10
**orthopedic** 18:21
**orthopedics** 29:2
42:17
**orthopedist** 17:7
**osteo** 28:1 33:7
**osteomyelitis**
12:10 21:19,24
22:20 24:7 28:1
33:3,10,13,15,18
34:3,22 35:12
**outcomes** 51:15
**overwhelming**
47:11

**p**

**p** 2:4
**p.m.** 1:11 57:22
**page** 5:1 13:6 59:3
59:17
**pages** 5:1 11:15
15:24 16:3,4,6,8
**pain** 20:20,25 44:6
45:5
**paint** 44:3
**paper** 42:1
**paragraph** 15:10
30:20,21 37:17,23
40:23 41:1 53:19
**paragraphs** 37:11
37:14
**part** 5:11 8:3
33:11 35:22 36:16
50:19 54:15
**particular** 30:18
42:17

**particularly** 23:23
28:6
**party** 58:9
**pass** 29:1
**pathognomonic**
31:1 44:9,17
**pathologist** 21:23
39:15
**pathology** 19:17
21:21 27:21 34:15
39:20
**patient** 12:14
22:13 26:2,4,6,9
26:12 28:7,8,12
29:16,21 30:18
32:2 34:14 38:18
46:6 48:3 50:20
55:11
**patients** 22:9
25:15 26:11 27:7
30:7 47:20 56:4
**pattern** 42:25
**paul** 4:11 14:7
**payments** 7:14
**pending** 58:10
**people** 51:16,16,23
**percent** 8:13
**percentage** 8:7,12
**perform** 4:23 5:24
6:4 8:1 19:20
23:10 34:4
**performed** 30:1
33:9
**perimeter** 17:16
**period** 16:20,24
44:25 45:12
**person** 23:23
**person's** 23:6
**personally** 9:9
**phase** 16:1

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

**physician** 22:7
42:13
**physicians** 10:22
20:15 51:19
**plaintiff** 7:7 44:4
**plaintiff's** 13:20
16:3
**plaintiffs** 1:4 2:2
6:19 9:21
**plasma** 25:5,25
**plenty** 52:16,16
**podcasts** 10:16
**podiatric** 5:7
10:20,21 20:14
34:11,19 35:4,17
37:1
**podiatrist** 6:3 8:8
12:23 17:8,11,20
18:19 22:6 30:13
**podiatrists** 20:22
**podiatry** 5:15
10:13,17 27:5
45:6
**point** 4:12 9:23
14:2,17,20 16:1
41:18 50:7
**poor** 21:2 44:10
**portions** 16:10
**position** 56:13,23
57:1
**possibility** 43:22
**possible** 33:4 38:5
39:7 44:19 55:24
**possibly** 24:7
38:23 45:22
**postgraduate**
10:22
**potential** 28:13
57:15
**potentially** 29:22

**practice** 5:11,19
7:25 8:3,11 10:25
12:20
**pradaxa** 25:18
**preceding** 56:6
**preparation** 7:16
**prepare** 15:6,13
**prepared** 13:15,19
17:25,25 41:10
48:11
**presence** 21:13
**present** 37:15,18
42:2
**presented** 20:23
22:25
**preservation**
54:18
**preserve** 22:8
**presumably** 27:22
**presumed** 34:22
**presumption**
22:21 39:6
**presumptive**
21:24 54:10,23
55:8
**pretend** 41:18
**pretty** 12:1 56:4,8
56:8
**prevent** 56:20
**prior** 19:19 24:16
24:21 45:13 52:15
**priority** 50:21
**private** 8:10
**privy** 19:8
**probably** 11:9,25
12:6,22 13:24
24:20
**problem** 24:12
29:25 45:15 51:9
**problems** 28:21

**procedure** 34:5
38:19
**procedures** 5:25
6:4
**proceed** 26:23
**proceeded** 23:2,10
**proceeding** 19:14
19:20
**producers** 46:13
**produces** 46:14
**productivity** 10:4
**proof** 22:20
**proper** 42:12 45:9
**properly** 37:19
**prothrombic** 26:3
**prothrombin** 25:6
**provide** 6:11,20,23
7:10
**provided** 6:19,24
7:6,8 16:2,5 19:1
**public** 11:3 58:4
**publications** 11:20
**published** 11:23
12:8
**publishing** 12:5
**pulses** 49:18
**purposes** 16:19
17:10,18
**put** 11:8 14:13
17:15 39:14 41:5
45:11 48:14

**q**

**qualify** 35:4
**question** 3:20 8:6
30:3 35:20 47:8
52:6 56:12
**questions** 7:12
9:21 16:11 29:13
43:4 57:11,17
**quick** 30:4 53:12

**quickly** 4:18
**quite** 4:18,19
11:15 16:6,8 29:5
41:13 50:7
**quote** 23:14 24:15

**r**

**radiographs** 41:15
**radiologist** 18:18
41:19 56:25
**radiology** 41:11
49:6
**raising** 50:15
**range** 25:12 26:10
48:6
**rapidly** 52:24
**rate** 6:16,17,17
7:20,20 15:4 48:2
50:14 52:7
**rates** 6:15
**ravenel** 17:21 18:4
20:24 21:3 24:25
31:21 32:1,6,11,14
32:20 45:10,11,16
52:20
**ray** 21:19,25 22:19
34:23,24 46:17
**rays** 20:17 27:25
41:6,9 44:23
55:11
**read** 34:9,16 37:13
41:19 56:14 57:10
57:20
**readily** 7:12
**really** 12:4 20:22
24:11 28:4 29:5
48:21 51:14 53:22
**rear** 2:20
**reason** 14:18
27:14 39:8 56:17
**recall** 14:11 15:23
15:24 16:7,23

17:13 18:24 41:13
41:24 48:16 49:5
**recalling** 14:14
**receive** 4:5
**received** 18:6,7,11
18:18 48:17
**recess** 53:7
**recognize** 31:7
35:10
**recollection** 14:10
18:22 39:21
**record** 4:9 6:7
14:5,25 15:1 16:5
24:6 27:23 29:11
31:25 33:12 34:9
43:5,21 48:24,25
53:2 54:9 57:13
57:18 58:7
**records** 14:1 15:11
15:14,22,24 17:16
17:17 18:2,6
20:18 31:22,23
35:9 42:4 43:9
51:24
**redness** 20:20,24
21:6 44:5 45:5
**refer** 11:21
**reference** 30:23
49:2
**referral** 17:7
42:25
**referred** 17:7 27:7
**referring** 35:24
40:24
**reflected** 35:8
**refresh** 18:22
37:14
**regarding** 12:25
57:2
**regimen** 42:18

**region** 33:15
**regular** 12:5
**regularly** 11:13
**related** 11:21
29:18 58:9
**relates** 37:15
**relation** 13:14
**relatively** 51:17
**relevant** 10:16
16:10 44:22 48:15
**relying** 31:6
**remained** 51:1
**remember** 17:11
36:17,18
**remind** 46:9
**removal** 22:10
**remove** 23:6,14
38:14 39:2
**removed** 55:17
**removing** 55:13
**report** 3:18 13:21
13:22,24 14:8,17
18:18,24 19:16,17
41:21 48:7 49:6
56:11 57:1,11
**reported** 1:15 32:2
32:7,18
**reporter** 3:15 4:10
58:1,3 59:8
**reports** 18:14,16
19:3 48:18,19,22
**representative** 5:3
22:22 34:24 35:12
35:13
**represented** 15:8
**request** 14:17
42:23
**requested** 59:11
59:12
**required** 14:10
25:16 32:25 42:22

54:20
**requirement** 6:23
7:3 54:11
**requires** 40:8
**resorptive** 35:10
**respect** 11:17
**result** 19:1 33:3
50:2
**resulted** 12:17
**resume** 4:17 5:1
**retained** 48:18
**reverse** 25:20,21
**reversed** 25:3,8
**reversible** 26:10
**review** 13:25
**reviewed** 8:19,22
15:13 16:10
**reviewing** 42:4
**right** 4:20 14:22
20:13,20,25 21:11
26:6,12 28:13,15
30:12,20 35:7
37:20 40:22 44:24
47:20,21 55:22
57:20,21
**road** 1:12 14:20
**role** 3:12
**room** 19:14 25:9
26:2,7 42:13 43:9
**round** 45:22
**rpr** 1:15 58:22
**rule** 26:5
**rules** 6:23
**run** 8:1
**running** 11:16

| s |
|---|

**s** 59:15
**salvage** 39:1 54:14
54:20,25 57:8
**salvageable** 23:9
39:23,25 40:4,6

51:8 55:2
**salvaging** 22:11
**salvation** 54:17
**satisfied** 21:8
**savannah** 2:5
**save** 23:14 32:21
38:22
**saw** 24:25 44:14
48:20,23 49:7,7
51:22
**saying** 15:21 27:17
30:17 38:13 39:20
46:4,19 47:18
52:4,14 54:21
**says** 24:10 30:21
34:10 35:16 37:17
37:18,23
**sc** 2:5,10,16
**scan** 21:13 22:22
28:16 30:1 41:23
46:11,17
**scans** 41:9
**schedule** 6:11
**scope** 5:15,19
**sdeantonio** 2:11
**seal** 58:12
**second** 17:20
56:10
**sedimentation**
48:2
**see** 12:19 22:11
28:19 29:14 30:20
31:25 32:5,10,17
33:5 34:16 36:13
37:21 38:1,3,22
40:25 45:1 48:24
50:23 54:9
**seeing** 18:24 36:17
36:23 52:20
**seeking** 16:16

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

**seemingly** 51:17
**seen** 14:4 30:15
  32:13 37:5 45:6
  51:21 56:9
**send** 7:24 9:20
**sense** 10:3 11:22
**sent** 4:3 7:13,16
  41:12
**sentence** 37:12
**separate** 7:25
**sepsis** 30:22 50:12
**septic** 50:13
**serious** 25:15 51:7
  51:14
**seriousness** 50:15
**served** 8:15 27:3
**service** 42:23
**services** 8:1 27:4,6
**serving** 6:12 8:7,8
**set** 20:1 57:13
**settlement** 9:11
**severe** 20:14
**sheet** 6:18
**shock** 50:10
**shocking** 44:12
**shoes** 51:11
**showed** 21:13
**sick** 52:17 56:5
**sign** 30:18 57:20
**signature** 13:7
  58:20
**signed** 13:15 15:5
  15:9 17:25 18:1
**significant** 24:2
**significantly** 44:12
**signs** 25:1 28:17
  30:21 31:10 44:7
  44:8 52:4 53:16
  53:20
**similar** 37:12

**simply** 21:17
  22:23
**simultaneous**
  38:18
**sir** 8:23 13:17
  17:15
**site** 39:22
**sites** 10:18
**situation** 39:10
  42:14
**six** 9:6
**skin** 39:16
**social** 10:15,18
**soft** 12:11,13
  29:18
**somebody** 55:24
**somewhat** 19:6
  27:12
**soon** 17:5 53:4
**sorry** 15:19 46:22
**sort** 12:3 23:15
  43:3 48:23 51:10
  55:14
**sorts** 50:9,12
**sound** 5:2 29:8
**sounds** 54:8
**south** 1:1 3:7 5:17
  5:20 6:3,8 15:15
  30:13 34:11 58:4
  58:13
**speak** 14:1 51:24
**specialty** 36:11
**specific** 5:14
**specifically** 36:25
**spectrum** 48:15
**spend** 12:4
**spending** 11:16
**spreading** 56:21
**st** 1:13 5:10,15
  27:8

**stable** 22:16 23:13
  23:24 28:6 47:13
**staff** 34:11,19 35:4
  35:17 37:1
**standard** 54:3
  56:19,23
**standards** 54:6
**start** 10:1 29:15
**started** 5:17 20:19
  50:8
**starts** 48:4
**state** 23:12 58:4
**stated** 21:17 36:18
**statement** 34:18
  35:16,25
**statements** 19:4
  37:6
**states** 1:1,6 2:13
  2:14 3:6,10 5:12
  33:12
**status** 49:16
**stenographic** 3:18
**step** 51:3
**stephen** 2:8
**steve** 4:11
**stopped** 12:1
**street** 2:15
**streptococcus**
  29:23
**stretch** 53:6
**strictly** 21:24
  36:15
**strong** 49:17 57:1
**stronger** 49:10
**strongly** 57:4
**studies** 22:1,16
  31:11 45:1
**study** 45:11
**style** 13:25
**submit** 14:2

**submitted** 13:21
  14:12
**subscribe** 11:1
**subsequently**
  17:23
**succumb** 51:17
**sued** 9:3,12
**suffered** 24:17
  37:24
**sufficient** 46:9
**suggest** 44:20 55:5
**suggested** 19:18
**suggesting** 45:21
  54:12
**suggestion** 25:9
**suggestive** 30:22
**suite** 1:13 2:10,16
**summaries** 53:12
**summarize** 16:9
  20:5
**superimposed**
  27:18
**suppose** 9:18 21:6
  55:23
**sure** 7:21 11:24
  15:1 20:4 29:15
  43:5 46:10 47:12
  47:17 48:5 53:5
  55:9
**surgeon** 18:21,23
  54:1 56:18,24
**surgeons** 51:20
**surgeries** 6:4
**surgery** 4:23
  11:18 26:5 27:9
  29:2 42:5,9,14,16
  42:21 54:4,6 55:5
**survive** 51:16
**suspicious** 42:10
**swelling** 20:20,25
  21:6 44:6 45:5

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

**[swollen - unfortunately]**                                           Page 13

**swollen** 51:10
**sworn** 3:2
**symptom** 49:19
**symptomatic** 43:17
**symptoms** 25:2 28:17 30:21 31:6 31:23 43:12,23 44:7,9 52:14 53:17,20,21 56:5
**system** 27:10

**t**

**t** 59:15
**take** 3:17 5:2 22:9 26:1,14 29:4,9 30:2 35:3,19 44:1 53:6 55:15 56:11 56:13 57:10
**taken** 1:14 25:9 41:13
**takes** 50:21
**talk** 3:14 19:24 38:17 40:9
**talked** 53:23
**talking** 15:2 39:20 40:11 43:6 47:9 47:16
**telephone** 14:1
**tell** 5:14 11:19 15:11 19:25 20:7
**term** 24:8 42:1 49:7 51:15
**terrible** 23:8 44:10 51:16
**testified** 3:2 7:4 10:12 29:14 31:18 53:13
**testify** 20:2 54:4,6
**testifying** 30:24
**testimony** 10:6 13:13 36:24 37:3

53:11
**thank** 5:6 57:16
**thanks** 14:22
**theoretically** 55:23
**therapy** 23:19
**thereof** 58:10
**thing** 26:15 39:3 39:25 40:3 49:23 51:21
**things** 9:19 31:5 31:11 43:8 44:9 44:16 48:2 50:17 51:16 53:3 56:3
**think** 4:19 5:3 6:14,20 7:17,21 8:12,24 9:6,24 11:25 13:2 14:4 14:12 16:15,18 17:5 22:9,10 23:4 23:6 26:16,17 27:10 29:4,6,11 31:15 33:2,8,14 34:1,3 36:9,21 39:2 42:21,24 47:4 48:13,20,22 49:15,24 50:20 52:22 53:13 54:11 55:18 56:22
**thinking** 47:14
**thinner** 24:20
**thought** 19:12,21 24:11 36:19 38:11 55:16
**thoughts** 15:8
**thousand** 15:24 16:6
**threatening** 24:12
**three** 11:9 18:16 19:2

**thrombophlebitis** 24:17
**tibia** 33:20
**time** 1:11 7:16 8:10 11:8,17,18 12:4 15:18,22 16:4,7,20,24 17:2 17:18 18:3 29:12 38:23,24 44:25 45:13,20 49:7 52:16 55:15 56:7 56:10 57:12
**timeframe** 52:20
**times** 8:15,19 9:5 9:6 30:5,8
**tinkler** 2:3,4 4:15 6:25 14:9,21 57:16
**tinklerlaw.com** 2:6
**tissue** 12:11,13 29:18 40:14 45:2 46:1,1 55:20
**today** 4:22 9:22 26:13 30:1
**toe** 51:8,11,12
**told** 32:10,13 51:8 52:24
**tons** 12:19
**trained** 41:16
**training** 12:9
**transcript** 2:20 57:20 58:6
**transcripts** 18:7
**transpired** 53:7
**travel** 40:19
**treat** 26:4 33:3,10 33:23 34:2
**treatable** 51:12
**treated** 20:14 37:19,25 46:6

**treating** 12:15 33:6
**treatment** 35:15 46:25
**treats** 56:3
**trial** 6:17 20:1
**tried** 45:21
**true** 54:21 58:6
**truly** 50:6
**try** 14:19 20:4 22:8 30:4 35:14 53:3,9
**trying** 30:5 33:3 49:15
**two** 11:9 18:4,12 19:2 20:14 21:16 26:7 35:15 41:14 48:22
**type** 10:19 22:5
**typically** 43:1 52:13 56:4

**u**

**ultimate** 50:22
**ultimately** 50:24
**ultrasound** 21:7
**unable** 9:22
**unaware** 6:2
**understand** 17:6 18:17,19,20 22:6 36:24 39:19,19 53:10
**understanding** 16:12 37:3 40:7 45:18 47:6
**understood** 36:22
**unfamiliar** 27:9 34:13,20 35:17 37:2
**unfortunately** 55:15

Allen Mark Jacobs, DPM                                March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

**[unimpressive - zone]**                                                Page 14

**unimpressive**
  22:17 24:24
**united**  1:1,6 2:13
  2:14 3:6,9
**unsalvageable**
  29:7 39:10
**unstable**  28:11
**update**  11:5
**updated**  5:4
**updates**  5:2
**updating**  11:7
**urgency**  23:14
**urgent**  22:13
  25:10 26:20 37:20
  49:21
**usdoj.gov**  2:17
**uses**  27:24
**usually**  54:19

|       **v**       |
**v**  24:18,22
**va**  21:10 27:1,2,3,4
  27:6,8,9 34:19
  42:18
**vague**  14:10
**vancomycin**  47:1
**vascular**  18:23
  29:2 42:4,9,14,15
  42:21 49:16 51:20
  54:1,3,6 55:21
  56:18,24
**vein**  24:17
**verification**  27:16
  29:7
**verify**  23:1,4 28:2
**verifying**  27:21
**versus**  3:9
**veterans**  15:15
  27:4,7 34:12
**videoconference**
  1:9,16 2:4,9,15

**visualized**  22:22
  40:20
**visualizing**  55:4
**vitamin**  25:22
**voluminous**  15:19
  16:8
**vomit**  32:14 53:16
**vomiting**  43:7
  50:17
**vs**  1:5

|       **w**       |
**wait**  3:19 24:13
  25:4,10,11
**waiting**  26:13
**waives**  57:21
**want**  4:17 6:16
  9:25 10:23 13:12
  14:16 16:19 20:6
  22:10 29:9 35:18
  40:9 43:3 46:9
  51:12,13 52:6
  57:14
**wanted**  43:5 44:3
  55:9
**warfarin**  24:16,19
**warmth**  21:6
**washington**  27:3,5
**watching**  29:21,25
**way**  12:21 22:25
  27:11 41:5
**ways**  25:20
**webex**  3:16
**website**  10:21,24
  11:6
**websites**  10:15
**weeds**  10:24
**weeks**  18:12
**weightbearing**
  45:12
**weighted**  12:20

**went**  15:18 21:9
  49:11 53:21
**white**  22:15 24:2
  28:10 31:2 47:22
  47:25 50:9,15
**william**  2:4
**williamtinkler**  2:6
**withdrawn**  9:12
**witness**  3:9 6:13
  19:2 57:19 58:11
**womack**  18:20
**woman**  51:7
**wondering**  16:4
**word**  30:25
**words**  27:24
**work**  11:10 12:12
  30:13 55:1
**working**  9:13
**works**  27:1
**worse**  52:22
**wound**  40:18
**write**  24:11 30:19
**written**  13:22 14:2
  14:8 37:5
**wrong**  26:17 36:20

|       **x**       |
**x**  20:17 21:19,25
  22:19 27:25 34:23
  34:24 41:6,9
  44:23 46:17 55:11
  59:1,15
**xarelto**  25:18

|       **y**       |
**yeah**  14:21 44:8
  55:18
**year**  12:17,19
  16:16 28:8 29:17
  29:21 30:8 36:19
**years**  4:20 7:5
  8:20 9:19,19 11:9

41:14

|       **z**       |
**zone**  11:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

## NOTICE REGARDING BENCH TRIAL

**To provide for an orderly and expeditious disposition of the cases on the trial calendar, the following provisions must be complied with:**

1.  **Fed.R.Civ.P. 26(a)(3) PRETRIAL DISCLOSURES** shall be filed and exchanged between the parties **thirty (30) days prior to the date set for trial**.  Within fourteen (14) days thereafter, parties shall file and exchange Fed. R. Civ. P. 26(a)(3) objections, any objections to use of a deposition designated by another party and any deposition counter-designations under Fed. R. Civ. P. 32(a)(6)

2.  **MOTIONS IN LIMINE** must be filed no later than **30 days prior to the date set for trial**. Written responses are due seven (7) days thereafter.  *No motions in limine shall be filed until counsel have consulted and attempted to resolve the matter as required by Local Civil Rule 7.02.*

3.  **TRIAL BRIEFS** are due at least **seven (7) days prior to trial** and are to be e-mailed in WordPerfect or MS WORD format to chambers at Dawson_Ecf@scd.uscourts.gov in accordance with Rule 26.05 of the Local Rules.

4.  **EXHIBITS**.  Attorneys for each party shall meet at least **seven (7) days prior to trial** for the purpose of exchanging and marking all exhibits to be used at trial, and, where possible, agree on the admissibility of all trial exhibits.  In the event there is an objection to any exhibit, the attorneys must notify the court of such objection *at least one day prior to trial*.  Otherwise, such objection will be deemed waived.  The exhibit list shall be furnished by each side to the Courtroom Clerk on the day of trial.  All exhibits listed shall be deemed admitted for all purposes unless the court denies admission based on objections submitted to the court as set out above.

5.  **PROPOSED FINDINGS AND CONCLUSIONS OF LAW**.  The parties are to submit proposed findings and conclusions of law via email to chambers at Dawson_Ecf@scd.uscourts.gov no later than five (5) business days prior to trial.

**THE COURT MAY NOT CONSIDER ANY EXHIBITS FOR TRIAL SUBMITTED AFTER THE ABOVE REFERENCED DATES.**

**COUNSEL ARE REQUIRED TO USE THE ELECTRONIC COURTROOM PRESENTATION SYSTEM IN TRIAL.**  If your case is going to trial and you did not participate in electronic courtroom training when it was offered, it is **YOUR** responsibility to contact the court clerk for information regarding use of the electronic courtroom **PRIOR TO TRIAL.**  It is not possible to be trained the morning of trial.

In accordance with the provisions of 28 U.S.C. 636(c), you are hereby notified that the United States Magistrate Judges of the District Court, in addition to their other duties, may, upon consent of all parties in a civil case, and with the approval of the District Judge, conduct any or all proceedings, including a Jury or Non-Jury trial, and order the entry of a final judgment.

BY DIRECTION OF THE COURT
s/Rob Weber
ROBIN BLUME, CLERK

2

**JA 155**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

## NOTICE REGARDING BENCH TRIAL

**To provide for an orderly and expeditious disposition of the cases on the trial calendar, the following provisions must be complied with:**

1.    **TRIAL BRIEFS** are due at least **seven (7) days prior to trial** and are to be e-mailed in WordPerfect or MS WORD format to chambers at Dawson_Ecf@scd.uscourts.gov in accordance with Rule 26.05 of the Local Rules.

2.    **EXHIBITS**.  Attorneys for each party shall meet at least **seven (7) days prior to trial** for the purpose of exchanging and marking all exhibits to be used at trial, and, where possible, agree on the admissibility of all trial exhibits.  In the event there is an objection to any exhibit, the attorneys must notify the court of such objection ***at least one day prior to trial***.  Otherwise, such objection will be deemed waived.  The exhibit list shall be furnished by each side to the Courtroom Clerk on the day of trial.  All exhibits listed shall be deemed admitted for all purposes unless the court denies admission based on objections submitted to the court as set out above.

3.    **PROPOSED FINDINGS AND CONCLUSIONS OF LAW**.  The parties are to submit proposed findings and conclusions of law via email to chambers at Dawson_Ecf@scd.uscourts.gov no later than five (5) business days prior to trial.


**THE COURT MAY NOT CONSIDER ANY EXHIBITS FOR TRIAL SUBMITTED AFTER THE ABOVE REFERENCED DATES.**


**COUNSEL ARE REQUIRED TO USE THE ELECTRONIC COURTROOM PRESENTATION SYSTEM IN TRIAL**.  If your case is going to trial and you did not participate in electronic courtroom training when it was offered, it is **YOUR** responsibility to contact the court clerk for information regarding use of the electronic courtroom **PRIOR TO TRIAL**.  It is not possible to be trained the morning of trial.

**JA 156**

2:20-cv-04277-JD    Date Filed 07/25/22    Entry Number 48    Page 2 of 2

In accordance with the provisions of 28 U.S.C. 636(c), you are hereby notified that the United States Magistrate Judges of the District Court, in addition to their other duties, may, upon consent of all parties in a civil case, and with the approval of the District Judge, conduct any or all proceedings, including a Jury or Non-Jury trial, and order the entry of a final judgment.

BY DIRECTION OF THE COURT

s/Rob Weber

ROBIN BLUME, CLERK

JA 157

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Keith Lynn and Jennifer Lynn, | **CA: 2:20-cv-04277-JD** |
| Plaintiffs, | |
| v. | **ORDER** |
| United States of America, | |
| Defendant. | |

In this Federal Tort Claims Act ("FTCA") case, Defendant United States of America ("Defendant") has filed a Motion *In Limine* (DE 34) seeking to limit Plaintiffs Keith Lynn ("Mr. Lynn") and Jennifer Lynn's ("Mrs. Lynn") (collectively "Plaintiffs") expert Dr. Allen Mark Jacobs ("Dr. Jacobs") testimony under Rule 702, Fed. R. Evid., and <u>Daubert</u> "to his field of expertise, and only regarding the events forming the basis of the SF-95." (DE 34 p. 6); <u>see</u> <u>also</u> <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 592 (1993). Plaintiffs have submitted a Memorandum in Opposition to Defendant's Motion *In Limine*. (DE 39.) After reviewing the motion and memoranda, the Court denies Defendant's Motion *In Limine* (DE 34) for the reasons stated herein.

## <u>BACKGROUND</u>

Mr. Lynn is a fifty-one-year-old former member of the United States Navy who was honorably discharged in June 1997 after approximately seven and one-half years of service. Mr. Lynn is eligible to receive medical care from the Department of Veterans Affairs ("VA") as a benefit of his naval service. (DE 1, ¶ 1.) According to Plaintiffs, on or about January 15, 2019, Mr. Lynn presented at the VA's Charleston facility with pain and swelling of his right leg. (<u>Id.</u> at ¶ 8.) At that time, Keith had a history of pain and swelling of his leg and was being monitored by podiatrists at the VA for a diagnosis of Charcot's joint disease. (<u>Id.</u>) After presentation on January

1

15, 2019, the non-podiatry staff at the VA diagnosed osteomyelitis and performed a below the knee amputation of Keith's right leg.[1] (Id. at ¶ 9.) Plaintiffs allege that they thought a misdiagnosis had occurred leading to the amputation, so they gave notice of their claim to the VA on October 10, 2019, by submitting Standard Form 95s ("SF-95"). (DE 34, p. 3.) Further, Plaintiffs' Complaint alleges "[t]hat there was insufficient evidence to support a diagnosis of osteomyelitis and the amputation performed on January 17, 2019, was unnecessary." (DE 1, ¶ 10.) On the other hand, Defendant contends Plaintiffs' SF-95 only indicated that the basis of Plaintiffs' claim is that the government failed to diagnose osteomyelitis resulting in the above knee amputation. (DE 34, 34, p. 4.) Thereafter, on December 9, 2020, Plaintiffs filed this action claiming medical negligence under the FTCA, and they retained Dr. Jacobs to provide his opinion. (DE 1.) Dr. Jacobs, a podiatrist with over 40 years of experience treating patients who suffer from diabetes, neuropathy and Charcot joint disease, performed a review of Mr. Lynn's medical records from the VA and opined,

> 'with a reasonable degree of medical certainty' that '[t]he medical records indicate clinical signs, symptoms, and radiographic and imaging changes consistent with Charcot's joint disease' and that 'there was never any direct evidence demonstrating osteomyelitis, and the urgent removal of Mr. Lynn's right leg was neither indicated nor necessary and was a departure from the applicable standard of care.'

(DE 1-1, ¶¶ 11, 36.) However, during his deposition, Dr. Jacobs was examined on the decision of the vascular surgeon to amputate the leg for necrotizing fasciitis, and whether that was a deviation in the standard of care of vascular surgery. (DE 39-2, p. 15-16, 53:25-54:4.) Dr. Jacobs testified that "[o]bviously you know as well as I do I cannot testify to vascular surgery standards of care." (DE 39-2, p. 16, 54:5.) Given the information on the SF-95 and Dr. Jacobs's testimony, Defendant

---

[1]    According to the Defendant, Mr. Lynn's medical records indicate that he had the below knee amputation on January 17, 2019, and then in June 2019, he had a revision surgery due to heterotopic calcification of the amputated bone, which led to an above the knee revision surgery.

seeks to limit Dr. Jacobs's expert testimony "to the field of podiatry regarding to [sic] the failure to diagnose osteomyelitis resulting in the below knee amputation that occurred on January 17, 2019, as that is the basis and date of the injury identified in the claim presented to the agency under the Federal Tort Claims Act."  (DE 34, p. 3.)

## **LEGAL STANDARD**

### **Motion in Limine**

"Questions of trial management are quintessentially the province of the district courts." United States v. Smith, 452 F.3d 323, 332 (4th Cir. 2006).  "The purpose of a motion *in limine* is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider."  United States v. Verges, No. 1:13-cr-222-JCC, 2014 U.S. Dist. LEXIS 17969, 2014 WL 559573, at *2 (E.D. Va. Feb. 12, 2014).  When ruling upon a motion *in limine*, a federal district court exercises "wide discretion."  United States v. Aramony, 88 F.3d 1369, 1377 (4th Cir. 1996) (quoting United States v. Heyward, 729 F.2d 297, 301 n. 2 (4th Cir. 1984)).  However, a motion *in limine* "should be granted only when the evidence is clearly inadmissible on all potential grounds."  Verges, 2014 U.S. Dist. LEXIS 17969, 2014 WL 559573, at *3; see also Fulton v. Nisbet, C/A No. 2:15-4355-RMG, 2018 U.S. Dist. LEXIS 13342, 2018 WL 565265, at *1 (D.S.C. Jan. 25, 2018).

### **Expert Witness/Fed. R. Evid. 702**

District courts "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  Daubert, 509 U.S. at 589.  Rule 702 was amended in response to Daubert and its progeny and now provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of an expert witness's testimony bears the burden of proving that such testimony meets the requirements of Rule 702 by a preponderance of evidence. See Daubert, 509 U.S. at 592 n. 10. District courts serve as gatekeepers for expert testimony and carry a "special obligation" to ensure that expert testimony is reliable and relevant. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999). The Court must, therefore, ensure that an expert's testimony is based on "scientific knowledge," and "will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592. The first inquiry asks, "whether the reasoning or methodology underlying the testimony is scientifically valid." Id. at 592-93. District Courts are guided by several factors in determining the reliability of a particular scientific theory or technique: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community. See id. at 593-94. These factors are not exclusive; what factors are relevant to the analysis "depend[] upon the particular circumstances of the particular case at issue." Kumho Tire, 526 U.S. at 150. In conducting the reliability inquiry, the focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.

The second inquiry "goes primarily to relevance." Id. at 591. Relevance is determined by ascertaining whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute. Id. at 593. "A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note to 2000 Amendments. "Daubert did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a

4

**JA 161**

replacement for the adversary system.'" Id. (quoting United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss., 80 F.3d 1074, 1078 (5th Cir. 1996)).

## **DISCUSSION**

Defendant contends if Dr. Jacobs is qualified to offer expert testimony, his testimony should be limited to his field of expertise and only regarding the events forming the basis of the SF-95. (DE 34, p. 6.) Putting aside whether Dr. Jacobs meets the requirements of Rule 702, Fed. R. Evid., Defendant's attempt to limit his testimony to allegations in Plaintiffs' SF-95 filing, rather than Plaintiffs' Complaint is misplaced in a motion *in limine*. Defendant does not identify any proffered testimony that it claims to be inadmissible. Instead, Defendant challenges whether Plaintiffs may advance a theory of liability raised in its Complaint that allegedly differs in form (but not necessarily in substance) from the theory advanced in Plaintiffs' SF-95 notice. "The purpose of a motion *in limine* is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." Verges, 2014 U.S. Dist. LEXIS 17969, 2014 WL 559573, at *2.

On its face, Defendant does not raise an evidentiary issue, rather the gravamen of Defendant's motion targets the efficacy of Plaintiffs' complaint which is jurisdictional. See Drew v. United States, 217 F.3d 193, 196 (4th Cir.), reh'g en banc granted, opinion vacated (Sept. 8, 2000), on reh'g en banc sub nom. Drew ex rel. Drew v. United States, 231 F.3d 927 (4th Cir. 2000) ("The FTCA prohibits the filing of a civil action against the Government unless the underlying claim is 'first presented' to the appropriate federal agency and subsequently denied. (Citation omitted). Where such a claim is not first presented to the appropriate agency, the district court must, pursuant to Fed. R. Civ. P. 12(b)(1), dismiss the action for want of subject matter jurisdiction."); see also Kokotis v. United States Postal Serv., 223 F.3d 275, 278 (4th Cir.2000)

(identifying the filing of an administrative claim as a "jurisdictional prerequisite to filing suit under the FTCA").  The Fourth Circuit in <u>Drew</u> has "repudiate[d] the notion that the validity of a judicial complaint under the FTCA depends on it having been *cloned* from its predecessor, the administrative claim."  <u>Drew v. United States</u>, 217 F.3d at 197 (*emphasis added*).  To that end, Plaintiffs contend

> the predicate of the medical negligence claim involved an amputation on January 17, 2019, resulting from an incorrect diagnosis related to Mr. Lynn's treatment by the identified VA employees.  The United States was on notice of the 'relevant facts' and witnesses, was in possession of Mr. Lynn's medical records, and could evaluate 'the chain of events leading to the complained-of injury.'

(DE 39, p. 5.)  Defendant did not file a reply to Plaintiffs' response regarding the sufficiency of the Defendant's written notice, which provided the basis to investigate Plaintiffs' claim.  "The notice must be 'sufficient to cause the agency to investigate' the incident in order to determine its exposure to liability."  <u>Degenhard v. United States</u>, No. 5:13-CV-685-BR, 2015 WL 632211, at *1 (E.D.N.C. Feb. 13, 2015) (quoting <u>Ahmed v. United States</u>, 30 F.3d 514, 516 (4th Cir. 1994).  Nevertheless, a claimant need not give the government notice of "every possible theory of recovery."  <u>Id</u>. at 1.  Rather a claimant must allege a sufficient factual predicate for the government to investigate the underlying conduct "to reasonably assess the extent of its liability vis-a-vis the complaint that was subsequently filed."  <u>Drew v. United States</u>, 217 F.3d at 198.  Accordingly, the SF-95 presented the agency with sufficient facts to put it on notice of the medical incident underlying Plaintiffs' claim; and, therefore, since the jurisdictional administrative exhaustion requirement of the FTCA relevant to the theories contained in the Complaint are satisfied, testimony regarding the same is appropriate.

Next, Defendant contends if Dr. Jacobs testifies as an expert at trial his testimony should be limited to the field of podiatry and not vascular surgery standards of care.  Although Plaintiffs concede Dr. Jacobs is not being offered in the field of vascular surgery, and Dr. Jacobs agrees he

"cannot testify to vascular surgery standards of care[,]" nevertheless, Plaintiffs argue his qualifications in podiatry allows him to testify concerning the unnecessary amputation. (DE 39, pp. 7-8.) To that end, Plaintiffs offer Dr. Jacobs's opinion to show "that the medical evidence supports Mr. Lynn's diagnosis of Charcot joint disease and that the VA's providers departed from the standard of care in urgently removing Mr. Lynn's right leg when 'there was never any direct evidence demonstrating osteomyelitis.'" (DE 6, p.10, quoting DE 1-1, ¶ 36.) The proponent of an expert witness's testimony bears the burden of proving that such testimony meets the requirements of Rule 702 by a preponderance of evidence. See Daubert, 509 U.S. at 592 n. 10. Here, Mr. Lynn's case involved multiple different specialties, including podiatry, radiology, emergency medicine, and surgery, but the alleged condition that Mr. Lynn was suffering from– Charcot joint disease—is managed routinely by podiatrists.

Federal Rule of Evidence 702 requires an expert to be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "[A] witness'[s] qualifications to render an expert opinion are [] liberally judged by Rule 702. Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed: knowledge, skill, experience, training, or education." Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993). "Accordingly, a challenge based on lack of qualifications alone must demonstrate that 'the purported expert [has] neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.'" In re Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prods. Liab. Litig., 214 F. Supp. 3d 478, 496 (D.S.C. 2016) (quoting Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989)). "If, again in the disjunctive, the proposed testimony will recount or employ 'scientific, technical, or other specialized knowledge,' it is a proper subject." Kopf, 993 F.2d at 377. Defendant does not

challenge Dr. Jacobs's more than 40 years of experience as a podiatrist and there is nothing in the record to suggest the conditions presented by Mr. Lynn are not treated by a podiatrist.  While the Court notes that "an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise[,]" the record is devoid of these impediments.  <u>In re Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prods. Liab. Litig.</u>, 214 F. Supp. 3d at 496.  Given the record before the Court at this time, the Court finds that Dr. Jacobs has satisfactory knowledge, skill, experience, training, or education on the issue for which the opinion is proffered; and therefore, denies Defendant's Motion *In Limine* to the extent it seeks to limit or exclude Dr. Jacobs's proffered testimony based on his qualifications.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, Defendant's Motion *In Limine* (DE 34) is denied as provided herein.

**IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

August 15, 2022
Florence, South Carolina

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Keith Lynn and Jennifer Lynn | ) | Case No.: 2:20-CV-04277-JD |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER GRANTING** |
| United States of America, | ) | **CONTINUANCE** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Before the Court is Plaintiffs Keith Lynn and Jennifer Lynn's ("Plaintiffs') Emergency Consent Motion for a Trial Continuance (DE 54) requesting that the trial scheduled for Monday, November 14, 2022, through Friday, November 18, 2022, be continued due to the illness of Plaintiffs' lead counsel. The motion (DE 54) is **granted**. The parties are directed to meet and confer regarding any conflicts for possible trial dates of December 5, 2022 – December 8, 2022, January 9, 2023 – January 12, 2023, and February 27, 2023 – March 2, 2023. Furthermore, the parties are directed to file a joint status report regarding any conflicts with the proposed dates by November 21, 2022.

In addition, after reviewing the record, including the parties' disclosures, pretrial briefs, and the Court's Order denying the Defendant's Motion in Limine (DE 50) in preparation for trial, the Court would like to explore whether there is a fact question on proximate cause. See Hughes v. Children's Clinic, P. A., 269 S.C. 389, 398, 237 S.E.2d 753, 757 (1977) ("Negligence is not actionable unless it is a proximate cause of the injuries, and it may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided."). As the parties know, Plaintiffs offer Dr. Jacob to show "that the medical evidence supports Mr. Lynn's diagnosis of Charcot joint disease and that the VA's providers departed from

1

**JA 166**

the standard of care in urgently removing Mr. Lynn's right leg when 'there was never any direct evidence demonstrating osteomyelitis.'" (DE 50, p. 7; see also DE 6, p. 10, quoting DE 1-1, ¶ 36.) While the Court denied Defendant's motion in limine (DE 34), finding that "Dr. Jacobs has satisfactory knowledge, skill, experience, training, or education on the issue for which the opinion is proffered[,]" that finding does not establish Plaintiffs' burden to show by expert testimony whether osteomyelitis was the proximate cause of Mr. Lynn's injuries. See David v. McLeod Reg'l Med. Ctr., 367 S.C. 242, 247, 626 S.E.2d 1, 4 (2006) ("[T]he plaintiff must show that the defendants' departure from such generally recognized practices and procedures was the proximate cause of the plaintiff's alleged injuries and damages. (Citation omitted). The plaintiff must provide expert testimony to establish both the required standard of care and the defendants' failure to conform to that standard, . . . .").

Accordingly, the Court hereby authorizes and directs the parties to file briefs (supported by declarations of the parties' experts) on the question of whether Plaintiffs can (with the witness proffered for trial) establish their burden of proof for medical malpractice regarding the proximate cause of Lynn's injuries. The parties shall have until November 23, 2022, to brief the issue and to file any replies by December 1, 2022. Thereafter, the Court will consider the briefs to determine if judgment is appropriate under Rule 56(f), Fed. R. Civ. P.

**AND IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

November 14, 2022
Florence, South Carolina

**JA 167**

Allen Mark Jacobs, DPM                                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 1

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF SOUTH CAROLINA
2                        CHARLESTON DIVISION
3       KEITH LYNN AND JENNIFER LYNN,
4                  Plaintiffs,
5            vs.          CASE NO. 2:20-cv-4277-JD
6       UNITED STATES OF AMERICA,
7                  Defendant.
8
9       VIDEOCONFERENCE
        DEPOSITION OF:    ALLEN MARK JACOBS, DPM
10
        DATE:             March 11, 2022
11
        TIME:             2:05 p.m.
12
        LOCATION:         6400 Clayton Road
13                        Suite 402
                          St. Louis, MO  63117
14
        TAKEN BY:         Counsel for the Defendant
15
        REPORTED BY:      KAREN NELLIUS, RPR
16                        (Appearing via videoconference)
        _____
17
18
19
20
21
22
23
24
25

Page 6

1          A.    Yes.

2          Q.    Okay.  And you are unaware as to

3    whether or not in South Carolina a podiatrist is

4    allowed to perform surgeries and procedures above

5    the ankle?

6          A.    I am not.

7          Q.    Okay.  Just so the record is clear, you

8    are not familiar with the South Carolina law on

9    that issue; is that fair?

10         A.    That's correct.

11         Q.    Okay.  Did you provide a fee schedule

12   to Mr. Lynn's attorneys in anticipation of serving

13   as an expert witness?

14         A.    I would think.

15         Q.    And what are your current rates?  And

16   if you want to break that down to an hourly rate or

17   a deposition rate or a trial rate.

18         A.    I don't have that sheet with me.  I'm

19   certain my girls provided it to plaintiffs'

20   counsel.  I would think they can provide you with a

21   copy or I can obtain one if you need one.

22         Q.    We will need one because the federal

23   rules provide a requirement that that information

24   be provided.

25               MR. TINKLER:  I do have that.  I can

Page 22

1   studies that also would be consistent with

2   Charcot's joint disease and no effort was made to

3   establish that diagnosis.

4            More importantly to me is this issue of

5   amputating the leg without any type of evaluation.

6   You have to understand to a podiatrist losing a leg

7   is like a physician losing a life.  That's what we

8   try to preserve, are legs.  And dealing with many

9   amputee patients, I don't think we should take the

10  removal of a man's leg lightly.  I think you want

11  to see if there is any chance of salvaging that

12  limb.

13           This is a patient that had no urgent

14  need for amputation.  Mr. Lynn was not febrile.  He

15  did not have an elevated white cell count.  He was

16  hemodynamically stable.  His laboratory studies

17  were unimpressive, and, in fact, were inconsistent

18  with a necrotizing fascial infection.  And based on

19  an x-ray that was interpreted as being

20  osteomyelitis without any proof of bone infection

21  and based on a presumption that the gas on the CT

22  scan that was visualized was representative of a

23  necrotizing infection and not simply an infection

24  with a gas-forming organism which would have

25  presented the same way, no effort was made to

Allen Mark Jacobs, DPM                                March 11, 2022

Lynn, Keith and Jennifer v. United Sates Of America

Page 28

1    osteomyelitis.  And if it was osteo, we don't know

2    that because no one ever did anything to verify the

3    diagnosis.

4            So that's my -- that's really where I'm

5    focused, is the decision to do the amputation,

6    particularly in a man who is stable.  This was not

7    a patient who was on death's door.  I had a

8    patient, as I said earlier, this year.  His foot

9    was gangrene and dead.  He was febrile.  He had

10   like a 20,000 something white count.  He was

11   hemodynamically unstable.  Mr. Lynn was far from

12   that.  He was far from that.  And the patient I

13   have right now in the hospital with a potential

14   necrotizing fascial infection, infectious disease

15   and I are going back and forth right now because

16   she has got an initial negative CT scan but she has

17   got some arguable signs and symptoms consistent

18   with a necrotizing fascial infection.  I'm going to

19   see her this evening, and she may have to be an

20   add-on if her CT comes back confirming that, yes,

21   she has got problems, but we are going to open it

22   up and look and confirm that she has a major issue,

23   and we're going to debride her and do an incision

24   and drainage but we are not going to -- well, I

25   can't amputate legs anyway by law, but we are

Allen Mark Jacobs, DPM                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 33

1    not have an infection.

2          Q.    Do you think that Mr. Lynn's amputation

3    was a result of trying to treat osteomyelitis?

4          A.    It's possible.

5          Q.    Did you see --

6          A.    You mean treating a Charcot that was,

7    in fact, osteo?  Is that what you are asking me?

8          Q.    What I'm asking you is do you think

9    that Dr. Brothers performed an amputation on

10   Mr. Lynn to treat osteomyelitis?

11         A.    That was part of his -- yes, because he

12   states in his record that Mr. Lynn had

13   osteomyelitis.  Dr. Brothers made that diagnosis.

14         Q.    Okay.  Do you think that the

15   osteomyelitis was in the foot region where the

16   Charcot foot disease was?

17         A.    I don't know that there was ever

18   osteomyelitis anywhere.  But if it was, it could

19   have been in the foot, it could have been in the

20   ankle, it could have been in the distal tibia and

21   fibula.

22         Q.    Okay.  Do you believe that Dr. Brothers

23   amputated the leg of Mr. Lynn to treat the

24   necrotizing fascitis?

25         A.    Yes.

Allen Mark Jacobs, DPM                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

                                            Page 53

1          Q.   Dr. Jacobs, I'm going to ask if we can

2    go off the record for a few minutes.  I'm just

3    going to look over a couple of things and try to

4    get back as soon as I can on this.  Okay?

5          A.   Sure.

6          Q.   Stretch or take a comfort break.

7               (A recess transpired.)

8    BY MR. BERLINSKY:

9          Q.   I'm just going to try to close out the

10   deposition, Dr. Jacobs.  If I understand your

11   testimony, then I'm just going to get a couple

12   quick summaries.

13              I think that you testified that the

14   blood glucose, the intermittent chills, the

15   decreased energy, the decreased appetite, the

16   fatigue, and the vomit, those are signs and

17   symptoms of an infection?

18         A.   Can be.

19         Q.   Okay.  And where you say in paragraph 4

20   that there were no signs and symptoms of infection

21   -- symptoms of infection, we just went through

22   that, that's not really as accurate based on what

23   we just talked about, correct?

24         A.   Correct.

25         Q.   And as far as the decision of the

Allen Mark Jacobs, DPM                    March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 54

```
 1   vascular surgeon to amputate the leg for

 2   necrotizing fascitis, that in and of itself is not

 3   a deviation in the standard of care of vascular

 4   surgery.  Are you able to testify on that opinion?

 5        A.   Obviously you know as well as I do I

 6   cannot testify to vascular surgery standards of

 7   care.

 8        Q.   Okay.  It sounds to me like you didn't

 9   see any evidence in the record that cleared up a

10   presumptive finding of necrotizing fascitis and you

11   think that was a requirement, correct?

12        A.   No.  What I'm suggesting is even if the

13   diagnosis were that of necrotizing fascitis that

14   there is still the opportunity to salvage a limb.

15   Or other part of the body.  I mean, it's not a

16   disease you just get on the leg or the foot.  There

17   is the opportunity for salvation of that -- or

18   preservation of that limb with an aggressive

19   debridement, usually multiple debridements are

20   required, but you can salvage the leg.  So I'm

21   saying even if there was a true diagnosis of

22   necrotizing fascitis, because all we have is

23   indirect presumptive evidence, that still does not

24   mandate amputation of the limb, that you can

25   salvage limbs with necrotizing fascitis.  It's a
```

Allen Mark Jacobs, DPM                          March 11, 2022
Lynn, Keith and Jennifer v. United Sates Of America

Page 58

1                    CERTIFICATE OF REPORTER

2

3                 I, Karen Nellius, Court Reporter and

4        Notary Public for the State of South Carolina at

5        Large, do hereby certify that the foregoing

6        transcript is a true, accurate, and complete

7        record.

8                    I further certify that I am neither

9        related to nor counsel for any party to the cause

10       pending or interested in the events thereof.

11                   Witness my hand, I have hereunto

12       affixed my official seal this 22nd day of March,

13       2022 at Charleston, Berkeley County, South

14       Carolina.

15

16

17

18

19

20

21

22       _____

         Karen Nellius, RPR

23       My Commission Expires

         November 14, 2024

24

25

**In The Matter Of:**

*Keith Lynn and Jennifer Lynn v.*
*United States of America*

---

*Thomas E. Brothers, MD*
*March 3, 2022*

---

*Barnett Reporting*
*meg.f.barnett@gmail.com*

**Min-U-Script® with Word Index**

**Thomas E. Brothers, MD - March 3, 2022**          1

```
 1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF SOUTH CAROLINA
 2                 CHARLESTON DIVISION

 3

 4

 5

 6
    KEITH LYNN AND
 7  JENNIFER LYNN,           )
                             )
 8            Plaintiffs,    )
                             )
 9         vs.               )
                             )
10  UNITED STATES OF AMERICA,)
                             )
11            Defendant.     )
    -------------------------

12

13      THE ZOOM DEPOSITION OF THOMAS E. BROTHERS, MD

14

15

16  DATE:            Thursday, March 3, 2022

17  TIME:            2:00 p.m.

18  WITNESS
    LOCATION:        Via Zoom
19                   Charleston, SC

20  REPORTER:        Margaret F. Barnett
                     Court Reporter and Notary Public
21

22

23

24

25
```

```
 1   are for.  We can't rely on memory.
 2            Well, can you just tell us, either from
 3   your recollection or your review of the records, how
 4   Mr. Keith Lynn presented and when he presented to you?
 5        A.   So he presented to us in consultation
 6   through the emergency department -- I did write down
 7   the date -- I think on the 15th of January 2019.  He
 8   had presented with a swollen, inflamed, discolored
 9   right leg.  The story was that he had a Charcot foot
10   for which he was being followed in podiatry, that he
11   had come in, been seen by them.  And after their
12   evaluation, he was unhappy with that evaluation and
13   returned to the emergency department, where we were
14   asked to see him.
15            We saw him and felt that he had evidence
16   of a surgical urgency/emergency and required admission
17   to the hospital for likely operative debridement
18   versus amputation versus drainage.  He had evidence of
19   likely necrotizing fasciitis and myositis on his scan.
20   In fact, that's why the emergency department physician
21   had contacted us.  Unfortunately, he also was
22   anticoagulated, over-anticoagulated.  He was on
23   Coumadin and his level of anticoagulation was more
24   than twice normal of what is desired.
25            So he was, therefore, readmitted to the
```

 1   hospital, with the idea of being able to treat him and

 2   take care of this so he didn't lose his leg and his

 3   life.  It felt necessary to start him on antibiotics

 4   and to reverse his anticoagulation.  As I recall, he

 5   was not febrile at the time and his white count wasn't

 6   febrile in hemodynamically.  He was doing well and his

 7   blood pressure was okay, and so it wasn't something

 8   that we had to take him emergently to the operating

 9   room to do.

10           Over the course of the next day and a

11   half, he remained without going into sepsis or septic

12   shock.  We were able to reverse his anticoagulation to

13   where it would then be safe to operate on him, and

14   subsequently took him to the operating room, where,

15   because of the extensive nature of his myonecrosis and

16   the findings, we felt it was best -- I felt it was

17   best to perform an above-knee -- excuse me, a

18   below-knee amputation.  He subsequently recovered from

19   that, healed up and was able to go home.

20   Unfortunately, a number of months later, he came back

21   with something called heterotopic calcification and he

22   required further surgical revision.

23           Q.   When you referred to the findings of, what

24   was it, myo what?

25           A.   Myonecrosis or -- so necrotizing fasciitis

1   on a clinical finding, if I understand your testimony.

2   Is that right?

3        A.   I believe that's correct, yes.

4        Q.   When you performed the amputation, is it

5   my understanding that was a decision that was made

6   once you, I guess, dissected or opened up the surgery

7   and determined whether or not debridement and drainage

8   would be an appropriate relief?

9        A.   So I don't have -- that is my suspicion,

10  but I do not have independent recollection of that,

11  and I did not include that in my operative note.  So

12  that would be typically what I would do, but I do not

13  specifically recall that in this instance.

14       Q.   Again, the reason or the decision to

15  amputate related to the gaseous tissues that were

16  identified, that were suspicious of this necrotizing

17  fasciitis or myositis.  Is that correct?

18       A.   Yes.

19       Q.   And I know that -- taking away from the

20  lawyers' perspective that an ankle bone is connected

21  to the tibia and the fibula and it's all sort of

22  interrelated.  Taking that apart from the medical

23  standpoint, did the amputation have anything to do

24  with the treatment of the Charcot foot that Mr. Lynn

25  was being treated for by podiatry?

```
 1                 CERTIFICATE OF REPORTER

 2

 3          I, Margaret F. Barnett, Professional Court

 4     Reporter and Notary Public for the State of South

 5     Carolina at Large, do hereby certify that the

 6     foregoing transcript is a true, accurate, and complete

 7     record of the testimony of the witness and of all

 8     objections made at the time of the examination.

 9          I further certify that I am neither related to

10     nor counsel for any party to the cause pending or

11     interested in the events thereof.

12          Witness my hand, I have hereunto affixed my

13     official seal this 7th day of March, 2022 at

14     Charleston, Charleston County, South Carolina.

15

16

17                         Margaret F. Barnett

18          _____

19                         Margaret F. Barnett
                           Notary Public
                           My Commission expires
20                         February 25, 2030

21

22

23

24

25
```

**Declaration of John Womack, MD**
**In the Matter of Lynn vs. United States of America**

Nov 16,2021

I am a board certified orthopaedic surgeon with fellowship training in foot and ankle surgery. I have practiced almost exclusively foot and ankle surgery for the past 15 years in Greenville, South Carolina. I take care of patients with diabetic foot problems including Charcot arthropathy on a daily basis including diagnosis as well as both conservative and surgical management of these patients. I routinely treat diabetic infections of the lower extremity and perform below knee amputations as a necessary life saving measure for patients where appropriate. In addition I currently serve as the chairman of the Joint Podiatry Advisory Committee for the South Carolina State Department of Labor, Licensing, and Regulation at the pleasure of the governor of South Carolina as well as the State Board of Medical Examiners. Mr. Lynn would be a typical patient that I may encounter in my practice on a daily basis.

The scope of practice for podiatry in South Carolina does not include the treatment of overwhelming soft tissue infections above the level of the ankle joint or performing below knee amputations.

I have reviewed extensively the plaintiff's medical records from the VA Medical Center in Charleston from July of 2015 until December of 2020 including all of the outpatient and inpatient notes as well as laboratory tests available to me. I have also reviewed the patient's pertinent imaging studies performed at this institution that relates to the care of the patient's right lower extremity.

The patient and his wife then presented to the ER of the VA Medical Center in Charleston on 1/15/19, according to the intake nurse's note, seeking a second opinion about his right foot due to the increased swelling and pain in his right leg. Vascular surgery was consulted while the patient was in the ER for management of his right leg. The vascular surgery consultation dated 1/15/19 indicates that the patient had edema of his right lower extremity from the ankle to mid calf with erythematous blisters. I reviewed both the CT report and images from the CT of the right LE performed that day while the patient was in the ER which demonstrated a 7x12x4 cm abscess of the leg above the ankle level which contained both fluid and gas. Given the absence of an external wound this can only represent an overwhelming and life threatening soft tissue infection of the patient's leg. This conclusion is also supported by the appearance of the leg in photographs submitted by the plaintiff of his leg before the amputation was performed.

The infection seen on the CT scan of the patient's leg represents a large abscess with necrotizing soft tissue infection that is a life threatening condition. The accepted and recognized treatment options by surgically trained providers (orthopaedic surgeons, vascular surgeons and general surgeons) would be an attempt at drainage of the infection and removal of all dead tissue from the patient's leg or below knee amputation to remove the infection burden from the patient and prevent sepsis and death. Given the magnitude of the infection and the patient's multiple medical problems including poorly controlled diabetes as well as severe heart disease it is my opinion that incision and drainage with removal of the dead tissue in the leg was not a

viable option due to the patient's poor potential to heal this surgery and with such a debridement that the leg would not be functional due to the large amount of tissue that would need to be removed.

It is my medical opinion within a reasonable degree of medical certainty that Dr. Brothers and the vascular surgery team did not deviate from the standard of care when offering and performing a below knee amputation of this patient's right lower extremity as a life saving measure. Dr. Brothers met the standard of care.

The patient had an overwhelming abscess of his leg above his known Charcot foot deformity that was likely with his many comorbidities to become a life threatening condition if left unchecked. It is more likely than not that an incision and drainage of the infection would not have been successful and that the skin changes and mottling noted along with the CT findings likely represented a life threatening condition known as necrotizing soft tissue infection. The only cure for this condition is amputation in this clinical setting as radical debridement of the involved area would not have been successful.

It should be noted that the area of concern on the CT was a new problem above the known Charcot foot that the patient had been treated for previously. The records show that the patient was admitted for a diagnosis of cellulitis/leg abscess/ and osteomyelitis by the vascular surgery service. The reason for his amputation had nothing to do with his well established history of Charcot foot related to his diabetes but rather his overwhelming soft tissue infection around his tibia well above the area of Charcot in his foot.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Executed this _____18th_____ day of November, 2022

_____(signed) _John Womel, MD_ _JOHN WOMACK, MD_

Print Your Name and Date

**JA 183**

Declaration of Mark R. Jackson, M.D.

By background I am a board-certified vascular surgeon in the active practice of vascular surgery since completing my vascular surgery fellowship at the Walter Reed Army Medical Center in June of 1993. Upon completion of my vascular surgery fellowship I remained at Walter Reed Army Medical Center as a staff vascular surgeon, while also having appointments at the Uniformed Services University of the Health Sciences in Bethesda, MD as an Assistant Professor Surgery, and also while having an assignment at the Walter Reed Army Institute of Research. I was honorably discharged from the Army in 1997 at the rank of Lieutenant Colonel, and then resumed my vascular surgery career at the University of Texas Southwestern Medical Center in Dallas, where I was promoted to the rank of Associate Professor of Surgery while having an active vascular surgery practice at The Dallas North Texas Veterans Affairs Hospital, Parkland Memorial Hospital, and Zale Lipshy University Hospital. During this time I started an endovascular program within the Division of Vascular Surgery specializing in the then-new technology of abdominal aortic aneurysm stent graft repair. My academic credentials also include publication of over 70 original articles in peer- reviewed journals, book chapters, and published abstracts. I have also presented medical scientific work at national and regional vascular surgery meetings. In 2003 I moved to Greenville, SC were I have continued my career in vascular surgery in the community hospital setting, initially as a hospital-employed vascular surgeon, and now in independent private practice. I have extensive clinical experience treating patient with severe vascular disease of the legs, including performance of procedures to restore blood flow to the legs, and amputation procedures, such as was required for Lynn. I have also provided surgical treatment for many patients with severe infections of the legs, including necrotizing fasciitis. Such infections are often seen in patients with severe vascular disease of the legs.

11/20/2022

**Exhibit D**

In preparation of this report I have reviewed the case files which include close to 9,000 pages. I have also reviewed the source images of the X-rays and CT scans that were performed in the course of Lynn's care. I have read the expert report of Dr. Jacobs. I have read the depositions of Dr. Jacobs, Dr. Brothers, Dr. Ravenell, Mr. Lynn, and Mrs. Lynn.

Based upon my review of these records I have no doubt that Dr. Brothers and the vascular team arrived at the correct diagnosis of a necrotizing soft tissue infection (necrotizing fasciitis with myonecrosis) - a severe infection of the muscle and deep tissues of the leg. The CT scan findings of extensive gas and infected fluid in the leg muscle, extending well above the ankle and into the middle portion of the leg, clearly and unmistakably support the diagnosis of necrotizing fasciitis with myonecrosis. The accepted standard practice and procedure for this condition requires surgical treatment such as the below knee amputation as was performed by Dr.Brothers.

While the option of a more limited incision and drainage, or debridement, might be acceptable in a more limited infection, the extensive degree of infection in this case necessitated amputation of the leg. In cases of necrotizing fasciitis for which amputation is not performed, thereby leaving behind infected tissue, there is a substantial and fatal risk of uncontrolled spread of the infection throughout the body (sepsis) since all of the dead and infected tissue has not been surgically removed.

Given the severity and extent of Lynn's necrotizing fasciitis with myonecrosis, a below the knee amputation was the appropriate treatment and Dr.Brothers' care clearly met the standard of care.

11/30/2022

The correct diagnosis of necrotizing fasciitis with myonecrosis is independent of any podiatric issues related to either Charcot foot and/or osteomyelitis below the ankle - neither of which had any bearing on the need for below the knee amputation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___20___ day of November, 2022

(signed)_____  11/20/2022

Mark R. Jackson, M.D.

## DECLARATION OF JAN FRITZ, M.D.

1.  I am a physician and hold board certification in Diagnostic Radiology. I am an Associate Professor of Radiology at New York University Grossman School of Medicine in New York, New York. My attached curriculum vitae details my education, publications, and clinical background. I currently work as an attending physician at New York University Langone Health, Bellevue Hospital, and Gouverneur Hospital, all in New York, New York. I also serve as the Musculoskeletal Radiology Departmental Division Chief at New York University Langone Health in New York, New York. As part of my many years of clinical practice, I have completed many diagnostic interpretations of radiographs, ultrasonography, computer tomography, and magnetic resonance imaging examinations of patients with soft tissue infection, osteomyelitis, and joint infections. In addition, I have performed many percutaneous image-guided biopsy procedures to obtain tissue specimens for microbiological, laboratory, and pathological examination. As part of performing those procedures, I have assessed and treated many adult patients with acute and chronic musculoskeletal infections of soft tissues, bones, and joints. I am a member of multiple radiology societies, boards, professional organizations, and advisory committees, and I have published over 225 medical literature articles and given many presentations in the field of diagnostic radiology. Based on my education, clinical experience, training, and knowledge of medical literature, I am intimately familiar with the care and treatment of adult patients with the full spectrum of musculoskeletal infections.

2.  I reviewed select legal documents associated with this case. Documents that were provided to me for evaluation and forming my opinion included:
    - Complaint filed in this lawsuit alleging the deviation of the standard of care owed.
    - Declaration of Plaintiff's Expert Witness Allen Mark Jacobs
    - Pathology report dated 1/17/2019.
    - U.S. Department of Veterans Affairs Medical Records of Mr. Lynn.
    - Imaging studies of Mr. Lynn, including:
        - Radiographs of the **RIGHT** foot dated 7/23/2017
        - Radiographs of the **RIGHT** foot dated 6/21/2018
        - M.R.I. of the **RIGHT** foot dated 7/28/2018
        - Radiographs of the **RIGHT** and left foot dated 8/13/2018
        - Radiographs of the **RIGHT** foot dated 10/12/2018

Exhibit E

- o C.T. of the **RIGHT** lower extremity dated 1/15/2019
- Deposition Rahn Ravenell, MD, March 1, 2022
- Deposition Thomas E. Brothers, MD, March 3, 2022
- Deposition Allan Mark Jacobs, D.P.M., March 11, 2022
- Deposition Jennifer Lynn, March 31, 2022
- Deposition Keith Lynn, March 18, 2022

3. On 1/15/2019, Mr. Lynn presented with an acutely life-threatening, gas-producing, necrotizing infection involving soft tissues overlying the shin above the ankle joint. The gas-producing soft tissue infection and gangrenous muscle tissue necrosis are unequivocally demonstrated on the CT examination dated 1/15/21. The CT images demonstrated tissue necrosis and gas inside the muscle tissues and that the infection had already spread across two muscle compartments cross-sectionally and to the mid-region of the shin. The two circles below outline the soft tissue gas (dark spots). At that point, the cross-sectional spread of the infection measured approximately 6.7 x 4.2 m:



Page 2 of 5

**JA 188**



The constellation of findings was unequivocally diagnostic of gas gangrene, also known as infectious myonecrosis, which is a life-threatening surgical emergency. These infections are clinically feared due to fulminant tissue destruction, systemic toxicity, and high death rate. Dr. Brothers evaluated Mr. Lynn promptly and acutely, who was acutely sick at that time with systemic signs of toxicity, including at least one documented episode of vomiting and persistent nausea. Dr. Brothers immediately admitted Mr. Lynn and initiated broadband intravenous antibiotic treatment to combat systemic toxicity. On 1/17/2019, the vascular team documented systemically stable conditions of Mr. Lynn but persistent necrotizing shin infection, despite intravenous antibiotic broad-spectrum therapy, indicating that they were ineffective in controlling the infection. Following surgical consent, Dr. Brothers performed the life-saving below-the-knee amputation on 1/17/2019.

4. The center of the necrotizing soft tissue infection (circle) was located in the center of the shin, approximately 7.6 cm above the ankle joint line (horizontal line):



In head-to-foot direction, the inflammation of the necrotizing soft tissue infection extended to the mid-level of the shin over an area of approximately 8.6 cm:



5. The necrotizing gangrenous soft tissue infection of the shin musculature was spatially located above the ankle joint line and more remote than that from the midfoot, where previously Charcot foot and possible osteomyelitis were documented. Therefore, the necrotizing gangrenous soft tissue infection was independent of any podiatric-related issues and unrelated to Charcot foot and a previous diagnosis of possible midfoot osteomyelitis.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of November 2022

Jan Fritz, M.D., P.D., D.A.B.R., R.M.S.K.

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Keith Lynn and Jennifer Lynn, | Case No. 2:20-cv-04277-JD |
| Plaintiffs, | |
| vs. | **DECLARATION OF ALLEN MARK JACOBS DPM, FACFAS, FAPWH** |
| United States of America, | |
| Defendant. | |

1.      My career has been devoted to saving the lower extremities of patients.  I was formerly the assistant head of the VA podiatry service in Washington, D.C.  I am frequently consulted by other specialists, including emergency room physicians and surgeons, on questions involving potential amputation of lower limbs.  A case like Mr. Lynn's falls squarely in my field of expertise.  I refer the Court to my previous Declaration dated December 2, 2020, and my deposition dated March 11, 2022, for my qualifications and further elaboration of my opinions.  In my opinion there was a deviation from the standard of care in by VA personnel in failing to arrive at a proper diagnosis and in amputating Mr. Lynn's leg below the knee rather than using alternative measures to arrive at a definitive diagnosis and treat accordingly.  These departures from the standard of care constitute the proximate cause of Mr. Lynn's injury, i.e. the amputation of his leg.

2.      The record reveals that Mr. Lynn definitely suffered from Charcot joint disease, which had manifested itself in June 2018.  The condition grew progressively worse during the remainder of 2018.

3.      When Mr. Lynn was seen in the ER on January 15, 2019, his CT suggested to the radiologist who interpreted it that he had osteomyelitis.  Charcot joint disease and osteomyelitis are difficult to distinguish using radiographic images.  The "gold standard" for establishing a

diagnosis of osteomyelitis is a bone biopsy.  This was not performed.  Nor do the operative report of January 17th or the resulting pathology report give any information to confirm the presence of osteomyelitis.

4.    There was possibly some infective process going on - possibly even osteomyelitis. However, even if Mr. Lynn had osteomyelitis, the proper course of treatment would have been first to confirm the diagnosis and then determine the extent of the infection in the bone and consider the possible available less drastic treatments before amputating the leg.  Mr. Lynn was hemodynamically stable, had no fever and no elevated white blood count.  It is possible that an amputation might ultimately be called for, but that is speculative, given the record.

5.    Similarly, there was never any diagnosis of necrotizing fasciitis or other immediately life-threatening infection.  Even if the diagnosis of necrotizing fasciitis had been established by confirmation after performing an incision and inspection, the proper treatment would have required an evaluation of the extent of the problem and consideration of whether surgical debridement, rather than amputation, was the indicated treatment.  Here, neither the operative report nor the pathology report indicate the presence of necrotic (dead) tissue.

6.    In summary, by amputating Mr. Lynn's leg without first confirming a diagnosis and/or performing less drastic treatment measures, the VA medical personnel departed from the standard of care as widely accepted the in the relevant authoritative literature.  That departure proximately caused Mr. Lynn's injury.  My opinion is given with reasonable medical certainty.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___11 / 18___, 2022.

Dr. Allen Mark Jacobs, DPM,
FACFAS, FAPWH

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Keith Lynn and Jennifer Lynn,

        Plaintiffs,

    vs.

United States of America,

        Defendant.

Case No. 2:20-cv-04277-JD

**PLAINTIFFS' MEMORANDUM
IN REPLY TO DEFENDANT'S
RULE 56(f) BRIEF**

        Plaintiffs Keith Lynn and Jennifer Lynn submit this Memorandum in reply to Defendant's

Rule 56(f) Brief to highlight the disputed facts that require trial. Defendant United States of

America, which never moved for summary judgment before, argues that Plaintiffs failed to meet

their burden to establish proximate cause: (1) because the testimony of Plaintiffs' podiatry expert,

Dr. Allen Mark Jacobs, "focuses" on the condition of Mr. Lynn's foot and (2) because Mr. Lynn's

leg was amputated due to a "life-threatening, necrotizing soft tissue infection in [his] calf and shin

area"—a condition Dr. Jacobs "does not treat." Def.'s Br., ECF No. 58, at 2. While this may be

Defendant's theory of the case,[1] Dr. Jacobs's testimony squarely contradicts it, creating genuine

disputes of material fact that can only be resolved after subjecting the parties' witnesses to cross-

examination and credibility determinations.

---

[1] Defendant states in its brief that it submitted proposed findings of fact and conclusions of
law. Def.'s Br. 1. After a review of the communications from and preferences of this Court,
Plaintiffs are unaware of any request or requirement to submit proposed findings and conclusions
*before* the evidence is presented at trial. For that reason and because of Local Civil Rule 26.05,
which states that "[p]roposed findings and conclusions should not be submitted with the pretrial
brief **unless requested by the court**," (emphasis added), Plaintiffs did not submit them. Further,
Defendant did not serve its proposed findings and conclusions on Plaintiffs. For these reasons,
Plaintiffs are concerned that Defendant provided the Court with improper argument on assumed
testimony *ex parte* and request that the Court permit Plaintiffs to review Defendant's proposed
findings and conclusions.

*First*, Dr. Jacobs's testimony does not "focus" on Mr. Lynn's foot, as Defendant argues. Rather, as supported by his two declarations and deposition testimony, his focus is on the universe of symptoms Mr. Lynn presented to the VA personnel before his amputation and the standard of care that Mr. Lynn should have received by VA personnel for those symptoms. Dr. Jacobs unequivocally established that his expertise—which includes decades of experience, prolific publication, and a stint with the VA—is with the "foot, ankle, and ***lower leg***," the area where Mr. Lynn's amputation was performed. ECF No. 39-2, at 5:22–23 (emphasis added); *see also* ECF No. 59-1, at ¶ 1 ("I am ***frequently consulted*** by other specialists, including emergency room physicians and surgeons, ***on questions involving potential amputation of lower limbs***." (emphasis added)). He led seminars about the management of infectious disease and diagnostic radiologic techniques relating to lower extremities. ECF No. 1-1, at 14–15. And he specified that he has experience treating osteomyelitis and necrotizing infections. *See* ECF No. 39-2, at 12:8–23 ("I have one patient in house now that I'm treating with a ***necrotizing infection*** of the foot. ***Of the leg, actually***. I had one earlier this year that resulted in a leg amputation. So actual ***necrotizing fascial*** infections are not common, ***but I see several a year***." (emphasis added)); *see also* ECF No. 1-1, at 15 (listing one of Dr. Jacobs's publications entitled "Management of Osteomyelitis.")). Thus, at a minimum, a factual question exists as to whether Dr. Jacobs, whose "career has been devoted to saving the lower extremities of patients," can credibly support his fundamental opinions relating to duty and causation in this medical negligence case. ECF No. 59-1, at ¶ 1.

*Second*, Dr. Jacobs's fundamental opinion relating to causation is that the medical evidence did not, within a reasonable degree of medical certainty, support the amputation of Mr. Lynn's lower leg. ECF No. 59-1, at ¶ 1. Hence, VA personnel breached that duty when they amputated it. Defendant's factual assertion that the amputation was necessary because of a "necrotizing soft

tissue infection" is a (quite genuinely) disputed fact, and this Court need look no further than the VA's own medical records to appreciate that genuineness. In particular, the attending vascular surgeon who amputated Mr. Lynn's lower leg listed, ***after the amputation***, that Mr. Lynn's diagnoses were "osteomyelitis . . . [,] abscess, [and] cellulitis." USA DOCS_1145–46, Ex. A. In fact, the only mention of necrotizing fasciitis in the 8,948 pages of medical records that Defendant provided this Court in advance of trial was as a *provisional* diagnosis by another physician in a single consult request to the VA's vascular surgery department. USA DOCS_1744–45, Ex. B. According to that record, the attending vascular surgeon agreed upon an assessment and plan to treat "Osteomyelitis and Abscess," USA DOCS_1756, Ex. C, and he acknowledged this six days ***after the amputation***, USA DOCS_1757, Ex. D. Dr. Jacobs's causation opinion is premised on his review of these medical records and his vast experience as expressed above. As he reiterated in his November 18, 2022 declaration, "Mr. Lynn was hemodynamically stable, had no fever and no elevated white blood count." ECF No. 59-1, at ¶ 4. No bone biopsy or incision was performed, and the pathology report did not "indicate the presence of necrotic (dead) tissue." *Id.* at ¶¶ 3–4. This evidence, which must be viewed in a light most favorable to Plaintiffs, reasonably implies that VA personnel did not need to amputate Mr. Lynn's lower leg.

*Third*, crediting Defendant's witnesses over Plaintiffs' witnesses would require weighing the evidence and short-circuit a proper trial on the merits. Defendant invites error by not fully explaining the law and cherry-picking the evidence. As to the law: Defendant's reference to *International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Manaco*, 329 F.3d 359 (4th Cir. 2003), and the proposition that, "[w]hen a case is set for bench trial, the Court may draw inferences from established facts since the Court will act as the finder of fact anyway" does not fully explain what "established facts" actually are. Def's Br. 2. In that case, "the

parties did not contradict one another's proffered facts" and conceded that the district court could dispose of the matter on the paper record before it at the summary judgment hearing. *Int'l Bancorp*, 329 F.3d at 362. *International Bancorp* affirms the commonsense proposition from *Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991), (also cited by Defendant) that "it makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, ***unless those inferences involve issues of witness credibility or disputed material facts***." (Emphasis added). This case unquestionably presents the latter scenario because the parties present differing theories, creating issues of witness credibility and disputed material facts that require trial—not trial by affidavit. *See Tolen v. Cotton*, 572 U.S. 650, 660 (2014) (affirming the "fundamental principle" that "reasonable inferences should be drawn in favor of the non-moving party").

Defendant further attempts to "establish" facts in representing that Dr. Jacobs admitted that he "believe[s] that Dr. Brothers amputated the leg of Mr. Lynn to treat the necrotizing fasciitis." Def.'s Br. 3–4. But when Dr. Jacobs's testimony is read in its totality, he is not really admitting this at all. *See, e.g.*, ECF No. 39-2, at 22:16–18 ("[Mr. Lynn's] laboratory studies were unimpressive, and, in fact, were inconsistent with a necrotizing fascial infection."); *id.* at 46:16–19 ("Finding air density on an x-ray or CT scan does not equal a diagnosis of gas gangrene or a necrotizing fascial infection."); *id.* at 54:20–25 ("So I'm saying even if there was a true diagnosis of necrotizing fasciitis, because all we have is indirect presumptive evidence, that still does not mandate amputation of the limb, that you can salvage limbs with necrotizing fasciitis."); ECF No. 59-1, at ¶ 5 ("[T]here was never any diagnosis of necrotizing fasciitis or other immediately life-threatening infection."). Necrotizing fasciitis, according to Dr. Jacobs, can only be confirmed during surgery, and that simply was not done. ECF No. 39-2, at 55:4–8. Thus, the point Dr. Jacobs

2:20-cv-04277-JD    Date Filed 12/01/22    Entry Number 63    Page 5 of 6

makes in his testimony is that, based on the actual medical evidence in this case, whether Mr. Lynn

actually had osteomyelitis or necrotizing fasciitis or even something else, Dr. Jacobs believes that

Mr. Lynn's lower leg did not need to be amputated when it was. This opinion alone precludes

summary judgment.

Accordingly, Plaintiffs respectfully request that they be permitted to review Defendant's

proposed findings of fact and conclusions of law and to present their case at trial.

Respectfully submitted,

TINKLER LAW FIRM LLC

 /s/ William P. Tinkler
Paul E. Tinkler (D.S.C. No. 4108)
William P. Tinkler (D.S.C. No. 11794)
P.O. Box 31813
Charleston, SC  29417
(843) 853-5203
(843) 261-5647 (fax)
paultinkler@tinklerlaw.com
williamtinkler@tinklerlaw.com

Stephen F. DeAntonio (D.S.C. No. 1049)
DeANTONIO LAW FIRM, LLC
P.O. Box 30069
Charleston, SC  29417
sdeantonio@deanlawfirm.com

December 1, 2022                              *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2022, I electronically filed **PLAINTIFFS'**

**MEMORANDUM IN REPLY TO DEFENDANT'S RULE 56(f) BRIEF** through this Court's

CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of

the Court's electronic filing system.

/s/ William P. Tinkler
William P. Tinkler (D.S.C. No. 11794)

# Discharge Summaries

Printed On Aug 2, 2021

---

=36). Historically much decreased requirements while inpatient. 20U NPH BID, 10U aspart TID with meals with SSI and DM diet.

4. Iron Deficiency Anemia: Follows with anemia clinic. Holding off on IV iron infusions until complete clearance of signs of infection. Oral Fe given. Seen by GI consult and will consider outpt EGD/colon.

5. AKI on CKD3: quickly resolved with IVF. Back to baseline at discharge. Continue bicarb 1300mg BID and avoid nephrotoxic agents.

6. Factor V Leiden: therapeutic on coumadin so home regimen 5mg PO on M/W/F/S/Sun and 7.5mg On T/Th was continued.

7. Hypertension: BP low at 107/68 in ED but quickly returned to normal with IVF. Intitially home regiment held but was resumed at discharge. Home regiment lisinopril 40mg PO daily, Coreg 50mg BID, Lasix 20mg BID.

8. Chronic Low Back Pain: stable, home regiment cont during hospital course and was unchanged at discharge. Home regiment: Oxycodone SA 20mg BID, robaxin 1000mg q6hr prn, and pain contract with PCP.

9. CAD: no recent CP, stable on home regimen: ASA, atorvastatin 80mg PO daily

10. PTSD: reports stable on current regimen. Follows with psych in Goose Creek. NO change to outpt regiment: mirtazapine 45mg daily and topiramate with atarax prn

11. Asthma: stable, Recently evaluated by pulmonary 2/15, PFTs consistent with air- trapping. Possible mixed etiology given concurrent GERD, obesity, OSA. No change to homoe regiment: Symbicort BID with albuterol prn
.
.

/es/ William H. Shelley III, MD 253
Attending Physician
Signed: 10/22/2019 09:51

---

LOCAL TITLE: Discharge Summary
 ADMIN DATE: JAN 15, 2019          DISCH. DATE: JAN 23, 2019
STANDARD TITLE: DISCHARGE SUMMARY
  DICT DATE: JAN 23, 2019@11:05     ENTRY DATE: JAN 23, 2019@11:05:47
 DICTATED BY: QUINN,KRISTEN M      ATTENDING: BROTHERS,THOMAS E
     URGENCY: routine               STATUS: COMPLETED


DISCHARGE SUMMARY

DISCHARGE DIAGNOSIS:

Please enter the primary diagnosis during this hospitalization.  osteomyelitis

---

| PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| LYNN,KEITH EDWARD<br>108 RUDOLPH CT<br>RIDGEVILLE, SOUTH CAROLINA  29472 | Printed at CHARLESTON VAMC |

**JA 200**

# Discharge Summaries

Printed On Aug 2, 2021

Please enter key secondary diagnoses during this hospitalization. abscess, cellulitis

Please indicate additional medical problems that have been addressed during this hospitalization
PROCEDURES PERFORMED DURING EPISODE OF CARE:
Right BKA 1/17

HPI:

47 y/o with Uncontrolled DM (A1C 10.6) with
Peripheral Neuropathy, CAD s/p MI and Stent placement, Factor V Leiden Mutation, Sleep Apnea on BiPAP, HTN, HLD, GERD, Chronic Pain, and PTSD with a PMH of CVA x 4, Bilateral Lower Extremity DVT on lifelong Coumadin, and Repair of Bilateral Tibial Fractures s/p MVC complicated by MRSA infection and subsequent removal of hardware from LLE presents to ED with complaint of right leg pain associated with redness, warmth, and swelling. Right leg pain has been a chronic problem since July '18, at which time he was treated for Gout. He was then diagnosed with R Charcot foot later that month. Since that time, his right foot has continued to be bothersome, painful at times. He has been followed by Podiatry. He began using a CROW boot last fall until approximately 6 weeks ago when he was instructed to be NWB on the RLE and began using a wheelchair for mobility. Approximately 4 days ago, he reports worsening pain in his right leg with an increase in swelling and varying redness and discoloration of his lower leg, foot, and ankle. The pain and swelling continued to get worse, and he was concerned about the redness and warmth. He was evaluated by Podiatry today and is awaiting a new CROW boot. He states that he had a negative DVT study following his visit with Podiatry, but remains concerned about possible infection and is requesting further evaluation. Patient states he was directed to ED by patient advocate. He reports intermittent chills for the past month and decreased energy and appetite with fatigue in the past 4 days. He reports vomiting yesterday, but denies nausea and vomiting today. He denies fevers, sweats, lightheadedness, dizziness, palpitations, dyspnea, abdominal pain, diarrhea, constipation, bleeding, open leg wounds, and recent injuries.


PAST MEDICAL HISTORY:

1. Essential hypertension (SNOMED CT 59621000)      11/12/15
HERNDON,PAMELA
2. ALLERGIC RHINITIS NOS                            02/28/07
COLEY,IRENE B
3. Obesity (SNOMED CT 414916001)                    11/18/15
COBB,DANIEL B
     CLASS III, BMI 40
4. Asthma (SNOMED CT 195967001)                     11/08/17
HAYGOOD,ALLEN R
5. GERD                                             12/11/00
COLEY,IRENE B
6. Hyperlipidemia (SNOMED CT 55822004)              09/06/16

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation
LYNN,KEITH EDWARD
108 RUDOLPH CT
RIDGEVILLE, SOUTH CAROLINA  29472

Printed at CHARLESTON VAMC

**JA 201**

# Consult Requests

Printed On Aug 2, 2021

```
Current PC Provider:    HERNANDEZ-ALICEA,WILLIAM
Current PC Team:        GCR PACT 06 MD *WH*
Current Pat. Status:    Outpatient
UCID:                   534_3190237
Primary Eligibility:    SERVICE CONNECTED 50% to 100%(VERIFIED)
Patient Type:           SC VETERAN
OEF/OIF:                NO


Service Connection/Rated Disabilities
SC Percent:             100%
Rated Disabilities:     ANXIETY DISORDER  (100%)
                        ARTERIOSCLEROTIC HEART DISEASE  (60%)
                        MIGRAINE HEADACHES  (30%)
                        PARALYSIS OF ALL RADICULAR NERVE GROUPS  (20%)
                        PARALYSIS OF EXTERNAL POPLITEAL NERVE  (10%)
                        HYPERTENSIVE VASCULAR DISEASE  (10%)


Order Information
To Service:             VASCULAR SURGERY OUTPT
From Service:           4BS SURG
Requesting Provider:    TAYLOR,MICHAEL L
Service is to be rendered on an INPATIENT basis
Place:                  Consultant's choice
Urgency:                Routine
Clinically Ind. Date:   Jan 15, 2019
DST ID:
Orderable Item:         VASCULAR SURGERY OUTPT
Consult:                Consult Request
Provisional Diagnosis: Necrotizing Fasciitis(ICD-10-CM M72.6)
Reason For Request:
LYNN,KEITH EDWARD          ██████████            DOB:
                     ████████
                                       4BS SURG B424-16
DS - Disabilities
Eligibility: SERVICE CONNECTED 50% to 100%          VERIFIED
Total S/C %: 100

HEMORRHAGE OF THE BRAIN                       10%
  S/C
MIGRAINE HEADACHES                            30%
  S/C
ARTERIOSCLEROTIC HEART DISEASE                30%
  S/C
HYPERTENSIVE VASCULAR DISEASE                 10%
  S/C
ANXIETY DISORDER                             100%
  S/C
Combat Veteran Status: None Indicated
Enrollment Priority: GROUP 1
```

---

**PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)**

```
LYNN,KEITH EDWARD
108 RUDOLPH CT
RIDGEVILLE, SOUTH CAROLINA  29472
```

**VISTA Electronic Medical Documentation**

Printed at CHARLESTON VAMC

**JA 202**

# Consult Requests

```
ATTENDING: N Glover MD
DIAGNOSIS: necrotizing fasciitis
REASON FOR REQUEST:     eval and treat

PERTINENT INFORMATION:  as discussed



The patient understands this consult may be answered electronically.
What is the best time for the patient to be reached
to schedule this consult?
Evening (4p-8p)

Inter-facility Information
This is not an inter-facility consult request.

Status:                  COMPLETE
Last Action:             COMPLETE/UPDATE

Facility
 Activity                Date/Time/Zone      Responsible Person  Entered By
 ------------------------------------------------------------------------------
 CPRS RELEASED ORDER     01/15/19 23:08      TAYLOR,MICHAEL L    TAYLOR,MICHAEL L
 INCOMPLETE RPT          01/15/19 23:25      MUNACO,SANDRA S     MUNACO,SANDRA S
     Note# 40146678
 COMPLETE/UPDATE         01/16/19 02:39      MUNACO,SANDRA S     MUNACO,SANDRA S
     Note# 40146678

Note: TIME ZONE is local if not indicated

 -------------------------------------------------------------------------------

 LOCAL TITLE: VASCULAR SURGERY CONSULT/HISTORY&PHYSICAL
STANDARD TITLE: VASCULAR SURGERY CONSULT
DATE OF NOTE: JAN 15, 2019@23:09     ENTRY DATE: JAN 15, 2019@23:10:14
      AUTHOR: MUNACO,SANDRA S      EXP COSIGNER:
      URGENCY:                        STATUS: COMPLETED

HISTORY AND PHYSICAL
ATTENDING PHYSICIAN: BROTHERS,THOMAS E


LEVEL OF SUPERVISION: Patient discussed with Dr. S. Allen, who discussed with
Attending, who concurs with findings and plan.


CHIEF COMPLAINT: Came to the ED to get a second opinion about my foot.
```

---

**PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)**

LYNN,KEITH EDWARD
108 RUDOLPH CT
RIDGEVILLE, SOUTH CAROLINA  29472

**VISTA Electronic Medical Documentation**
Printed at CHARLESTON VAMC

**JA 203**

Page 1745 of 8946

# Consult Requests

involvement of the distal extensor digitorum longus muscle.

Large complex fluid collection surrounding the ankle and
hindfoot, contiguous with and not clearly separable from the
abscess at the lateral ankle and distal calf, presumably also
reflecting abscess. There is osseous destruction anteriorly at
the calcaneus with periosteal reaction at the cuboid middle and
lateral cuneiforms and navicular, compatible with osteomyelitis.

Diffuse density throughout the subcutaneous fat of the distal
calf and ankle consistent with cellulitis.


VTE PROPHYLAXIS:
    Pharmacologic VTE prophylaxis:
      to be started on admission (score > or = 4)
    Mechanical VTE prophylaxis:
      to be started on admission


ASSESSMENT AND PLAN:
Discussed with Dr. S. Allen, who discussed with Attending, who is in agreement
with assessment and plan.

RLE Osteomyelitis and Abscess:
- Admit to ward, Vascular Surgery
- IV Antibiotics: Zosyn 3.375 mg IV Q 6hrs and Vancomycin 1250 mg IV Q 12hrs
- Xray Right knee to evaluate stability of existing hardware
- Phytonadione 5 mg SQ x 1 dose and repeat Coags in am
- Diabetic diet, then NPO after MN for possible OR 1/16/19
- NS @ 100 ml/hr
- Consult Psychiatry in the am prior to any OR
- Repeat CBC and BMP in the am
- Pain control: Oxycodone 15 mg PO Q4hrs PRN and Dilaudid 0.5 mg IV Q2hrs PRN
- Continue home meds to prevent opioid-induced constipation

Uncontrolled Diabetes:
- Hold home meds: Metformin, Insulin
- BG monitoring AC & HS when taking PO and Q 4hrs when NPO
- High dose sliding scale
- Transfer to ICU for Insulin gtt if BG > 400
- Consider Endocrine Consult in the am

Factor V Leiden Mutation w/ PMH of Multiple DVT
- Hold Warfarin upon admission
- Phytonadione 5 mg SQ x 1 dose (INR 4.2) for possible OR 1/16/19 and repeat
Coags in am
- Begin Heparin 5000u SQ Q8hrs for DVT prophylaxis

Sleep Apnea

| PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| LYNN,KEITH EDWARD<br>108 RUDOLPH CT<br>RIDGEVILLE, SOUTH CAROLINA  29472 | Printed at CHARLESTON VAMC |

**JA 204**

# Consult Requests

Printed On Aug 2, 2021

```
- Consult RRT to evaluate patient and initiate home BiPAP as needed

CAD/HTN/HLD
- Continue home meds with the exception of Lasix and Lisinopril
- Continue ASA

PTSD/Depression
- Continue home meds
- Consult Psychiatry in the am

GERD
- Continue home meds

Cyst
- Removed from R neck by Dermatology 1/2/19 with instructions for suture removal
in 7-10 days. Will need suture removal during this admission.




/es/ SANDRA S MUNACO, NP
NURSE PRACTITIONER
Signed: 01/16/2019 02:39

Receipt Acknowledged By:
01/21/2019 11:10        /es/ SHELBY LYNN ALLEN, MD
                             RESIDENT
01/18/2019 18:46        /es/ THOMAS E BROTHERS, MD
                             ATTENDING SURGEON
===============================================================================
=================================== END ===================================
```

| | |
|---|---|
| Current PC Provider: | HERNANDEZ-ALICEA,WILLIAM |
| Current PC Team: | GCR PACT 06 MD *WH* |
| Current Pat. Status: | Outpatient |
| UCID: | 534_3183332 |
| Primary Eligibility: | SERVICE CONNECTED 50% to 100%(VERIFIED) |
| Patient Type: | SC VETERAN |
| OEF/OIF: | NO |

```
Service Connection/Rated Disabilities
SC Percent:             100%
Rated Disabilities:     ANXIETY DISORDER  (100%)
                        ARTERIOSCLEROTIC HEART DISEASE  (60%)
                        MIGRAINE HEADACHES  (30%)
                        PARALYSIS OF ALL RADICULAR NERVE GROUPS  (20%)
```

| PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| LYNN,KEITH EDWARD<br>108 RUDOLPH CT<br>RIDGEVILLE, SOUTH CAROLINA  29472 | Printed at CHARLESTON VAMC |

**JA 205**

2:20-cv-04277-JD    Date Filed 04/04/23    Entry Number 68    Page 1 of 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Keith Lynn and Jennifer Lynn, | **CA: 2:20-cv-04277-JD** |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| United States of America, | |
| Defendant. | |

This Federal Tort Claims Act ("FTCA") case involves Plaintiffs Keith Lynn ("Mr. Lynn")
and Jennifer Lynns' ("Mrs. Lynn") (collectively "Plaintiffs") claims for medical malpractice
against Defendant United States of America ("Defendant" or "United States"). Their claims arise
out of the below-knee amputation of Mr. Lynn's leg at the Charleston, South Carolina, VA
Hospital. This case was set for a bench trial the week of November 14, 2022. (DE 48.) On
November 11, 2022, Plaintiffs filed an Emergency Consent Motion for a Trial Continuance (DE
54) requesting that the trial scheduled for Monday, November 14, 2022, through Friday, November
18, 2022, be continued due to the illness of Plaintiffs' lead counsel. The Court granted the
emergency motion to continue the trial. (DE 55.) However, after reviewing the record, including
the parties' disclosures, pretrial briefs, and the Court's Order denying the Defendant's Motion in
Limine (DE 50) in preparation for trial, the Court directed the "parties to file briefs (supported by
declarations of the parties' experts) on the question of whether Plaintiffs can (with the witness
proffered for trial) establish their burden of proof for medical malpractice regarding the proximate
cause of [Mr.] Lynn's injuries." (DE 55.)

Defendant filed a United States Rule 56(f) Brief (DE 58), which the Court accepts as
responsive to its November 14, 2022, order (DE 55), and Plaintiffs filed a Memorandum in

1

Response to the order.  (DE 59.)  The parties have also filed replies thereto.  (DE 62, 63)  After reviewing the same and the record, the Court grants Defendant Summary Judgment pursuant to Rule 56(f), Fed. R. Civ. P., for the reasons stated herein.

## BACKGROUND

Mr. Lynn is a fifty-one-year-old former member of the United States Navy who was honorably discharged in June 1997 after approximately seven and one-half years of service.  Mr. Lynn is eligible to receive medical care from the Department of Veterans Affairs ("VA") as a benefit of his naval service.  (DE 1, ¶ 1.)  According to Plaintiffs, on or about January 15, 2019, Mr. Lynn presented to the VA's Charleston facility with pain and swelling of his right leg.  (Id. at ¶ 8.)  At that time, Mr. Lynn had a history of pain and swelling of his leg and was being monitored by podiatrists at the VA for a diagnosis of Charcot's joint disease.  (Id.)  After presentation on January 15, 2019, Plaintiffs' Complaint alleges the non-podiatry staff at the VA diagnosed his condition as osteomyelitis and performed a below the knee amputation of Mr. Lynn's right leg.[1] (Id. at ¶ 9.)  Further, Plaintiffs' Complaint alleges "there was insufficient evidence to support a diagnosis of osteomyelitis and the amputation performed on January 17, 2019, was unnecessary."[2] (DE 1, ¶ 10.)

On the other hand, Defendant contends that Mr. Lynn's leg was amputated due to a life-threatening, necrotizing soft tissue infection in the calf and shin area.  (DE 58, p. 2.)  Dr. Thomas E. Brothers, M.D. (Dr. "Brothers"), Mr. Lynn's treating vascular surgeon, testified that he

---

[1]   According to the Defendant, Mr. Lynn's medical records indicate that he had the below knee amputation on January 17, 2019, and then in June 2019, he had a revision surgery due to heterotopic calcification of the amputated bone, which led to an above the knee revision surgery.  (DE 34, p. 3.)

[2]   Plaintiffs allege "a factual question exists as to whether [Plaintiffs' expert] whose 'career has been devoted to saving the lower extremities of patients,' can credibly support his fundamental opinions relating to duty and causation in this medical negligence case."  (DE 63, p. 2.)

2:20-cv-04277-JD   Date Filed 04/04/23   Entry Number 68   Page 3 of 12

amputated Keith Lynn's leg because Lynn "had evidence of likely necrotizing fasciitis and myositis on his scan."[3]  (DE 58-2, pp. 10-11.)  Dr. Jacobs does not dispute this testimony stating he "believed Dr. Brothers amputated the leg of Mr. Lynn to treat the necrotizing fasciitis[.]"  (DE 58-1, p. 10.)  Furthermore, Defendant's expert Dr. Jackson, a vascular surgeon, opined that "[g]iven the severity and extent of Lynn's necrotizing fasciitis with myonecrosis, a below the knee amputation was the appropriate treatment and Dr. Brothers' care clearly met the standard of care."  Moreover, Defendant's expert Dr. Womack, an orthopedic surgeon, opined, "[t]he reason for his amputation had nothing to do with his well established history of Charcot foot related to his diabetes but rather his overwhelming soft tissue infection around his tibia well above the area of Charcot in his foot."  (DE 58-3.)  Dr. Womack opined "[i]t is more likely than not that an incision and drainage of the infection would not have been successful and that the skin changes and mottling noted along with the CT findings likely represented a life threatening condition known as necrotizing soft tissue infection. The only cure for this condition is amputation in this clinical setting as radical debridement of the involved area would not have been successful."  (Id.)

In addition, Dr. Fritz, Defendant's expert radiologist, opined, "Mr. Lynn presented with an acutely life-threatening, gas-producing, necrotizing infection involving soft tissues overlying the shin above the ankle joint."  (DE 58-5.)  He further opined that, "[t]he necrotizing gangrenous soft tissue infection of the shin musculature was spatially located above the ankle joint line and more remote than that from the midfoot, where previously Charcot foot and possible osteomyelitis were documented.  Therefore, the necrotizing gangrenous soft tissue infection was independent of any

---

[3]      In addition to the testimony of Dr. Brothers, Defendant proffers declarations from John Womack, M.D. (Dr. "Womack") a board certified orthopedic surgeon, Mark R. Jackson, M.D. (Dr. "Jackson") a board certified vascular surgeon, and Jan Fritz, M.D. ("Dr. Fritz") a board certified radiologist in support of summary judgment.

2:20-cv-04277-JD    Date Filed 04/04/23    Entry Number 68    Page 4 of 12

podiatric-related issues and unrelated to Charcot foot and a previous diagnosis of possible midfoot

osteomyelitis."  (DE 58-5.)

   On December 9, 2020, Plaintiffs filed this action claiming medical negligence under the

FTCA, and they retained Dr. Allen Mark Jacobs ("Dr. Jacobs") to provide his opinion.  (DE 1.)

Plaintiffs' sole expert, Dr. Jacobs, a podiatrist with over 40 years of experience treating patients

who suffer from diabetes, neuropathy and Charcot joint disease, performed a review of Mr. Lynn's

medical records from the VA and opined,

> with a reasonable degree of medical certainty that '[t]he medical records indicate
> clinical signs, symptoms, and radiographic and imaging changes consistent with
> Charcot's joint disease' and that 'there was never any direct evidence
> demonstrating osteomyelitis, and the urgent removal of Mr. Lynn's right leg was
> neither indicated nor necessary and was a departure from the applicable standard of
> care.'

(DE 1-1, ¶¶ 11, 36.)  However, during his deposition, Dr. Jacobs was examined on the decision of

the vascular surgeon to amputate the leg for necrotizing fasciitis, and whether that was a deviation

in the standard of care of vascular surgery.  (DE 39-2, p. 15-16, 53:25-54:4.)  Dr. Jacobs testified

that "[o]bviously you know as well as I do I cannot testify to vascular surgery standards of care."

(DE 39-2, p. 16, 54:5.)

## LEGAL STANDARD

**Federal Rule of Civil Procedure 56**

  "After giving notice and a reasonable time to respond, the court may:  (1) grant summary

judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider

summary judgment on its own after identifying for the parties material facts that may not be

genuinely in dispute." Fed. R. Civ. P. 56(f).  The party seeking summary judgment bears the initial

burden of demonstrating that there is no genuine issue of material fact.  See Celotex Corp. v.

Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  "A fact is 'material' if proof

2:20-cv-04277-JD    Date Filed 04/04/23    Entry Number 68    Page 5 of 12

of its existence or non-existence would affect disposition of the case under applicable law.  An

issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return

a verdict for the non-movant."  <u>Wai Man Tom v. Hosp. Ventures LLC</u>, 980 F.3d 1027, 1037 (4th

Cir. 2020) (citation omitted).

Only reasonable inferences from the evidence need be considered by the court because "[i]t

is the province of the jury to resolve conflicting inferences from circumstantial evidence.

Permissible inferences must still be within the range of reasonable probability, however, and it is

the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous

that it rests merely upon speculation and conjecture."  <u>Sylvia Dev. Corp. v. Calvert Cty.</u>, 48 F.3d

810, 818 (4th Cir. 1995).  Whether an inference is reasonable cannot be decided in a vacuum; it

must be considered "in light of the competing inferences" to the contrary.  <u>See</u> <u>Matsushita Elect.</u>

<u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588, 89 L. Ed. 2d 538, 106 S.Ct. 1348 (1986).

> In the end, the non-moving party must do more than present a 'scintilla' of evidence
> in its favor.  Rather, the non-moving party must present sufficient evidence such
> that 'reasonable jurors could find by a preponderance of the evidence' for the non-
> movant, 'for an apparent dispute is not 'genuine' within contemplation of the
> summary judgment rule unless the non-movant's version is supported by sufficient
> evidence to permit a reasonable jury to find the facts in his favor.'

 <u>Sylvia Dev. Corp.</u>, 48 F.3d at 818 (quoting <u>Stone v. University of Maryland Medical Sys. Corp.</u>,

855 F.2d 167, 175 (4th Cir. 1988) (internal citation omitted).  Thus, if the evidence is "merely

colorable" or "not significantly probative," a motion for summary judgment may be granted.  <u>Id.</u>

Accordingly, the court may grant summary judgment only if it concludes that the evidence

could not permit a reasonable jury to return a favorable verdict.  An assertion of a genuine dispute

of material fact must be supported by citations to materials in the record, including to depositions,

documents, electronically stored information, affidavits, stipulations, admissions, answers to

interrogatories, or to other materials, or by showing that the materials cited do not establish the

**JA 210**

2:20-cv-04277-JD    Date Filed 04/04/23    Entry Number 68    Page 6 of 12

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  See Fed. R. Civ. P. 56(c)(1).  The court only needs to consider the cited materials, but may consider other materials in the record.  Id. at 56(c)(3).  The plaintiff is entitled to have the credibility of all his evidence presumed.  See Shaw v. Stroud, 13 F.3d 791, 798 (4th. Cir 1994) (quoting Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1900)).  When deciding summary judgment, the record must be viewed in the light most favorable to the party against whom summary judgment is sought.  See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996).

## DISCUSSION

As noted above, this Court issued an order authorizing and directing the "parties to file briefs (supported by declarations of the parties' experts) on the question of whether Plaintiffs can (with the witness proffered for trial) establish their burden of proof for medical malpractice regarding the proximate cause of [Mr.] Lynn's injuries."  (DE 55, citing David v. McLeod Reg'l Med. Ctr., 367 S.C. 242, 247, 626 S.E.2d 1, 4 (2006) ("[T]he plaintiff must show that the defendants' departure from such generally recognized practices and procedures was the proximate cause of the plaintiff's alleged injuries and damages.  The plaintiff must provide expert testimony to establish both the required standard of care and the defendants' failure to conform to that standard, . . . ." (internal citation omitted)).)  In response to the Court's directive, Plaintiffs contend they can and offer a declaration of Dr. Jacobs.  (DE 59-1.)  That declaration states in pertinent part:

> 2. The record reveals that Mr. Lynn definitely suffered from Charcot joint disease, which had manifested itself in June 2018. The condition grew progressively worse during the remainder of 2018.
>
> 3. When Mr. Lynn was seen in the ER on January 15, 2019, his CT suggested to the radiologist who interpreted it that he had osteomyelitis. Charcot joint disease and osteomyelitis are difficult to distinguish using radiographic images. The 'gold standard' for establishing a diagnosis of osteomyelitis is a bone biopsy. This was

6

not performed. Nor do the operative report of January 17th or the resulting pathology report give any information to confirm the presence of osteomyelitis.

4. There was possibly some infective process going on - possibly even osteomyelitis. However, even if Mr. Lynn had osteomyelitis, the proper course of treatment would have been first to confirm the diagnosis and then determine the extent of the infection in the bone and consider the possible available less drastic treatments before amputating the leg. . . . It is possible that an amputation might ultimately be called for, but that is speculative, given the record.

(DE 59-1.)  Given the record before the Court, Plaintiffs' reliance on Dr. Jacobs' declaration coupled with his deposition testimony that "[he] cannot testify to vascular surgery standards of care[]" (DE 39-2, p. 16, 54:5) is insufficient to create a genuine issue of material fact to survive summary judgment.

"A physician commits malpractice by not exercising that degree of skill and learning that is ordinarily possessed and exercised by members of the profession in good standing acting in the same or similar circumstances." David v. McLeod Reg'l Med. Ctr., 367 S.C. at 247, 626 S.E.2d at 3-4.  "Additionally, medical malpractice lawsuits have specific requirements that must be satisfied in order for a genuine factual issue to exist.  Specifically, a plaintiff alleging medical malpractice must provide evidence showing (1) the generally recognized and accepted practices and procedures that would be followed by average, competent practitioners *in the defendants' field of medicine* under the same or similar circumstances, and (2) that the defendants *departed from the recognized and generally accepted standards.*" Id. (emphasis added).   "Also, the plaintiff must show that the defendants' departure from such generally recognized practices and procedures was the proximate cause of the plaintiff's alleged injuries and damages.  The plaintiff *must* provide expert testimony to establish both the required standard of care and the defendants' failure to conform to that standard, unless the subject matter lies within the ambit of common knowledge so that no special learning is required to evaluate the conduct of the defendants." Id.  (internal citation omitted) (emphasis added).

**JA 212**

Defendant argues "because Mr. Lynn's leg was amputated by a vascular surgeon due to a life-threatening, necrotizing soft tissue infection in the calf and shin area, the Lynns are unable to meet their burden to establish proximate cause with their sole expert—a podiatrist who does not treat such conditions and whose testimony focuses on the condition of Mr. Lynn's foot." (DE 58, p. 2.) Nevertheless, Plaintiffs contend Dr. Jacobs's testimony squarely contradicts Defendant's theory of the case, "creating genuine disputes of material fact that can only be resolved after subjecting the parties' witnesses to cross examination and credibility determinations." (DE 63, p. 1.) According to Dr. Jacobs,

> The record reveals that Mr. Lynn definitely suffered from Charcot joint disease . . . When Mr. Lynn was seen in the ER on January 15, 2019, his CT suggested to the radiologist who interpreted it that he had osteomyelitis. Charcot joint disease and osteomyelitis are difficult to distinguish using radiographic images. The 'gold standard' for establishing a diagnosis of osteomyelitis is a bone biopsy. This was not performed. Nor do the operative report of January 17th or the resulting pathology report give any information to confirm the presence of osteomyelitis.

(DE 59-1.) However, this factual dispute is not dispositive of the question on summary judgment here. "[I]t is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Sylvia Dev. Corp., 48 F.3d at 818. Whether an inference is reasonable cannot be decided in a vacuum; it must be considered "in light of the competing inferences" to the contrary. See Matsushita Elect. Indus. Co., 475 U.S. at 588.

Defendant has met its burden on summary judgment by demonstrating that there is no genuine issue of material fact. See Celotex Corp., 477 U.S. at 323. Dr. Brothers testified that he amputated Mr. Lynn's leg due to a necrotizing soft tissue infection (DE 58-2, p. 5), not osteomyelitis. Dr. John Womack, an orthopedic surgeon, stated, "the CT [of Mr. Lynn's leg] demonstrated a 7x12x4 cm abscess of the leg above the ankle level which contained fluid and gas.

Given the absence of an external wound this can only represent an overwhelming and life threatening soft tissue infection of the patient's leg."  (DE 58-3.)  Dr. Womack further opines that:

> The patient had an overwhelming abscess of his leg above his known Charcot foot deformity that was likely with his many comorbidities to become a life threatening condition if left unchecked. It is more likely than not that an incision and drainage of the infection would not have been successful and that the skin changes and mottling noted along with the CT findings likely represented a life threatening condition known as necrotizing soft tissue infection. The only cure for this condition is amputation in this clinical setting as radical debridement of the involved area would not have been successful.
>
> It should be noted that the area of concern on the CT was a new problem above the known Charcot foot that the patient had been treated for previously. The records show that the patient was admitted for a diagnosis of cellulitis/leg abscess/ and osteomyelitis by the vascular surgery service. The reason for his amputation had nothing to do with his well established history of Charcot foot related to his diabetes but rather his overwhelming soft tissue infection around his tibia well above the area of Charcot in his foot.

(Id. at p. 2.)  Dr. Jackson, a practicing vascular surgeon also opined:

> Based upon my review of these records I have no doubt that Dr. Brothers and the vascular team arrived at the correct diagnosis of a necrotizing soft tissue infection (necrotizing fasciitis with myonecrosis) - a severe infection of the muscle and deep tissues of the leg. The CT scan findings of extensive gas and infected fluid in the leg muscle, extending well above the ankle and into the middle portion of the leg, clearly and unmistakably support the diagnosis of necrotizing fasciitis with myonecrosis. The accepted standard practice and procedure for this condition requires surgical treatment such as the below knee amputation as was performed by Dr. Brothers.  . . .
>
> Given the severity and extent of Lynn's necrotizing fasciitis with myonecrosis, a below the knee amputation was the appropriate treatment and Dr. Brothers' care clearly met the standard of care.  The correct diagnosis of necrotizing fasciitis with myonecrosis is independent of any podiatric issues related to either Charcot foot and/or osteomyelitis below the ankle - neither of which had any bearing on the need for below the knee amputation.

(DE 58-4.)

Finally, Defendant's radiology expert Dr. Fritz opined that the gas bubbles in the CT clearly showed a life-threatening, necrotizing soft tissue infection.  Dr. Fritz declared that:

9

**JA 214**

> Mr. Lynn presented with an acutely life-threatening, gas-producing, necrotizing infection involving soft tissues overlying the shin above the ankle joint. The gas-producing soft tissue infection and gangrenous muscle tissue necrosis are unequivocally demonstrated on the CT examination dated 1/15/21. The CT images demonstrated tissue necrosis and gas inside the muscle tissues and that the infection had already spread across two muscle compartments cross-sectionally and to the mid-region of the shin.
> . . .
> The necrotizing gangrenous soft tissue infection of the shin musculature was spatially located above the ankle joint line and more remote than that from the midfoot, where previously Charcot foot and possible osteomyelitis were documented. Therefore, the necrotizing gangrenous soft tissue infection was independent of any podiatric-related issues and unrelated to Charcot foot and a previous diagnosis of possible midfoot osteomyelitis.

(DE 58-5.)

Once the movant has made this threshold demonstration, to survive the motion for summary judgment, the nonmoving party *must* "go beyond the pleadings *and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts* showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (emphasis added). Under this standard, the mere existence of a scintilla of evidence in favor of the non-movant's position is insufficient to withstand the summary judgment motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." Wai Man Tom, 980 F.3d at 1037.

Plaintiffs do not offer any declaration or discovery to oppose the declarations of Defendant's experts. Rather, Plaintiffs' offer Dr. Jacobs' declaration for the conclusion that "there was never any diagnosis of necrotizing fasciitis or other immediately life-threatening infection." However, Dr. Brothers' testimony and Mr. Lynn's medical records indicate that his leg was amputated due to a life-threatening, necrotizing soft tissue infection—not osteomyelitis. Dr. Jacobs does not dispute this testimony stating he "believed Dr. Brothers amputated the leg of Mr.

Lynn to treat the necrotizing fasciitis[.]"  (DE 58-1, p. 10.)  "It is well recognized that a plaintiff may not avoid summary judgment by submitting an affidavit that conflicts with earlier deposition testimony."  Alba v. Merrill Lynch & Co, 198 F. App'x 288, 300 (4th Cir. 2006); see also Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").  Therefore, an inference in a light most favorable to Plaintiffs would be tenuous at best, given it conflicts with Dr. Jacobs' testimony *and* the conclusion rests on speculation and conjecture.  See Sylvia Dev. Corp., 48 F.3d at 818.

Furthermore, the Court previously denied Defendant's Motion in Limine to limit or exclude Dr. Jacobs's proffered testimony.  Dr. Jacobs opined:

> The medical records indicate clinical signs, symptoms, and radiographic and imaging changes consistent with Charcot's joint disease' and that 'there was never any direct evidence demonstrating osteomyelitis, and the urgent removal of Mr. Lynn's right leg was neither indicated nor necessary and was a departure from the applicable standard of care.

(DE 1-1, ¶¶ 11, 36.)  While the Court recognized Dr. Jacobs is qualified to give opinion testimony regarding Charcot's joint disease and osteomyelitis, nevertheless, "an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise."  In re Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prods. Liab. Litig., 214 F. Supp. 3d 478, 496 (D.S.C. 2016).  Dr. Jacobs concedes he is not qualified to give opinion testimony regarding whether Dr. Brothers deviated from the standard of care for vascular surgeons when he performed the below the knee amputation.  Dr. Jacobs testified:

> Q. And as far as the decision of the vascular surgeon to amputate the leg for necrotizing fascitis, that in and of itself is not a deviation in the standard of care of vascular surgery.  Are you able to testify on that opinion?
>
> A. Obviously you know as well as I do I cannot testify to vascular surgery standards of care.

11

**JA 216**

(DE 58-1, p. 8.)  Further, Dr. Jacobs testified "I can't amputate legs anyway by law . . . ."  (DE 58-1, p. 4.)  Accordingly, without expert testimony to "establish both the required standard of care and the defendants' failure to conform to that standard," Plaintiffs cannot survive summary judgment.  David v. McLeod Reg'l Med. Ctr., 367 S.C. at 247, 626 S.E.2d at 3-4.

The Court finds that based on the experts presented by Defendant and the lack of expert(s) disputing them, Plaintiffs' FTCA medical malpractice claim cannot advance because they do not offer an expert who can establish Mr. Lynn's injuries were proximately caused by any breach in the relevant standard of care.[4]

## CONCLUSION

For the foregoing reasons, the Court grants Defendant summary judgment pursuant to Rule 56(f), Judgment Independent of the Motion, as provided herein; therefore, Plaintiffs' case is dismissed.

**AND IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

April 4, 2023
Florence, South Carolina

---

[4]      Plaintiffs' loss of consortium claim must fail for the same reason.  See Lee v. Bunch, 647 S.E.2d 197, 202 (S.C. 2007) ("Generally, a plaintiff spouse's claim for loss of consortium fails if the impaired spouse's claim fails, whether the claim is considered separate and independent from the impaired spouse's claim or derivative in nature.").

November 29, 2021

Lee E. Berlinsky
Assistant United States Attorney
United States Department of Justice
District of South Carolina-Charleston Office

Re: Lynn vs. United States of America

Dear Lee Berlinsky,

My name is Rick Delmonte and I practice Podiatric Medicine and Surgery in the Department of Orthopedics at NYU Langone Health. I joined NYU six years ago and was appointed Chief of the division. I specialize in all aspects of foot and ankle surgery with an emphasis on elective and reconstructive procedures. I am certified by The American Board of Foot and Ankle Surgery.

I was hired by Lee Berlinsky and his office to review this case to ascertain  any deviation of the standard of care related to the diagnosis of osteomyelitis of a charcot foot and related sequelae leading to the below knee amputation.

I was given the following documents to review and several discs containing x-rays, MRI and CT images:
PDF 0: Pages USA Docs 1-903. Patient Problem List, Problem List,Medications, Vitals, Radiology Reports, Allergies, Lab Results
PDF 1: Pages USA Docs 904-1903. Lab Results, Discharge Summaries,Consult Requests
PDF 2: Pages USA Docs 1904-2903. Consult Requests, Progress Notes(July 2021-Dec 2020)
PDF 3: Pages USA Docs 2904-3903. Progress Notes (Dec 2020-Oct 2019)PDF 4: Pages USA Docs 3904-4903. Progress Notes (Oct 2019-April 2019)

Exhibit 1

PDF 5: Pages USA Docs 4904-5903. Progress Notes (April 2019-Oct2018)
PDF 6: Pages USA Docs 5904-6903. Progress Notes (Oct 2018-July 2017)PDF 7: Pages
USA Docs 6904-7903. Progress Notes (July 2017-Nov 2000)
PDF 8: Pages USA Docs 7904-8903. Progress Notes (July 2015-Nov2000)
PDF 9: Pages USA Docs 8904-8946. Progress Notes (Oct 2000-July 2000), Surgical
Information (June 13, 2019; January 17, 2019), MedicalPackage Information

After reviewing all the materials provided I was able to formulate an organized opinion
that may help determine if there was any deviation by the defendants.
Unfortunately, the diagnosis of Charcot foot within the diabetic patient population is
quite challenging for all specialists. The plaintiff was appropriately treated with all
recommendations by the defendants including strict non-weight bearing in a CROW
device. Several times the plaintiff did not adhere to these important recommendations.
More importantly, all imaging done prior to the last CT scan on January 15 were clear of
any gas in the tissues. The plaintiff was seen by the DPM in clinic and felt the patient
could have had a DVT as the limb was edematous and erythematous. The plantiff sent
the defendant for an ultrasound. On the same day the plantiff was told to get an
ultrasound for a suspected DVT, the plantiff went to the ED where a CT was performed
which found gas in the tissues. The vascular surgeon was consulted and felt this patient
was a surgical emergency which unfortunately resulted in a below knee amputation.

In this specific patient with uncontrolled diabetes, elevated BMI, poor nutrition and
severe deformity from the charcot foot, it sets up an environment for high risk limb loss.
Additionally, the patient showed poor compliance with the recommended non weight-
bearing instructions. All visits including  the time of  diagnosis of gas in the tissues on the
CT scan on 1/15 there was no deviation from the standard of care.

It is in my medical opinion and within a reasonable degree of medical certainty that all
treatment provided by the plaintiff was appropriate.

Rick Delmonte, D.P.M.,F.A.C.F.A.S.
Chief, Division Podiatric Medicine and Surgery
Department of Orthopedics
NYU Langone Health

Jan Fritz, M.D., P.D., D.A.B.R.

██████████████████████ Y 10016

PH████████████████ @gmail.com

Monday, November 22, 2021

Lee E. Berlinsky
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, South Carolina 29401
(843) 367-5802

Re:   Lynn

Dear Mr. Berlinsky:

Upon your request, I reviewed medical records and imaging studies of Keith Edward Lynn, born ██████ and opine on the imaging findings and interpretation of the right lower extremity from 2017 to the time of below the knee amputation January 2019.

I reviewed select legal documents associated with this case. Documents that were provided to me for evaluation and forming my opinion included:

1.   Complaint filed in this lawsuit alleging the deviation of the standard of care owed.
2.   Declaration of Plaintiff's Expert Witness Allen Mark Jacobs
3.   Pathology report dated 1/17/2019.
4.   U.S. Department of Veterans Affairs Medical Records of Mr. Lynn.
5.   Imaging studies of Mr. Lynn, including:
     a.   Radiographs of the **RIGHT** foot dated 7/23/2017
     b.   Radiographs of the **RIGHT** foot dated 6/21/2018
     c.   MRI of the **RIGHT** foot dated 7/28/2018
     d.   Radiographs of the **RIGHT** and left foot dated 8/13/2018
     e.   Radiographs of the **RIGHT** foot dated 10/12/2018
     f.   CT of the **RIGHT** lower extremity dated 1/15/2019

I understand additional records and testimony may become available, and I will continue to review the materials as they become available and may have new opinions as discovery continues.

Page **1** of **10**

I am in the active practice of Diagnostic Radiology. I am familiar with the national standard of care applicable in this clinical circumstance for reasonable and prudent practitioners when a patient presents for imaging evaluation of acute and chronic conditions of the musculoskeletal system, including bones, joints, ligaments, tendons, nerves, and vessels of the spine, trunk, and extremities.

## Personal Background, Training, and Expertise

1.      I am a physician and hold board certification in Diagnostic Radiology. I am an Associate Professor of Radiology at New York University Grossman School of Medicine in New York, New York. My curriculum vitae is attached and details my education, publications, and clinical background.

2.      I currently work as an attending physician at New York University Langone Health, Bellevue Hospital, and Gouverneur Hospital, all in New York, New York. I also serve as the Musculoskeletal Radiology Departmental Division Chief at New York University Langone Health in New York, New York. I previously served as the Interventional Magnetic Resonance Imaging Service Departmental Director at Johns Hopkins University School of Medicine in Baltimore, Maryland, where I also held the rank of Assistant Professor. As part of my many years of clinical practice, I have assessed and treated adult patients with various acute and chronic musculoskeletal conditions, including infections and neuropathies of the musculoskeletal system and soft tissues, bones, and joints. I have also completed many diagnostic interpretations of radiographs, ultrasonography, computer tomography, and magnetic resonance imaging examinations of patients with osteomyelitis, joint infections, and neuropathic joints. In addition, I have performed many percutaneous image-guided biopsy procedures to obtain tissue specimens for microbiological, laboratory, and pathological examination. Based on my education, clinical experience, training, and knowledge of medical literature, I am intimately familiar with the care and treatment of adult patients with musculoskeletal infections and neuropathic joints.

3.      I earned my abitur degree in math and biochemistry from Laura-Schradin Gymnasium in Reutlingen, Germany in 1997 and my Medical Doctorate degree from Eberhard Karls University School of Medicine in Tubingen, Germany in 2005. I completed a residency in diagnostic radiology at Eberhard Karls University in Tubingen, Germany in 2007, as well as internship and residency

in diagnostic radiology at Johns Hopkins University in Baltimore, Maryland in 2012. I then completed a fellowship in musculoskeletal radiology at the Hospital for Special Surgery in New York, New York in 2013. I am a member of multiple radiology societies, boards, professional organizations, and advisory committees, and I have published many medical literature articles and given many presentations in the field of diagnostic radiology. Please see my CV for additional information regarding these positions.

4. I have extensive training and experience in Diagnostic Radiology. This report will summarize my opinions regarding the care and treatment Keith Edward Lynn received at the VA care system.

5. I will specifically discuss the imaging diagnosis of Mr. Lynn's right lower extremity, including radiographs, MRI, and CT examinations preceding the below-the-knee amputation performed in January 2019. I will describe the importance of the imaging findings and their implications for care and treatment decisions.

6. I hold the opinion and will testify that the treatment decision to proceed with the below-the-knee amputation based on the emergent imaging findings and the guarded prognosis was within the accepted standards of practice.

7. The opinions I hold and to which I will testify are all held to a reasonable degree of medical certainty. They are based on my education, training, clinical experience, and familiarity with medical literature associated with the issues, specifically the accepted standards of medical practice that apply to radiologists performing diagnostic imaging interpretation. My opinions were formed by applying well-known and generally accepted principles of science related to medicine. In forming my opinions, I reviewed Mr. Lynn's pertinent U.S. Department of Veterans Affairs medical records from 2017 to 2019.

**Review of Records and Time Line**

8. Mr. Lynn's medical record from the Charleston South Carolina Veterans Administration Hospital includes insulin-dependent diabetes mellitus, obesity, diabetic neuropathy, history of a motor vehicle collision in 2013 with right and left tibial fractures and recovery complicated by staph aureus infection, asthma, hyperlipidemia, cerebral infarction, cluster headaches, chronic posttraumatic

Page **3** of **10**

stress disorder, rotator cuff syndrome, spinal lumbar stenosis, chronic kidney disease stage III, iron deficiency anemia, hypertension, anxiety and depression disorder, gout, sleep apnea, cardiopulmonary disease, episodes of deep venous thrombosis, and diabetic neuropathy with neuropathic arthropathy of the right foot.

9.    Imaging studies dating from 7/23/2017 to 10/12/2018, including radiographs, venous Doppler ultrasound examinations, and an MRI of the right foot, demonstrate findings of neuropathic arthropathy ("Charcot foot") with degeneration of the midfoot joints over time, joint effusions, bone marrow edema, osseous fragmentation, synovitis, and periarticular soft tissue swelling. The main differential diagnostic consideration for the imaging appearance is chronic osteomyelitis, which may have co-existed. In addition, there were episodes of deep venous thrombosis.

10.    In 2018, Mr. Lynn was evaluated several times for right ankle swelling and decreasing ability to weight-bear and ambulate in the setting of Charcot's foot as the primary working diagnosis, including 8/13/2018 (Dr. Debbie Byron), 10/12/2018 (Dr. Byron), and 11/19/2018 (Dr. Ravenell).

11.    In the days preceding 1/15/2019, Mr. Lynn experienced progressive worsening of right lower extremity symptoms, including increasing swelling, redness, discoloration, warmth, and pain. Mr. Lynn also experienced systemic symptoms, including intermittent chills, decreased energy, decreased appetite, and fatigue.

12.    On 1/15/2019, Mr. Lynn was reevaluated by Dr. Ravenell, who documented, "There is marked edema at the ankle and midfoot. The foot is warm, and there is mild erythema present."

13.    On the same day, 1/15/2019, Mr. Lynn was also evaluated in the emergency department of the Charleston VA Medical Center due to concerns of active infection.

14.    Mr. Lynn underwent CT of the right lower extremity on 1/15/2019 interpreted by Dr. McAlhaney, who described cellulitis, osteomyelitis of the distal tibia and fibula, soft tissue gas in the extensor muscle compartment, and fluid collection in the distal calf. These findings were not present on previous imaging examinations.

15.   Dr. Brothers was the consulting vascular surgeon. He evaluated Mr. Lynn on 1/15/21 and documented the above stated chief complaint with a history of present illness, and performed a physical examination, which showed "significant edema RLE from the need to the foot with erythema from the ankle to the mid-calf, skin warmth and tenderness to touch, multiple intact erythematous blisters without open wound or drainage". Dr. Brothers further documented Mr. Lynn's inability to bear weight for six weeks and use of a wheelchair. Mr. Lynn was acutely sick at that time with systemic signs of toxicity, including at least one documented episode of vomiting and persistent nausea. Dr. Brothers initiated admission and ordered broadband intravenous antibiotic treatment.

16.   On 1/16/2019, the lower extremity remained swollen, red, and warm. An INR of 4 was treated as preparation for below the knee amputation, with the clinical team on standby to perform the amputation faster if clinical decline occurred.

17.   On 1/17/2019, the vascular team documented stable conditions with INR at 1.7 and persistent cellulitis, lower extremity swelling and warmth, despite intravenous antibiotic broad-spectrum therapy. The note describes "patient and wife agreeable to below the knee amputation". Surgical consent for below-the-knee amputation was obtained on 1/17/2019 at 904 hours and documented in the medical record. Later in the day, Dr. Brothers performed the below-the-knee amputation.

18.   The amputated specimen was sent for surgical pathology examination, which described "purple modeling and brown discoloration" of the skin surface. Dr. Woodham's report further describes that a posterior cut down was performed; however, of note, no anterior cut down was performed in the area of infection, gas gangrene, and tissue necrosis.

**Opinions**

19.   On 1/15/2019, Mr. Lynn presented with an acutely life-threatening, gas-producing, necrotizing infection of the right lower extremity involving soft tissues overlying the shin above the ankle joint. The gas-producing soft tissue infection with osteomyelitis, cellulitis, fasciitis, and muscular tissue necrosis is unequivocally demonstrated on the CT examination dated 1/15/21. The tissue necrosis and gas were located inside muscular tissue and had spread across two

muscle compartments at the CT (extensor and peroneus muscle compartments), spreading from above the ankle up to the mid-region of the shin. The circles below outline the soft tissue gas. The distance measurement of approximately 7.6 cm indicates the distance of the center of the gas-producing infection from the ankle joint line:



20.    The constellation of findings is diagnostic of gas gangrene, also known as infectious myonecrosis, which is a surgical emergency. Gas gangrene is part of necrotizing soft tissue infections (NSTIs), including necrotizing forms of infectious fasciitis, myositis, and cellulitis. Colloquially, organisms that cause necrotizing soft tissue infections have also been referred to as "flesh-eating bacteria." In the pelvic region, this infection is also known as "Fournier gangrene". These infections are characterized clinically by fulminant tissue destruction, systemic signs of toxicity, and high mortality. The degree of suspicion must be high since the clinical presentation is variable and prompt intervention is critical. Accurate diagnosis and appropriate treatment must include early surgical intervention and antibiotic therapy.

21.    Necrotizing soft tissue infections and gas gangrene typically present with erythema (72 percent, documented by Dr. Brothers), progressively intensifying pain which may be out of proportion to exam findings (72 percent, documented by Dr. Brothers), crepitus (50 percent, documented by Dr. Brothers), and skin bullae 38 percent, documented by Dr. Brothers). Fever is only present in 50% of patients. Because these infections begin deep in the soft tissues, superficial signs of infection may not appear until late in the disease. Ulcers and draining skin

Page 6 of 10

defects are often absent (Stevens DL, Bryant AE. Necrotizing Soft-Tissue Infections. N Engl J Med. 2017 Dec 7;377(23):2253-2265. doi: 10.1056/NEJMra1600673. PMID: 29211672.).

22.    The treatment of necrotizing infection consists of early broad-spectrum empiric antibiotic treatment, aggressive surgical resection of necrotic tissue, and hemodynamic support (Anaya DA, Dellinger EP. Necrotizing soft-tissue infection: diagnosis and management. Clin Infect Dis. 2007 Mar 1;44(5):705-10. doi: 10.1086/511638. Epub 2007 Jan 22. PMID: 17278065.).

23.    Although the administration of early antibiotic treatment is critical to control systemic toxicity, the mortality rate approaches 100 percent without surgical resection (Anaya DA, Dellinger EP. Necrotizing soft-tissue infection: diagnosis and management. Clin Infect Dis. 2007 Mar 1;44(5):705-10. doi: 10.1086/511638. Epub 2007 Jan 22. PMID: 17278065.)

24.    For advanced, severe, and broad-based necrotizing infections involving the extremities, amputation may be needed to control the infection (Anaya DA, Dellinger EP. Necrotizing soft-tissue infection: diagnosis and management. Clin Infect Dis. 2007 Mar 1;44(5):705-10. doi: 10.1086/511638. Epub 2007 Jan 22. PMID: 17278065.; Sudarsky LA, Laschinger JC, Coppa GF, Spencer FC. Improved results from a standardized approach in treating patients with necrotizing fasciitis. Ann Surg. 1987 Nov;206(5):661-5. doi: 10.1097/00000658-198711000-00018. PMID: 3314752; PMCID: PMC1493283.).

25.    Primary amputation may be the more expeditious and potentially life-saving intervention for some patients, reducing operative time and blood loss compared with successive debridements. Amputation may also be considered if repeated debridements are unlikely to obtain source control, when functional outcomes are likely to be better with amputation compared with reconstruction, or when no reconstructive options exist (Busse JW, Jacobs CL, Swiontkowski MF, Bosse MJ, Bhandari M; Evidence-Based Orthopaedic Trauma Working Group. Complex limb salvage or early amputation for severe lower-limb injury: a meta-analysis of observational studies. J Orthop Trauma. 2007 Jan;21(1):70-6. doi: 10.1097/BOT.0b013e31802cbc43. PMID: 17211275.: Stineman MG, Kwong PL, Xie D, Kurichi JE, Ripley DC, Brooks DM, Bidelspach DE, Bates BE. Prognostic differences for functional recovery after major lower limb amputation: effects of the timing and type of inpatient rehabilitation services in

the Veterans Health Administration. PM R. 2010 Apr;2(4):232-43. doi: 10.1016/j.pmrj.2010.01.012. PMID: 20430324; PMCID: PMC2917913.; Uehara K, Yasunaga H, Morizaki Y, Horiguchi H, Fushimi K, Tanaka S. Necrotising soft-tissue infections of the upper limb: risk factors for amputation and death. Bone Joint J. 2014 Nov;96-B(11):1530-4. doi: 10.1302/0301-620X.96B11.34888. PMID: 25371469.; Angoules AG, Kontakis G, Drakoulakis E, Vrentzos G, Granick MS, Giannoudis PV. Necrotising fasciitis of upper and lower limb: a systematic review. Injury. 2007 Dec;38 Suppl 5:S19-26. doi: 10.1016/j.injury.2007.10.030. Epub 2007 Nov 28. PMID: 18048033.).

26. The diagnosis of gas gangrene is consistent with Dr. Brothers description of the physical examination "significant edema RLE from the need to the foot with erythema from the ankle to the mid-calf, skin warmth and tenderness to touch, multiple intact erythematous blisters without open wound or drainage". The diagnosis was further corroborated by the CT findings described by Dr. McAlhaney.

27. Mr. Lynn showed systemic symptoms of infection toxicity and acute sickness when seen by Dr. Brothers in the emergency department, including at least one documented episode of vomiting and persistent nausea. Additional constitutional symptoms indicating the systemic toxicity effects of the developing infection were fatigue and decreasing appetite. Based on Mr. Lynn's vital signs, he was not in septic shock in the emergency department. Dr. Brothers prompt initiation of wide spectrum intravenous antibiotic therapy limited the systemic effects and prevented sepsis.

28. Despite broad-spectrum intravenous antibiotic therapy, the lower extremity remained erythematous, painful, swollen, and warm to touch over the next 24 hours. Although the systemic antibiotics stabilized Mr. Lynn's acute sickness, they were ineffective in treating the necrotizing infection locally. This is not unexpected, as the infection had progressed to a large area of active tissue necrosis, which, by definition, is no longer vascularized and therefore may not be reached by the blood supply and intravenous antibiotics.

29. Owing to the ineffectiveness of the antibiotics, imaging documentation of widespread tissue necrosis across to muscular compartments, initial presentation with systemic infection signs, and persistent guarded prognosis with possible death, below the knee amputation was indicated by Dr. Brothers, which falls within the standard of care.

Page **8** of **10**

30.  On 1/16/2001, Dr. Brothers appropriately considered incision and drainage, which may effectively treat purulent abscesses with non-necrotizing localized pus production. However, Mr. Lynn's right lower leg infection had already passed this stage, as widespread tissue necrosis with bacterial gas production had already occurred, spreading up to the mid-shin region.

31.  Mr. Lynn Charcot's arthropathy of the midfoot was unrelated to the indication for below-the-knee amputation. A below-the-knee amputation was required as the gas gangrene was in the anterior aspect of the lower calf (shin region), above the ankle joint line.

32.  The pathological report describes a posterior soft tissue incision. As the necrotizing tissue infection was located in the anterior muscle compartments, the pathology description of a posterior soft tissue incision explains why no tissue necrosis was seen.


**Conclusions**

33.  On 1/15/2001, Mr. Lynn presented with advanced gas gangrene necrotizing infection that had spread over two compartments of the anterior calf, which was a surgical emergency. When Dr. Brothers examined Mr. Lynn, Mr. Lynn had signs of systemic toxicity due to the infection and was acutely sick. The infection was located above the ankle and remote from Mr. Lynn's Charcot's arthropathy in the foot below the ankle. Mr. Lynn presented with an acutely life-threatening condition, which has a high mortality rate. Mr. Lynn's prognosis was additionally guarded due to signs of systemic infection toxicity. Dr. Brothers appropriately and promptly initiated intravenous broad-spectrum antibiotic therapy, which stabilized Mr. Lynn. However, despite high dose intravenous antibiotic treatment, the necrotizing gas gangrene infection did not improve over the next 24-48 hours. Consequently, according to the standard of care and with the informed consent of Mr. Lynn and his wife, below the knee amputation was indicated and performed in a timely matter to prevent further complications and death.

My conclusions are based on my knowledge, education, experience, and independent review of the imaging and review of the reports. I also rely on my knowledge of the applicable medical literature.

I hereby certify that this report is a complete and accurate statement of all of my opinions and the basis and reasons for them to which I will testify under oath. I also understand that other experts may author reports in this case, and I will review those and reserve the right to amend or supplement my opinions as additional information is obtained.

New York, NY
11/24/2012

Jan Fritz, M.D., P.D., D.A.B.R., R.M.S.K.

Mr. Keith Lynn, case summary
Prepared by Mark R. Jackson, MD
November 18, 2021

To: Lee E. Berlinsky, Assistant United States Attorney


1.  By background I am a board-certified vascular surgeon in the active practice of vascular surgery since completing my vascular surgery fellowship at the Walter Reed Army Medical Center in June of 1993. Upon completion of my vascular surgery fellowship I remained at Walter Reed Army Medical Center as a staff vascular surgeon, while also having appointments at the Uniformed Services University of the Health Sciences in Bethesda, MD as an Assistant Professor Surgery, and also while having an assignment at the Walter Reed Army Institute of Research. I was honorably discharged from the Army in 1997 at the rank of Lieutenant Colonel, and then resumed my vascular surgery career at the University of Texas Southwestern Medical Center in Dallas, where I was promoted to the rank of Associate Professor of Surgery while having an active vascular surgery practice at The Dallas North Texas Veterans Affairs Hospital, Parkland Memorial Hospital, and Zale Lipshy University Hospital. During this time I started an endovascular program within the Division of Vascular Surgery specializing in the then-new technology of abdominal aortic aneurysm stent graft repair. My academic credentials also include publication of over 70 original articles in peer-reviewed journals, book chapters, and published abstracts. I have also presented medical scientific work at national and regional vascular surgery meetings. In 2003 I moved to Greenville, SC were I have continued my career in vascular surgery in the community hospital setting, initially as a hospital-employed vascular surgeon, and now in independent private practice. I have extensive clinical experience treating patient with severe vascular disease of the legs, including performance of procedures to restore blood flow to the legs, and amputation procedures, such as was required for Lynn.
2.  In preparation of this report I have reviewed the case files which include close to 9,000 pages. I have also reviewed the source images of the X-rays and CT scans that were performed in the course of Lynn's care. I have also read Dr. Jacobs' written statement regarding the case.
3.  The pertinent clinical events are summarized as follows.
4.  On Jan 15, 2019, Lynn was seen by his podiatrist, Dr. Ravenell, with redness and swelling of the right foot. Dr. Ravenell's note describes "Marked edema at the ankle and mid foot. The foot is warm and there is mild erythema present." While Dr. Ravenell's assessment was "Charcot neuroarthropathy seems to be in the acute phase" these findings are also consistent with infection of the foot and leg.
5.  Later the same day, Jan 15, 2019, Lynn presented to the emergency department for treatment. A vascular surgery consultation was obtained. Dr. Thomas Brothers was the attending vascular surgeon. The consultation documents "significant edema of the right lower extremity from the knee to the foot with erythema from the ankle to mid-calf, skin warm to touch, multiple intact erythematous blisters …" This was followed by the assessment "Right lower extremity osteomyelitis and abscess." Lynn was then admitted to the hospital.
6.  A CT scan of the right leg was performed on Jan 15. The radiology report includes the following: "Large gas containing fluid collection 6.8 X 3.4 X 12 cm along the lateral aspect of the fibula. Periostial reaction distal tibia/fibula consistent with osteomyelitis. Large adjacent gas containing fluid collection consistent with abscess. Large complex fluid collection surrounding ankle and hind foot. Not clearly separable from the abscess."
7.  Dr. Brothers' note from Jan 16 reads: "Diagnosis: Infected right foot. Procedure: I&D (incision and drainage), debridement, possible amputation right foot."
8.  On Jan 17 Lynn underwent a right leg below-the-knee amputation performed by Dr. Brothers, and Dr. Kristen Quinn (presumably the surgical resident).

**JA 230**

9. Dr. Brothers' Hospital Discharge Summary (after the amputation) includes the following statements regarding Lynn's medical conditions and hospital presentation, which clearly indicate a medically-compromised patient and the presence of severe infection:
   1. Uncontrolled diabetes
   2. Lynn was non weight-bearing and in a wheelchair for 6 weeks prior to admission due to the Charcot's joint disease.
   3. Lynn presented to the Emergency Department (on Jan 15, 2019) with pain and redness of the right foot and chills for 1 month, and decreased energy, decreased appetite, and fatigue for 4 days.
10. On June 13, 2019 Lynn was again admitted to the hospital and underwent surgical revision of the right leg below-the-knee amputation due to "heterotopic bone growth with pain, right BKA stump."
11. Following is my summary and expert opinion of cared rendered to Lynn. My opinions are within a reasonable degree of medical certainty:
    1. Lynn presented to the Emergency Department with a severe, limb-threatening infection of the right foot and leg.
    2. The clinical findings clearly indicate severe infection and support the medical decision-making resulting in amputation.
    3. The CT scan, in particular, shows extensive soft tissue gas in the right leg. This finding is characteristic of necrotizing fasciitis and myonecrosis, an overwhelming, life- and limb-threatening condition of severe infection, that generally requires a major limb amputation such as was necessary for Lynn. Furthermore, the anatomic extent of infection, as documented on CT by the gas and fluid collection dimensions, provides additional compelling support for the necessity of amputation.
    4. It should be further noted that in cases of necrotizing fasciitis for which amputation is not performed, there is then the risk of systemic, uncontrolled infection (sepsis) that can result in death since all of the dead and infected tissue has not been surgically removed.
    5. Additionally, and with all due respect to Dr. Jacobs, no one is contesting that Lynn also had Charcot's joint disease. The point is that Lynn also, and more significantly, presented with severe, life- and limb-threatening infection.
    6. In summary, based upon my almost 30 years of clinical experience as a fellowship-trained, board certified vascular surgeon with extensive experience treating lower extremity problems in diabetic patients, I find that Dr. Brothers' care in the Lynn case was necessary and appropriate, and clearly meets the recognized standard of care.

Respectfully submitted,

*[signature]*

Mark R. Jackson, M.D.

## Declaration of John Womack, MD
## In the Matter of Lynn vs. United States of America

Nov 23,2021

I am a board certified orthopaedic surgeon with fellowship training in foot and ankle surgery. I have practiced almost exclusively foot and ankle surgery for the past 15 years in Greenville, South Carolina. I take care of patients with diabetic foot problems including Charcot arthropathy on a daily basis including diagnosis as well as both conservative and surgical management of these patients. Mr. Lynn would be a typical patient that I may encounter in my practice on a daily basis. I have attached my CV to this declaration.

I have been hired as an expert witness in the above litigation by the US Department of Justice in Charleston, South Carolina to review the case for a deviation in the standard of care related to the diagnosis and care of this plaintiff and his subsequent right below knee amputation performed at the VA Medical Center in Charleston, South Carolina on 1/17/2019.

I have reviewed extensively the plaintiff's medical records from the VA Medical Center in Charleston from July of 2015 until December of 2020 including all of the outpatient and inpatient notes as well as laboratory tests available to me. I have also reviewed the patient's pertinent imaging studies performed at this institution that relates to the care of the patient's right lower extremity.

It is my medical opinion that Dr. Brothers and the vascular surgery team did not deviate from the standard of care when offering and performing a below knee amputation of this patient's right lower extremity. A review of the patient's care as an outpatient by the Department of Podiatry at the VA shows that he was diagnosed with a right Charcot foot as early as July 28,2018. He was subsequently placed into a CROW AFO by Dr. Byron at Podiatry on August 13, 2018 and was also prescribed an external bone stimulator at that time. The patient had been counseled as to the risk of amputation with the severity of his right foot deformity and reported to his mental health counselor on 11/27/18 that his doctors told him that only 10% of patients with his right foot problem are able to keep their leg. Complicating his lower extremity management was also a history of staph infections from tibia fractures in 2013 that required hardware removal and antibiotics to treat the infections.

The patient presented back to Dr. Ravenell at Podiatry on 1/15/19 complaining of increased pain and swelling in his right leg with 8/10 pain and great difficulty wearing his CROW AFO as a result. Dr. Ravenell also noted that the patient had a fixed deformity of his foot with subluxation of his talus. In addition Dr. Ravenell recommended a doppler ultrasound to evaluate for a deep vein thrombosis and continued non weight bearing on the right leg.

The patient and his wife then presented to the ER that same day, according to the intake nurse's note, seeking a second opinion about his right foot due to the increased swelling and pain in his right leg. Vascular surgery was consulted while the patient was in the ER for management of his right leg. The vascular surgery consultation dated 1/15/19 indicates that the patient had edema of his right lower extremity from the ankle to mid calf with erythematous blisters. I reviewed both the CT report and images from the CT of the right LE performed that

day while the patient was in the ER which demonstrated a 7x12x4 cm abscess of the leg above the ankle level which contained both fluid and gas. It should be noted that the area of concern on the CT was a new problem above the known Charcot foot that the patient had been treated for previously.  The records show that the patient was admitted for a diagnosis of cellulitis/leg abscess/ and osteomyelitis by the vascular surgery services.  Emergent surgery to remove the leg was not performed as the patient's INR was 4.2 and given his stable vital signs and lack of evidence of sepsis the vascular surgery team elected to better medically stabilize the patient before surgery.  It should also be noted that his blood sugar at presentation to the ER was over 400 and that his most recent Hemoglobin A1C was 11.7%.

The patient was then taken to the operating room and underwent a right below knee amputation on 1/17/2019.  Of note the patient and his wife therefore had 48 hours to consider the amputation before electing to proceed. The pathology report from the leg specimen shows "purple mottling and skin discoloration." It should be noted that the area of the abscess was not dissected by the pathologists nor were bone biopsies performed which could have confirmed the presence of osteomyelitis. The patient was subsequently discharged in stable condition on 1/23/19.

It is my medical opinion that the decision to perform a below knee amputation does not represent a deviation from the standard of care.  The patient had an overwhelming abscess of his leg above his known Charcot foot deformity that was likely with his many comorbidities to become a life threatening condition if left unchecked.  It is unlikely that an incision and drainage of the infection would not have been successful and that the skin changes and mottling noted along with the CT findings likely represented a life threatening condition known as necrotizing fasciitis.  The only cure for this condition is really amputation in this clinical setting as radical debridement of the involved area would not have been successful.

I submit my above opinions within a reasonable degree of medical certainty.

My opinions may change if additional information is presented for review that may warrant changes.

Respectfully,

John Womack, MD



*Curriculum Vitae*
**John W. Womack, III**

## Education:

**Undergraduate** — B.A. History *cum laude* Duke University 1998

**Medical school** -- M.D. Medical University of South Carolina
Charleston, South Carolina 2002
Elected Alpha Omega Alpha Honor Society 2001

**Internship** -- University of Tennessee School of Medicine Department
Of Surgery
Memphis, TN 2003

**Residency** — University of Tennessee – Campbell Clinic Department
Of Orthopaedic Surgery -- 2002- 2007

**Fellowship** – E.Greer Richardson Foot and Ankle Fellowship –
Campbell Clinic 2007-2008

Board Certification -- ABOS through 2030

## Research:

"Evaluation of Shoulder Function in Hemodialysis Patients" Friedman,
Richard J and Womack, John
Medical University of South Carolina 2001

"Long Term Evaluation of Surgical Treatment for Interdigital
Neuroma" Womack, John. And Richardson, E. Greer
Published June 2008 *Foot and Ankle International*
Podium Presentation – American Orthopaedic Foot and Ankle Society
Annual Meeting Summer 2006
Roger A. Mann Award Finalist
Mid-America Orthopaedic Association Annual Meeting 2008

"Clinical Manifestations of Posterior Tibial Tendon Insufficiency"
Clinical Orthopaedic Association Annual Meeting 2007

1. Charcot Arthropathy Versus Osteomyelitis: Evaluation and Management.

Womack J.

Orthop Clin North Am. 2017 Apr;48(2):241-247. doi: 10.1016/j.ocl.2016.12.011. Epub 2017 Feb 1. Review.

PMID: 28336046

2.

Dunking the knot in suture button fixation for distal tibiofibular syndesmosis injury: technique tip.

Watson DJ, Weatherby BA, Womack JW.

Foot Ankle Int. 2012 Aug;33(8):686-8. No abstract available.

3. First metatarsophalangeal arthrodesis.

Womack JW, Ishikawa SN.

Foot Ankle Clin. 2009 Mar;14(1):43-50. doi: 10.1016/j.fcl.2008.11.008. Review.

4. Long-term evaluation of interdigital neuroma treated by surgical excision.

Womack JW, Richardson DR, Murphy GA, Richardson EG, Ishikawa SN.

Foot Ankle Int. 2008 Jun;29(6):574-7. doi: 10.3113/FAI.2008.0574.

5. Charcot Arthropathy Versus Osteomyelitis: Evaluation and Management.

Womack J.

Orthop Clin North Am. 2017 Apr;48(2):241-247. doi: 10.1016/j.ocl.2016.12.011. Epub 2017 Feb 1. Review.

PMID: 28336046

Similar articles

| | |
|---|---|
| **From:** | Berlinsky, Lee (USASC) |
| **To:** | "Stephen DeAntonio"; "Paul Tinkler"; "William Tinkler" |
| **Subject:** | Expert witness reports-Lynn |
| **Date:** | Tuesday, November 30, 2021 12:30:00 PM |
| **Attachments:** | delmontereport.pdf |
| | Lynn_Fritz report.pdf |
| | markjacksonreport.pdf |
| | womackdeclaration.pdf |

Greetings All:

Hope averyone is joyous in the holiday season. Thank you for the courtesies on this production. It is a complicated case. Here are the expert reports in Lynn v USA. As you will see, our case does not really think the focus is on the charcot foot as the cause for the amputation. We believe Mr. Lynn had a much more serious event that was life threatening as it related to his January 15th ED visit. The below knee amputation was related to a gas gangrene event located well above the charcot foot. I would like to discuss this with you after your review, so lets catch up afterwards. I am sending expert C.V.'s by separate email.

Lee

**From:** William Tinkler
**To:** Berlinsky, Lee (USASC)
**Cc:** Stephen DeAntonio; Paul Tinkler; Holmes, Lee (USASC)
**Subject:** [EXTERNAL] Re: Lynn v USA-PreTrial N-O
**Date:** Tuesday, November 8, 2022 3:22:28 PM

Thanks, Lee.  We just attached the list we sent you several weeks ago.

Sent from my iPhone

> On Nov 8, 2022, at 3:07 PM, Berlinsky, Lee (USASC)
> <Lee.Berlinsky@usdoj.gov> wrote:
>
>
> Sorry for any inconvenience. I thought this was sent yesterday. Apologies.
> Lee B.
>
> <pretrialbriefnando.pdf>

| From: | Paul Tinkler |
|---|---|
| To: | Berlinsky, Lee (USASC) |
| Cc: | Stephen DeAntonio; William Tinkler; Holmes, Lee (USASC) |
| Subject: | Re: [EXTERNAL] Re: Lynn v USA |
| Date: | Wednesday, March 22, 2023 6:03:39 AM |

Thanks, Lee.

It's been a while, but I think my Team may have concluded that sending proposed findings of fact and conclusions of law to the fact finder before a trial is a practical impossibility (given, for example, a 9000 page record) and made more problematic by rules regarding ex parte communications . Wouldn't such a document perforce involve the substance of the case?

Does the clerk's communique anywhere direct that we should send such a document ex parte?

These questions I put to you for discussion and, in the event of a hearing, this discussion would come into play.

Paul


On Fri, Mar 17, 2023 at 12:07 PM Berlinsky, Lee (USASC) <Lee.Berlinsky@usdoj.gov> wrote:

Greetings Paul:

Happy Friday, and hope all is well. Thank you for the clarification because I was not sure what you meant by a "proposed order" which I have not provided anything like that to Chambers. As for the Proposed Findings of Fact/Conclusions of Law that you referenced in your follow-up email, we are not willing to provide that to you under the protection of work product, much like the Pre-Trial Briefs. You and Steve made reference to our submission of the Proposed Findings of Fact/Conclusions of Law in your response to the Rule 56 brief you filed on December 1, 2022 (ECF Filing # 63) as being ex parte and improper. It seems you didn't see or at least didn't appreciate Judge Dawson's filing of his first Notice Regarding Bench Trials which was ECF Docket Entry #42 (Paragraph 5) filed on June 3, 2022, or his second Notice filed on July 25, 2022 ECF Docket Entry #48 (Paragraph 3) **that instructed the parties to file it five days prior to trial** . [Both Notices also instructed the parties how to meet and mark exhibits, which weren't followed accordingly by plaintiff either, so it's quite possible, the Notices weren't seen by your team.] At any rate, we did not act improper and we did not have an ex parte communication with Judge Dawson, quite the contrary.


As always, thank you for the consent to reach out to chambers on a scheduling issue. I will circle back with any response I may receive. If you have any questions or need to discuss the case, we are available. All the best.

Lee

**From:** Paul Tinkler <paultinkler@tinklerlaw.com>
**Sent:** Thursday, March 16, 2023 1:39 PM
**To:** Berlinsky, Lee (USASC) <LBerlinsky@usa.doj.gov>
**Cc:** Stephen DeAntonio <sdeantonio@deanlawfirm.com>; William Tinkler
<williamtinkler@tinklerlaw.com>; Holmes, Lee (USASC) <MHolmes1@usa.doj.gov>
**Subject:** Re: [EXTERNAL] Re: Lynn v USA


I was thinking you sent proposed findings of fact and conclusions of law to the court, but maybe I dreamed that…

Sent from my iPhone


> On Mar 16, 2023, at 1:34 PM, Berlinsky, Lee (USASC)
> <Lee.Berlinsky@usdoj.gov> wrote:


> What proposed order?


> Get Outlook for iOS

---

> **From:** Paul Tinkler <paultinkler@tinklerlaw.com>
> **Sent:** Thursday, March 16, 2023 12:17:41 PM
> **To:** Berlinsky, Lee (USASC) <LBerlinsky@usa.doj.gov>
> **Cc:** Stephen DeAntonio <sdeantonio@deanlawfirm.com>; William Tinkler
> <williamtinkler@tinklerlaw.com>; Holmes, Lee (USASC)
> <MHolmes1@usa.doj.gov>
> **Subject:** [EXTERNAL] Re: Lynn v USA


> Sure. Can you send us the proposed order you sent to the judge?

> Thanks.

> Paul

> Sent from my iPhone


> > On Mar 16, 2023, at 11:58 AM, Berlinsky, Lee (USASC)
> > <Lee.Berlinsky@usdoj.gov> wrote:

With your permission, I may try to call chambers and ask about the
scheduling of the pending Rule 56 motion hearing or file a letter
asking about it. lease let me know if I have consent.

Lee

| | |
|---|---|
| **From:** | Paul Tinkler |
| **To:** | Berlinsky, Lee (USASC) |
| **Cc:** | Holmes, Lee (USASC); Stephen DeAntonio; William Tinkler |
| **Subject:** | [EXTERNAL] Lynn v. U.S. |
| **Date:** | Friday, March 24, 2023 9:31:57 AM |

Lee,

I continue to object to the ex parte submission of proposed findings of fact and conclusions of law.
Nowhere does the notice authorize any such document to be submitted ex parte. I have never in my career heard of such an ex parte communication with the court being acceptable.

The claim of "work product" is not applicable. If you have some legal theory or mental impression or notes to prepare for trial, that is work product. But a statement of factual assertions and legal arguments that you supply to the judge, who also is the finder of fact, is not work product. And, if it was, it has been waived by producing it to the judge. I can only surmise that your assertions prompted the judge to raise the questions on which you are now requesting a hearing. The fundamental rules of advocacy require that I be able to review these substantive submissions so that I may be in a position to respond. This is what we call due process of law.

I need a prompt response from you on this. Otherwise I will be required to take this up with the judge forthwith.

Paul

**From:** **William Tinkler** williamtinkler@tinklerlaw.com
**Subject:** Re: [EXTERNAL] Lynn v USA
**Date:** October 19, 2022 at 2:00 PM
**To:** Lee Berlinsky Lee.Berlinsky@usdoj.gov
**Cc:** Paul Tinkler paultinkler@tinklerlaw.com, Holmes, Lee (USASC) Martin.Holmes@usdoj.gov, Stephen DeAntonio sdeantonio@deanlawfirm.com, Woods, Saundra (USASC) Saundra.Woods@usdoj.gov, McMillan, Terri (USASC) Terri.McMillan2@usdoj.gov



Lee,

Below is a link to a pdf file with exhibit/witness list and marked exhibits. I wanted to get this to you as you requested, but I note we are still reviewing your exhibits to make sure it is inclusive of the records we intend to refer to at trial. Our assumption is that it is, but if that proves incorrect, we will certainly revise our list accordingly prior to the "meet, mark, and exchange" deadline.

> 📄 **Lynn Exhibit List (with Exhibits).pdf**

Let me know if you have any questions or have any issues with the file.

Regards,

William

> On Oct 18, 2022, at 5:17 PM, Berlinsky, Lee (USASC) <Lee.Berlinsky@usdoj.gov> wrote:
>
> Everything is good.
>
> Sent from my iPhone
>
>> On Oct 18, 2022, at 2:48 PM, William Tinkler <williamtinkler@tinklerlaw.com> wrote:
>>
>> Lee,
>>
>> Is everything good on that motion for a status conference? Do you need anything more from us? You have our consent to file.
>>
>> Regards,
>>
>> William
>>
>>> On Oct 14, 2022, at 9:29 AM, William Tinkler <williamtinkler@tinklerlaw.com> wrote:
>>>
>>> Thanks, we'll get it figured out.
>>>
>>> On another note, you can go ahead a file the joint motion for a status conference with our consent.
>>>
>>>> On Oct 14, 2022, at 9:22 AM, Berlinsky, Lee (USASC) <Lee.Berlinsky@usdoj.gov> wrote:
>>>>
>>>> Greetings William:
>>>> I am not sure what files did not open. Are they all of them? That's weird. Wish we would have tried the disc yesterday. I will include Saundra on this email to see what she can suggest.
>>>>
>>>> Until I hear differently, I will assume it's just the Exhibits 2, 3, 4, and 5, which are the imaging studies. We have previously produced those imaging study exhibits on separate discs during Discovery, so maybe those original discs can be accessed by ya'll? I am not sure how to move forward but willing to offer any solution that will work. Can you check the previously produced discs of images that we provided during discovery to see if they worked with your software/hardware.
>>>> Thx.
>>>> Lee
>>>>
>>>> **From:** William Tinkler <williamtinkler@tinklerlaw.com>

**Sent:** Thursday, October 13, 2022 9:35 PM
**To:** Berlinsky, Lee (USASC) <LBerlinsky@usa.doj.gov>
**Cc:** Paul Tinkler <paultinkler@tinklerlaw.com>; Holmes, Lee (USASC)
<MHolmes1@usa.doj.gov>; Stephen DeAntonio <sdeantonio@deanlawfirm.com>
**Subject:** [EXTERNAL] Re: Lynn v USA

Lee,

I got the disc from Steve, and the files on it are in some format I do not have
software for.  Do you know what I need to do to review them?  Is that question for
Saundra?  For what it's worth, I have a Mac—I know sometimes these programs
require a PC.

Thanks,

William

> On Oct 13, 2022, at 12:47 PM, Stephen DeAntonio
> <sdeantonio@deanlawfirm.com> wrote:
>
> Your email comes as a surprise to me. If you were put out, you should
> have told me to my face. I perceived nothing negative as your email
> below suggests. We have plenty of time.
> I didn't know Saundra drove from Columbia. I regret any inconvenience
> to her. I neither sensed that.

**From:** Berlinsky, Lee (USASC) <Lee.Berlinsky@usdoj.gov>
**Sent:** Thursday, October 13, 2022 12:38 PM
**To:** Paul Tinkler <paultinkler@tinklerlaw.com>; Stephen DeAntonio
<sdeantonio@deanlawfirm.com>; William Tinkler
<williamtinkler@tinklerlaw.com>
**Cc:** Holmes, Lee (USASC) <Martin.Holmes@usdoj.gov>
**Subject:** RE: Lynn v USA

Greetings All:
Just wanted to circle back after our scheduled court ordered meeting to
mark exhibits this morning (see below email setting the date/time). We
are disappointed that the meeting did not go as planned with plaintiffs
not producing their finalized lists. We gladly would have postponed the
meeting if we knew you were not ready to go forward with the
Exhibit/Witness list as expected. Our paralegal, Saundra, woke up
extra early in her work day and drove from Columbia, SC this morning
at 6:00am to help us get the trial exhibits ready and produce our disc of
exhibits to you. We are currently in the midst of having several trials
going forward, and planning is critical, especially when it involves out of
town travel. Now, we are left in a bit of limbo, as we await your finalized
document.

Can you please discuss this amongst your team, and send us a

date/time when we can expect this information from plaintiff. **As a courtesy, can we propose the date not be beyond October 19, 2022 at 1:00pm?**
Thank you.
Lee

---

**From:** Berlinsky, Lee (USASC)
**Sent:** Thursday, September 15, 2022 11:48 AM
**To:** Paul Tinkler <paultinkler@tinklerlaw.com>; Stephen DeAntonio <sdeantonio@deanlawfirm.com>; William Tinkler <williamtinkler@tinklerlaw.com>
**Cc:** Woods, Sandra (USASC) <SWoods@usa.doj.gov>; McMillan, Terri (USASC) <TMcMillan1@usa.doj.gov>
**Subject:** Lynn v USA

Greetings All:
Please mark your calendars for meeting to mark exhibits in the Lynn Trial for Thursday, October 13th at 10:30. Our Office location is 151 Meeting Street, Suite 200.
Lee

**JA 245**

✎ AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

DISTRICT OF      South Carolina

Keith Lynn and Jennifer Lynn

V.

United States of America

## EXHIBIT AND WITNESS LIST

Case Number:  2:20-cv-04277-JD

| PRESIDING JUDGE<br>Joseph Dawson, III | | PLAINTIFF'S ATTORNEY<br>P. Tinkler, W. Tinkler, S. DeAntonio | | DEFENDANT'S ATTORNEY<br>L. Berlinksy, M. Holmes | |
| TRIAL DATE (S)<br>11/14/2022-11/18/2022 | | COURT REPORTER | | COURTROOM DEPUTY | |

| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| 1 | | | | | Pre-operative Photographs |
| 2 | | | | | Post-operative Photographs |
| 3 | | | | | Curriculum Vitae of Allen M. Jacobs |
| 4 | | | | | Curriculum Vitae of Oliver G. Wood, Jr. |
| | | | | | |
| | | | | | Keith Lynn |
| | | | | | Jennifer Lynn |
| | | | | | Allen M. Jacobs |
| | | | | | Oliver G. Wood, Jr. |
| | | | | | Debbie Byron (may call if needed) |
| | | | | | Thomas Brothers (may call if needed) |
| | | | | | Rahn Ravenell (may call if needed) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

**JA 246**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Keith Lynn and Jennifer Lynn, | ) |
| | ) |
| Plaintiffs, | ) CA No.: 2:20-cv-4277-JD |
| | ) |
| v. | ) |
| | ) |
| United States of America, | ) |
| | ) |
| Defendant. | ) |

**CIVIL PRE-TRIAL BRIEF: Sections (N) and (O)**

**(N) The final list of exhibits intended to be used in the trial of the case with any objections noted. This list shall be served on opposing counsel.**

The Defendant's exhibit list is as follows:

- Ex. 1 – VA Medical Records Documents 1-8694
- Ex. 2 – C/T Scan 1/15/19
- Ex. 3 – MRI 7/28/18 and 11/21/19
- Ex. 4 – Ultrasound 5/18/18; 6/21/18; 7/09/18; and 1/15/19
- Ex. 5 – X-rays 7/23/17; 6/21/18; 8/13/18; 10/12/18; 1/15/19; and 11/20/19
- Ex. 6 – Atlas of Human Anatomy Plate 501 Leg (A) and (B)
- Ex. 7 – Atlas of Human Anatomy Plate 504 Muscles of Leg
- Ex. 8 – SF-95 Keith Lynn
- Ex. 9 – SF-95 Jennifer Lynn
- Ex. 10 – Dr. Oliver G. Wood, Jr. Information Form
- Ex. 11 – Jennifer Lynn Informed Consent
- Ex. 12 – Keith Lynn Informed Consent

**(O) Attached to the pretrial brief should be counsel's request for voir dire questions (*see* Local Civil Rule 47.04) and request for jury instructions. Copies of the requests for voir dire questions and jury instructions shall be served on opposing counsel. If the requests for voir dire and jury instructions are not submitted seven (7) days prior to the selection of the jury, counsel shall be deemed to have waived the right to submit voir dire questions and jury instructions, unless made necessary by events at trial.**

Not applicable. This is a non-jury trial.

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

By: *s/Lee E. Berlinsky*

Lee E. Berlinsky (ID # 05443)
Martin L. Holmes (ID #13538)
Assistant United States Attorneys
151 Meeting Street, Suite 200
Charleston, SC 29401

November 7, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Keith Lynn and Jennifer Lynn, | ) |
| | ) |
| Plaintiffs, | ) CA No.:  2:20-cv-4277-JD |
| v. | ) |
| | ) |
| | ) |
| United States of America, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**UNITED STATES OF AMERICA'S PROPOSED _PRE-TRIAL_ FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO FED. R. CIV. P. 52**

The United States of America, by and through the undersigned Assistant United States Attorneys, submits the following Proposed Findings of Fact and Conclusions of Law based upon the anticipated record of the case.

This matter is brought before the Court pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346 _et. seq_. Plaintiffs' Complaint, filed on December 9, 2020, alleges personal injury stemming from medical negligence that occurred on January 17, 2019, and derivative loss of consortium. The bench trial is scheduled to begin on November 14, 2022.

After hearing the testimony, assessing the credibility of witnesses, and reviewing the exhibits, evidence, and briefs submitted by the parties, the Court should make the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

**FINDINGS OF FACT**

**A. Medical Treatment at the Ralph H. Johnson VA Medical Center-Charleston**

1. Keith Lynn ("Lynn") testified that he is a fifty-one-year-old resident of Ridgeville, South Carolina, with a complex medical history who was medically separated by honorable

**JA 248**

discharge from the United States Navy in June 1997, after serving for approximately seven and one-half years.

2.  Lynn testified that he is eligible to receive medical care from the Department of Veterans Affairs ("VA") as a benefit of his naval service, and it is not in dispute that in or around 2000, Lynn established a patient relationship at the Ralph H. Johnson VA Medical Center-Charleston ("VA-CHS").

3.  Lynn testified that following his military service retirement, the VA-CHS medical records show long term treatment and care for hypertension, asthma, allergies, obesity, GERD, hyperlipidemia, coronary arteriosclerosis, vascular disease, radicular nerve paralysis, cerebral infarction, diabetes mellitus, factor v leiden mutation, spinal stenosis of the lumbar spine, venous thrombosis, chronic kidney disease, Charcot foot arthropathy, migraines, and mental health related issues.

4.  Lynn testified that he received intermittent treatment and care for pain and swelling in his right ankle/foot at the VA-CHS Emergency Department on June 21, 2018, and July 20, 2018.

5.  Lynn testified that he received treatment and care for right ankle/foot swelling and pain in the VA-Podiatry Department beginning on August 13, 2018, from Dr. Debbie Byron("Byron"). These symptoms were first identified in the emergency department and confirmed by MRI on July 28, 2018. Lynn testified that Byron diagnosed Lynn with having Charcot foot disease arthropathy.

6.  Lynn testified that the Podiatry specialty team at the VA-CHS was treating him for the diagnosis of Charcot joint disease in his right mid-foot area.

7. Lynn testified that Dr. Rahn Ravenell ("Ravenell") is a member of the Podiatry team at the VA-CHS and provided follow-up treatment and care to him on November 19, 2018, and January 15, 2019, for Charcot foot disease.

8. The Court finds that the scope of Podiatry medicine in South Carolina allows patient treatment and care of the foot and ankle.

9. Lynn testified that following the January 15, 2019 clinic visit with Ravenell at the VA-CHS, he went upstairs to the Ultrasound Lab to have a deep vein thrombosis ("DVT") lab test done which was ordered by Ravenell, to determine if a DVT was the cause of the increased leg symptoms. The DVT test was negative.

10. Lynn testified that he went to the VA-Patient Advocate Office immediately after the ultrasound DVT lab test to seek guidance for continued health care concerns. The Patient Advocate referred Lynn downstairs to the VA-CHS Emergency Department for further evaluation.

11. Dr. Rick Delmonte ("Delmonte") testified that he is a retained expert witness in the field of Podiatry Medicine hired by the government and is currently employed at New York University-Langone Health as the Chief of the Division of Podiatric Surgery. Delmonte testified that Dr. Ravenell is a member of the Podiatry team at the VA-CHS and provided follow-up treatment and care on November 19, 2018, and January 15, 2019, to Lynn for Charcot foot disease.

12. Delmonte testified that Ravenell's treatment plan included a non-weight bearing protocol for mobility, confining Lynn to a wheelchair beginning on November 19, 2018.

13. Delmonte testified that Ravenell provided a scheduled follow-up clinic treatment visit on January 15, 2019, where Lynn was seen and evaluated for the Charcot foot disease, noting a patient-reported increase in the swelling and pain in Lynn's leg.

14. Delmonte testified, within a reasonable degree of medical certainty, that Ravenell's podiatric treatment and care of Lynn was appropriate.

15. Delmonte testified that below-knee amputations are outside of the scope of podiatric medicine.

16. Dr. Thomas Brothers ("Brothers") is a vascular surgeon employed by the VA-CHS. Brothers that testified that on January 15, 2019, Lynn was provisionally diagnosed by the Emergency Department physician, Dr. Neil Glover ("Glover"), with a necrotizing soft tissue infection in his leg near the mid-calf/shin area. This is an area separate from where Lynn suffered from Charcot foot disease.

17. Brothers testified that Glover based his provisional diagnosis on radiographic imaging and a C/T Scan that identified large gas bubbles in two separate muscle compartments of the right leg along the anterior and lateral aspect of the fibula between the peroneal muscles and the extensor digitorum.

18. Brothers testified that Glover requested a medical specialty consult by the vascular surgery team for confirmation and treatment of the soft tissue infection. The vascular surgery team, led by Brothers, confirmed the necrotizing soft tissue infection in Lynn's leg and admitted Lynn to the VA-CHS for treatment of the infection.

19. Brothers testified that Lynn's medical record contains the following symptomatic findings consistent with the necrotizing soft tissue infection in addition to the radiographic images taken on January 15, 2019: fatigue, decreased appetite, lack of energy, vomiting, a later

reported episode of nausea, edema from the knee to the foot, erythema from ankle to mid-calf, multiple erythematous blisters, and a glucose lab of 426 mg/dL.

20. Both Lynn and Brothers testified that the VA-CHS health care providers discussed the treatment plan and options with Lynn on several different occasions between January 15, 16, and 17, 2019. The treatment plans discussed included treating the soft tissue infection in Lee's leg with antibiotics and providing surgical interventions, to include an incision and drainage of the infection, a debridement of the infection, or amputation.

21. There is no dispute that Lynn's VA-CHS medical records have inconsistent descriptors of the diagnosis and erroneous descriptions of radiographic images during the January 15, 2019 hospital admission.

22. Brothers testified that during the January 15, 2019 hospital admission, Lynn's health care providers developed a multifaceted treatment plan for his infection and co-morbidities. The descriptors of the infection are described in the medical chart as osteomyelitis, cellulitis, abscess, and a soft tissue infection.

23. Brothers testified that the Informed Consent discussion and the decision to surgically treat Lynn on January 17, 2019, was made between the vascular surgery team and Lynn, including his wife, Jennifer Lynn, who was acting as power of attorney for her husband.

24. Lynn testified that after being informed of the benefits, risks, and alternatives available to treat the soft tissue infection in Lynn's leg, both Plaintiffs provided written consent for the surgical below knee amputation of Lynn's right leg that took place on January 17, 2019.

25. Lynn testified that the vascular team at VA-CHS informed him that they had a treatment plan for incision and drainage of the infection, debridement of the infection, or a below knee amputation of his right leg.

26. The Court finds Plaintiffs' allegation that the amputation was based on insufficient evidence to support a diagnosis of podiatric-related osteomyelitis necessitating amputation is factually misplaced.

27. The Court finds that Lynn had a necrotizing soft tissue infection located deep in his right leg muscle compartments near the shin/mid-calf—a life-threatening infection.

28. The Court finds that the below knee amputation on January 17, 2019, was within the standard of care in vascular surgical medicine to treat the necrotizing soft tissue infection in Lynn's right leg muscle compartments.

29. While Plaintiffs provided adequate testimony to this Court that Charcot joint disease in the foot and osteomyelitis in the foot mimic each other clinically, the Court is not persuaded by Plaintiffs' proffered testimony that this below knee amputation was to treat podiatric Charcot joint disease or osteomyelitis.

30. Brothers testified that the below knee amputation of Lynn's leg for treatment and care of necrotizing soft tissue infections falls under the standard of care offered by the vascular surgery team.

31. Dr. Mark Jackson ("Jackson") testified that he is a retained expert witness for the government in the field of vascular surgery and is currently employed at St. Francis Hospital, Greenville, S.C. Jackson testified that the below knee amputation to treat Lynn's necrotizing soft tissue infection was within the standard of care of vascular surgery.

32. Jackson testified that he treats patients with necrotizing soft tissue infections in their legs and performs below knee amputations.

33. Jackson testified that, within a reasonable degree of medical certainty, the necrotizing soft tissue infection was a large infection in Lynn's leg and the treatment by Brothers was appropriate and necessary.

34. Jackson testified that the necrotizing soft tissue infection in Lynn's leg was separate from the podiatric issues in Lynn's ankle/foot.

35. Dr. John Womack ("Womack") testified that he is a retained expert witness for the government in the field of orthopedic surgery by the government and is currently employed at Bon Secours Hospital, Greenville, S.C. Womack testified that the below knee amputation to treat Lynn's necrotizing soft tissue infection was within the standard of care of treating necrotizing soft tissue infections.

36. Womack testified that, within a reasonable degree of medical certainty, the necrotizing soft tissue infection was a large infection in Lynn's leg and the treatment by Brothers was appropriate and necessary.

37. Womack testified that the necrotizing soft tissue infection in Lynn's leg was separate from the podiatric issues in Lynn's ankle/foot.

38. Womack testified that he treats patients with necrotizing soft tissue infections in patient's legs and performs below knee amputations.

39. Dr. Jan Fritz ("Fritz") testified that he is a retained expert witness for the government in the field of diagnostic radiology with added qualifications in the subspecialty of musculoskeletal radiology and is currently employed at New York University-Langone Health as the Chief of Musculoskeletal Radiology.

40. Fritz testified that gas gangrene is part of necrotizing soft tissue infections, including necrotizing forms of infectious fasciitis, myositis, and cellulitis.

41. Fritz testified that Lynn presented to the VA-CHS with an acutely life-threatening gas producing necrotizing soft tissue infection of the right lower extremity overlying the shin above the ankle.

42. Fritz testified that although systemic antibiotics stabilized Lynn's acute sickness, they were ineffective in treating the necrotizing infection because the infection had progressed to the large area of active tissue necrosis seen in the C/T scan.

43.  Fritz testified that, within a reasonable degree of medical certainty, the necrotizing soft tissue infection was a large infection located in two separate leg muscle compartments and the amputation by Brothers was appropriate and necessary.

44. Fritz testified that the necrotizing soft tissue infection in Lynn's leg was separate from the podiatric issues in Lynn's ankle/foot.

45. Fritz testified that he treats patients with necrotizing soft tissue infections and is familiar with the incision and drainage, debridement, and amputation protocols. Although he does not perform those procedures himself, he monitors patients as a radiologist before or after those procedures.

46. Plaintiffs presented the testimony of their only retained medical expert witness, Dr. Allen Jacobs ("Jacobs"), Doctor of Podiatric Medicine, on the issues of standard of care and causation.

47. Jacobs testified that he is not experienced, trained, or skilled to testify on the standards of care in vascular surgical medicine.

48. Jacobs testified that by law, he is prohibited from performing leg amputations, including below knee amputations.

49. Jacobs testified that he cannot express the standards, practices, and procedures of whether other vascular surgeons in the community would have performed a below knee amputation on Lynn.

**B. Employment History**

50. Lynn testified that he was unemployed at the time of the amputation.

### II. CONCLUSIONS OF LAW

**A. Liability**

1. The United States is the proper defendant in this action pursuant to 28 U.S.C. § 1346(b) and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1346.

3. The FTCA imposes tort liability on the United States only "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and only to the extent that "a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* at § 1346(b)(1).

4. Under the FTCA, procedural matters are governed by federal law; however, the FTCA directs courts to examine substantive legal issues pursuant to the laws of the place where the act or omission occurred. *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991) ("A plaintiff has an FTCA cause of action against the government only if she would also have a cause of action under state law against a private person in like circumstances."). State law determines whether there is an underlying cause of action. *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 757 (4th Cir. 1990) ("United States liability under the FTCA depends upon state law."). In this case, Plaintiffs allege that the government acted negligently when it performed a below knee amputation at the VA-CHS on January 17,

2019, without first confirming a diagnosis of osteomyelitis. Therefore, South Carolina law governs this action because South Carolina is the site of the alleged tort. 28 U.S.C. § 1346(b)(1).

**B. Negligence in South Carolina**

5. To prove negligence in South Carolina, a plaintiff must show "(1) a duty of care owed by defendant to plaintiff; (2) breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty." *Bloom v. Ravoira*, 529 S.E.2d 710, 712 (S.C. 2000) (citation omitted).

6. Additionally, in South Carolina, a medical malpractice plaintiff will have to prove by a preponderance of the evidence (1) the recognized and generally accepted standards, practices, and procedures in the community that would be exercised by competent physicians in the same specialty under similar circumstances; (2) that the physicians or medical personnel in question negligently deviated from the generally accepted standards, practices, and procedures; (3) that such negligent deviation was the proximate cause of plaintiff's injury; and (4) that the injury can be measured. *Dumont v. United States*, 80 F. Supp. 2d 576, 581 (D.S.C. 2000); *Yonce v. Chaudhary*, No. 1:15-CV-02547-JMC, 2018 WL 1697385 (D.S.C. Apr. 6, 2018) (citing *David v. McLeod Reg'l Med. Ctr.*, 367 S.C. 242, 247-48 (2006)).

7. Under South Carolina law, "[a] physician or surgeon is not an insurer of health, and he is not required to guarantee results [;] [the physician] undertakes only to meet the standard of skill possessed generally by others practicing in his field under similar circumstances." *Dumont*, 80 F. Supp. 2d at 581.

8. Under South Carolina law, expert testimony is required to establish proximate cause in a medical malpractice action if determining the presence of the required causal link is outside the common knowledge or experience of laypersons. *Bramlette v. Charter-Medical-Columbia*, 302 S.C. 68, 72-73 (1990). Plaintiffs must provide expert testimony to establish both the required standard of care and Defendant's failure to conform to that standard. *Pederson v. Gould*, 341 S.E.2d 633, 634 (S.C. 1986); *Cox v. Lund*, 334 S.E.2d 116, 118 (S.C. 1985).

**C. Expert Testimony**

9. Under Federal Rules of Evidence 104(a) and 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The Court acts as a gatekeeper "to verify that expert testimony is based on sufficient facts or data." *E.E.O.C. v. Freeman*, 778 F. 3d 463, 472 (4th Cir. 2015) (Agee, J., concurring) (quotations omitted). The trial court must ensure that (1) "the testimony is the product of reliable principles and methods," (2) "the expert has reliably applied the principles and methods to the facts of the case," and (3) the "testimony is based on sufficient facts or data." Fed. R. Evid. 702(b), (c), (d). This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," *Daubert*, 509 U.S. at 592-93, and whether the expert has "faithfully appl[ied] the methodology to facts." *Roche v. Lincoln Prop. Co.,* 175 F. App'x 597, 602 (4th Cir. 2006).

10. Because expert witnesses have the potential to be both powerful and misleading, it is crucial that the district court conduct a careful analysis into the reliability of the expert's proposed opinions. *United States v. Fultz*, 591 F. App'x 226, 227 (4th Cir. 2015) (The

Court excluded unreliable testimony that would have been likely to mislead rather than enlighten the fact finder.). "This reliability standard does not require proof 'that the opinion is objectively correct, but only that the witness has sufficient expertise.'" *Donnelly v. Linden Cap. Partners III, L.P.*, No. 2:20-CV-3719-RMG, 2022 WL 2314611, at *2 (D.S.C. June 28, 2022) (quoting *TBL Collectibles, Inc. v. Owners Ins. Co.*, 385 F. Supp. 3d 1170, 1179 (D. Colo. 2018)).

11. The proponent of the expert testimony must establish its admissibility by a preponderance of proof. *Cooper v. Smith & Nephew, Inc*., 259 F.3d 194, 199 (4th Cir. 2001).

12. Under *Daubert*, the court must address two questions: first, whether the expert's testimony is based on "scientific knowledge;" and second, whether the testimony "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. The first question is answered by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." Several factors should be considered when determining the reliability of a particular scientific theory or technique: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; (4) has the existence and maintenance of standards controlling the technique's operation; and (5) has attained general acceptance in the pertinent scientific community. *Id*. at 591-596. In considering these factors, the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 593-595. What factors are relevant to the analysis "depends upon the particular circumstances of the particular case at issue." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).

13. Courts have looked at the qualifications of the witness in determining whether the proffered opinions are sufficiently reliable to be admissible. *Wehling v. Sandoz Pharmaceutical Corp.*, 162 F.3d 1158 (4th Cir. 1998) (Plaintiff wanted to use a pharmacist/toxicologist to testify as an expert but the court said he did not have training, education, or experience in the field of pharmacology or as a medical doctor and was, under *Daubert*, insufficiently qualified to testify on the issues in dispute.); *In Re Paoli R.R. Yard PCB Litig.*, 35 F. 3d 717, 749 (3d Cir. 1994).

14. Plaintiffs proffered the expert testimony of a podiatrist to testify on the standards of care of a vascular surgeon. Jacobs testified that he is not trained, experienced, or skilled to testify on the standards of care in vascular surgical medicine. Jacobs testified that he is prohibited by law from performing below knee amputations to treat necrotizing soft tissue infections in his patients' legs.

15. The Court finds that, under *Daubert*, Jacobs is insufficiently qualified to testify on the issues in dispute and that Jacobs does not have the experience, knowledge, or skill to form opinions regarding the standard of care of a vascular surgeon.

**D. Damages**

16. Because Plaintiffs have failed to establish liability, they are not entitled to damages.

## CONCLUSION

Based on the foregoing, the court FINDS AND CONCLUDES that the United States is not liable to Plaintiffs. The medical providers at VA-CHS met the standards of care required when presented with the conditions Lynn described and demonstrated and no negligent act or

omission on behalf of the VA-CHS providers proximately caused any injury to Plaintiffs.

Plaintiffs shall take nothing from Defendant. Judgment is entered in favor of the United States.

 **AND IT IS SO ORDERED**.


_____
JOSEPH DAWSON, III
UNITED STATES DISTRICT JUDGE

_____, 2022
_____, South Carolina

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Keith Lynn and Jennifer Lynn, | **CA: 2:20-cv-04277-JD** |
| Plaintiffs, | |
| v. | **ORDER** |
| United States of America, | |
| Defendant. | |

Before the Court is Plaintiffs Keith Lynn and Jennifer Lynn's ("Plaintiffs" or "Lynns")

Rule 59(e) Motion for Reconsideration (DE 70) regarding the Court's April 4, 2023, Order and

Judgment ("Order") (DE 68) granting Defendant United States of America ("Defendant" or

"United States") Summary Judgment pursuant to Rule 56(f), Fed. R. Civ. P.  For the reasons set

forth below, the motion is denied.

"A district court has the discretion to grant a Rule 59(e) motion only in very narrow

circumstances." Hill v. Braxton, 277 F.3d 701, 708 (4th Cir. 2002).  Specifically, the Court may

reconsider its prior order only "(1) to accommodate an intervening change in controlling law; (2)

to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent

manifest injustice." Collison v. Int'l Chm. Workers Union, 34 F.3d 233, 236 (4th Cir. 1994)

(internal quotation marks omitted).  First, the Lynns contend this Court "effectively reversed itself"

by granting summary judgment on the basis that their sole medical expert could not offer testimony to

meet the Lynns' burden on proximate cause after denying the United States' Motion in Limine to limit

the expert's testimony in the field of podiatry.[1]  (DE 70, p. 1.)  The Lynns contend that "if the Court

---

[1]     The Lynns also contend that the Court granted summary judgment to the United States "without
notice to the Plaintiffs."  (DE 70, p. 1.)  However, the Court draws the parties' attention to its request for,
and receipt of, full briefing from the Lynns.  (DE 55, 59, 63.)  On November 23, 2022, the Lynns filed their

1

had granted the United States' Motion in Limine, Plaintiffs would have had the opportunity to seek

leave to name additional experts." (Id.)  However, the Lynns presume the Court would have granted

their request to name additional experts, but the second extended deadline to disclose experts expired

on December 31, 2021, four months prior to the United States' motion on May 2, 2022. (DE 23, 34.)

Discovery closed on March 31, 2022, and the Court ruled on the United States' motion on August 15,

2022. (DE 30, 50.)  Therefore, there is no valid basis for the Court to alter its determination or alter

or amend its Order in this regard.

Second, the Lynns contend that the Court did not address the Lynns' request to receive a copy

of the United States' proposed findings of fact and conclusions of law, which the Lynns contend was

an improper *ex parte* communication. (DE 70, p. 2.)  Although Plaintiffs acknowledge that they missed

a hyperlink requiring Plaintiffs to submit certain information to the Court, they maintain the proposed

findings of fact and conclusions of law submitted by the United States should have been provided to

Plaintiffs.[2]  (DE 72.)  In support thereof, the Lynns cite to Canon 3(A)(4) of the Code of Conduct for

U.S. Judges, which addresses "*unauthorized* ex parte communication . . . ."  Code of Conduct for U.S.

Judges Canon 3(A)(4) (emphasis added).  However, the Court's Order requiring the parties to submit

proposed findings of fact and conclusions of law was an *authorized* communication.  In addition, Local

Rule 7.10 (B)(4), pertaining to proposed orders, provides:

> Copies of proposed orders will be provided to all counsel of record at the same time
> and in the same manner as provided to the court; provided, however, that *if the court
> requests proposed findings and conclusions to be submitted before trial, the court may
> postpone the required exchange until after trial.*

---

first brief in opposition.  (DE 59.)  On December 1, 2022, they filed their second brief in opposition.  (DE
63.)

[2]    In response to the Lynns' request for a copy of the Defendants' proposed findings of facts and
conclusions of law, the Court directed Defendant to provide the same to Plaintiffs and authorized Plaintiffs
to provide a supplemental memorandum with respect to any additional or supplemental matters in support
of the Motion for Reconsideration (DE 73), which Plaintiffs filed on July 28, 2023 (DE 75).

2

Local Civ. Rule 7.10 (D.S.C.) (emphasis added).  Likewise, Local Rule 26.05, pertaining to pretrial

briefs, provides:

> Absent order to the contrary, the information required by Local Civ. Rule 26.05(A)-
> (M) (D.S.C.) is *for the sole use of the court and will not be furnished to opposing
> counsel* without consent of counsel. Therefore, these portions of the trial brief ((A)-
> (M)) are not served absent order to the contrary. Information contained in (N) and (O)
> shall be served on opposing parties. Proposed findings and conclusions should not be
> *submitted with the pretrial brief unless requested by the court*.

Local Civ. Rule 26.05 (D.S.C.) (emphasis added).   Despite the Lynns' unauthorized ex parte

communication claim, they in turn submitted a pretrial brief to chambers without disclosing its contents

to opposing counsel *albeit* in compliance with the local rules and the Notice Regarding Bench Trial

(DE 48).  The pretrial brief included facts and legal authorities to support their claims and defenses.

Ironically, the Lynns interpose no culpability to this *ex parte* communication.   Nevertheless, the

Notice Regarding Bench Trial (DE 48) directed the parties to submit proposed findings of fact and

conclusions of law.   The notice also specified that the submission should occur "via email to

chambers."  (Id.)  Nothing about the Court's order superseded the local rules' special treatment of

pretrial submissions that could disclose a party's strategic trial decisions.   Furthermore, the

information provided in the proposed findings of fact and conclusions of law provided by

Defendant was not unique to that particular submission because it was equally contained in

Defendant's filed briefs, including its Rule 56(f) Brief and attachments thereto.   (DE 58.)

Accordingly, the Lynns fail to demonstrate an error of law or manifest injustice.[3]

---

[3]     Although the Lynns contend that summary judgment is improper for the reasons stated in their
opposition brief, the Court summarily rejects this argument because Rule 59(e) may not be used to relitigate
old matters.   See Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008) (recognizing that Rule 59(e)
"may not be used to relitigate old matters, or to raise arguments or present evidence that could have been
raised prior to the entry of judgment" (internal quotation marks omitted)).  Equally, to the extent Plaintiffs'
motion for reconsideration is a veiled request for leave to name an additional expert witness in an attempt
to overcome the deficiency in their case at the *twelfth* hour, the Court declines to do so.  (See DE 75, p. 4.)

**JA 264**

Therefore, the Court's Order is not a clear error of law nor manifestly unjust, nor has there been a change in controlling law or new evidence to consider since the ruling. Accordingly, there is no basis to reconsider the Court's prior Order. For these reasons, the Court denies Plaintiffs' motion for reconsideration.

**IT IS SO ORDERED.**

Joseph Dawson, III
United States District Judge

August 24, 2023
Florence, South Carolina

**JA 265**

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Keith Lynn and Jennifer Lynn, | Case No. 2:20-cv-04277-JD |
| Plaintiffs, | |
| vs. | **NOTICE OF APPEAL** |
| United States of America, | |
| Defendant. | |

Notice is hereby given that Plaintiffs Keith Lynn and Jennifer Lynn appeal to the United States Court of Appeals for the Fourth Circuit from the orders entered in this action on April 4, 2023 (ECF Nos. 68 & 69) and August 24, 2023 (ECF No. 78), which include the final judgment.

Respectfully submitted,

TINKLER LAW FIRM LLC

/s/ William P. Tinkler
Paul E. Tinkler (D.S.C. No. 4108)
William P. Tinkler (D.S.C. No. 11794)
P.O. Box 31813
Charleston, SC  29417
(843) 853-5203
(843) 261-5647 (fax)
paultinkler@tinklerlaw.com
williamtinkler@tinklerlaw.com

Stephen F. DeAntonio (D.S.C. No. 1049)
DeANTONIO LAW FIRM, LLC
P.O. Box 30069
Charleston, SC  29417
sdeantonio@deanlawfirm.com

October 19, 2023                    *Counsel for Plaintiffs*

1

**JA 266**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2023, I electronically filed the **NOTICE OF APPEAL** through this Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ William P. Tinkler
William P. Tinkler (D.S.C. No. 11794)
