# APPEAL NO. 23-2103

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————————

### JENNIFER BECKETT-LYNN,
*Plaintiff-Appellant,*

*versus*

### UNITED STATES OF AMERICA,
*Defendant- Appellee.*

————————————

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA AT CHARLESTON

————————————

## BRIEF OF APPELLEE

————————————

**ADAIR F. BOROUGHS**
**UNITED STATES ATTORNEY**

**MARTIN L. HOLMES, JR.**
**ASSISTANT U.S. ATTORNEY**
**151 MEETING STREET, SUITE 200**
**CHARLESTON, SOUTH CAROLINA 29401**
**TEL.:       (843) 727-4381**
**FAX:       (803) 929-3135**
**martin.holmes@usdoj.gov**
*ATTORNEY FOR APPELLEE*

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ............................................................................ iii

STATEMENT OF JURISDICTION .................................................................... 1

STATEMENT OF THE ISSUES ........................................................................ 2

I.      Whether the district court abused its discretion when it determined a podiatrist—who admitted that he cannot amputate legs by law or testify to vascular surgery standards of care—was unable to opine on a vascular surgeon's amputation of a leg.

II.     With Lynn's sole medical expert disqualified, whether there is a genuine dispute as to the applicable standard of care or that Mr. Lynn's leg was amputated due to a life-threatening soft-tissue infection in conformity with that standard.

III.    Whether the district court abused its discretion when it found the United States' court-ordered submission of proposed findings of fact and conclusions of law caused no error of law or manifest injustice.

STATEMENT OF THE CASE ............................................................................ 3

SUMMARY OF THE ARGUMENT ................................................................. 14

ARGUMENT ................................................................................................. 15

I.      The district court did not abuse its discretion when it determined Dr. Jacobs could not offer an opinion on whether a breach in the standard of care proximately caused the amputation of Mr. Lynn's leg. ........................... 15

        a. Standard of review ...................................................................... 15

        b. The Lynns' podiatrist and sole medical expert was unable to opine on a vascular surgeon's amputation of a leg. ........................................ 15

II.     With Lynn's sole medical expert disqualified, there is no genuine dispute as to the relevant standard of care or that Mr. Lynn's leg was amputated due to a life-threatening, necrotizing soft-tissue infection in conformity with that standard ....................................................................................... 17

i

a. Standard of review. ...........................................................17

b. South Carolina medical malpractice..................................19

c. There is no genuine dispute as to the relevant standard of care or that Mr. Lynn's leg was amputated due to a life-threatening, necrotizing soft-tissue infection...........................................................................21

III.  The district court did not abuse its discretion when it found the United States' court-ordered submission of the proposed findings of fact and conclusions of law was authorized and caused no error of law or manifest injustice. ........24

a. Standard of review. ..........................................................24

b. The United States' court-ordered submission of proposed findings of fact and conclusions of law was authorized and caused no error of law or manifest injustice...........................................................................25

CONCLUSION...........................................................................28

STATEMENT REGARDING ORAL ARGUMENT .......................................29

CERTIFICATE OF COMPLIANCE..............................................................30

## <u>TABLE OF AUTHORTIES</u>

<u>Cases</u> <u>Page</u>

*Arlington Cnty., Va.*,
   36 F.4th 240 (4th Cir. 2022) ...................................................................... 18

*Betton v. Belue*,
   942 F.3d 184 (4th Cir. 2019) ...................................................................... 19

*Bishop v. Triumph Motorcycles (Am.) Ltd.*,
   No. 21-2113, 2022 WL 17103710 (4th Cir. Nov. 22, 2022) ......................... 16

*Brouwer v. Sisters of Charity Providence Hosps.*,
   763 S.E.2d 200 (S.C. 2014) ........................................................................ 19

*Carter v. Fleming*,
   879 F.3d 132 (4th Cir. 2018) ...................................................................... 18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................... 17

*Cleveland ex rel. Cleveland v. United States*,
   457 F.3d 397 (5th Cir. 2006) ...................................................................... 17

*David v. McLeod Reg'l Med. Ctr.*,
   626 S.E.2d 1 (S.C. 2006) ............................................................................ 20

*Estrangers a Monaco*,
   329 F.3d 359 (4th Cir. 2003) ...................................................................... 18

*Exxon Shipping Co. v. Baker*,
   554 U.S. 471 (2008) ................................................................................... 11

*Hanna v. Plumer*,
   380 U.S. 460 (1965) ................................................................................... 19

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................... 15

*Lee v. Bunch*,
   647 S.E.2d 197 (S.C. 2007) ........................................................................ 20

*Libertarian Party of Va. v. Judd,*
   718 F.3d 308 (4th Cir. 2013) ...................................................................... 18

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) ...................................................................... 24

*Matter of Placid Oil Co.*,
   932 F.2d 394 (5th Cir. 1991) ...................................................................... 18

*McCourt By & Through McCourt v. Abernathy*,
   457 S.E.2d 603 (S.C. 1995) ........................................................................ 19

*Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*,
   148 F.3d 396 (4th Cir. 1998) ...................................................................... 25

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ............................................................19
*United States v. Beasley*,
   495 F.3d 142 (4th Cir. 2007)..............................................17
*Wehling v. Sandoz Pharms. Corp.*,
   162 F.3d 1158 (4th Cir. 1998)............................................17

## **Statutes**

28 U.S.C. § 1291 ...................................................................1
28 U.S.C. § 2674 .................................................................20
28 U.S.C. § 2675 ...................................................................3
28 U.S.C. § 1346(b) ..............................................................1

## **Rules**

Fed. R. App. P. 4(a)(1)(B)(i).................................................1
Fed. R. App. P. 4(A)(iv)........................................................1
Fed. R. Civ. P. 1..................................................................19
Fed. R. Civ. P. 56(a)............................................................18
Fed. R. Civ. P. 56(f).......................................................1, 17
Fed. R. Evid. 702.................................................................16
Federal Rule of Civil Procedure 56.....................................19
Federal Rule of Civil Procedure 59(e).................................10

## **STATEMENT OF JURISDICTION**

The district court had subject-matter jurisdiction over this Federal Tort Claims Act medical malpractice suit under 28 U.S.C. § 1346(b), 2671-80. *See* JA 231. On April 4, 2023, it granted summary judgment in the United States' favor pursuant to Fed. R. Civ. P. 56(f), dismissing the case in its entirety. JA 4-5.

Following the grant of summary judgment, Plaintiff Jennifer Beckett-Lynn ("Lynn")[1] timely filed a Rule 59(e) motion to alter or amend that judgment—tolling the time during which Lynn could file an appeal. JA 5; Fed. R. App. P. 4(A)(iv). The district court denied Lynn's Rule 59(e) motion on August 24, 2023, and Lynn timely filed a notice of appeal on October 19, 2023. *See* Fed. R. App. P. 4(a)(1)(B)(i); JA 5.

This Court has subject-matter jurisdiction to review the district court's final decision under 28 U.S.C. § 1291.

---

[1] This suit was filed in the district court by Keith Lynn and Jennifer Lynn. JA 6. Keith Lynn subsequently died. Dkt. No. 15. In this Court, Jennifer Beckett-Lynn, individually and as personal representative of the estate of Keith Lynn, has been substituted as the sole party. Dkt. No. 19. Depending on the context, the United States may use "the Lynns" or "Lynn," but both are meant to be a reference to the Plaintiff-Appellant.

1

## <u>STATEMENT OF THE ISSUES</u>

1. Whether the district court abused its discretion when it determined a podiatrist—who admitted that he cannot amputate legs by law or testify to vascular surgery standards of care—was unable to opine on a vascular surgeon's amputation of a leg.

2. With Lynn's sole medical expert disqualified, whether there is a genuine dispute as to the applicable standard of care or that Mr. Lynn's leg was amputated due to a life-threatening soft-tissue infection in conformity with that standard.

3. Whether the district court abused its discretion when it found the United States' court-ordered submission of proposed findings of fact and conclusions of law caused no error of law or manifest injustice.

2

## STATEMENT OF THE CASE

This FTCA medical malpractice case arises from the below-knee amputation of Keith Lynn's right leg at the Charleston, South Carolina, VA hospital by Dr. Thomas Brothers. JA 184. As the United States' experts explained in declarations submitted to the district court, the procedure likely saved his life. JA 207-216. Mr. Lynn has since died for reasons unknown. *See* Dkt. No 15. During his treatment at the VA January 15-17, 2019, Mr. Lynn's right calf and shin area had become infected with a fast-moving, life-threatening soft-tissue infection for which amputation was the only real option. JA 207-216.

Nonetheless, Mr. and Mrs. Lynn each submitted a Standard Form 95 ("SF-95")—a form submitted to the federal government to begin the administrative claims process—on October 4, 2019. JA 118-121. Keith Lynn's SF-95 states the basis of his claim is "Failure to diagnose Osteomyelitis [a bone infection] resulting in an above the knee amputation." JA 118, 143. After the statutorily mandated wait-period expired, the Lynns filed suit in district court on December 9, 2020, alleging "medical negligence" as to Mr. Lynn and "loss of consortium" as to Mrs. Lynn. JA 6-9; *see* 28 U.S.C. § 2675 ("The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim . . . .").

3

As trial approached, the United States filed a motion in limine to limit testimony of the Lynns' sole medical expert witness—podiatrist Dr. Allen Mark Jacobs. JA 3. A vascular surgeon, Dr. Brothers, amputated Mr. Lynn's leg below the knee. JA 203-204. The United States filed its motion in limine because podiatrists' scope of practice is limited to the foot and because Dr. Jacobs testified at deposition, "Obviously you know as well as I do I cannot testify to vascular surgery standards of care." *See* JA 183-90. After briefing, the district court denied the United States' motion, "[g]iven the record before the Court at this time . . . ." JA 190.

The case was set for a bench trial the week of November 14, 2022. JA 4. The district court granted a continuance days before trial due to the illness of one of the Lynns' attorneys. *Id*. At the time the district court granted the continuance, however, it had already reviewed "the record, including the parties' disclosures, pretrial briefs, and the Court's Order denying the Defendant's Motion in Limine." JA 191. The United States had also submitted, ex parte, proposed findings of fact and conclusions of law pursuant to the district court's order. JA 179-182. *Sua sponte*, the district court ordered the parties to brief "whether Plaintiffs can (with the witness proffered for trial) establish their burden of proof for medical malpractice regarding the proximate cause of Lynn's injuries." JA 192.

After receiving briefing from all parties, the district court granted summary judgment in the United States' favor pursuant to Federal Rule of Civil Procedure

56(f). JA 4-5. The district court ruled "that based on the experts presented by Defendant and the lack of expert(s) disputing them, [the Lynns'] FTCA medical malpractice claim cannot advance because they do not offer an expert who can establish Mr. Lynn's injuries were proximately caused by any breach in the relevant standard of care." JA 242. Importantly, the district court received a detailed explanation of the medicine and actions taken by the VA vascular surgeon in the form of expert declarations from both the parties, as well as key deposition testimony. JA 193-218.

These declarations and deposition testimony, which mirrored pretrial submissions, are what brought the flaw with the Lynns' sole medical expert into focus for the district court—a benefit the district court did not have when it denied the United States' motion in limine. *See generally* JA 193-218. Because Mr. Lynn's leg was amputated by a vascular surgeon due to a life-threatening, necrotizing soft-tissue infection in the calf and shin area, the Lynns were unable to meet their burden to establish proximate cause with their sole expert—a podiatrist who does not treat such conditions and whose scope of practice is limited to the foot. JA 193-218.

In his declaration attached to the complaint, Dr. Jacobs—the Lynns' sole medical expert—stated "[it a]ppears that Mr. Lynn suffered from Charcot's joint disease [(degradation of bones in the foot due to nerve damage)] of the right foot and possibly the left foot . . . a diagnosis of osteomyelitis [(a bone infection)] was made

by indirect evidence, that is, an incorrect diagnosis based on the clinical signs, symptoms, and imaging studies as osteomyelitis. While an abscess may have existed, there was never any direct evidence demonstrating osteomyelitis, and the urgent removal of Lynn's right leg was neither indicated nor necessary and was a departure from the applicable standard of care." District Court Dkt. No. 1-1 at 8.[2]

But Dr. Jacobs' opinion that "there was never any direct evidence demonstrating osteomyelitis" is made irrelevant by the fact that Keith Lynn had a necrotizing soft-tissue infection in the calf and shin area of his leg—an area and condition totally different from Jacobs' focus on Charcot's joint disease and possible osteomyelitis in the foot. *Id.*; JA 207-216. Dr. Jacobs admitted in his deposition that the reason for the amputation was a necrotizing soft-tissue infection:

> Q.   Okay. Do you believe that Dr. Brothers amputated the leg of Mr. Lynn to treat the necrotizing fascitis [sic]?
>
> A.   Yes.
>
> Q.   Okay. Do you think that there was an amputation to treat necrotizing fascitis [sic] and osteomyelitis? Do you think that was in Dr. Brothers' differential diagnosis, to perform that procedure?
>
> A.   Yes.

---

[2] This page printed blank in the Joint Appendix. *See* JA 17. Thus, the citation is to the district court docket.

JA 154-155. After having the benefit of the United States' expert reports, Dr. Jacobs

offered a summary judgment declaration that included a focus on the necrotizing

soft-tissue infection in the calf and shin area, which Dr. Jacobs contended had not

been finally diagnosed or confirmed. JA 217-218, JA 243-262.

At his deposition, Dr. Brothers, the treating VA vascular surgeon, summarized

Mr. Lynn's case as follows:

> Q.    Well, can you just tell us, either from your
> recollection or your review of the records, how Mr.
> Keith Lynn presented and when he presented to
> you?
>
> A.    So he presented to us in consultation through the
> emergency department -- I did write down the date
> -- I think on the 15th of January 2019. He had
> presented with a swollen, inflamed, discolored right
> leg. The story was that he had a Charcot foot for
> which he was being followed in podiatry, that he
> had come in, been seen by them. And after their
> evaluation, he was unhappy with that evaluation and
> returned to the emergency department, where we
> were asked to see him.
>
> We saw him and felt that he had evidence of a
> surgical urgency/emergency and required
> admission to the hospital for likely operative
> debridement versus amputation versus drainage. He
> had evidence of likely necrotizing fasciitis and
> myositis on his scan. In fact, that's why the
> emergency department physician had contacted us.
> Unfortunately, he also was anticoagulated, over-
> anticoagulated. He was on Coumadin and his level
> of anticoagulation was more than twice normal of
> what is desired.

So he was, therefore, readmitted to the hospital, with the idea of being able to treat him and take care of this so he didn't lose his leg and his life. It felt necessary to start him on antibiotics and to reverse his anticoagulation. As I recall, he was not febrile at the time and his white count wasn't febrile in hemodynamically. He was doing well and his blood pressure was okay, and so it wasn't something that we had to take him emergently to the operating room to do.

Over the course of the next day and a half, he remained without going into sepsis or septic shock. We were able to reverse his anticoagulation to where it would then be safe to operate on him, and subsequently took him to the operating room, where, because of the extensive nature of his myonecrosis and the findings, we felt it was best -- I felt it was best to perform an above-knee -- excuse me, a below-knee amputation. He subsequently recovered from that, healed up and was able to go home. Unfortunately, a number of months later, he came back with something called heterotopic calcification and he required further surgical revision.

JA 203-204. Mr. Lynn's medical records confirm that he was referred to Dr. Brothers with a provisional diagnosis of necrotizing fasciitis, a soft-tissue infection. JA 227-228. And Mr. Lynn's discharge papers show a primary diagnosis of osteomyelitis with a "key" secondary diagnosis of "abscess, cellulitis." JA 225-226; *see also* JA 208 (using "overwhelming *abscess* of his leg above his known Charcot foot" interchangeably with "overwhelming *soft tissue infection* around his tibia well above the area of Charcot in his foot") (emphasis added).

8

The United States presented the district court with three expert declarations in response to its request for briefing pursuant to Rule 56(f): one each from a radiologist, an orthopedic surgeon, and a vascular surgeon. JA 207-216. The declaration of Dr. Mark Jackson, a practicing vascular surgeon trained at the Walter Reed Army Medical Center, fairly summarizes the United States' experts views:

> Based upon my review of these records I have no doubt that Dr. Brothers and the vascular team arrived at the correct diagnosis of a necrotizing soft tissue infection (necrotizing fasciitis with myonecrosis) - a severe infection of the muscle and deep tissues of the leg. The CT scan findings of extensive gas and infected fluid in the leg muscle, extending well above the ankle and into the middle portion of the leg, clearly and unmistakably support the diagnosis of necrotizing fasciitis with myonecrosis. The accepted standard practice and procedure for this condition requires surgical treatment such as the below knee amputation as was performed by Dr. Brothers.
>
> While the option of a more limited incision and drainage, or debridement, might be acceptable in a more limited infection, the extensive degree of infection in this case necessitated amputation of the leg. In cases of necrotizing fasciitis for which amputation is not performed, thereby leaving behind infected tissue, there is a substantial and fatal risk of uncontrolled spread of the infection throughout the body (sepsis) since all of the dead and infected tissue has not been surgically removed.
>
> Given the severity and extent of Lynn's necrotizing fasciitis with myonecrosis, a below the knee amputation was the appropriate treatment and Dr. Brothers' care clearly met the standard of care.
>
> The correct diagnosis of necrotizing fasciitis with myonecrosis is independent of any podiatric issues related to either Charcot foot and/or osteomyelitis below the ankle - neither of which had any bearing on the need for below the knee amputation.

JA 210-211.

The district court determined that the heart of Dr. Jacobs' declaration offered at summary judgment—"there was never any diagnosis of necrotizing fasciitis or other immediately life-threatening infection"—was simply not supported by the record, contradicted his prior deposition testimony, and rested on speculation and conjecture. JA 240. The district court pointed to "Dr. Brothers' [deposition] testimony and Mr. Lynn's medical records" directly contradicting Dr. Jacobs—who is not a fact witness. JA 240. The district court explained that Dr. Jacobs "believed Dr. Brothers amputated the leg of Mr. Lynn to treat the necrotizing fasciitis." JA 240-241. Importantly, when faced with far more facts and a deeper understanding of the medicine involved, the district court found that Dr. Jacobs was not qualified to opine as to whether Dr. Brothers deviated from the standard of care for a vascular surgeon. JA 241-242. The district court noted Dr. Jacobs' deposition testimony that "you know as well as I do I cannot testify to vascular surgery standards of care" and "I can't amputate legs anyway by law." JA 241-242. The district court determined that the Lynns had no expert in the relevant field who could rebut the United States' experts, and, therefore, granted summary judgment. JA 242.

Next, the Lynns moved for reconsideration pursuant to Federal Rule of Civil Procedure 59(e). JA 5. The Lynns advanced three arguments in their Rule 59(e) motion: (1) the district court "effectively reversed itself" by granting summary judgment after denying the United States' motion in limine to limit the Lynns' expert

testimony; (2) for the reasons expressed in the Lynns' opposition to summary judgment, summary judgment is improper; and (3) "the Court did not address" the Lynns' request to receive a copy of the United States' proposed findings of fact and conclusions of law, which the Lynns contend was an improper ex parte communication. JA 287-290. The district court found "no valid basis" for the claim that it had reversed itself by granting summary judgment when it had previously denied the motion in limine. JA 288. It also summarily rejected in a footnote the Lynns' request to reconsider summary judgment as an attempt to "relitigate old matters." JA 289 (*citing Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008)).

Finally, the district court addressed the Lynns' concern that the district court had not previously responded to one footnote in the Lynns' summary judgment briefing. JA 219, JA 288. As the district court explained, that footnote contained the Lynns' "request to receive a copy of the United States' proposed findings of fact and conclusions of law, which the Lynns contend was an improper *ex parte* communication." JA 288. The Lynns discovered the United States' ex parte submission of the proposed findings of fact and conclusions of law because the United States stated it had done so in its Rule 56(f) briefing. District Court Dkt. No. 58 at 1. The Lynns' footnote before the district court also stated the Lynns "are unaware of any request or requirement to submit proposed findings and conclusions *before* the evidence is presented at trial." JA 219.

11

The problem with the Lynns' footnote was that the district court had twice ordered the parties to do just that. JA 179-182. Each order contained the words "proposed findings of fact and conclusions of law" in all red and all caps. JA 179-182. Each order stated, "The parties are to submit proposed findings and conclusions of law via email to chambers at Dawson_Ecf@scd.uscourts.gov no later than five (5) days prior to trial." *Id*.

When counsel for the United States brought this to the Lynns' counsel's attention by email, one of the Lynns' counsel responded on March 22, 2023, "I think my Team may have concluded that sending proposed findings of fact and conclusions of law to the fact finder before a trial is a practical impossibility (given, for example, a 9000 page record) and made more problematic by rules regarding ex parte communications." JA 264. Two months later, another one of the Lynns' counsel told the district court, "the undersigned missed a hyperlink associated with what he thought was merely a text entry notice of a bench trial, and Plaintiffs' counsel was unaware of this requirement until the United States' counsel mentioned it [by email]." District Court Dkt. No. 72 at 3.

The district court then ordered the United States to produce its proposed findings of fact and conclusions of law to the Lynns and the United States complied. JA 5, JA 273-286. After receiving another round of briefing—with the proposed findings of fact and conclusions of law in both parties' hands—the district court

rejected the Lynns' ex parte communication claim, finding the submission was authorized and did not cause an error in law or manifest injustice. JA 288-289. The district court noted the irony of the Lynns' concern given their own ex parte submission of pretrial briefs. JA 289.

## SUMMARY OF THE ARGUMENT

The district court's grant of summary judgment in the United States' favor should be affirmed. It did not abuse its discretion when it determined a podiatrist—who admitted that he cannot amputate legs by law or testify to vascular surgery standards of care—was unable to opine on a vascular surgeon's amputation of a leg. With Lynn's sole medical expert disqualified, there is no genuine dispute as to the applicable standard of care or that Mr. Lynn's leg was amputated due to a life-threatening soft-tissue infection in conformity with that standard.

The district court did not abuse its discretion when it found the United States' court-ordered submission of proposed findings of fact and conclusions of law was authorized and did not cause an error in law or manifest injustice. The Lynns' district court counsel failed to comply with a court order to provide the district court proposed findings of fact and conclusions of law, which they had twice been ordered to do. JA 179-182. Faced with the orders to provide the district court proposed findings of fact and conclusions of law, the Lynns' counsel admitted that they "missed" the hyperlink to the orders. The district court ordered the United States' proposed findings of fact and conclusions of law disclosed and provided the Lynns the opportunity to explain any prejudice suffered. They were unable to do so.

This Court should affirm the district court.

14

# ARGUMENT

**I. The district court did not abuse its discretion when it determined Dr. Jacobs could not offer an opinion on whether a breach in the standard of care proximately caused the amputation of Mr. Lynn's leg.**

The district court did not abuse its discretion when it determined a podiatrist—who admitted that he cannot amputate legs by law or testify to vascular surgery standards of care—was unable to opine on a vascular surgeon's amputation of a leg.

### a. Standard of review.

"[A] court of appeals is to apply an abuse-of-discretion standard when it reviews a trial court's decision to admit or exclude expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (quotations and citation omitted).

### b. The Lynns' podiatrist and sole medical expert was unable to opine on a vascular surgeon's amputation of a leg.

Dr. Jacobs' declaration attached to the complaint focused on whether Mr. Lynn had Charcot joint disease or osteomyelitis in the foot. *See* JA 10-12. After having the benefit of the United States' expert reports, Dr. Jacobs offered a summary judgment declaration that included a focus on the necrotizing soft-tissue infection in the calf and shin area, which Dr. Jacobs contended had not been finally diagnosed or confirmed. JA 217-218, JA 243-262. But Dr. Jacobs, a podiatrist, is simply not qualified to offer opinions on a leg infection and amputation.

15

It is not surprising that Dr. Jacobs' first declaration would be myopically focused on the foot and not consider the whole patient. He is a podiatrist, not a physician, and he testified at deposition, "You have to understand to a podiatrist losing a leg is like a physician losing a life." JA 195. Dr. Jacobs then testified, "I can't amputate legs anyway by law . . . ." JA 196. To put a finer point on it, Dr. Jacobs further testified:

> Q.    And as far as the decision of the vascular surgeon to amputate the leg for necrotizing fasciitis [sic], that in and of itself is not a deviation in the standard of care of vascular surgery. Are you able to testify on that opinion?

> A.    Obviously you know as well as I do I cannot testify to vascular surgery standards of care.

JA 198-199. Even if Dr. Jacobs did offer an opinion on the standard of care for Dr. Brothers at trial, he would be unqualified to do so—by his own admission.

The district court did not abuse its discretion when it determined Dr. Jacobs could not offer an opinion on whether a breach in the standard of care—about which Dr. Jacobs admitted he was unqualified to testify—proximately caused the amputation of Mr. Lynn's leg. *See* Fed. R. Evid. 702; *Bishop v. Triumph Motorcycles (Am.) Ltd.*, No. 21-2113, 2022 WL 17103710, at *3 (4th Cir. Nov. 22, 2022) (unpublished) (In granting summary judgment and excluding the expert testimony of Byron Bloch, "the district court reasonably exercised its discretion by electing to rule on the parties' briefs, Bloch's report, Bloch's deposition testimony, and his case

16

file."); *United States v. Beasley*, 495 F.3d 142, 150 (4th Cir. 2007) ("[W]e conclude that the district court did not abuse its discretion by not conducting a *Daubert* hearing in this case."); *Wehling v. Sandoz Pharms. Corp.*, 162 F.3d 1158 (4th Cir. 1998) (district court did not abuse its discretion by excluding opinion testimony of pharmacist and toxicologist who is neither a pharmacologist nor a medical doctor relating to drug interaction); *Cleveland ex rel. Cleveland v. United States*, 457 F.3d 397, 405 (5th Cir. 2006) (district court did not abuse its discretion by excluding internist opinion on standard of care for emergency physician).

> **II.**   **With Lynn's sole medical expert disqualified, there is no genuine dispute as to the relevant standard of care or that Mr. Lynn's leg was amputated due to a life-threatening, necrotizing soft-tissue infection in conformity with that standard.**

To sustain her medical malpractice action, South Carolina law requires Lynn to put forth expert testimony that establishes the relevant standard of care and that a departure from that standard was the proximate cause of Mr. Lynn's injury. Once the district court determined Dr. Jacobs could establish neither, there was no genuine dispute of material fact and the district court properly granted summary judgment.

### a. Standard of review.

"After giving notice and a reasonable time to respond," a district court may grant summary judgment *sua sponte*. Fed. R. Civ. P. 56(f); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing

party was on notice that she had to come forward with all of her evidence."). "[This Court reviews] a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018) (citation omitted).[3]

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a reasonable finder of fact could return a verdict for the nonmoving party. *Libertarian Party of Va. v. Judd,* 718 F.3d 308, 313 (4th Cir. 2013) (citation and internal quotation marks omitted) (referring to a reasonable jury). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* Courts must construe the evidence

---

[3] In non-jury cases where the parties have agreed to submit the record for dispositive decision, this Court has recognized that a district court may draw inferences from the facts in granting summary judgment. In that context, this Court applies a clear error standard of review. *See Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003) (when the only dispute before the court was inferences to draw from the facts and the parties had agreed to submit the record for dispositive decision, "being en route to a bench trial anyway, the court properly proceeded to judgment in the case") (citing *Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991)); *compare United States v. 8.929 Acres of Land in Arlington Cnty., Va.*, 36 F.4th 240, 253 n.11 (4th Cir. 2022) (declining to apply clear-error review in a case set for a bench trial because the parties had not agreed to a dispositive decision on summary judgment). Here, although the case was set for a bench trial, Lynn did not agree to submit the record to the district court for dispositive decision.

in the light most favorable to the non-moving party, but courts may not "weigh the evidence or make credibility determinations." *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019).

Lynn cites two South Carolina Supreme Court cases for the proposition that the district court erred by determining the standard of care on summary judgment. Dkt. No. 25 at 23. Neither case contains the words "summary judgment," nor do they stand for the proposition that the standard of care must be determined at trial. *See Brouwer v. Sisters of Charity Providence Hosps.*, 763 S.E.2d 200 (S.C. 2014) (reversing grant of motion to dismiss because Plaintiff could rely on common knowledge and did not need an expert affidavit); *McCourt By & Through McCourt v. Abernathy*, 457 S.E.2d 603 (S.C. 1995) (affirming verdict in medical malpractice suit despite challenges to jury charges and damages amount). More importantly, Lynn confuses what authority controls in federal court with what authority controls in state court. Only federal procedural rules control in federal court. *See* Fed. R. Civ. P. 1; *Hanna v. Plumer*, 380 U.S. 460 (1965); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010). Even if the South Carolina cases Lynn cites did say the standard of care can't be determined on summary judgment, it wouldn't matter. The standard for summary judgment in federal court is defined in Federal Rule of Civil Procedure 56 and the federal cases interpreting it.

**b. South Carolina medical malpractice.**

"The United States shall be liable, [for tort claims], in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Thus, the substantive law of South Carolina controls this case because Mr. Lynn's leg was amputated at the VA hospital in Charleston, South Carolina. The Lynns allege two causes of action: (1) medical negligence by Keith Lynn; and (2) loss of consortium by Jennifer Lynn. JA 7-8.

Under South Carolina law, "a plaintiff alleging medical malpractice must provide evidence showing (1) the generally recognized and accepted practices and procedures that would be followed by average, competent practitioners in the defendants' field of medicine under the same or similar circumstances, and (2) that the defendants departed from the recognized and generally accepted standards. Also, the plaintiff must show that the defendants' departure from such generally recognized practices and procedures was the proximate cause of the plaintiff's alleged injuries and damages." *David v. McLeod Reg'l Med. Ctr.*, 626 S.E.2d 1, 4 (S.C. 2006) (citation omitted). Importantly, Lynn "must provide expert testimony to establish both the required standard of care and the defendants' failure to conform to that standard . . . ." *Id*. "Generally, a plaintiff spouse's claim for loss of consortium fails if the impaired spouse's claim fails, whether the claim is considered separate and independent from the impaired spouse's claim or derivative in nature." *Lee v. Bunch*, 647 S.E.2d 197, 202 (S.C. 2007) (quoting 41 Am. Jur. 2d Husband and Wife

20

§ 227 (2007)). Both of the Lynns' causes of action therefore fail because they did not offer an expert who could establish Keith Lynn's injuries were proximately caused by any breach in the relevant standard of care.

> **c. There is no genuine dispute as to the relevant standard of care or that Mr. Lynn's leg was amputated due to a life-threatening, necrotizing soft-tissue infection.**

Dr. Brothers, the treating VA vascular surgeon, amputated Keith Lynn's leg because he had a life-threatening soft-tissue infection—necrotizing fasciitis and myonecrosis—in the calf and shin area, not because he had osteomyelitis in his foot. With Dr. Jacobs' testimony excluded, Lynn offers no expert who could opine otherwise, or who could establish the standard of care or proximate cause of Mr. Lynn's injury as South Carolina law requires.

At his deposition, Dr. Brothers explained that "because of the extensive nature of [Mr. Lynn's] myonecrosis and the findings . . . I felt it was best to perform . . . a below-knee amputation." JA 204. Dr. Jacobs—Lynn's sole medical expert—admitted as much in his deposition:

> Q. Okay. Do you believe that Dr. Brothers amputated the leg of Mr. Lynn to treat the necrotizing fasciitis [sic]?
>
> A. Yes.

JA 154. This is a sufficient reason alone—independent from Dr. Jacobs' focus on Charcot foot or possible osteomyelitis in the foot—for amputating the leg.

The United States' experts' review and explanation of the record further establish that Dr. Brothers amputated Mr. Lynn's leg due to a necrotizing soft-tissue infection, not osteomyelitis. Dr. John Womack, an orthopedic surgeon who performs below-knee amputations and serves as the Chairman of the Joint Podiatry Advisory Committee for the South Carolina State Department of Labor, stated "the CT [of Mr. Lynn's leg] demonstrated a 7x12x4 cm abscess of the leg above the ankle level which contained fluid and gas. Given the absence of an external wound this can only represent an overwhelming and life threatening soft tissue infection of the patient's leg." JA 207. Dr. Womack went on to opine:

> The patient had an overwhelming abscess of his leg above his known Charcot foot deformity that was likely with his many comorbidities to become a life threatening condition if left unchecked. It is more likely than not that an incision and drainage of the infection would not have been successful and that the skin changes and mottling noted along with the CT findings likely represented a life threatening condition known as necrotizing soft tissue infection. The only cure for this condition is amputation in this clinical setting as radical debridement of the involved area would not have been successful.

> It should be noted that the area of concern on the CT was a new problem above the known Charcot foot that the patient had been treated for previously. The records show that the patient was admitted for a diagnosis of cellulitis/leg abscess/ and osteomyelitis by the vascular surgery service. The reason for his amputation had nothing to do with his well established history of Charcot foot related to his diabetes but rather his overwhelming soft tissue infection around his tibia well above the area of Charcot in his foot.

JA 208.

The United States' vascular surgery expert concluded essentially the same thing. Dr. Mark Jackson, a practicing vascular surgeon trained at the Walter Reed Army Medical Center, opined:

> Given the severity and extent of Lynn's necrotizing fasciitis with myonecrosis, a below the knee amputation was the appropriate treatment and Dr. Brothers' care clearly met the standard of care.
>
> The correct diagnosis of necrotizing fasciitis with myonecrosis is independent of any podiatric issues related to either Charcot foot and/or osteomyelitis below the ankle - neither of which had any bearing on the need for below the knee amputation.

JA 210-211.

Finally, the United States' radiology expert establishes—along with the orthopedic and vascular surgeons—that the gas bubbles in the CT clearly showed a life-threatening, necrotizing soft-tissue infection. Dr. Jan Fritz is a radiologist and professor at New York University who has published over 225 times. JA 212. Dr. Fritz opined:

> Mr. Lynn presented with an acutely life-threatening, gas-producing, necrotizing infection involving soft tissues overlying the shin above the ankle joint. The gas-producing soft tissue infection and gangrenous muscle tissue necrosis are unequivocally demonstrated on the CT examination dated 1/15/21. The CT images demonstrated tissue necrosis and gas inside the muscle tissues and that the infection had already spread across two muscle compartments cross-sectionally and to the mid-region of the shin.
>
> . . .
>
> The necrotizing gangrenous soft tissue infection of the shin musculature was spatially located above the ankle joint line and more

23

remote than that from the midfoot, where previously Charcot foot and possible osteomyelitis were documented. Therefore, the necrotizing gangrenous soft tissue infection was independent of any podiatric-related issues and unrelated to Charcot foot and a previous diagnosis of possible midfoot osteomyelitis.

JA 213-216.

With Dr. Jacobs' testimony excluded, Lynn had no evidence to rebut the United States' experts. More importantly, because Lynn bears the burden of proving her case, she had no evidence to put forth establishing the standard of care or that a departure from that standard was the proximate cause of Mr. Lynn's injury. South Carolina law requires such proof. The district court properly determined there was no genuine dispute of material fact and granted summary judgment.

**III.    The district court did not abuse its discretion when it found the United States' court-ordered submission of proposed findings of fact and conclusions of law was authorized and caused no error of law or manifest injustice.**

Lynn contends that the United States' submission of its proposed findings of fact and conclusions of law was an improper ex parte communication that prejudiced her. Dkt. No. 25 at 24-27. It's unclear what remedy she seeks or under what authority she purports this Court should act. *See generally id.*

### a.  Standard of review.

This Court reviews the denial of a Rule 59(e) motion for abuse of discretion. *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 192 (4th Cir. 2009). It recognizes three grounds for altering or amending a judgment pursuant to

Rule 59(e): "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (citations omitted).

### b. The United States' court-ordered submission of proposed findings of fact and conclusions of law was authorized and caused no error of law or manifest injustice.

The district court did not abuse its discretion by not proceeding to trial when it found the United States' court-ordered submission of proposed findings of fact and conclusions of law was authorized and caused no manifest injustice or error of law. JA 289. In her brief, Lynn goes as far as to cite the Code of Conduct for U.S. Judges, suggesting that the district court acted unethically by receiving an allegedly unauthorized ex parte communication and not notifying the parties. Dkt. No. 25 at 25 (citing Fed. Code of Jud. Conduct, Canon 3(A)(4)(a)). Lynn claims "the District Court had the opportunity to review Respondent's best arguments and evidence for [sic] well in advance of trial, but the Lynns were given no reciprocal notice." *Id.*

What really happened is that the Lynns' district court counsel failed to comply with a court order to provide the district court proposed findings of fact and conclusions of law, which they had twice been ordered to do. JA 179-182. This fact is readily apparent on the text of the footnote in which Lynn's district court counsel first raised the issue: "[the Lynns] are unaware of any request or requirement to

submit proposed findings and conclusions *before* the evidence is presented at trial."
JA 219. Faced with the orders to provide the district court proposed findings of fact
and conclusions of law, the Lynns' counsel admitted that they "missed" the hyperlink
to the orders. District Court Dkt. No. 72 at 3. Lynn continues to advance this after-
the-fact attack in this Court to obscure the fact that the Lynns' district court counsel
failed to comply with a court order. This Court should decline the invitation to make
the district court and the United States suffer the consequences of their failure to
comply with a court order.

In her brief, Lynn admits that ex parte communications can be authorized by
law. Dkt. No. 25 at 25 (citing Fed. Code of Jud. Conduct, Canon 3(A)(4) (addressing
only "*unauthorized* ex parte communication . . . .") (emphasis added)). When it
denied the Lynns' Rule 59(e) motion, the district court—relying on its own orders to
provide proposed findings of fact and conclusions of law and the local rules for the
District of South Carolina—ruled that the United States' submission of proposed
findings of fact and conclusions of law was in fact authorized. JA 288-289. In doing
so, the district court noted the text of the orders themselves—"the submission should
occur 'via email to chambers'"—and "the local rules' special treatment of pretrial
submissions that could disclose a party's strategic trial decisions." JA 289. The
district court noted the irony of the Lynns' complaint given their own ex parte
submission of pretrial briefs. JA 289. The irony continues in this Court. *See* Dkt. No.

26

25 at 22 (In arguing that the grant of summary judgment deprived her of the ability to cross-examine the United States' experts, Lynn refuses to disclose all topics of cross-examination as "protected trial strategy.").

Most importantly, the district court noted that "the information provided in the proposed findings of fact and conclusions of law provided by [the United States] was not unique to that particular submission because it was equally contained in [the United States'] filed briefs, including its Rule 56(f) brief and attachments thereto." JA 289. And that is precisely the reality. Even with the proposed findings of fact and conclusions of law in hand, Lynn does not—and cannot—point to one thing in the district court's order granting summary judgment that wasn't presented to the district court through the Rule 56(f) briefing process. *See* JA 231-242.

The district court went out of its way to consider every argument the Lynns could put forth. It considered two of the Lynns' briefs and supporting documents on summary judgment. JA 4. It considered two of the Lynns' briefs and supporting documents on the Lynns' Rule 59(e) motion. JA 5. It then ordered the United States to produce the proposed findings of fact and conclusions of law. JA 5. It then considered the Lynns' supplemental brief and supporting documents prior to denying the Rule 59(e) motion. JA 5. Lynn has not suffered an injustice; she simply can't make her case. The district court did not abuse its discretion in so finding.

27

## <u>CONCLUSION</u>

The district court should be affirmed.

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

<u>/s/Martin L. Holmes, Jr.</u>
Assistant U. S. Attorney
151 Meeting Street, Suite 200
Charleston, SC 29402
Direct: 843-727-4381
Email: martin.holmes@usdoj.gov

March 15, 2024

## **STATEMENT REGARDING ORAL ARGUMENT**

The United States respectfully suggests that oral argument is not necessary in this case. The facts and legal issues are adequately presented in the materials before the Court and oral argument likely would not aid the Court in reaching its decision.

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __23-2103__  Caption: __Jennifer Beckett-Lynn  v. United  States__

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔] this brief or other document contains __6669__ [*state number of*] words

[ ] this brief uses monospaced type and contains_____[*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✔] this brief or other document has been prepared in a proportionally spaced typeface using __Microsoft Word 2016__ [*identify word processing program*] in __Times New Roman 14 Point__ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

*/s/Martin L. Holmes, Jr.*, Assistant United States Attorney
Party Name:  United States of America, Appellee
Dated:  March 15, 2024

11/14/2016 SCC